UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

ROSANNE F. OTT,                                          :
Derivatively on behalf of similarly situated             :
shareholders of Alger Health Science Fund,               :
                                                         :
          Plaintiffs,                                    :          Civ. No. 11 Civ 4418-RJH
                                                         :
                                                         :
     v.                                                  :
                                                         :
                                                         :
FRED ALGER MANAGEMENT, INC.,                             :
FRED ALGER & COMPANY, INC.,                              :
ALGER ASSOCIATES, INC., and DANIEL                       :          ECF Case
C. CHUNG, individually,                                  :          **Electronically Filed**
                                                         :
          Defendants.                                    :

------------------------------------------------------------ X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT


Todd C. Norbitz
Anne B. Sekel
Foley & Lardner LLP
90 Park Avenue
New York, New York  10016-1314
Tel:  (212) 682-7474
Fax:  (212) 682-2329

Of counsel:
Bennett L. Epstein (admitted *pro hac vice*)
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, Illinois  60654-5313
Tel:  (312) 832-4500
Fax:  (312) 832-4700


**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

1.  PRELIMINARY STATEMENT ................................................................................. 1

2.  STATEMENT OF FACTS .................................................................................... 1

3.  ARGUMENT ............................................................................................. 9
    a.  MOTION TO DISMISS STANDARD ................................................................. 9
    b.  COUNT ONE (Dodd-Frank Whistleblower Statute Violation)...................................... 10
        i.   Ott fails to allege that she engaged in protected activity. .......................... 11
        ii.  Ott fails to allege that any adverse employment action she
             purportedly suffered resulted from any protected activity. ......................... 15
    c.  COUNT TWO (Violation of § 204A of the "1940 Act") ........................................ 17
    d.  COUNT FOUR (Violation of § 204A of the "1940 Act" and "SEC
        Code of Ethics") .......................................................................... 19
    e.  COUNT THREE (Violation of § 17(d) of the Investment Company
        Act) ...................................................................................... 20
        i.   Plaintiff lacks standing to bring a direct claim on this issue. ..................... 21
        ii.  Ott fails to allege a necessary element of a claim for violation of
             § 17(d). ........................................................................... 22
    f.  COUNT FIVE (Violation of NY Labor Law § 740) ............................................. 25
        i.   NY Labor Law § 740 applies only where the whistleblower
             reported a public health or safety violation, thus, it is
             inapplicable here. ................................................................. 25
    g.  COUNTS SIX THROUGH NINE (Breach of Contract, Breach of
        Implied Contract, Promissory Estoppel, and Quantum Meruit and
        Unjust Enrichment) ........................................................................ 27
        i.   Plaintiff's claims for bonuses and deferred compensation fail
             because such amounts were solely within Alger's discretion. ....................... 27
        ii.  Plaintiff's breach of contract and related claims also fail
             because she does not allege at least one essential element of
             each claim. ........................................................................ 28
    h.  COUNT TEN (Breach of Fiduciary Duty Against Chung) ....................................... 32
        i.   Plaintiff fails under Fed.R.Civ.P. 23.1 to allege a demand. ........................ 32
        ii.  Plaintiff fails under Massachusetts Law to allege a demand. ........................ 33
        iii. Plaintiff fails to state a claim for breach of fiduciary duty. ..................... 35
    i.  ALL CLAIMS AGAINST DEFENDANTS FRED ALGER &
        COMPANY, INC. AND ALGER ASSOCIATES INC. MUST BE
        DISMISSED ................................................................................. 39
    j.  CLAIM FOR ATTORNEYS' FEES AND PUNITIVE DAMAGES ........................................... 39

4.  CONCLUSION .......................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Astor Holdings, Inc. v. Roski*,
    No. 01 CIV.1905(GEL) 2002 WL 72936 (S.D.N.Y. Jan. 17, 2002) ......................................39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)....................................................10, 17

*Bessemer Trust Co., N.A. v. Branin*,
    498 F. Supp.2d 632 (S.D.N.Y. 2007)......................................................................... 27, 30-31

*Blake v. Smith*,
    No. 0300003B, 2006 WL 4114305 (Mass. Super., Hampden Ctny. Dec. 11, 2006)..............36

*Bloom v. Bradford*,
    480 F. Supp. 139 (E.D.N.Y. 1979) ..................................................................................... 23-24

*Bos. Children's Heart Found., Inc. v. Nadal-Ginard*,
    73 F.3d 429 (1st Cir. 1996)...................................................................................................36

*Bose v. Interclick, Inc.*,
    No. 10 Civ. 9183(DAB), 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) ......................... 29-30

*Burry v. Madison Park Owner LLC*,
    84 A.D.3d 699, 924 N.Y.S.2d 77 (1st Dep't 2011) ...............................................................35

*Cambridge Funds, Inc. v. Abella*,
    501 F. Supp. 598 (S.D.N.Y. 1980) ......................................................................................22

*Caniglia v. Chic. Tribune-N.Y. News Syndicate, Inc.*,
    204 A.D.2d 233, 612 N.Y.S.2d 146 (1st Dep't 1994) ..........................................................29

*Crowley v. VisionMaker, LLC*,
    512 F. Supp.2d 144 (S.D.N.Y. 2007)...............................................................................9-10, 29

*Day v. Staples, Inc.*,
    555 F.3d 42 (1st Cir. 2009).................................................................................................13

*Foster v. Bowen*,
    311 Mass. 359, 41 N.E.2d 18 (Sup. Jud. Ct. of Mass. 1942)...........................................36-37

*Gall v. Summit, Rovins & Feldesman*,
    222 A.D.2d 225, 635 N.Y.S.2d 17 (1st Dep't 1995) ............................................................38

*Gen. Time Corp. v. Am. Investor Fund, Inc.*,
    283 F. Supp. 400 (S.D.N.Y. 1968) .....................................................................................24

NYC_1241831.7

*Gilmore v. Parametric Tech. Corp.*,
   2003-SOX-1 (A.L.J. February 6, 2003) ...................................................................12

*Gould v. Russi*,
   830 F. Supp. 139 (N.D.N.Y. 1993) .........................................................................10

*Holmes v. Camp*,
   168 A.D. 688, 154 N.Y.S. 513 (1st Dep't 1915) ....................................................35

*Hudes v. Aetna Life Ins. Co.*,
   No. 10-1444(JEB), 2011 WL 3805679 (D.D.C. Aug. 30, 2011) .............................12

*Hydrogen L.L.C. v. Blomen*,
   No. 08-14139 (AJG), 2010 WL 1609536 (Bankr. S.D.N.Y. April 20, 2010) ........35

*Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995) ..........................................................................................2

*Jones v. Nat'l Commc'n & Surveillance Networks*,
   409 F. Supp.2d 456 (S.D.N.Y. 2006) <u>aff'd sub nom</u>. *Jones v. Nat'l Commc'ns &
   Surveillance Networks*, 266 F. App'x 31 (2d Cir. 2008) ........................................10

*Kachaylo v. Brookfield Tp. Bd. of Trs.*,
   778 F. Supp.2d 814 (N.D. Ohio Mar. 9, 2011) .................................................11, 16

*Kriegel v. Bank of Am., N.A.*,
   Nos. 07cv12245-NG, 08cv11598-NG, 2010 WL 3169579 (D. Ma. Aug. 10, 2010) .............35

*Kunkler v. Global Futures & Forex, Ltd.*,
   2003-SOX-6 (A.L.J April 24, 2003) .......................................................................12

*Langer v. Brown*,
   913 F. Supp. 260 (S.D.N.Y. 1996) ..........................................................................24

*Leibowitz v. Bank Leumi Trust Co.*,
   152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989) ..............................................26

*Lewis v. Valley*,
   476 F. Supp. 62 (S.D.N.Y. 1979) ............................................................................32

*McGrane v. Reader's Digest Ass'n, Inc.*,
   822 F. Supp. 1044 (S.D.N.Y. 1993) ........................................................................25

*Mina Inv. Holdings, Ltd. v Lefkowitz*,
   51 F. Supp.2d 486 (S.D.N.Y. 1999) ........................................................................31

*Monheit v. Carter*,
   376 F. Supp. 334 (S.D.N.Y. 1974) ..........................................................................24

iv

*Nikitovich v. O'Neal*,
   40 A.D.3d 300, 836 N.Y.S.2d 34 (1st Dep't 2007) ...............................................27

*Pipia v. Nassau Cnty.*,
   34 A.D.2d 644, 826 N.Y.S.2d 318 (2d Dep't 2006)................................................26

*Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*,
   2009 N.Y. Slip. Op. 32262U (N.Y. Sup. Ct. Sept. 29, 2009) aff'd, 74 A.D.3d 613 (1st
   Dep't 2010) .........................................................................................................38

*Remba v. Fed'n Employ. & Guid. Serv.*,
   149 A.D.2d 131, 545 N.Y.S.2d 140 (1st Dep't 1989), aff'd, 76 N.Y.2d 801 (1990) ......... 25-26

*Ribando v. Silhouette Optical*,
   871 F. Supp. 675 (S.D.N.Y. 1994) .......................................................................25

*Rocanova v. Equitable Life Assur. Soc. of U.S.*,
   83 N.Y.2d 603, 612 N.Y.S.3d (1994) ....................................................................40

*Rohrbaugh v. Inv. Co. Inst.*,
   No. Civ.A. 00-1237, 2002 WL 31100821 (D.D.C. July 2, 2002)............................... 21-22, 24

*S.E.C. v. Commonwealth Sec. Investors, Inc. et al.*,
   No. 2161, 1970 WL 202 (E.D.Ky. October 21, 1970)............................................24

*Schultz v. North Am. Ins. Group*,
   34 F. Supp.2d 866 (W.D.N.Y. 1999) ....................................................................26

*SEC v. Talley Indus., Inc.*,
   399 F.2d 396 (2d Cir. 1968).................................................................................23

*Stoner v. Walsh*,
   772 F. Supp. 790 (S.D.N.Y. 1991) ................................................................... 32-33

*Suthers v. Amgen Inc.*,
   441 F. Supp.2d 478 (S.D.N.Y. 2006).....................................................................30

*US ex rel. Smith v. Yale Univ.*,
   415 F. Supp.2d 58 (D. Conn. 2006)................................................................... 15-16

*Valentine v. Carlisle Leasing*,
   No. 97CV1406(RSP/GJD), 1998 WL 690877 (N.D.N.Y., Sept. 30 1998) ...........................28

*Vella v. United Cerebral Palsy, Inc.*,
   535 N.Y.S.2d 292 (1988)......................................................................................26

*Vishevnik v. Sup. Ct. of the State of N.Y.*,
   No. 99 Civ. 3611(RWS), 1999 WL 796180 (S.D.N.Y. Oct. 6, 1999) .....................................39

*Yameen v. Eaton Vance Distrib., Inc.*,
  394 F. Supp.2d 350 (D. Ma. 2005) ...........................................................34

**STATUTES, RULES & REGULATIONS**

17 C.F.R. § 240.21F-2(b)(i) ...................................................................11

17 C.F.R. §§ 240.21F-2(b)(i), 240.21F-2(b)(ii) ....................................13

17 C.F.R. § 271.17d-1(c) .......................................................................22

15 U.S.C. § 78u-6(a)(6) ..........................................................................11

15 U.S.C. § 80b-4a ...........................................................................17-19

18 U.S.C. 1514A(a) ................................................................................13

Fed.R.Civ.P. 8(a) ....................................................................................15

Fed.R.Civ.P. 8(a)(2) ...............................................................................10

Fed.R.Civ.P. 12(b)(6) ...............................................................................9

Fed.R.Civ.P. 23.1 ...........................................................................1, 32-33

Mass. Gen. Law ch. 156D, § 7.42 .....................................................33-34

New York Labor Law § 740(1)(e) ..........................................................25

New York Labor Law § 740 ............................................................9, 25-26

New York Labor Law § 740(a) ...............................................................25

Rule § 275.204A-1 ............................................................................19-20

Section 21F of the Securities Exchange Act of 1934 ....................... Passim

Securities Exchange Act of 1934 ...........................................................17

§ 204A of the Investment Advisers Act of 1940 ...........................9, 17, 19

vi

Defendants Fred Alger Management, Inc. ("Alger"), Fred Alger & Company, Incorporated, Alger Associates Inc. and Daniel C. Chung ("Chung") (collectively "Defendants"), submit this Memorandum of Law in support of their motion, pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6), to dismiss all Counts of the Amended Complaint ("Am. Compl.") filed in this action by Plaintiff Rosanne Ott ("Plaintiff" or "Ott"), and also, to dismiss Count Ten pursuant to Fed.R.Civ.P. 23.1.

## 1.    PRELIMINARY STATEMENT

Facing an increasingly strained relationship with Alger due to her deteriorating professional performance, Ott contrived a controversy regarding a trading policy implemented for the fund she co-managed.  Apparently unsatisfied with the results produced by this artifice, Ott now seeks to extract a self-styled "severance package" by suing Defendants.  Further to this cynical effort, and on the basis of conclusory and often contradictory allegations, Plaintiff, in a blunderbuss style, asserts ten causes of action – many of which are not even recognized claims. For the reasons set forth herein, each such claim should be dismissed with prejudice.

## 2.    STATEMENT OF FACTS

Alger[1] is an investment adviser (Am. Compl. at ¶¶ 30-31) for various mutual funds, private portfolios and institutional and individual clients, including a healthcare sector fund entitled the Health Sciences Fund ("HS Fund").[2]  Affidavit of Todd C. Norbitz ("Norbitz Aff."),

---

[1] While Ott does not define with any clarity or uniformity terms for the corporate defendants in the Amended Complaint, apparently, "FAM" or "Alger" refers to Fred Alger Management, Inc.

[2] Other than providing some basic corporate information about defendant Fred Alger & Company, Incorporated, which, in any event, Ott gets wrong, (see Am. Compl. at ¶¶ 25, 27, 31), there are no substantive allegations made against this entity.  Similarly, Ott asserts no substantive factual allegations against defendant Alger Associates Inc.  Id. at ¶ 26.  As set forth more fully infra at 40, for this reason alone, all claims against these entities should be dismissed.

dated October 21, 2011, Exhibit ("Ex.") 1 at 5.[3]  While the HS Fund is the only sector-specific fund Alger manages, healthcare sector securities are part of every fund managed by Alger.  Id. at 5-6.

Ott performed dual roles at Alger.  First, beginning in 2002, and during all relevant times thereafter, Ott was an Analyst, and later a Senior Analyst, for the healthcare analyst team at Alger.  Am. Compl. at ¶ 90.  As a member of the healthcare analyst team, Ott was initially required to produce investment analytics and related trade recommendations in the "medical supplies and device sectors (including cardiology, orthopedics, diabetes, ophthalmology, gynecology, gastroenterology, general surgery, and lasers)…death care/funeral home services and pharmaceuticals and biotech" (Am. Compl. at ¶ 90) for the benefit of all Alger-managed funds (Norbitz Aff., Ex. 1 at 1).  This role was very important because research analysts are relied upon by Alger portfolio managers ("PMs").  Id. at 9; see also Am. Compl. at ¶ 31, Ex. Q (August 30, 2010 email from Chung to Ott) at 1.  Indeed, Ott herself has referred to Alger as an "Analyst-centric" firm.  Norbitz Aff., Ex. 1 at 9.

In addition, Ott was a Co- PM of the HS Fund from November 2005 until her departure from Alger in 2010.  Am. Compl. at ¶ 92; Norbitz Aff., Ex. 1 at 1.  Defendant Daniel Chung is the Chief Executive Officer ("CEO") and the Chief Investment Officer ("CIO") of Alger.  Am. Compl. at ¶ 1; Norbitz Aff., Ex. 1 at 1.  With Ott and another then-Alger employee, David

---

[3] Ott refers to, but does not attach to the Amended Complaint, a summary report by Stroock & Stroock & Lavan LLP ("Stroock & Stroock") of a factual investigation and legal analysis of the trading policy at-issue in this action (the "Stroock Report").  See Am. Compl. at ¶ 228.  The Court may consider the full text of this document in deciding Defendants' motion to dismiss without converting the proceeding into one for summary judgment.  Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).  A copy of the Stroock Report is attached to the Norbitz Aff. as Ex. 1.  Nonetheless, the factual predicate for each of Defendants' arguments is otherwise reflected in the reasonable application of the allegations in the Amended Complaint.

Farhadi, Chung also was the Co-PM of the HS Fund at the time the trading policy at-issue in the Amended Complaint was implemented.  Am. Compl. at ¶¶ 1, 29, 141.

Early in her tenure as Co-PM, various issues with Ott's performance arose.  First, after two years under Ott's co-management, the HS Fund suffered a decrease in performance, slipping from the 5th percentile (according to an independent third-party ranking agency) when she became Co-PM in November 2005 (Am. Compl. at ¶ 132) to the 20th percentile in 2006 (id. at ¶ 95).  In fact, in 2006, as part of Alger's review and evaluation of Ott's performance in her first full year as a Co-PM, Ott was told that the HS Fund was suffering from unanticipated weakened performance.  Id., Ex. B.  The situation did not improve in subsequent years and the HS Fund continued to underperform, hitting lows of the 62nd and 80th percentiles in 2008 and 2010, respectively. Id. at ¶¶ 132, 228.

More importantly, Ott's performance as Senior Analyst also was deteriorating in this same period.  In her 2006 year-end evaluation, Ott was advised that she "need[ed] to be more decisive about best stocks" and that her communication with PMs of other funds was not sufficiently effective.  See id., Ex. B.  Similarly, Ott's 2007 "Analyst Review" identified several serious problems with her performance, including that Ott did not communicate information on her sector research often enough.  Id., Ex. D.  Further, Ott was told as part of her written Analyst Review in 2007 that there was a "gap" between her stock pitches, her research follow-up and her communication with PMs such that the PMs were unable to make the "right calls" with her.[4]  Id., Ex. D.  Further, in her 2008 Analyst Performance Review, another PM noted that Ott tended to

---

[4] PMs are responsible for "vet[ting] the Analysts' research to determine whether or not to adopt their recommendations, and have sole authority, subject to the Chief Investment Officer's oversight, to place the recommended securities transaction on behalf of the funds."  Norbitz Aff., Ex. 1 at 10.

neglect her role as an Analyst.  Norbitz Aff., Ex. 1 at 14.  Finally, in Ott's 2010 Mid Cap

Review, she was advised that her performance as an analyst was "the second worst among all the

Analysts."  Am. Compl., Ex. P.  Similarly, Ott was advised that, as of August 30, 2010, her

"absolute performance in the Analyst Fund" was "the worst among the analysts at Alger."  Id.,

Ex. Q (August 30, 2010 email from Chung to Ott regarding Mid Cap Review Reply).

Ott's total compensation during this time of declining performance was correspondingly

reduced.[5]  Specifically, the amounts of Ott's discretionary bonus awards fell from $375,000 in

2007, to $135,000 in 2008, to $121,000 in 2009 and finally, to $10,000 in 2010.  Similarly, Ott's

discretionary "Long Term Compensation awards" steadily declined from $100,000 in 2007, to

$75,000 in 2008, to $25,000 in 2009, to nothing in 2010.  Id. at ¶¶ 102, 107, 130, 233, 291.

Chung believed that a significant cause of Ott's lagging performance as an Analyst was

her focus on the HS Fund to the detriment of her responsibilities as a Senior Analyst.  See, e.g.,

Am. Compl., Ex. Q (August 30, 2010 email from Chung to Ott) at 1, ¶ 170; Norbitz Aff., Ex. 1 at

14.  Indeed, this was recognized by several other PMs, as well as specifically noted in Ott's 2008

Analyst Performance Review.  Norbitz Aff., Ex. 1 at 14.  Other PMs observed that Ott placed too

much focus on her role as Co-PM (id.), "misallocated" her duty as Analyst and Co-PM and that

both her communication skills and performance were "poor (id.)."  One PM stated that the HS

Fund would place trades prior to his fund being given any opportunity to place a

contemporaneous trade and he often was forced to find out what trades the HS Fund was placing

by calling the trading desk.  Id. at 14-15.  Further, Ott herself admitted that she placed more

---

[5] Ott's base salary was $350,000 or more from approximately 2006 to the time her
employment with Alger ended.  Am. Compl. at ¶ 201.

emphasis on portfolio managing than her role as an Analyst.  See Am. Compl., Ex. Q (September 2, 2010 letter from Ott to Chung) at 3.

     In the spring of 2010, in another effort to address these issues, Chung, as Alger's CIO, began to explore a means to ensure that Ott, in her role as Senior Analyst, provided timely healthcare sector analytics to all of the Alger funds, while at the same time avoiding the perception that such information was being used by Ott as Co-PM only to benefit the HS Fund. Norbitz Aff., Ex. 1 at 16.  Chung decided to implement a version of a trading policy already employed by the Alger Analyst Fund – and to which Ott complied (see Am. Compl., Ex. Q (September 2, 2010 letter from Ott to Chung) at 3) – which had faced similar challenges to those Chung was trying to remedy with Ott.[6]  Norbitz Aff., Ex. 1, at 17.  On April 8, 2011, Chung announced a trading policy (the "Trading Policy") which provided that:

> [I]n line with the Alger Analyst Fund, (a) no trades should be executed in the HC [HS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, (b) Trading, if you receive an order, you will hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours.

Am. Compl. at ¶ 141.  This policy ensured that Ott would share her healthcare sector trade recommendations contemporaneously with the PMs of other funds which relied on her analytical work and that Chung, as CIO and Co-PM, could participate in investment decisions of the HS Fund.  Norbitz Aff., Ex. 1 at 2.  By its terms, a trade for the HS Fund could be directed to the

---

[6] The Alger Analyst Fund is a fairly small fund and, consequently, Analysts trading for the fund hold smaller positions than other funds and buy and sell no more than a few hundred shares at a time.  In a situation such as that, there is a risk that a trader, to improve his or her performance, may place an order and then recommend the stock to a fund whose purchase could impact market price.  Accordingly, Chung had implemented a policy to ensure that trade ideas for the Analyst Fund were shared contemporaneously with other funds.  Specifically, he required the Analyst Fund PMs to email new trade ideas to all PMs prior to trading and prohibited any trades to be executed before 3:00 p.m.  Norbitz Aff., Ex. 1 at 17.  No one – including Ott – "ever questioned the appropriateness of the trading policy for the Analyst Fund."  Id.

trading desk within minutes, and in no event could the communication of the trade direction be delayed more than two hours. Am. Compl. at ¶ 141.

Ott's initial reaction to the policy was acceptance.  She told Chung "OK, David [Farhadi] and I will send emails to PMs and Trading" (id.)  and "abide by [it]…" (Am. Compl., Ex. L at 2). However, despite that the Trading Policy requires nothing more than timely notification to other Alger Fund PMs regarding healthcare sector analytics and trade analysis, Ott later characterized the Trading Policy as "discriminatory" because she misperceived it as requiring the permission of these other fund PMs before Ott could execute trades.  See Am. Compl., Ex. M, ¶ 166.  She felt that the Trading Policy's implementation and the restrictions it imposed on her authority (following on the heels of poor performance reviews and corresponding bonus and deferred compensation decreases) were "the last straw" for her at Alger.  Id. at ¶ 300.

Given the backdrop of Ott's declining performance reviews as both Senior Analyst and Co-PM, and allegedly in response to this "last straw," Ott hired an employment attorney, Jonathan Sack (Norbitz Aff., Ex. 1 at 20), to devise an exit strategy for Ott.  Id. at 20; Am. Compl. at ¶¶ 165, 300.  She also reported the Trading Policy to the Securities and Exchange Commission ("SEC") and to Alger.  Id. at ¶¶ 152, 175.  Specifically, in April 2010 – a full three months prior to the effective date of the Dodd-Frank Act (the "Act" or "Dodd-Frank"), pursuant to which Ott now asserts a claim – Ott had "multiple conversations with members of the Securities Exchange Commission's Investment Management Division [sic]" regarding "the legitimacy and legality of the newfangled HS Fund trading policy."  Id. at ¶ 152, 153.  In addition to reporting the trading policy to the SEC, Ott decided to "rectify" the policy with Alger herself.  Id. at ¶ 160.  Accordingly, in June 2010, Ott's attorney, Sack, met with Alger's General Counsel and conveyed to him the contents of a written document which Ott alleges was a letter

she wrote on June 22, 2010 in which she laid out "specific examples of the HS Fund not receiving best execution for trades within the fund because of the policy and specifically how the policy harmed investors." Id. at ¶ 166.  Sack then proposed that a "remedy" to correct the Trading Policy was to sell the HS Fund to Ott.  Id. at ¶ 171.  Consistent with Chung's intention in implementing the policy, Alger's General Counsel explained to Sack that the policy had been put in place to remedy Ott's problematic performance and was entirely proper.  Id. at ¶¶ 167, 170.

After the meeting with Sack and still prior to the effective date of Dodd-Frank, Alger "self-reported" the Trading Policy and Ott's complaints "to Douglas J. Scheidt, Associate Director and Chief Counsel of the SEC's Division of Investment Management," and also, engaged Stroock & Stroock "to investigate the charges made by Ott."  Id. at ¶ 175.

In addition, in July 2010 – again, prior to the enactment of Dodd-Frank – Ott prepared another letter regarding the Trading Policy.  This letter, dated July 14, 2010 – addressed to "Alger Board of Trustees" and "Alger Management" and cc-ed to a list of individuals (see generally Am. Compl. at ¶¶ 181-186; see also id., Ex. L) – presented a message similar to that of Ott's June 22, 2010 letter and to the information communicated by Sack to Alger's General Counsel during their June 2010 meeting.  The stated purpose of her new letter was to bring the Trading Policy to the Board's "attention."  Am. Compl., Ex. L.  Regarding possible solutions to the perceived "problem," Ott once again suggested that Alger sell the HS Fund to her.  Ott did not demand – or even suggest – that a possible course of action would be for the HS Fund to sue Chung for breach of fiduciary duty (or even to stop using the Trading Policy).  Nor does Ott demand that any claim be brought by the HS Fund at all.  Indeed, the only discussion of litigation whatsoever is Ott's statement that she has been harmed by the Trading Policy as a shareholder

7

and that it is "ironic" that she will be a litigant against her own firm and the fund she manages. <u>Id</u>. Even in the context of this threat, Ott did not supply the type of legal claim she considered could be asserted, the form it would take, whom it would be against and why it would succeed. <u>Id</u>.

A few months after Ott's July 14 letter, in October 2010, Stroock & Stroock completed its investigation and Alger provided Ott with the findings of the Strook Report. Am. Compl. at ¶ 228; Norbitz Aff., Ex. 1. The Stroock Report stated that the policy did not run afoul of any federal securities law or rules. It concluded that the Trading Policy did not violate any duties owed by Alger to the HS Fund and it was an entirely appropriate course of action for Chung to take. <u>See</u> Norbitz Aff., Ex. 1 at 2, 31. Further, the Stroock Report concluded that Ott's assertion that a two hour trading delay could impair the performance of the HS Fund is entirely implausible given that "[i]t is rare that the HS Fund trades with the intent of capitalizing on a short-term price increase or decrease, where it would be important to place an order at a particular moment during the day." <u>Id</u>. at 31. Indeed, Stroock & Stroock found that the shareholders of the HS Fund suffered no harm whatsoever from the implementation of the Trading Policy. <u>Id</u>. at 27.

By the time Ott was advised of the Stroock Report and its conclusions, however, Ott already had recycled her April 2010 report to the SEC, her June 22 letter (which Alger self-reported to the SEC in June) and her July 14 letter into an "Investor Complaint Form," which she filed with the SEC in September 2010. <u>See</u> Am. Compl., Ex. R, ¶ 218. Thus, by the date that

NYC_1241831.7

Ott filed this form with the SEC, the SEC had been aware of Ott's purported quarrel with the Trading Policy for five months, and well before the effective date of Dodd-Frank.[7]

From these facts, Ott asserts ten claims: Count One for a violation of Dodd-Frank (id. at ¶¶ 302-307); Count Two for violation of § 204A of the "1940 Act" (id. at ¶¶ 308-312); Count Three for effecting transactions in investment companies on a less advantageous basis in violation of § 17(d) of the Investment Company Act (id. at ¶¶ 313-316); Count Four for retaliation of supervised person in violation of § 204A of the "1940 Act and SEC Code of Ethics" (id. at ¶¶ 317-324); Count Five for retaliation of Employee in Violation of NY Labor Law § 740 (id. at ¶¶ 325-330); Count Six for breach of contract (id. at ¶¶ 331-335); Count Seven for breach of implied contract (id. at ¶¶ 336-339); Count Eight for promissory estoppel (id. at ¶¶ 340-343); Count Nine for quantum meruit/unjust enrichment (id. at ¶¶ 344-50); and Count Ten for breach of fiduciary duty against Chung (id. at ¶¶ 351-555).  Plaintiff also asserts a claim for attorney's fees and costs and "punitive damages – bad faith" (id. at ¶¶ 356-357).

As discussed in detail below, the facts alleged are insufficient to support any of these claims or no private cause of action exists whatsoever.

## 3.   ARGUMENT

### a.   MOTION TO DISMISS STANDARD

"On a motion to dismiss a complaint under Fed.R.Civ.P. 12(b)(6), the Court 'must accept the allegations contained therein as true and draw all reasonable inferences therefrom in favor of the plaintiff."  Crowley v. VisionMaker, LLC, 512 F. Supp.2d 144, 150 (S.D.N.Y. 2007) (internal citation omitted).  However, "[w]hile a complaint attacked on a Rule 12(b)(6) motion

---

[7] Like other similarly situated Alger professionals, Ott performed pursuant to the Trading Policy from the time it was implemented, until eight months later when she left Alger in January 2011.  Am. Compl., Ex. L at 2; Norbitz Aff., Ex. 1 at 2.

does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 150 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Accordingly, unless a plaintiff has "nudged [its] claims across the line from conceivable to plausible, [plaintiff's] complaint must be dismissed."  Bell Atl. Corp., 550 U.S. at 570.[8]

Plaintiff's allegations fall short of meeting this standard for any of the ten Counts she asserts.  Accordingly, the Amended Complaint must be dismissed in its entirety.

### b.        COUNT ONE (Dodd-Frank Whistleblower Statute Violation)

Ott's first cause of action is brought under Section 21F of the Securities Exchange Act of 1934 entitled "Securities Whistleblower Incentives and Protection."  Dodd-Frank creates a private right of action for employees that are subject to adverse employment action because they engaged in protected activity after the statute's July 22, 2010 effective date.

Under Dodd-Frank, a plaintiff must make a *prima facie* case that (i) she engaged in protected activity; (ii) she suffered adverse employment action; and (iii) the action was causally connected to the protected activity.  See Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934, Exchange Act Release No. 34-64545 (May 25, 2011) at 19, n. 41.  Furthermore, no report to the SEC can be considered a

---

[8] Moreover, a complaint fails to satisfy the pleading requirement of Fed.R.Civ.P. 8(a)(2) and should be dismissed where it does not contain factual allegations which correspond to and support the elements of the claim purportedly asserted.  See, e.g., Gould v. Russi, 830 F. Supp. 139, 143 (N.D.N.Y. 1993).  "Rule 8 seeks to avoid placing 'an unjustified burden on the court and on the parties who must respond to [the complaint] because they are forced to select the relevant material from a mass of verbiage.'"  Jones v. Nat'l Commc'n & Surveillance Networks, 409 F. Supp.2d 456, 464 (S.D.N.Y. 2006) aff'd sub nom. Jones v. Nat'l Commc'ns & Surveillance Networks, 266 F. App'x 31 (2d Cir. 2008) (internal citations and quotations omitted).

protected activity and, consequently, qualify for the retaliation protection under Section 21F, unless the reporting employee possesses a reasonable belief that the reported information relates to a possible securities law violation.  17 C.F.R. § 240.21F-2(b)(i).  Failure to allege facts sufficient to support every element of the claim warrants dismissal.  Kachaylo v. Brookfield Tp. Bd. of Trs., 778 F. Supp.2d 814, 816 (N.D. Ohio Mar. 9, 2011) (granting defendant's motion to dismiss plaintiff's retaliation claim under the False Claims Act – which contains anti-retaliation provisions similar to those in Dodd-Frank – for failure to allege facts supporting every element of the claim).

The allegations of the Amended Complaint fail to state a claim for retaliation under 21F for two primary reasons.  First, Ott does not allege that she engaged in activity which is protected within the meaning of the Act.  Second, Ott does not allege that the supposed adverse employment action she purports to have suffered was causally connected to Ott's communications with the SEC (or Alger) about the trading policy.

> ### i. Ott fails to allege that she engaged in protected activity.

> #### (1) Ott did not provide new information to the SEC after the effective date of Dodd-Frank.

Under Section 21F(a)(6) a whistleblower is defined as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission."  15 U.S.C. § 78u-6(a)(6).  To qualify for protection from retaliation as a whistleblower under this section, *the information provided by the individual must be new to the Commission after the statute's effective date*.  Specifically, the Commission comments that:

> Congress enacted Section 21F in order to provide new incentives for individuals with knowledge of securities violations to report those violations to the Commission.  We believe that applying Section 21F prospectively – for new information provided to the Commission after the statute's enactment and not to

11

> information previously submitted is most consistent with Congressional intent and
> with the language of the statute."

Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act

of 1934, Exchange Act Release No. 34-64545 (May 25, 2011) at 41-42 (emphasis added); see

also, Gilmore v. Parametric Tech. Corp., 2003-SOX-1 (A.L.J. February 6, 2003) (considering the

strong presumption against retroactivity and that Congress' intent not to have the anti-retaliation

protections of Sarbanes-Oxley apply retroactively is manifested in the statute, finding the statute

to apply only prospectively); Kunkler v. Global Futures & Forex, Ltd., 2003-SOX-6 (A.L.J April

24, 2003) (confirming that the anti-retaliation provisions of the Sarbanes-Oxley Act – which are

similar to those of Dodd-Frank – do not apply retroactively to protected activity that occurred 60

days prior to the effective date of the statute); Hudes v. Aetna Life Ins. Co., No. 10-1444(JEB),

2011 WL 3805679, at *8 (D.D.C. Aug. 30, 2011) (dismissing Dodd-Frank claim on other

grounds but noting that a plaintiff alleging claims for protected activity prior to the effective date

of Dodd-Frank faces "the hurdles of retroactivity").

       Here, Ott does not allege that she provided new information to the SEC after the

Act's July 22, 2010 effective date.  To the contrary, Ott specifically states that within weeks of

Chung's implementation of the April 8, 2010 Trading Policy, she had "multiple conversations

with members of the Securities Exchange Commission's Investment Management Division [sic]"

regarding the legality of the Trading Policy.  Am. Compl. at ¶¶ 152-153.  Further, prior to the

Act's July 22, 2010 effective date, Alger self-reported to the SEC the Trading Policy and Ott's

concerns as Sack had communicated them to Alger and as Ott claims she stated in her June 22,

2010 letter.  Am. Compl. at ¶ 175.  Accordingly, by Plaintiff's own allegations, the SEC was

advised of the Trading Policy and Ott's concerns and criticisms on multiple occasions prior to

the July 22, 2010 effective date of Dodd-Frank.  Thus, by the time Ott became – as she self-

servingly deems herself to be – an "official whistleblower," the information comprising her

report was not "new" to the SEC.

Because Ott has not alleged that she reported any new information to the SEC

after the effective date of Dodd-Frank, she has not engaged in any activity protected by the Act,

and, consequently, has failed to allege sufficiently this element of her retaliation claim.

### (2)    Ott fails to allege that she reasonably believed that the trading policy violated securities law.

Ott's whistleblower claim also fails because she does not allege a reasonable

belief that the Trading Policy violated securities law.

The regulations implementing Section 21F clarify that to qualify as a

whistleblower an employee must:

> (i) [] possess a reasonable belief that the information [] provid[ed] relates to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. 1514A(a)) that has occurred, is ongoing, or is about to occur, and;
> (ii) [] provide that information in a manner described in Section 21F(h)(1)(A).

17 C.F.R. §§ 240.21F-2(b)(i), 240.21F-2(b)(ii).  The Commission further explains:

> We believe that requiring a "reasonable belief" on the part of a whistleblower seeking anti-retaliation protection strikes the appropriate balance between encouraging individuals to provide us with high-quality tips without fear of retaliation, on the one hand, while not encouraging bad faith or frivolous reports, or permitting abuse of the anti-retaliation protections, on the other.

Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act

of 1934, Exchange Act Release No. 34-64545 (May 25, 2011) at 16.  In addition, the "reasonable

belief" requirement has both a subjective component requiring good faith on the part of the

employee and an objective component requiring that other similarly situated employees might

have reasonably possessed the same belief.  Id.;  Day v. Staples, Inc., 555 F.3d 42, 53-54 (1st

Cir. 2009).

Ott's allegations do not sufficiently demonstrate that she had a reasonable belief – either subjectively or objectively – that the Trading Policy constituted a possible violation of securities law.  Specifically, it is clear that:

- Ott's initial reaction to the policy was acceptance (see Am. Compl., Ex. L at 2; Norbitz Aff., Ex. 1 at 2);

- For more than two months after the implementation of the Trading Policy, from April 8, 2010 until June 22, 2010, Ott did not complain about it to Alger (Am. Compl. at ¶ 161; Norbitz Aff., Ex. 1 at 20).  Furthermore, when she did discuss the Trading Policy with Alger, it was through her employment attorney in the context of a severance discussion in which Ott proposed that Alger spin-off the HS Fund to her (Am. Compl at ¶ 171, Ex. L at 3);

- Ott understood that Chung had authority as CIO of Alger to take a "last look" at HS Fund trades before they occurred and had the right as Co-PM of the HS Fund to participate in the fund's investment decisions – which is precisely what the Trading Policy allowed him to do (Norbitz Aff., Ex. 1 at 22);

- Ott understood that the Trading Policy was very similar to a policy long-employed by the Analyst Fund (another Alger-managed mutual fund), to which Ott was subject (see Am. Compl., Ex. Q (September 2, 2010 letter from Ott to Chung) at 3), and about which neither Ott nor anyone else had ever raised any question regarding legality (Norbitz Aff., Ex. 1 at 17); and

- Ott specifically had been told that, as a Senior Analyst in healthcare for all Alger mutual funds, she placed too much focus on the HS Fund, to the detriment of the other funds to which she owed a duty to provide timely information and recommendations for healthcare sector trades (id. at 14) and that the Trading Policy specifically targeted and attempted to remediate this problem (id. at 14-15; Am. Compl. at ¶ 170, Ex. L at 4).[9]

---

[9] The insufficiency of Ott's allegations supporting this element of her claim is also clear from the matters on which she is utterly silent.  Specifically, Ott does not allege that after any of the communications either she or Alger had with the SEC regarding the Trading Policy, that the SEC condemned the Trading Policy as unlawful.  Further, Ott does not allege that the one similarly situated Alger employee, Co-PM of the HS Fund and fellow Senior Analyst, David Farhadi, concluded that the Trading Policy violated securities law or reported the Trading Policy to the SEC.  Moreover, even if Ott had alleged a reasonable belief that the Trading Policy violated securities law, such an allegation would be entirely implausible given Ott's repeated assertion that abandoning the Trading Policy would be an inadequate remedy (in fact, Ott never requested that the Trading Policy be rescinded) and rather that Alger should employ a "corrective solution" which clearly inures only to her benefit (i.e. spinning off the

Consequently, having failed to allege any facts supporting the reasonableness of her belief that the trading policy is unlawful, Ott has failed to allege any protectable activity under Dodd-Frank.  Her claim must, therefore, be dismissed.

### ii.    Ott fails to allege that any adverse employment action she purportedly suffered resulted from any protected activity.

By force of logic, Plaintiff's failure to allege a protected activity as defined by Dodd-Frank precludes her from alleging that any adverse employment action resulted from her conduct.  Assuming, *arguendo*, that Ott had engaged in a protectable activity subsequent to the effective date of Dodd-Frank, Plaintiff nevertheless fails to allege a causal connection between the termination of her work for Alger and her communications with either the SEC or Alger.[10]

To sufficiently allege the element of causation, a plaintiff must provide more than a conclusory statement of causation, a plaintiff must also provide facts to support the allegation.  "Although detailed pleading of the facts is not required, see Fed.R.Civ.P. 8(a), a complaint must 'allege a factual predicate concrete enough to warrant further proceedings.'" US ex rel. Smith v. Yale Univ., 415 F. Supp.2d 58, 106-107 (D. Conn. 2006) (granting defendant's motion to

---

management of the HS Fund from Alger to Ott) and does not address the purported damage alleged to have been sustained by the HS Fund as a result of the Trading Policy.  See, e.g., Am. Compl., Ex. L.

[10] While the Amended Complaint is unclear about what specific reporting activity by Ott is supposedly protectable under the Act, her internal reports of the Trading Policy to Alger are not protectable because, like her April 2010 report to the SEC, such communications took place before the Act was in effect.  Am. Compl. at ¶¶ 161, 166, 182.  Moreover, under Dodd-Frank the "retaliation protections for internal reporting afforded by Section 21F(h)(1)(A) do not broadly apply to employees of entities other than public companies."  Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934, Exchange Act Release No. 34-64545 (May 25, 2011) at 17-18.  Ott does not allege – nor could she – that Alger is a public company.  Thus, none of her internal reporting supports a retaliation claim under Dodd-Frank.

15

dismiss claim for retaliation where relator did not "allege[] facts sufficient to support a conclusion that the alleged harassment and 'forced' resignation did, in fact, constitute retaliation for his protected activity") (citations omitted); <u>Kachaylo</u>, 778 F. Supp.2d at 821 ("[c]onclusory allegations, without any factual allegations in support, are insufficient to state the causation element of a whistleblower claim") (citation omitted).

Here, with respect to causation, Ott alleges only that "Chung retaliated against [her] in blatant violation of the Whistle Blower Protection Act and cut her 2010 Bonus by 92% and then fired [her]." Am. Compl. at ¶ 301. That is all. One conclusory statement in a 357-paragraph complaint. That is entirely inadequate under the standard set forth in <u>Smith</u> and <u>Kachaylo</u>.

Moreover, this statement is squarely contradicted by allegations found in the other 356 paragraphs of the Amended Complaint. Indeed, Ott's pleading reflects that her professional performance had been declining since 2006 (<u>see, e.g.</u>, Am. Compl. at ¶¶ 132, 94-95, Ex.s B and D) and that she had a strained employment relationship with Alger for nearly two years prior to her departure from the firm in January 2011. To wit, Ott has alleged that: (i) Chung's purportedly "vindictive" treatment of Ott began during the Summer of 2009 – some <u>18 months</u> prior to the time Ott alleges she was terminated (<u>id</u>. at ¶¶ 125, 162, 278), <u>nearly a year</u> before the trading policy was even announced or Ott communicated with the SEC (<u>id</u>. at ¶¶ 140, 152) and a <u>year</u> prior to Ott supposedly becoming an "official whistleblower" (<u>id</u> at ¶ 218); (ii) in <u>2009</u>, Chung "resented" Ott's performance in "her" HS Fund and in her "marketing and client interaction" and, consequently, "denied her a promotion" and "awarded [her] an unjustified lower bonus at year end" (<u>id</u>. at ¶¶ 129, 162); and (iii) Chung's enactment of the Trading Policy was "the last straw" for Ott (<u>id</u> at ¶ 300) – confirming Ott's long history of work-related

16

problems entirely unrelated and prior to the announcement of the Trading Policy or Ott's actions in response to it.  Moreover, Ott herself, through her attorney Sack, sought to "depart[] her gainful employment at Alger" in January 2011.  Id. at ¶ 275.

It is plainly evident that none of these allegations support a causal connection between Ott's communications with the SEC and her departure from Alger.  Moreover, these facts render her claim implausible (and, therefore, insufficient to state a claim) under the Twombly standard.  For this and all the other foregoing reasons, Ott's claim for retaliation must be dismissed.

### c.  COUNT TWO (Violation of § 204A of the "1940 Act")

Count Two of Plaintiff's Amended Complaint purports to state a claim under § 204A of the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-4a, which requires investment advisers to "establish, maintain and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse in violation of this chapter or the Securities Exchange Act of 1934 [] or the rules or regulations thereunder, of material, nonpublic information by such investment adviser or any person associated with such investment adviser."

As a preliminary matter, this claim fails because Ott alleges no facts whatsoever regarding the subject matter of this statute section – specifically, the establishment, maintenance and enforcement of written policies regarding non-public information.  Ott does not explain what Alger's or the HS Fund's policies regarding non-public information are, how these policies are lacking, if at all, or how any purported inadequacy facilitated or permitted the misuse of non-public information.  Instead, Ott purports to assert, without any basis in the statute, an entirely self-styled disclosure violation.  Specifically, Ott alleges that "Alger, while acting as investment advisers" violated "§ 204A of the 1940 Act, 15 U.S.C. § 80b-4a" by "disclos[ing] material,

nonpublic information concerning the portfolio holdings of its advisory clients." Am. Compl. at ¶ 310. Section 80b-4a supports no such claim. Even assuming the truth of this allegation, given that § 80b-4a does not address disclosure of non-public information, let alone the remedies for such disclosure, such an allegation fails to state a claim under § 80b-41.

Moreover, even if § 80b-4a addressed disclosure violations, Ott's claim would nevertheless fail for the additional and fully dispositive reason that § 80b-4a does not even provide a private right of action. 15 U.S.C. § 80b-4a; see also Bromberg & Lowenfels on Securities Fraud and Commodities Fraud, § 6:386 (confirming that there is no private right of action and "probably no implied right of action" for failure to maintain policies or procedures regarding non-public information). Further, the legislative history for § 80b-4a contains no indication that Congress considered creating a private right of action for a failure to maintain proper policies and procedures regarding non-public information. Moreover, while the Congressional Record for the bill which contained § 80b-4a includes the comment that "courts are given leeway to develop private rights of action in an exp[a]nsive fashion in the future as they see fit" (see 100 CONG. REC. S19218-22 (daily ed. October 21, 1988) (statement of Sen. William Proxmire)), the courts have not seen fit in the twenty years since this section of the Investment Advisers Act was signed into law to develop such a right for violations of § 80b-4a.

Finally, even if § 80b-4a were to provide for a private right of action for disclosure violations, Ott's allegations would still fail to state a claim. As she does with all her claims, Ott incorporates each and every allegation of the pleading into this count. However, the only paragraphs which, even taking the most generous view of the pleadings, conceivably could be construed to support this claim relate to a discussion among Chung, Ott, Farhadi and the CEO of a private pharmaceutical company whose largest investor was Sanofi Aventis regarding

18

"possible synergies of a [ ]merger [between AGN and Sanofi Aventis]"  Am. Compl. at ¶¶ 179-

80.  In particular, Ott alleges that Chung disregarded her recommendation to sell AGN shares (id.

at ¶¶ 177, 180) and instead purchased AGN shares purportedly in reliance on his discussion with

the CEO.  Clearly, these allegations, which describe a conversation about <u>hypothetical</u> synergies

with an individual <u>wholly unrelated</u> to the company in whose stock Alger-managed funds traded,

neither reflect the disclosure of any material or non-public information, nor a conversation with

an insider from which Chung could have learned non-public information.  Such irrelevant and

inconsequential facts cannot state a claim for wrongful disclosure.

Accordingly, this claim must be dismissed.

### d.      COUNT FOUR (Violation of § 204A of the "1940 Act" and "SEC Code of Ethics")

In Count Four of the Amended Complaint, Ott asserts a claim for retaliation of a

supervised person in violation of the same section (§ 204A of the 1940 Act, as amended, 15

U.S.C. § 80b-4a) as that under which she asserts Count Two.

This claim, therefore, fails for the exact same reasons as those provided with respect to

Count Two.  <u>See</u> <u>supra</u> at 18 (there is no private right of action for violations of § 80b-4a).

Moreover, as also set forth <u>supra</u> at 18, § 80b-4a addresses the establishment and maintenance of

written policies and procedures regarding non-public information.  It does not contain any anti-

retaliation prohibitions or provide any remedy for retaliation.

Ott also purports to bring this claim pursuant to an unspecified section of the "S.E.C.

Code of Ethics."[11]  To support this cause of action, Ott alleges that she "complained" of Alger's

---

[11] Defendants assume that the code of ethics to which Plaintiff refers is SEC Rule § 275.204A-1 Investment Adviser Codes of Ethics.  Plaintiff's allegations in this regard, however, are incomprehensibly vague and Defendants' research has not uncovered an "SEC Code of Ethics."

"unlawful use of material nonpublic (inside) information" and "[i]n retaliation of Ott's lawful

conduct, Alger terminated Ott's employment."[12]  Am. Compl. at ¶¶ 319-21.

Nothing in SEC Rule § 275.204A-1 even addresses the issue of adverse employment

action or retaliation in any way whatsoever, and it certainly does not provides a private right of

action for retaliation.[13]

Consequently, Count Four must be dismissed.

**e.    COUNT THREE (Violation of § 17(d) of the Investment Company Act)**

Ott alleges that "Alger, while acting as affiliated persons of a registered investment

company, effected transactions in which certain of the Funds were joint participants with Alger,

in contravention of rules and regulations the Securities Exchange Commission has prescribed for

the purpose of limiting or preventing participation by registered companies, such as the Funds,

on a basis different from or less advantageous than that of such other participant without filing an

application with the Commission and without a Commission order approving the transaction."

Id. at ¶ 314.  Again, while Ott incorporates each and every paragraph of her 357-paragraph

complaint into every count, the only allegations relevant to this claim appear to relate to a

decision by Chung not to add shares of UnitedHealth Group Inc., Wellpoint, Inc. and Humana,

Inc. to the HS Fund's portfolio.  Id. at ¶¶ 143-48.  Specifically, Ott claims that she recommended

---

[12] In one of many instances of confusing allegations in the Amended Complaint, in connection with this claim, Ott demands an injunction to "restrain continued violations of the New York Labor Law" – a law on which this claim is not based.  Yet, she does not demand the same relief for Count Five which alleges a violation of New York Labor Law.  As discussed below, however, since both Counts Four and Five fail to state a claim upon which relief can be granted, the mistake makes little practical difference.

[13] Moreover, other than her conclusory reference to "complaining" of such unlawful use, there are absolutely no factual allegations that Ott ever made such a complaint.

the purchase of shares of each company but was "never allowed to add to its positions at all," while another fund was. Id. at ¶ 147. [14]

These allegations fail to state a claim for a violation of § 17(d) of the Investment Company Act for several reasons. First, assuming the truth of Plaintiff's allegations, the facts state only an alleged injury to the HS Fund and not one to Plaintiff individually. Thus, Ott lacks standing to assert a direct claim against Alger and if the claim can be brought at all, it must be asserted against Alger derivatively. Second, Plaintiff fails to allege a necessary element of a § 17(d) claim – specifically, the required element of a joint transaction between the HS Fund (as the investment company) and Alger (as the affiliate).

### i.      Plaintiff lacks standing to bring a direct claim on this issue.

Whether a plaintiff may bring a direct claim or whether a claim is actually derivative and must be brought on behalf of the investment company is determined by the law of the state of the investment company's incorporation. See Rohrbaugh v. Inv. Co. Inst., No. Civ.A. 00-1237, 2002 WL 31100821, at *6 (D.D.C. July 2, 2002). The applicable law here is Massachusetts law because that is the state in which the HS Fund was incorporated (see http://sec.gov). Under Massachusetts law, "shareholders may bring suit directly only where they 'suffer a distinct injury, i.e. an injury that does not derive from the corporate injury itself.'" Furthermore, "a direct suit is possible only upon a showing that a plaintiff's injury is 'distinct from that suffered by shareholders generally.'" Rohrbaugh, 2002 WL 31100821 at *6 (internal citations omitted).

Here, the sole focus of Ott's claim is the purportedly differential treatment of the HS Fund by Alger to the detriment of the HS Fund and its shareholders. Indeed, the only alleged

---

[14] Even assuming that Ott intends to support this claim with each and every instance she cites in which a trading decision made on behalf of the HS Fund was different from the decision made on behalf of another fund, the analysis set forth below applies with equal force.

injury experienced by Ott is entirely due to her status as an HS Fund shareholder.  She does not allege any additional or different damage she experienced individually.[15]  Accordingly, if brought at all, this claim can only be brought derivatively.[16]

> ### ii.    Ott fails to allege a necessary element of a claim for violation of § 17(d).

Ott's § 17(d) claim fails for the additional reason that she has not alleged a necessary element of a § 17(d) violation.

To state a claim under § 17(d), a plaintiff must assert three elements:

> [F]irst, the defendant must be 'affiliated' with the Fund as that word is defined in Section 2 of the Act; second, the defendant, acting as principal, must have effected a transaction in which the Fund was a joint or a joint and several participant with the defendant-the phrase 'joint and several' embraces even a loose, informal combination, SEC v. Talley Indus., Inc., 399 F.2d 396 (2d Cir. 1968); and third, the defendant must have effected this transaction in contravention of an SEC rule or regulation prescribed to limit or prevent participation by the Fund on a basis different from, or less advantageous than, that of the defendants-here the relevant SEC rule is Rule 17d-1 which requires that the joint trader have obtained prior approval from the SEC.

Cambridge Funds, Inc. v. Abella, 501 F. Supp. 598, 630 (S.D.N.Y. 1980).[17]  Failure to allege that the affiliate and the investment company have engaged in a joint transaction warrants dismissal of a § 17(d) claim.  Rohrbaugh, 2002 WL 31100821, at *7-8.

---

[15] The nature of the damages demanded by Ott further demonstrates that this count is inappropriately alleged as a direct claim.  Specifically, Ott seeks $3 million in damages for herself personally despite that she alleges an injury to the entire HS Fund.

[16] Moreover, Ott cannot save this count by arguing that, in substance, it sufficiently states a derivative claim and accordingly should be treated as such.  As discussed in detail infra at 32-35, Ott has not alleged a demand on the Board of Trustees of the HS Fund and certainly not a demand sounding in a violation of § 17(d), as would be required as a prerequisite to any properly asserted derivative claim herein.

[17] 17 C.F.R. § 271.17d-1(c) defines " 'joint enterprise or other joint arrangement or profit-sharing plan' as any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered

The applicable standard for what constitutes a joint transaction is set forth in the case Bloom v. Bradford, 480 F. Supp. 139, 145 (E.D.N.Y. 1979).  In Bloom, the plaintiff, a shareholder in a mutual fund managed by an investment adviser to an entire complex of funds which included the at-issue fund, brought a claim under § 17(d).  She alleged that her fund traded at a time and a price less favorable than other funds in the complex.  Specifically, she alleged that certain officers common to her fund and other funds in the same complex and of the investment adviser itself had given priority to the other funds in the complex with respect to the purchase and sale of a certain security.  She further alleged that the investment adviser acted to advance its own interests and the interests of its chairman, who also owned the at-issue stock.  In dismissing plaintiff's claim, the court stated that:

> A prerequisite to liability under [§ 17(d)] is that there be 'joint' participation in a transaction.  Plaintiff argues that the purchase of the same stock by the three funds, coupled with the interlocking directorates and the fact that [investment adviser] reports mentioned the holdings of all three funds prove that there was a 'joint' enterprise.  But Section 17(d) requires an intentional act of agreement or at least a consensual pattern.  Thus, Rule 17d-1, C.F.R. Reg. § 270.17d-1 defines 'joint enterprise' as: 'any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking.'  Those cases in which liability has been imposed under Section 17(d) have found considerably more in terms of combination than the mere purchase and sale of securities on the open market by distinct investment companies.  The opinions have stressed that 'some element of "combination" is required.'

Id. at 145 (internal citations omitted) (emphasis added).  Accord S.E.C. v. Talley Indus., Inc., 399 F.2d 396, 396 (2d Cir. 1968) (sustaining § 17(d) claim where an investment company explicitly agreed to purchase securities in a corporation for which an affiliate of the investment

---

investment company or a controlled company thereof and any affiliated person of or a principal underwriter for such registered investment company, or any affiliated person of such a person or principal underwriter, have a joint or a joint and several participation, or share in the profits of such enterprise or undertaking, including but not limited to, any stock option or stock purchase plan, but shall not include an investment advisory contract subject to section 15 of the Act."

company also was purchasing shares and was planning to make a take-over bid); Langer v. Brown, 913 F. Supp. 260, 268-269 (S.D.N.Y. 1996) (refusing to dismiss a § 17(d) claim which alleged that the at-issue investment company and its affiliates were in joint operation of radio stations – one of which was alleged to have been sold to the investment company by an affiliate).

Here, Ott has made no such allegation of consensual pattern, explicit agreement or joint operation. In fact, nowhere in the Amended Complaint does Ott allege that Alger, as an affiliate, and the HS Fund, as the investment company, "combined" for purposes of a "joint" transaction. Furthermore, as Bloom makes clear, allegations like those offered by Plaintiff in support of her claim that the HS Fund traded at times or at prices different from the trades made by other Alger funds, even if true, are insufficient. See e.g., Gen. Time Corp. v. Am. Investor Fund, Inc., 283 F. Supp. 400, 402 (S.D.N.Y. 1968) (unlike the situation alleged by Plaintiff here, evaluating a joint transaction in which an affiliate used an investment company to further its own interests to the detriment of the company); Monheit v. Carter, 376 F. Supp. 334, 341-42 (S.D.N.Y. 1974) (same); S.E.C. v. Commonwealth Sec. Investors, Inc. et al., No. 2161, 1970 WL 202, at *10 (E.D.Ky. October 21, 1970) (same).

Accordingly, Ott's Count Three must be dismissed. See Rohrbaugh 2002 WL 31100821, at *7-8.[18]

---

[18] While not an element of a § 17d claim, the issue of whether the purported joint transaction places an investment company at a disadvantage is nevertheless relevant given the purpose of § 17d. See Gen. Time Corp., 283 F. Supp. at 402. Here, even assuming for the sake of argument that Ott adequately alleged a joint transaction between the HS Fund and Alger, her claim is flawed because she has not alleged the disadvantage to which the HS Fund alleged was placed. In fact, Ott completely fails to link the allegedly "unlawful" Trading Policy to any detriment whatsoever. Other than claiming in a conclusory manner that the HS Fund's performance lagged due to the Trading Policy and that the HS Fund was denied execution on certain trades, Ott does not state what specific trades were made by other funds and not by the HS Fund and whether those trades resulted in a decrease in HS Fund value. Moreover, the Stroock Report states that

24

f.       **COUNT FIVE (Violation of NY Labor Law § 740)**

i.       **NY Labor Law § 740 applies only where the whistleblower reported a public health or safety violation, thus, it is inapplicable here.**

Ott's fifth Count is brought under New York Labor Law § 740.  Section 740 is a whistleblower statute related to public health and safety violations.  The law prohibits retaliatory personnel action against an employee because such employee reported a violation of law, rule or regulation, which violation "creates or presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud."  N.Y. Labor Law § 740; see also Remba v. Fed'n Employ. & Guid. Serv., 149 A.D.2d 131, 132, 545 N.Y.S.2d 140, 142-44 (1st Dep't 1989), aff'd, 76 N.Y.2d 801 (1990).

Ott claims that she "suffered a 'Retaliatory personnel action' as defined under New York Labor Law § 740(1)(e)" as a result of her lawful reporting to the SEC and to Alger's Compliance Department regarding "Alger's unlawful trading policy."  Am. Compl. at ¶¶ 329-330.

This allegation cannot support a claim for violation of N.Y. Labor Law § 740 because the trading policy, and Ott's complaints regarding it, do not relate in any way to a "danger to the public health or safety, or which constitutes health care fraud…"  N.Y. Labor Law § 740(a).

The legislative history of the statute and the commentary from the Attorney General make clear that "white collar" crime was not the intended target of the statute's protection.  Remba, 149 A.D.2d at 133-38; see also Ribando v. Silhouette Optical, 871 F. Supp. 675, 676 (S.D.N.Y. 1994) (stating that § 740 "is limited to matters involving health or safety hazards.");  McGrane v. Reader's Digest Ass'n, Inc., 822 F. Supp. 1044, 1051 (S.D.N.Y. 1993) ("[f]inancial improprieties within a corporation do not constitute threats to public health or safety").

the HS Fund did not suffer any decrease in value as a result of the trading policy.  Norbitz Aff., Ex. 1 at 27.

25

Furthermore, courts repeatedly have refused to expand the reach of § 740(2) to protect whistleblowers who report financial improprieties.  See Schultz v. North Am. Ins. Group, 34 F. Supp.2d 866, 869 (W.D.N.Y. 1999) (overbilling of customers and irregular business practices not dangers to public health or safety); Pipia v. Nassau Cnty., 34 A.D.2d 644, 665-666, 826 N.Y.S.2d 318, 319-20 (2d Dep't 2006) (financial impropriety not sufficient to sustain a cause of action for violation of § 740); Remba, 149 A.D.2d at 133-38 (fraudulent billing practices not violations contemplated by the statute).

Moreover, cases abound in which § 740 claims have been dismissed because the at-issue complaint did not specifically assert that the illegal policy qualified as a significant public health or safety danger.  See, e.g., Vella v. United Cerebral Palsy, Inc., 535 N.Y.S.2d 292, 294 (1988); Remba 149 A.D.2d at 133-38; Leibowitz v. Bank Leumi Trust Co., 152 A.D.2d 169, 176-79, 548 N.Y.S.2d 513, 518-19 (2d Dep't 1989) (dismissing claim where allegations of fraud did not present significant public health or safety danger).

Here, Plaintiff's allegations could not fall more clearly outside the purview of § 740. Plaintiff asserts only that she or her attorney, Sack, reported to the SEC and Alger's Compliance Department that Alger implemented an "unlawful trading policy."  Am. Compl. at ¶ 329.  She does not even attempt to claim that the policy or the activity which resulted from its implementation affected public health or safety – let alone threatened it.  Moreover, her complaints, regarding a white collar, financial matter, are precisely the type which repeatedly have been held not to support a claim under this section.  Consequently, Plaintiff cannot state a claim for violation of § 740 and Count Five must be dismissed.

g.      COUNTS SIX THROUGH NINE (Breach of Contract, Breach of
Implied Contract, Promissory Estoppel, and Quantum Meruit and Unjust
Enrichment)

Counts Six through Nine of Plaintiff's Amended Complaint purport to state claims for

breach of contract, breach of implied contract, promissory estoppel, quantum meruit and unjust

enrichment.  Am. Compl. at ¶¶ 331-350.  In support of these claims, Ott alleges that her annual

performance bonuses for the years 2009 and 2010 (which are amounts additional to her base

salary of $375,000 (id. at ¶ 201)) were "inconsistent with the total compensation of similar level

Alger employees" and, accordingly, that she is entitled to a "true-up" of both years' bonuses in

the amount of $694,000.  Id. at ¶¶ 292-94.  Plaintiff further alleges that she is entitled to a *pro

rata* share in the amount of $154,688.00 of the deferred compensation awards she received in the

years 2007 through 2009.  Id. at ¶¶ 295-8.

Plaintiff's claims cannot stand as a matter of law because each claim seeks payment of

amounts which were within Alger's sole discretion either to pay (and how much to pay or not to

pay).  Accordingly, the failure to pay such discretionary amounts (or Plaintiff's dissatisfaction

with the amounts paid) cannot support a claim for their recovery.  Furthermore, Plaintiff has

failed adequately to allege the requisite elements of these claims.

i.      Plaintiff's claims for bonuses and deferred compensation fail
because such amounts were solely within Alger's discretion.

It is well-settled that the non-payment of professional bonuses, the payment of which is

within the sole discretion of the employer, cannot sustain a breach of contract or other related

claims.  See, e.g., Nikitovich v. O'Neal, 40 A.D.3d 300, 300, 836 N.Y.S.2d 34, 34 (1st Dep't

2007) (stating that "[a]n employee has no enforceable right to compensation under a

discretionary compensation or bonus plan"); Bessemer Trust Co., N.A. v. Branin, 498 F. Supp.2d

632, 638-9 (S.D.N.Y. 2007) (holding that plaintiff's breach of contract and related claims were

27

barred by bonus plan allowing bonus from 0% to 250% of salary); <u>Valentine v. Carlisle Leasing</u>, No. 97CV1406(RSP/GJD), 1998 WL 690877 at *3 (N.D.N.Y., Sept. 30 1998) (holding that bonus provision "is unenforceable if the written terms of the [] plan make clear that the employer has 'absolute discretion' in deciding whether to grant or pay a bonus") (internal citations omitted).

Nowhere in Ott's Amended Complaint does she allege that her bonus and deferred compensation awards were anything but in the sole discretion of Alger.  Indeed, other than one completely bald reference to a supposed "contract" (Am. Compl. at ¶ 332), Ott does not cite to any agreement – written or oral – guaranteeing her a particular bonus amount or deferred compensation award.  Moreover, the term of the Alger Management "Incentive Plan," to which Plaintiff refers in connection with her claim for deferred compensation, addresses only the distribution of a previously awarded amount after termination of employment.  It does not address any issue in connection with the level of bonus or deferred compensation to which Ott was eligible or entitled in the first instance.  <u>Id</u>. at ¶ 295.  Further, Ott acknowledges that the "[d]eferred compensation grants vested in four (4) years, with a <u>potential</u> match of <u>up to</u> 175% paid in cash."  <u>Id</u>. at ¶ 283.

Consequently, because Ott's breach of contract and related claims all rest on the non-payment of discretionary amounts, they are barred.

> ### ii.   Plaintiff's breach of contract and related claims also fail because she does not allege at least one essential element of each claim.

> #### (1)   Breach of Contract

> ##### (a)   Plaintiff fails to allege sufficiently a contract.

"To state a claim for breach of contract under New York law, a plaintiff must allege (1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the

contract; (3) that the defendant failed to perform his or her obligations thereunder; and (4) that plaintiff was thereby damaged." Crowley, 512 F. Supp.2d at 151. Further, "[i]n pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." Id. Failure to allege in nonconclusory language the essential terms of the parties' purported contract warrants dismissal of a breach of contract claim. Caniglia v. Chic. Tribune-N.Y. News Syndicate, Inc., 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 146 (1st Dep't 1994) (dismissing breach of contract claim for failure to allege the essential terms of the contract, including the "specific provisions of the contract upon which liability is predicated").

Here, Plaintiff fails to plead adequately the requisite element of the existence of a contract, let alone what specific provisions of the contract were breached. Specifically, as discussed supra at 28, other than one unsubstantiated reference to a "contract" (which makes no mention whatsoever as to its terms and conditions), and a singular reference to an "Incentive Plan" (which, from Plaintiff's description, addresses only Plaintiff's claim to a pro rata portion of her already awarded compensation), Plaintiff does not provide any description of the nature of the supposed contract or attach the purported document to the Amended Complaint.

This failure requires dismissal of the entire claim.

### (2)   Breach of Implied Contract

#### (a)   Plaintiff fails to allege a reasonable expectation that she would be paid the sums that she seeks.

"In order to recover for breach of implied contract or quasi contract under New York law, a plaintiff must establish: (1) the performance of service in good faith, (2) the acceptance of the service by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the service." Bose v. Interclick, Inc., No. 10 Civ. 9183(DAB), 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011). Failure to allege an element of the claim

NYC_1241831.7

requires dismissal.  Id. at *10.

Here, Ott has not alleged any conduct by Alger which implied that she would receive the bonus amounts that she now claims she should have received.  Nor has Ott alleged any "course of dealing" with Alger which would lead her to believe that she was going to receive a specific bonus amount.  To the contrary, she has alleged that her bonuses varied from year to year and were entirely determined in Alger's discretion.  Am. Compl. at ¶¶ 233, 291, 338.

Because Ott has not stated sufficiently a reasonable expectation of payment of a particular bonus amount, the claim must be dismissed.

### (3)      Promissory Estoppel

#### (a)      Plaintiff fails to allege a promise or her reasonable reliance thereon.

"To establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise."  Suthers v. Amgen Inc., 441 F. Supp.2d 478, 486 (S.D.N.Y. 2006) (citations omitted).

Plaintiff's only allegation of a "clear and unambiguous promise" is her bald reference to "representations and express promises of Alger made with respect to certain compensation in respect of his [sic] employment, of which he [sic] was paid zero."  Am. Compl. at ¶ 342.  Ott provides no details whatsoever explaining what, in fact, Alger promised.  Without allegations in this regard, Ott's claim cannot stand.  Further, Ott does not allege reasonable reliance on any promise.  Indeed, given that her bonus amounts were determined in Alger's discretion and varied each year she worked at Alger, she could not allege reliance on the receipt of any particular amount.  Bessemer Trust Co, 498 F. Supp.2d at 638-39.

NYC_1241831.7

Having failed to allege required elements of this claim, Plaintiff's Count Eight must be dismissed.

### (b) Promissory estoppel is a not a recognized cause of action in the employment context.

This claim fails for the additional reason that promissory estoppel is not a recognized claim in the employment context under New York law.  See Bessemer Trust, 498 F. Supp.2d at 638-9.

### (4) Quantum Meruit; Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must plead that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution.  Mina Inv. Holdings, Ltd. v Lefkowitz, 51 F. Supp.2d 486, 489 (S.D.N.Y. 1999).  Failure to allege these elements warrants dismissal of the claim.  Id. at 490.

Here, Plaintiff does not plead sufficiently any of these elements.  Other than her unsupported claim that she provided the "services required to perform services [sic] with the full expectation of being paid the compensation promised to him [sic] that is described hereunder."[19] Plaintiff does not allege why her substantial salary was insufficient to compensate her for her work.[20]  Without such allegations, Ott's claim for quantum meruit and unjust enrichment must be dismissed for failure to state a claim.

---

[19] No compensation is ever described "hereunder."

[20] Plaintiff does not allege in the Amended Complaint that she was not paid her substantial fixed salary of more than $350,000 (Am. Compl., Ex. E, ¶ 291).

NYC_1241831.7

### h.      COUNT TEN (Breach of Fiduciary Duty Against Chung)

Count Ten of Ott's Amended Complaint, which is the only claim asserted derivatively, purports to state a cause of action against Chung for a breach of fiduciary duty to the shareholders of the HS Fund.  Ott alleges that Chung "acted to put his personal interests ahead of the interests of Plaintiffs," and "illegally deprived Plaintiffs of best execution transactions," causing $3,000,000.00 of damages to Plaintiffs.  Am. Compl. at ¶¶ 352-55.  Once again taking the "kitchen sink" approach to pleading, Plaintiff does not specify what particular acts constitute Chung's supposed breach of duty.  Instead, Ott refers and incorporates all her prior allegations in this claim.  Presumably, however, Ott intends to refer specifically to Chung's institution of the Trading Policy (id. at ¶ 140) and the incidents which Ott believes reflect the supposed negative consequences of the policy for the HS Fund (id. at ¶¶ 142-48, 185, 252-58, Ex. L).

This claim fails for two reasons.  First, because it is brought derivatively, Plaintiff must both allege a demand on the Board of Trustees of the HS Fund with particularity, as well as allege that she made an adequate demand on the Board under the applicable state law – here, Massachusetts law.  See supra at 21.  She has done neither.  Second, Plaintiff has failed adequately to allege several of the requisite elements of a breach of fiduciary duty claim.  Accordingly, her claim must be dismissed.

### i.      Plaintiff fails under Fed.R.Civ.P. 23.1 to allege a demand.

"The starting point for evaluating the pleadings of a derivative suit in federal court is Fed.R.Civ.P. 23.1: In a derivative action brought by one or more shareholders…to enforce a right of a corporation…, the complaint shall be verified and shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority."  Stoner v. Walsh, 772 F. Supp. 790, 795 (S.D.N.Y. 1991) (internal citations and quotations omitted).  Failure to allege such facts warrants dismissal of a plaintiff's

32

complaint.  Lewis v. Valley, 476 F. Supp. 62, 64 (S.D.N.Y. 1979) (dismissing complaint pursuant to Fed.R.Civ.P. 23.1 for failure to allege "with particularity the efforts if any made by the plaintiff to obtain the action he desires from the directors" and noting that Rule 23.1 "has been read to embody a substantive policy favoring the intra-corporate exhaustion of remedies") (internal citations omitted).

Here, the allegations of the Amended Complaint do not pass muster.  As a preliminary matter, Plaintiff's Amended Complaint is not verified as required by Rule 23.1.  Further, Ott makes no reference in her entire pleading, let alone a particularized statement, as required by Rule 23.1, regarding a demand to the HS Fund Board of Trustees to sue Chung for breach of fiduciary duty.  To be sure, Ott references her July 14, 2010 letter to the Board of Alger Management, but, as discussed in further detail infra at___, the July 14, 2010 letter does not itself contain any demand for litigation against Chung.  Consequently, no reference to it in the Amended Complaint can possibly suffice to satisfy the stringent pleading requirement set forth in Rule 23.1.

Accordingly, this claim must be dismissed.

### ii.    Plaintiff fails under Massachusetts Law to allege a demand.

In addition to the facial insufficiency of Plaintiff's allegations of a demand, the Amended Complaint is inadequate for the additional reason that it contains no claim that Ott satisfied the substantive requirements under Massachusetts law.

For Count Ten to stand, Ott must also plead facts sufficient to show that her demand was substantively adequate under the law of the state of the HS Fund's incorporation, Massachusetts. Stoner v. Walsh, 772 F. Supp. at 795, 797.  Massachusetts' Business Corporation Law contains a universal demand requirement.  It provides in pertinent part that "[n]o shareholder may commence a derivative proceeding until: (1) a written demand has been made upon the

33

corporation to take suitable action."  Mass. Gen. Law ch. 156D, § 7.42 (July 1, 2004); ING

Principal Prot. Funds Derivative Litig., 369 F. Supp.2d 163, 170 (D. Ma. 2005) (confirming that

under § 7.42, "there are no exceptions" to the demand requirement "whether or not the directors

are independent with respect to the matter subject to the demand").  Further, a demand should

"set forth the facts concerning share ownership and be sufficiently specific to apprise the

corporation of the act or omission to be challenged and the grounds for that challenge so that the

demand can be evaluated, and describe the relief requested."  Comment 1 to Mass. Gen. Law ch.

156D, § 7.42 (July 1, 2004) (emphasis added).  Where a plaintiff fails to make such demand, her

complaint must be dismissed.  Id.; see also Yameen v. Eaton Vance Distrib., Inc., 394 F. Supp.2d

350, 352 (D. Ma. 2005).

   Here, it is clear that Ott's July 14, 2010 letter is insufficient in two respects.  First, Ott's

letter does not contain any demand for litigation let alone a demand for the specific claim

asserted by Ott in this action (i.e. a breach of fiduciary duty claim against Chung).  To the

contrary, the only remedial action Ott proposed in her letter was Alger selling her the

management of the HS Fund.  Indeed, she refers to this course of action as the "best corrective"

and "most elegant" solution.  Am. Compl., Ex. L.  Moreover, Ott's only reference to litigation in

the letter is not framed as a demand that the Board of Trustees initiate a breach of fiduciary duty

claim against Chung, as it must be.  Rather, it is presented as a not-so-veiled threat, made to

elicit, in Ott's own words, "a more constructive solution" from the HS Fund.  Second, even

assuming Ott made a demand for litigation, she nevertheless fails to satisfy the requirement of

Mass. Gen. Law ch. 156D, § 7.42 that she set forth the grounds on which a claim should be

brought so that the demand can be properly evaluated by the HS Fund Board of Trustees.  To the

contrary, Ott states only generalized complaints – characterizing the at-issue policy as "perhaps

illegal" and vaguely referencing the Investment Advisors Act and a supposed SEC comment that the policy "hurts investors by all but guaranteeing poor execution."  Am. Compl. at ¶¶ 155, 182, Ex. L at 2.  None of these statements even comes close to articulating the specific basis for her current claim against Chung in the Amended Complaint – that institution of the Trading Policy was a violation of Chung's fiduciary duties.

Having failed in every respect to satisfy the pleading requirements for a demand on the HS Fund Board of Trustees, dismissal of Ott's derivative claim against Chung is warranted.[21]

### iii.    Plaintiff fails to state a claim for breach of fiduciary duty.

"To satisfy the elements of a claim for breach of fiduciary duty under Massachusetts law, the plaintiff must allege four elements: (1) existence of a fiduciary duty arising from a relationship between the parties, (2) breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages."  Kriegel v. Bank of Am., N.A., Nos. 07cv12245-NG, 08cv11598-NG, 2010 WL 3169579, at *12 (D. Ma. Aug. 10, 2010).[22]  Further,

---

[21] Under Massachusetts law (see supra at 33-34), futility of a demand does not excuse the lack of one.  Thus, even were Ott to claim futility here – which she has not – such an assertion would nevertheless be insufficient to save her derivative claim.

[22] Defendants believe Massachusetts law applies here because, to the extent that Ott alleges a breach of fiduciary duty to the shareholders of the HS Fund, under the internal affairs doctrine, Massachusetts' law, as the law of the state of the entity's incorporation, may apply. Hydrogen L.L.C. v. Blomen, No. 08-14139 (AJG), 2010 WL 1609536, at *4, *7  (Bankr. S.D.N.Y. April 20, 2010).  Notwithstanding this fact, Defendants note that under an interest analysis choice of law review used for breach of fiduciary duty claims which do not involve officers or directors, New York law also could apply.  Ibid.  No choice of law analysis is required here, however, because the elements of a breach of fiduciary duty claim and the scope of fiduciary duties of officers and directors are substantively the same under both New York and Massachusetts law.  See, e.g., Burry v. Madison Park Owner LLC, 84 A.D.3d 699, 699-700, 924 N.Y.S.2d 77, 78 (1st Dep't 2011) ("[t]o state a claim for breach of fiduciary duty, plaintiffs must allege that (1) defendant owed them a fiduciary duty, (2) defendant committed misconduct, and (3) they suffered damages caused by that misconduct"); Holmes v. Camp, 168 A.D. 688, 693, 154 N.Y.S. 513, 517 (1st Dep't 1915) ("directors of a corporation are not liable for errors of judgment where they act without corrupt intent, with reasonable care, and in good faith").

35

to state a claim for the breach of fiduciary duties owed by officers or directors of a corporation, a plaintiff must show a breach of the duties of (i) care ("act[] on an informed basis"), (ii) loyalty ("maintain[ing], in good faith, the corporation's and it shareholders' best interests over anyone else's interests") or (3) good faith (acting without any intent to do harm to the corporation). Blake v. Smith, No. 0300003B, 2006 WL 4114305, at *6-7 (Mass. Super., Hampden Ctny. Dec. 11, 2006).  Moreover, no claim for breach of an officer's or director's fiduciary duty can stand if it is premised on "mere errors of judgment or want of prudence in the performance of their duties."  Bos. Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996); Foster v. Bowen, 311 Mass. 359, 359-637, 41 N.E.2d 18, 181-185, (Sup. Jud. Ct. of Mass. 1942).

Here, Plaintiff fails to allege adequately the elements of breach of duty, damages and causation.  Accordingly, Ott's claim against Chung must be dismissed.

### (1)     Ott fails to allege a breach of fiduciary duty.

None of the complained-of acts are sufficient to state a breach by Chung of his fiduciary duties to the HS Fund.

Regarding the Trading Policy, far from being a dereliction of duty or a manifestation of his own self-interest, Chung's enactment of the Trading Policy was an effort he made as Alger CIO to protect the interests of all Alger-managed funds – including the HS Fund.  In particular, Chung implemented the Trading Policy to address concerns (expressed as early as 2008) by other Alger PMs that, as an Analyst, Ott was not sufficiently sharing healthcare sector research and trade recommendations with other PMs, but was instead, as Co-PM of the HS Fund, effecting such recommendations substantially in only the HS Fund.  Norbitz Aff., Ex. 1 at 14; Am. Compl. at ¶ 170, Ex. L at 4.  Indeed, during her 2008 Analyst Performance Review, Ott specifically told that she placed too much focus on the HS Fund and not enough on other portfolios.  Norbitz Aff., Ex. 1 at 14.  Further, Ott was told that her research and communication as an Analyst were

36

inadequate.  Am. Compl., Exs. B and D.  Moreover, the HS Fund had suffered a gradual decline in performance during Ott's tenure as Co-PM of the HS Fund.  Id. at ¶¶ 94-95, 132, Ex. B.  Accordingly, Chung instituted the Trading Policy to (i) allow him to be involved in all investment decisions of the HS Fund and (ii) ensure both that Ott did not subordinate her role as Senior Healthcare Analyst to her role as Co-PM and that she regularly and timely shared healthcare sector research and trade recommendations with the PMs of the other funds which also invested in healthcare stocks.  Norbitz Aff., Ex. 1 at 1, 16; see also Am. Compl. at ¶ 170, Ex. L at 4.  Furthermore, after conducting a full factual and legal analysis, Stroock & Stroock determined (i) that Chung was well within the bounds of his authority and duty as CIO of Alger to enact the policy to protect the investments of shareholders in all the Alger-managed funds and (ii) that the policy did not violate Alger's fiduciary duty to seek best execution for its clients.  Norbitz Aff., Ex. 1 at 3, 31-32.

To the extent that Plaintiff supports her breach of fiduciary duty claim by citing examples of Chung's participation in HS Fund investment decisions – decisions with which Ott disagreed (see, e.g., Am. Compl. at ¶¶ 142-48, 185, 252-58) – such participation does not state a breach of a fiduciary duty because Chung has the right, as Co-PM of the HS Fund, to participate in investment decisions for the HS Fund.  Norbitz Aff., Ex. 1 at 22.  Even if those decisions could be characterized as unsuccessful business decisions, which, in any event, they cannot be – these too would be insufficient to state a claim for breach of fiduciary duty.  See, e.g., Foster v. Bowen, 311 Mass. at 366, 41 N.E.2d at 184.

### (2)      Ott fails to allege damage to the HS Fund.

Plaintiff's claim also fails because she has not alleged an identifiable damage to the HS Fund.

Other than her conclusory and unsubstantiated assertion that the HS Fund was damaged by Chung's behavior, Ott does not allege how the HS Fund was damaged.  In fact, Ott appears to advance the contradictory position that the HS Fund experienced no damage whatsoever apart from the damage she experienced individually.  Specifically, Plaintiff alleges that the HS Fund shareholders, on whose behalf she purports to bring this claim, were damaged by Chung's breach of fiduciary duty in the exact same amount – $3,000,000 – that she claims she was individually damaged as a result of all her other claims – including those which are Ott's individual direct claims related to her employment.  Such a failure to allege an actual, identifiable loss to the HS Fund is fatal to her claim.  See, e.g., Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP, 2009 N.Y. Slip. Op. 32262U, 8 (N.Y. Sup. Ct. Sept. 29, 2009) aff'd, 74 A.D.3d 613 (1st Dep't 2010) (dismissing breach of fiduciary duty claim where plaintiff failed to allege actual losses suffered because of defendant's actions).

Furthermore, it is clear that the HS Fund did not, in fact, suffer any loss in value attributable to the Trading Policy.  Norbitz Aff., Ex. 1 at 27.  Indeed, there was a slight increase in value attributable to the short trading delays.  Id.

### (3)    Ott fails to allege causality.

Finally, even assuming that Ott satisfied the second and third elements of the cause of action – which she has not – she utterly fails to allege any causal connection between the alleged unlawful Trading Policy or any of Chung's actions and the purported damages.  This failure to connect the enactment of the Trading Policy with her demand for damages is fatal to Ott's claim.  See Gall v. Summit, Rovins & Feldesman, 222 A.D.2d 225, 226, 635 N.Y.S.2d 17, 18 (1st Dep't 1995).

Regarding the effect of the Trading Policy, Ott does not include in her Amended Complaint any stock quotes or other specific information linking a trading delay caused by the

38

Case 1:11-cv-04418-LAP   Document 15   Filed 10/21/11   Page 45 of 46


Trading Policy with any quantifiable damage to the HS Fund. <u>See</u> Norbitz Aff., Ex. 1 at 27.[23]

Moreover, the Stroock Report specifically found there to be no damage to the HS Fund as a

result of Trading Policy. Norbitz Aff., Ex. 1 at 27.

　　　Having failed to allege the required elements of a breach of fiduciary duty claim, Ott's

Count Ten must be dismissed.

### i.　ALL CLAIMS AGAINST DEFENDANTS FRED ALGER & COMPANY, INC. AND ALGER ASSOCIATES INC. MUST BE DISMISSED

　　　The law is clear that where no substantive allegations are asserted against a named

defendant, any claim purportedly asserted against that defendant must be dismissed. <u>See</u>

<u>Vishevnik v. Sup. Ct. of the State of N.Y.</u>, No. 99 Civ. 3611(RWS), 1999 WL 796180, at *1

(S.D.N.Y. Oct. 6, 1999).

　　　Here, other than providing the most basic corporate information about Fred Alger &

Company, Incorporated and Alger Associates, Inc. (<u>see</u> Am. Compl. at ¶¶ 25-26, 31), which, in

any event, Ott gets wrong, there are absolutely no allegations made against these entities.

Accordingly, all counts against them must be dismissed.

### j.　CLAIM FOR ATTORNEYS' FEES AND PUNITIVE DAMAGES

　　　Plaintiff requests attorneys' fees, costs, and punitive damages as part of her demand for

relief. These categories of recovery are barred as a matter of law. <u>See, e.g.</u>, <u>Astor Holdings, Inc.</u>

<u>v. Roski</u>, No. 01 CIV.1905(GEL) 2002 WL 72936 (S.D.N.Y. Jan. 17, 2002) (under New York

---

[23] The Amended Complaint contains a smattering of unsupported comments relating to damages. These statements are so implausible, however, that they cannot support Ott's claim for damages. For example, Ott claims that the HS Fund fell to a ranking of 60th place as a result of the Trading Policy. <u>See</u> Am. Compl., Ex. M. Yet, she makes this claim in June, 2010, only approximately two months after the Trading Policy was implemented and without providing the date on which the HS Fund performance was supposedly ranked. Also, Ott claims that certain trades were never executed because Chung did not respond to Ott's requests. <u>Id.</u> Yet, Ott does not explain how the Trading Policy, which mandates the holding of trades for no more than two hours, could possibly be responsible for this.

39

law, attorneys' fees are not recoverable by prevailing parties absent express statutory or contractual authority or court rule, citing <u>Severino v. Classic Collision, Inc</u>., 280 A.D.2d 463, 464 (2d Dep't 2001)) and <u>Rocanova v. Equitable Life Assur. Soc. of U.S.</u>, 83 N.Y.2d 603, 613, 612 N.Y.S.3d 339, 342 (1994) (punitive damages are unavailable for breaches of contract unless a defendant engages in conduct "aimed at the public generally").  Therefore, to the extent that any claims for which Ott improperly requests these categories of damages are not dismissed pursuant to this motion, Ott's damage demands must be stricken.

    **4.**           **CONCLUSION**

      For all the foregoing reasons, Defendants respectfully request that the Amended Complaint be dismissed in its entirety with prejudice against all Defendants.

Dated:  October 21, 2011                    Respectfully submitted,


                    By: /s/ Todd C. Norbitz
                      Todd. C. Norbitz

                    Todd C. Norbitz
                    Anne B. Sekel
                    Foley & Lardner LLP
                    90 Park Avenue
                    New York, New York  10016-1314
                    Tel:  (212) 682-7474
                    Fax:  (212) 682-2329

                    Of counsel:
                    Bennett L. Epstein (admitted *pro hac vice*)
                    Foley & Lardner LLP
                    321 North Clark Street
                    Suite 2800
                    Chicago, Illinois  60654-5313
                    Tel:  (312) 832-4500
                    Fax:  (312) 832-4700