UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                        :

**ROSEANNE F. OTT**,                  :       Civ No.  11 Civ. 4418(RJH)
Derivatively on behalf of similarly situated  :
shareholders of Alger Health Science Fund,  :
                        :

         Plaintiff,          :

                        :

        - against -        :

                        :

                        :

**FRED ALGER MANAGEMENT, INC.,**  :
**FRED ALGER & COMPANY, INC.,**    :
**ALGER ASSOCIATES, INC.** and **DANIEL** :
**C. CHUNG,** individually,       :

         Defendants.      :

                        :
------------------------------------------------------------------- x

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

---

**SACK & SACK, ESQS.**

Attorneys for Plaintiff

110 East 59th Street, 19th Floor
New York, New York 10022-2050
(212) 702-9000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... III

P R E L I M I N A R Y   S T A T E M E N T .................................................... 1

S T A T E M E N T   O F   F A C T S ........................................................... 2

I.    OTT'S PERFORMANCE ................................................................ 2

II.   OTT'S COMPENSATION............................................................ 5

III.  ALGER IMPLEMENTS AN UNLAWFUL POLICY .................................. 6

IV.  OTT IS RETALIATED AGAINST AS A WHISTLEBLOWER ............................................................................. 9

A R G U M E N T .......................................................... 11

I.    DEFENDANTS DO NOT MEET THE HIGH STANDARD WARRANTING DISMISSAL UNDER FRCP 12(B)(6) ......................................................................... 11

II.   OTT STATES A CLAIM FOR VIOLATION OF DODD-FRANK......................................................................................... 13

    A.    OTT ENGAGED IN PROTECTED ACTIVITY .................................................... 13

        i.   OTT PROVIDED NEW INFORMATION TO THE SEC AFTER THE EFFECTIVE DATE OF DODD-FRANK. ............................................................. 13

        ii.  OTT ALLEGES THAT SHE REASONABLY BELIEVED THE TRADING POLICY VIOLATED SECURITIES LAW. ......................................... 15

    B.    OTT ALLEGES AN ADVERSE EMPLOYMENT ACTION THAT IS CASUALLY CONNECTED TO HER PROTECTED ACTIVITY ...................... 17

III.  OTT STATES A CLAIM FOR BREACH OF CONTRACT...................................................................................... 18

    A.    THE BONUSES ARE WAGES UNDER NEW YORK LAW ............................... 18

IV.  PLAINTIFF STATES VALID CLAIMS UNDER QUASI-CONTRACT THEORIES ............................................................ 20

**V.      OTT'S      ALTERNATIVE      QUASI-CONTRACT
        THEORIES MUST BE SUSTAINED** ............................................................... 21

        **A.      PLAINTIFF'S IMPLIED AND QUASI CONTRACT CLAIMS MUST BE
                SUSTAINED** ............................................................................................... 21

        **B.      PLAINTIFF STATES A VALID CLAIM FOR PROMISSORY ESTOPPEL** .... 22

**VI.     OTT      STATES      A      CLAIM      FOR      BREACH      OF
        FIDUCIARY DUTY** ......................................................................................... 24

**VII.    PUNITIVE DAMAGES** .............................................................................................. 26

**C O N C L U S I O N** .................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Absalom Gonzalez-Jimenez v. United States of America</u>, 2000 U.S. Dist. LEXIS 14040 (S.D.N.Y. 2000) ............................................................................................... 11

<u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009) ................................................................. 11

<u>Ashcroft v. Iqbal</u>, 490 F.3d 143 (2<sup>nd</sup>Circ. 2008)................................................... 11

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955 (2007). ......................... 11

<u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ...................................................................................................................... 26

<u>Carter v. Katz</u>, 465 N.Y.S.2d 991 (N.Y.Sup.Ct.1983)................................................. 21

<u>Caruso v. Allnet Communications Servs.</u>,242 A.D.2d 484, 484-485, 662 N.Y.S.2d 468 (1st Dep't 1997) ............................................................................................... 19

<u>Citibank, N.A. v. Walker</u>, 12 A.D.3d 480, 787 N.Y.S.2d 48 2d Dep't 2004) ............................. 21

<u>City of Syracuse v. R.A.C. Holding, Inc.</u>, 258 A.D.2d 905, 685 N.Y.S.2d 381 (4th Dep't 1999) .............................................................................................................. 21

<u>Cohen v. Koenig</u>, 25 F.3d 1168 (2d Cir. 1994)........................................................... 12

<u>Conley v. Gibson</u>, 355 U.S. 41 (1957)........................................................................ 11

<u>Connell v. Signoracci</u>, 153 F.3d 74 (2d Cir. 1998)...................................................... 12

<u>Cosmas v. Hasset</u>, 886 F.2d 8 (2d Cir. 1989).............................................................. 12

<u>Cyberchron Corp. v. Calldata Sys. Dev., Inc.</u>, 47 F.3d 39 (2d Cir. 1995) ................................. 23

<u>Drake v. Seaman</u>, 97 N.Y. 230, 234 (1884) ................................................................ 18

<u>Egan v. Trading Screen, Inc.</u>, 2011 WL 1672066 (S.D.N.Y. 2011................................ 1

<u>Egan v. Trading Screen, Inc.</u>, 2011 WL 4344067 (S.D.N.Y. 2011) ............................. 1

Fiorenti v. Central Emergency Physicians, 187 Misc.2d 805, 723 N.Y.S.2d 851, 855 (N.Y.Sup.Ct.2001) .............................................................. 19

Furia v. Furia, 116 A.D.2d 694, 498 N.Y.S.2d 12 (2d. Dept. 1986).................................. 18

Gant v. Wallingford Bd. of Educ., 69 F.3d 669 (2d Cir. 1995) ..................................... 12

Giuntoli v. Garvin Guybutler Corp., 726 F. Supp. 494 (S.D.N.Y. 1989) .................................. 20

Goldman v. Belden, 754 F.2d 1059 (2d Cir. 1985) ....................................... 12

International Custom Assocs. v. Ford Motor Co., 893 F. Supp. 1257 (S.D.N.Y. 1995)............................................................................. 22

International Paper Co. v. Suwyn, 978 F.Supp. 506, 514 (S.D.N.Y.1997)................................. 19

Jemzura v. Jemzura, 36 N.Y.2d 496, 330 N.E.2d 414, 396 N.Y.S.2d 400 (1975) ................ 20, 21

John J. Kirlin, Inc. v. Conopco, Inc., No. 94 Civ. 2675, 1995 WL 15468 (S.D.N.Y. 1995) ................................................................. 20

JP Morgan Chase v. J.H. Electric of New York, Inc., 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dept. 2010) ........................................ 18

Kaible v. U.S. Computer Group, 27 F. Supp. 2d 373, 1998 U.S. Dist. LEXIS 19214 (S.D.N.Y. 1998)................................................................. 11

Kenneth Dash v. The Equitable Life Assurance Society of the United States and Ecuicor—Equitable HCA Corp., 753 F. Supp. 1062; 1990 U.S. Dist. LEXIS 17708; 59 FairEmpl. Prac. Cas. (BNA) 685 (E.D.N.Y. 1990) .................................. 12

Knight Sec. v. Fiduciary Trust Co., 5 A.D.3d 172, 774 N.Y.S.2d 488 (1st Dep't 2004)................................................................. 23

Kriegel v. Bank of Am., N.A., Nos. 07cv12245-NG, 08cv11598-NG, 2010 WL 3169579 (D. Ma. Aug. 10, 2010) .................................................. 24

LaBounty v. Adler, 933 F.2d 121 (2d Cir. 1991) ....................................... 12

Land-Site Contr. Corp. v. Marine Midland Bank, 177 A.D.2d 413, 576 N.Y.S.2d 255 (1st Dep't 1991) ................................................... 20

Lanzet v. Eastern Wholesale Fence, Co., 213 A.D.2d 601, 602, 624 N.Y.S.2d 443, 444 (2nd Dept. 1995) ................................................................................. 18

Matter of Adams, 1 A.D.2d 259262, 149 N.Y.S.2d 849 (4th Dep't 1956), aff'd. 2 N.Y.2d 796, 140 N.E.2d 549, 159 N.Y.S.2d 698 (1957) ............................................. 22

Moors v. Hall, 143 A.D.2d 336, 532 N.Y.S.2d 412 (2d Dep't 1988) .......................... 22

Morris v. 702 E. Fifth St. HDFC, 46 A.D.3d 478, 479, 850 N.Y.S.2d 6 (1st Dept. 2007) .......................................................................................... 18

Nakamura v. Fuji, 253 A.D.2d 387, 677 N.Y.S.2d 113 (1st Dep't 1998) ................... 21

Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41 (2d Cir. 1997) ......................... 11

Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 285 N.E.2d 695, 334 N.Y.S.2d 388 (1972) .......................................................... 21

Pearce v. Manhattan Ensemble Theater, Inc., 2007 U.S. Dist. LEXIS 16487 (S.D.N.Y. 2007) .......................................................................................... 23

People v. Wood, 121 N.Y. 522 (1890) ..................................................................... 21

Rose v. Spa Realty Associates, 42 N.Y.2d 338, 397 N.Y.S.2d 922 (1977) ............... 21

S.E.C. v. U.S. Environmental, Inc., 155 F.3d 107 (2d Cir. 1998) ............................... 11

Shapira v. United Med. Serv., 15 N.Y.2d 200, 205 N.E.2d 293, 257 N.Y.S.2d 150 (1965) ....................................................................................... 20

Sharp v. Patterson, 2004 WL 2480426  at *8 (S.D.N.Y. 2004) ................................. 21

Signature Brokerage Inc. v. Group Health Inc., 5 A.D.3d 196, 772 N.Y.S.2d 812 (1st Dept. 2004) ................................................................................... 18

Simas v. Merrill Corp., 2004 WL 213013 (S.D.N.Y. 2004) ...................................... 19

Trott v. Dean Witter & Co., 438 F. Supp. 842 affd, 578 F.2d 1370 (2d Cir. 1978) ..... 22

Truelove v. Northeast Capital & Advisory Inc., 268 A.D.2d 648, 702 N.Y.S.2d 147 (3rd Dep't 2000) ................................................................................. 19

<u>Truelove v. Northeast Capital & Advisory, Inc.</u>, 95 N.Y.2d 220, 224, 715
N.Y.S.2d 366, 738 N.E.2d 770 (2000) .......................................................................... 19

<u>Villager Pond, Inc. v. Town of Darien</u>, 56 F.3d 375 (2d Cir. 1995), <u>cert</u>. <u>denied</u>, 519
U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14 (1996) .......................................................... 12

<u>W.B. David & Co. v. DWA Communications, Inc.</u>, No. 02 Civ 8479 WL 369147,
at *2 (S.D.N.Y. 2004) .................................................................................................... 21

<u>Weiner v. Diebold Group</u>,  (173 A.D.2d 166, 568 N.Y.S.2d 959 (1st Dep't 1991) .................... 19

<u>Weisman v. LeLandais</u>, 532 F.2d 308 (2d Cir. 1976) .................................................... 12

VI

# PRELIMINARY STATEMENT

Plaintiff, Roseanne Ott ("*Ott*" or "*Plaintiff*"), by her attorneys Sack & Sack Esqs., hereby respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Amended Complaint.

Though the Amended Complaint contains several causes of action concerning Defendants' unlawful actions, Plaintiff opposes dismissal of only those causes of action that warrant sustainment based upon the strict standards imposed by the U.S. Supreme Court concerning pre-discovery dispositive motions.

The gravamen of Plaintiff's complaint rests on a statute of first impression for this Court; the Dodd-Frank Act. Specifically, the private cause of action for whistleblowers discriminated against in retaliation for lawful complaints or information provided to the Securities and Exchange Commission.[1]

The facts set forth in the Amended Complaint clearly support Ott's claims as a whistleblower under Dodd-Frank and, despite Defendants' valiant attempt to manipulate the timeline of events concerning Ott's protected complaints and her retaliatory termination that followed, Ott's allegations fall squarely within the whistleblower protections of Dodd-Frank.

Furthermore, Ott's claims for breach of contract concerning her compensation must similarly be sustained as well as Ott's claims for breach of fiduciary duty and punitive damages.

Accordingly, Defendants' Motion to Dismiss must be denied as set forth herein.

---

[1] Though this Court has written decisions concerning the Whistleblower Protection afforded by Dodd-Frank, the issues before Judge Sand are distinguishable; See, Egan v. Trading Screen, Inc., 2011 WL 4344067 (S.D.N.Y. 2011); See also, Egan v. Trading Screen, Inc., 2011 WL 1672066 (S.D.N.Y. 2011).

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to the Amended Complaint filed in this matter for a full rendition of Plaintiff's allegations.  Plaintiff, however, does set forth some background facts as follows:

Ott is a highly experienced Portfolio Manager and equity analyst who has been managing a healthcare portfolio since 2005 and analyzing securities on Wall Street since 1998.  See, Am. Compl. at ¶32.

In April 2002, Ott accepted an opportunity to join Fred Alger Management, Inc. as a Vice President and Senior Analyst, covering the medical supplies and device sectors (including cardiology, orthopedics, neurovascular, diabetes, ophthalmology, gynecology, gastroenterology, general surgery, and lasers).  Ott also covered death care/funeral home services as well as pharmaceuticals and biotech.  Id. at ¶90.

### I.      OTT'S PERFORMANCE

At Alger, Ott succeeded as an analyst and by 2004, Ott ranked No. 1 in the Small Cap Fund in overall contribution to the fund's performance.  Ott also tied for the top spot in the absolute return of firm-wide owned stocks, which were up 33%.  Id. at ¶91.  As a Portfolio Manager, Ott always strived to rank in the top quartile of Morningstar rankings as compared against other competing Health Sciences ("HS") Funds.  In each year from 2005 through 2009, Ott managed to deliver consistent, top quartile performance with the exception of the "exceptional" market in 2008.  Id. at ¶131.

In 2005, Ott's HS Fund ended with a Lipper ranking in the 6th percentile and assets under management ("AUM") at $85.7 million.  Also in 2005, Alger's Marketing department began to tap Ott for client meetings with the purpose of either retaining current assets or winning

additional assets for the firm to manage.  By the end of 2005, Ott had conducted 8 client meetings (6 more than the previous year) in addition to her new role as Portfolio Manager and senior analyst.  Id. at ¶94.

In 2006 and 2007, Ott's HS Fund year end rankings were in the top 20th percentile along with a Morningstar Rating of 5 stars, the agency's top rating.  Id. at ¶95.

In 2006, Ott conducted 14 marketing meetings (6 more than the prior year).  Chung noted on Ott's bonus paperwork that, "**Your [Ott's] presentations to clients have been very strong and you are one of our best representatives.**"  Id. at ¶96, Am. Compl. Exhibit B.  Chung continued in his comments, stating, "**[Ott is] very responsive to all requests and analysis. All PMs appreciate your professionalism and desire to go the extra step as needed.  Strong knowledge of industry and companies.  Modeling is detailed and thorough.  Excellent work product, improved this year from already good work in past years.  Strong work ethic. All sense commitment to 'the Team' and our collective performance.**"  Id. at ¶97, Am. Compl. Exhibit B.

By 2007, Ott had maintained positive attribution across all Alger Funds/Portfolios and again held the number one spot in the firm's largest fund, the Small Cap Fund, in terms of attribution.  Id. at ¶99.  In Ott's 2007 analyst review dated December 17, 2007, Ott was noted for, "**Small cap stock picking leader (again).  Strong client representation skills – participation in key consultant meetings, Illinois teachers final.  Team player - good mentoring re junior analysts.  Knowledge of industry, hard worker.**"  Id. at ¶101, Am. Compl. Exhibit D.

In 2008, Ott also participated in formalized public speaking training arranged by Tambone along with Chung, PMs Patrick Kelly (*"Kelly"*) and Andrew Silverberg (*"Silverberg"*), and fellow PM/analyst Christopher Walsh (*"Walsh"*).  Id. at ¶105.

In 2008, Ott's meetings with clients grew to 33 meetings (more than double the prior year).  Id. at ¶106.

In 2009, Ott went on to conduct an astonishing 69 key marketing meetings, media interviews and panel discussions on behalf of the firm.  Id. at ¶112.  Nearly every single week during 2009, Ott met with investors, media, consultants, advisors, wholesalers, internal marketing personnel and also participated as panel expert at large healthcare conferences on behalf of FAM.  Ott's marketing effort on behalf of the firm more than doubled from the previous year.  Id. at ¶113.  In fact, Ott's marketing meetings, which had previously been rewarded at year-end, had grown from two investor meetings in 2004 to a total of 140 meetings by 2009.  Id. at ¶115.

By the end of 2009, the HS Fund had outperformed the S&P Healthcare Sector by 22% and the S&P500 by nearly 4% (Source: Morningstar).  Ott completed the fourth year of managing the fund and the record was impressive in its consistent, favorable returns.  Id. at ¶127.

From 2005 to 2009, compared to its peers, the HS Fund ranked in the 5th, 20th, 17th, 62nd and 22nd percentiles, respectively.  Id. at ¶132.  In fact, despite a revolving door of co-managers on the HS fund, and heavy distractions from marketing, as well as senior analyst responsibilities and team leader functions, Ott outperformed the S&P Healthcare Index, the S&P 500 ***or both*** in 4 out of 5 years (2005-2009).  Id. at ¶134.

## II.    OTT'S COMPENSATION

In respect of 2006, Ott was awarded a $275,000 bonus on top of a $350,000 base salary and a Deferred Compensation Grant of $150,000 for a total compensation package of $775,000. Id. at ¶98, Am. Compl. Exhibit B.

In respect of 2007, Ott received a $375,000 bonus and Deferred Compensation Grant of $100,000 in addition to her salary of $350,000 for a total compensation package of $825,000.  Id. at ¶102, Am. Compl. Exhibit E.

In 2008, as a result of her hard work and success, Ott was promoted to Senior Vice President and received an increase in salary of $25,000, bringing her salary to $375,000.  Id. at ¶103, Am. Compl. Exhibit F.  In calendar year 2008, Ott's bonus award and grant letter dated January 12, 2009 simply stated, "**In recognition and appreciation of your contributions, Fred Alger & Company, Incorporated will pay you the following:  Discretionary Bonus of $135,000 and Deferred Compensation Grant of $75,000.  Thank you for your continued support.**"  Id. at ¶107, Am. Compl. Exhibit G.  Ott's total compensation for calendar year 2008 was $585,000; down 29%. Id.

During the meeting in which Chung gave Ott her 2008 bonus award, Chung informed Ott that all bonuses were down significantly as a result of the selloff of the market and the suddenly dramatic and significant losses of assets under management.  The Madoff Scandal had a deleterious effect; investors were wary of fund managers. Id. at ¶108.

During her 2009 bonus discussion, Chung resented that Ott's performance in her HS Fund did not match up to the attribution in his fund because he did not listen to Ott's recommendations. Increasingly, Chung also resented all the glowing feedback he received

regarding Ott's marketing and client interaction.  Id. at ¶129.  Amazingly, Ott received a calendar year 2009 bonus of $121,500, which was lower than the previous year and Deferred Compensation Grant of $25,000, which was significantly lower than the previous year in addition to her salary of $375,000 for a total compensation package of $521,500.  Id. at ¶130.

In total, as a result of Defendants' breach of contract, Ott is entitled to at least $848,188, comprised of (i) $278,500 in respect of her 2009 bonus true-up; (ii) $415,000 in respect of her 2010 bonus true-up; and (iii) $154,688 in deferred compensation.  Id. at ¶298.

### III.    ALGER IMPLEMENTS AN UNLAWFUL POLICY

On April 8, 2010, Alger implemented an unprecedented trading policy (the "*Trading Policy*") guaranteeing that investors in the HS Fund would *not* receive the best execution of transactions within the fund.  Id. at ¶140.

In an email to both Co-Portfolio Managers (*"Co-PMs"*) of the HS Fund, Ott and David Farhadi, MD. (*"Farhadi"*), as well as all of the members of Alger's trading desk, Chung wrote, "**We need to implement a change to portfolio management on the HC [HS] fund, in particular, in line with the Alger Analyst Fund, a) no trades should be executed in the HC [HS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, b) Trading, if you receive an order, you will need to hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours.**"  Id. at ¶141, Compl. Exhibit J.

The consequence of this policy allowed other Portfolio Managers managing different Alger funds to "front run" ideas for the HS fund.  Given these other PMs are compensated for the

performance in their funds, they were allowed to personally gain by trading in front of the HS Fund and by obtaining better execution in their funds.  Id. at ¶142.

Believing this Trading Policy to be unlawful, in response to the issuance of this new "policy", Ott, a Senior Vice President holding the FINRA Series 7 license, a Co-PM for the Alger HS Fund and a supervised employee as defined under the 1940 Act, took affirmative actions to stop, prevent, and curb the unlawful trading restrictions engaged in by Alger and its senior managers.  Id. at ¶149.

At the time this new policy was implemented, Ott's Co-PM, Farhadi, described the new trading policy as "**sabotage**" intended to destroy the stellar performance of the fund.  Farhadi further informed Ott that he spoke with Alger's General Counsel, Hal Liebes, about the legality of the policy.  Rather than taking the matter seriously, Liebes was dismissive to Farhadi stating there was "**nothing wrong with the policy**" and that the policy was "**fine.**"  Id. at ¶150.

Upon hearing that concerns raised by the Co-PM, Farhadi, and Head of Trading, Thumm, had been ignored by both Liebes and Alger's Compliance Department, Ott inquired with the Securities and Exchange Commission ("*SEC*") as to the legitimacy and legality of the newfangled HS Fund trading policy.  Id. at ¶152.  After multiple conversations with members of the SEC's Investment Management Division, Office of Chief Counsel, Ott was informed that there appeared, on its face, to be serious securities law issues with Alger's newfangled trading policy.  Id. at ¶153.

During this time, SEC representative, Michael S. Didiuk (*"Didiuk"*), Division of Investment Management, after conferring with other members of his staff, determined that the policy appeared to harm investors in Ott's HS Fund.  Id. at ¶154.  Furthermore, because Chung is

also listed on the HS Fund as a co-manager and since he is also FAM's CIO, the SEC representatives found his actions the "**most offensive.**" Id. at ¶156.

On June 22, 2010, Ott drafted a letter to Chung to complain about the illegal policy and outlined specific instances where shareholders of the HS fund were harmed as a result of poor trading execution. Id. at ¶161, Compl. Exhibit M.

Given Chung's history of irrational and caustic behavior, Ott felt it prudent to retain counsel, Jonathan Sack, Esq. (*"Sack"*). Id. at ¶165. On June 22, 2010, on behalf of Ott, Sack met with Alger's General Counsel, Liebes, to discuss the unlawful trading policy solely directed at Ott's HS Fund. Previously, Ott had written a letter to Chung. Sack read this letter to Liebes. The letter outlined specific examples of the HS Fund not receiving best execution for trades within the fund and specifically how the trading policy harmed investors. Id. at ¶166.

On July 1, 2010, Liebes informed Sack (via letter) that Alger had self-reported Ott's assertion that Alger had not complied with its obligations to clients to Douglas J. Scheidt, Associate Director and Chief Counsel of the SEC's Division of Investment Management. In his letter, Liebes advised the SEC that Alger had directed its very own outside counsel to investigate the charges made by Ott and would provide "the [SEC] Staff" with a copy of Alger's Counsel's report. Id. at ¶175.

In mid-July 2010, with no resolution regarding the trading policy and with the HS Fund's performance at all-time lows, Ott reached out to the Alger Trustees and Officers of the Trust, Alger Associates and members of Alger Management (*"the Board"*). Id. at ¶181. Ott, acting with a fiduciary responsibility to the shareholders of the HS Fund, notified the Board in written correspondence dated July 14, 2010, of the "**improper, unethical, and perhaps illegal**

**trading policy**" instituted "**without forewarning or explanation**" by Chung.  Id. at ¶182, Compl. Exhibit L.

In late July 2010, after no response from Alger or from the Board of Trustees, which is responsible for protecting the interests of shareholders, and after giving Alger every opportunity to correct the trading policy that was now severely harming the performance of the HS Fund, Ott's attorney [Sack] contacted the SEC and Ott became an official Whistle Blower under the provisions of the now in-effect Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §78u-6 ("*Dodd-Frank*").  Id. at ¶218.

### IV.   OTT IS RETALIATED AGAINST AS A WHISTLEBLOWER

On August 4, 2010, under the protections of Dodd-Frank, Ott met with four members of the SEC's Division of Enforcement at the SEC's offices in World Financial Center, New York, New York.  The meeting was headed by Gwen Licardo, Senior Investigative Counsel of the SEC New York Regional Office.  Ott answered questions for more than two hours.  Id. at ¶221.

Ott provided fourteen (14) exhibits to the SEC containing more than sixty (60) pages of documentation showing multiple examples of poor execution or no execution in the HS Fund. The newfangled and illegal trading policy had a material and adverse effect on Ott's HS Fund performance.  Id. at ¶222.

Almost immediately upon her complaints to Alger regarding the new trading policy, Chung engaged in a retaliatory harassment campaign against Ott.  Id. at ¶¶ 200 - 217.  Chung's harassment campaign began following Ott's August 4, 2010 meeting with the SEC and continued throughout the duration of Ott's employment at Alger. Such retaliatory actions included, but were not limited to, demoting Ott, creating "busy work" for Ott, and numerous other efforts to negatively influence Ott's performance.  Id. at ¶¶ 231 – 251, 259 – 265.

On October 21, 2010, Alger's outside counsel, Brosterman, sent the "findings" of his investigation to Sack on behalf of Ott.  Brosterman determined that the impact to investors was minimal and that "the policy is appropriate, lawful, and in the best interest of Alger's investors" despite the fund ranking in the 80th percentile compared to the historical and nearly consistent ranking in the top quartile.  Id. at ¶228.

On December 15, 2010, Chung issued a 2010 Performance Review for Ott.  As expected, the review consisted of a subjectively false characterization of Ott's work.  Chung assigned blame of 34% losses despite the fact that Chung had acted on his own decisions and hardly any of Ott's as was previously and very specifically pointed out by Ott in response to the "Midyear Midcap Review" given in August 2010.  Then, as a direct result of Ott's formal SEC Whistle Blower Complaint, Ott was retaliated against and paid a bonus of merely $10,000, down 92% from the previous year.  Id. at ¶¶ 270, 273.

On January 20, 2011, Alger ultimately terminated Ott's gainful employment at Alger without notice, justification or cause in retaliation for Ott's vociferous objections concerning Alger's unlawful Trading Policy, despite being protected as a whistleblower under the newly enacted Dodd-Frank Act.  Id. at ¶278.

**ARGUMENT**

**I. DEFENDANTS DO NOT MEET THE HIGH STANDARD WARRANTING DISMISSAL UNDER FRCP 12(B)(6)**

As more fully described herein, Defendant does not meet the stringent standard to obtain dismissal for failure to state a claim. Kaible v. U.S. Computer Group, 27 F. Supp. 2d 373, 376, 1998 U.S. Dist. LEXIS 19214 at *5 (S.D.N.Y. 1998).

To survive a motion to dismiss, a complaint need only contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007)(emphasis added). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. Determining whether a complaint states plausible claim for relief will be a context specific task that requires the reviewing court to draw on its judicial experience and common sense. Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), citing Ashcroft v. Iqbal, 490 F.3d 143 (2nd Circ. 2008). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. at 1950.

On a motion to dismiss for failure to state a claim, a complaint should be dismissed only if it appears beyond doubt that the Plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. S.E.C. v. U.S. Environmental, Inc., 155 F.3d 107 (2d Cir. 1998); Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41 (2d Cir. 1997); quoting, Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

It is more than well-established law, that "on a Motion to Dismiss, the allegations in the complaint are accepted as true." Absalom Gonzalez-Jimenez v. United States of America, 2000

U.S. Dist. LEXIS 14040 (S.D.N.Y. 2000), citing, Cohen v. Koenig, 25 F.3d 1168, 1172-73 (2d Cir. 1994). See also, Kenneth Dash v. The Equitable Life Assurance Society of the United States and Ecuicor—Equitable HCA Corp., 753 F. Supp. 1062; 1990 U.S. Dist. LEXIS 17708; 59 FairEmpl. Prac. Cas. (BNA) 685 (E.D.N.Y. 1990).  "In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hasset, 886 F.2d 8, 11 (2d Cir. 1989).

The issue before the Court on a Rule 12(b)(6) motion "is not whether [Ott] will ultimately prevail, but whether [Ott] is entitled to offer evidence to support the claim." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14, (1996).  Even if recovery may appear remote and unlikely on the face of the pleading, that is not the test for dismissal.  Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); citing, Weisman v. LeLandais, 532 F.2d 308, 311 (2d Cir. 1976).

This honorable Court is well aware that it is not the Court's function to weigh the evidence that might be presented at a trial.   Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)(emphasis added).  This Court must accept the allegations of the Complaint as true, and construe all reasonable inferences in his favor.  Connell v. Signoracci, 153 F.3d 74 (2d Cir. 1998); Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996); LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991).

Accordingly, the Court MUST assume the detailed facts set forth in the Amended Complaint as true, and in doing so, must agree that Plaintiff has plausibly stated a claim for Alger's violation of Dodd-Frank's whistleblower protections, breach of contract, breach of implied contract, promissory estoppel, quantum meruit/unjust enrichment, breach of fiduciary duty against Chung.

## II. OTT STATES A CLAIM FOR VIOLATION OF DODD-FRANK

Ott alleges that she is entitled to relief under the Securities Whistleblower Incentives and Protection provisions of the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u–6. Specifically, Ott invokes the statute's private cause of action for whistleblowers alleging retaliatory discharge or other discrimination. Id. § 78u–6(h)(1)(B)(i).

Under Dodd-Frank, a Plaintiff must demonstrate that (i) she engaged in protected activity; (ii) she suffered adverse employment action; and the action was casually connected to the protected activity. See, Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934, Exchange Release No. 34-64545 (May 25, 2011) at 19, n. 41.

Defendants argue that Ott has failed to state a claim for retaliation under 21F for two reasons: (i) Ott does not allege that she engaged in protected activity and (ii) Ott does not allege that her adverse employment action was casually connected to Ott's communications with the SEC (or Alger) regarding the trading policy. See, Def. Memo. at pg. 11. Based upon the allegations set forth in the Amended Complaint, both of these arguments fail.

### A. Ott Engaged in Protected Activity

#### i. OTT PROVIDED NEW INFORMATION TO THE SEC AFTER THE EFFECTIVE DATE OF DODD-FRANK.

Under Section 21F(a)(6), a whistleblower is defined as "any individual who provides… information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission. 15 U.S.C. § 78u-6(a)(6). Defendants contend that Ott did not provide any *new* information to the SEC after Dodd-Frank July 22, 2010 effective date. By doing so, Defendants disregard Ott's allegations in the Amended Complaint which allege that she provided information to the SEC after the statute's enactment date.

Though, on April 8, 2011, Alger unlawfully implemented an unprecedented trading policy guaranteeing that investors in the HS Fund would not receive the best execution of transactions within the fund. Amended Complaint¶ 140.

After being ignored by Alger's Compliance Department, Ott inquired with the SEC as to the legitimacy and legality of the new trading policy. Id. at ¶ 152. Ott then alleges that after multiple conversations with members of the Securities Exchange Commission's Investment Management Division, Office of Chief Counsel, Ott was informed that there appeared, on its face, to be serious securities law issues with Alger's new trading policy. Ott's discussions with the SEC continued through the Summer of 2010. Id. at ¶ 153. On July 1, 2010, Alger's attorney, Liebes informed Ott's attorney, Jonathan Sack, that Alger had self-reported Ott's assertion that Alger had not complied with its obligations to clients to the SEC. Id. at ¶ 175.

Defendants attempt to persuade the Court that the relevant timeline conveniently ends here; prior to the enactment of Dodd-Frank. However, Defendants ignore Ott's allegation that, in *late* July 2010, Ott contacted the SEC and became an official whistleblower under the provisions Dodd-Frank. Also conveniently omitted from Defendants' papers is Ott's significant August 4, 2010 meeting with four members of the SEC's Division of Enforcement where she answered questions for more than two hours providing information as defined under the Act's Whistleblower statute. Id. at ¶ 221. Furthermore, Ott alleges that during this meeting, she provided fourteen (14) new exhibits to the SEC containing more than sixty (60) pages of documentation showing multiple examples of poor execution or no execution in the HS Fund. Id. at ¶ 222.

Under the definitions provided by Dodd-Frank, certainly, the information provided by Ott during this August 4, 2010 meeting contained new documentation, evidence, and information

that she did not initially provide to the SEC which is protected under the whistleblower protections of Dodd-Frank.  In fact, many of the examples of poor execution occurred after Ott's initial communications with the SEC.

Defendants' desperate attempt to characterize Ott's reports of information to the SEC as untimely calls for the Court to disregard the allegations in the Amended Complaint, which it cannot do in this motion.  Accordingly, Ott engaged in protected activity protected by the Act.

    ii.   OTT ALLEGES THAT SHE REASONABLY BELIEVED THE TRADING POLICY VIOLATED SECURITIES LAW.

Defendants also contend that Ott does not allege a reasonable belief that the trading policy violated securities law.  Defendants shockingly argue that Ott's initial "acceptance" of the trading policy, her lack of complaints to Alger for two months concerning the trading policy, and Chung's authority for a "last look" at HS Fund trades and that it was similar to a policy employed in a different Alger Fund, are evidence that Ott did not have a reasonable belief that the trading policy is unlawful.  In doing so, Defendants disregard the gravamen of Ott's allegations in the Amended Complaint and defy common sense; Ott reported Alger to the SEC!

In denying Defendants' motion, the Court must ask itself: why would Ott inquire with the SEC regarding Alger's new trading policy if she did not believe it was unlawful?  Furthermore, why would Ott notify Alger's Board of Directors if she did not have a reasonable belief that the trading policy was unlawful?  If the Court does indeed ask itself these questions, it must deny Defendants' motion in this respect.

In the Amended Complaint, Ott specifically alleges that, "**In response to the issuance of this new 'policy', Ott, a Senior Vice President holding a FINRA Series 7 license, a Co-PM for the Alger HS Fund and a supervised employee as defined under the 1940 Act, took affirmative actions to stop, prevent, and curb the unlawful trading restrictions engaged in**

**by Alger and its senior managers.**" <u>See</u>, Amended Complaint ¶ 149.  In confirmation of Ott's reasonable belief that the new trading policy violated securities laws, after speaking with the SEC, Ott was informed that on its face, the new trading policy appeared to be in violation of securities laws.

Second, it is irrelevant that Ott did not complain to Alger for two months after the implementation of the new trading policy.  At the time the new trading policy was implemented, Ott spoke with her Co-PM, David Farhadi, who informed her that he spoke with Alger's General Counsel, Liebes, regarding the legality of the policy.  Farhadi informed Ott that Alger's General Counsel was dismissive in his concerns.  <u>Id.</u> at ¶ 150.  Furthermore, Ott learned that Alger's Head of Trading, Steve Thumm, spoke to Barry Mullen, Alger's Chief Compliance Officer, who informed Thumm that he was unaware of the policy.  Clearly, even if Ott complained to Alger immediately following the implementation of the trading policy, Alger's response would have been dismissive.  The fact that Ott inquired with the SEC regarding the legality of the trading policy demonstrates her reasonable belief that it violated securities laws and that Alger had refused to do anything about it.

Third, Defendants contend Ott understood that Chung had authority as CIO of Alger to take a "last look" at HS Fund trades which is what the new policy allowed him to do.  This argument fails to demonstrate whether Ott's belief that the policy was illegal was reasonable. Defendants attempt to show that since Chung had authority to participate in the HS Fund's investment decisions and Ott understood this concept, her belief that it violated securities laws cannot be reasonable.  This far-reaching argument fails because whether or not Chung had this authority is irrelevant as to whether Ott's belief was reasonable.

Similarly, Defendants argue that the trading policy is very similar to a policy employed in another Alger Fund.  Defendants contend that neither Ott nor anyone else had ever raised any question regarding its legality.  Once again, Defendants miss the point.  It is irrelevant whether the new trading policy was similar to another long employed policy in another fund and whether Ott complained about that policy.  The case at bar involves the trading policy implemented regarding the HS Fund.  It is alleged that Ott complained about the trading policy to the SEC and that Ott was terminated as a consequence of those complaints.

Accordingly, Ott has alleged a reasonable belief, subjectively and objectively, regarding the lawfulness of the trading policy.  Therefore, Ott has engaged in protected activity under Dodd-Frank.

### B.  Ott Alleges An Adverse Employment Action That Is Casually Connected To Her Protected Activity

Defendants' contention that Ott has failed to allege a casual connection between the engagement of her protected activity and an adverse employment action is meritless.

In the Amended Complaint, Ott alleges that almost immediately upon her complaints to Alger regarding the new trading policy, Chung engaged in a harassment campaign against Ott.  See, Amended Complaint ¶¶ 200 - 217.  Chung's harassment campaign continued throughout the duration of Ott's employment at Alger and included demoting Ott, creating "busy work" for Ott, and numerous other efforts to negatively influence Ott's performance.  Id. at ¶¶ 231 – 251, 259 – 265.

On December 15, 2010, Chung issued a negative 2010 Performance Review for Ott.  As expected, the review consisted of a subjectively false characterization of Ott's work.  Chung assigned blame of 34% losses despite the fact that Chung had acted on his own decisions and hardly any of Ott's as was previously and very specifically pointed out by Ott in response to the

"Midyear Midcap Review" given in August 2010.  Then, as a direct result of Ott's formal SEC Whistle Blower Complaint, Ott was retaliated against and paid a bonus of merely $10,000, down *92%* from the previous year.  Id. at ¶¶270, 273.

Ultimately, on January 20, 2011, Alger terminated Ott's employment in direct retaliation of her lawful complaints concerning Alger's harmful trading policy directed at the HS Fund investors.

In weighing the allegations set forth in the Amended Complaint against the plausibility standard, Ott has alleged a claim under Dodd-Frank.

### III.    OTT STATES A CLAIM FOR BREACH OF CONTRACT
#### A. The Bonuses Are Wages Under New York Law

Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.  Morris v. 702 E. Fifth St. HDFC, 46 A.D.3d 478, 479, 850 N.Y.S.2d 6 (1st Dept. 2007);  JP Morgan Chase v. J.H. Electric of New York, Inc., 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dept. 2010);  Furia v. Furia, 116 A.D.2d 694, 498 N.Y.S.2d 12 (2d. Dept. 1986).  For a valid contract to exist, it must contain all material terms.  Drake v. Seaman, 97 N.Y. 230, 234 (1884).  In an employment agreement, duration, compensation and the services to be rendered are material terms.  See, e.g., Signature Brokerage Inc. v. Group Health Inc., 5 A.D.3d 196, 772 N.Y.S.2d 812 (1st Dept. 2004);  Lanzet v. Eastern Wholesale Fence, Co., 213 A.D.2d 601, 602, 624 N.Y.S.2d 443, 444 (2nd Dept. 1995).

Defendants made an express promise to pay Ott in various forms of compensation. Specifically, during her tenure at Alger, and based upon express promises, guarantees, and

representations, Ott was entitled to compensation in the form of base salary, deferred compensation, and bonus compensation.  Ott performed under these various contracts.

The dispositive factor in determining whether compensation constitutes wages is not the labeling of the plan but whether the compensation is vested and mandatory as opposed to discretionary and forfeitable.  Truelove v. Northeast Capital & Advisory Inc., 268 A.D.2d 648, 702 N.Y.S.2d 147 (3rd Dep't 2000), citing, Caruso v. Allnet Communications Servs., 242 A.D.2d 484, 484-485, 662 N.Y.S.2d 468 (1st Dep't 1997).

Unlike other cases, in which courts have found bonuses were not wages, many of the bonuses here are not dependent upon broad firm performance.  Simas v. Merrill Corp., 2004 WL 213013 (S.D.N.Y. 2004), compare, Truelove v. Northeast Capital & Advisory, Inc., 95 N.Y.2d 220, 224, 715 N.Y.S.2d 366, 738 N.E.2d 770 (2000)(bonus not wages where payments not predicated upon plaintiff's own personal productivity but rather depended solely on employer's financial success) and International Paper Co. v. Suwyn, 978 F.Supp. 506, 514 (S.D.N.Y.1997) with Fiorenti v. Central Emergency Physicians, 187 Misc.2d 805, 723 N.Y.S.2d 851, 855 (N.Y.Sup.Ct.2001) (bonuses were wages where the formula for determining the bonus amount accounted for the employee's own personal productivity).

In short, the buckets of compensation here are more directly tied to the work of Ott such that they can and should be considered wages; as wages, they could not be forfeited. Weiner v. Diebold Group, 173 A.D.2d 166, 167, 568 N.Y.S.2d 959 (1st Dep't 1991).

## IV.   PLAINTIFF STATES VALID CLAIMS UNDER QUASI-CONTRACT THEORIES

In the event this Court rules that the contract governing the terms, conditions, and privileges of Ott's employment with Alger, which it must, in the alternative, Ott has stated a valid claim for breach of implied contract.

An implied contractual relationship may be established by conduct of the parties, as well as by express agreement.  Land-Site Contr. Corp. v. Marine Midland Bank, 177 A.D.2d 413, 415, 576 N.Y.S.2d 255 (1st Dep't 1991).[2]  The course of dealing between the parties, as alleged by Ott, evinces an implied promise that Ott would receive deferred compensation and annual bonus as part of hercompensation, a pattern of practice followed for all ofOtt's prior years at Alger.  Giuntoli v. Garvin Guybutler Corp., 726 F. Supp. 494 (S.D.N.Y. 1989); Shapira v. United Med. Serv., 15 N.Y.2d 200, 210, 205 N.E.2d 293, 257 N.Y.S.2d 150 (1965) ("existence of an implied contract is a question of fact").

The law recognizes that a contract implied in fact is just as binding as an express contract arising from declared intention, since the law makes no distinction between agreements made by words and those made by conduct.  A contract implied in fact is derived from the "presumed" intention of the parties as indicated by their conduct.  Jemzura v. Jemzura, 36 N.Y.2d 496, 503-504, 330 N.E.2d 414, 420, 396 N.Y.S.2d 400, 408 (1975).

An implied contract "may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct.  It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words

---

[2]The federal rules do not require consistency in pleadings and permit Plaintiff to make claims alternatively on an express contract and on an implied contract.  John J. Kirlin, Inc. v. Conopco, Inc., No. 94 Civ. 2675, 1995 WL 15468, at *2 (S.D.N.Y. 1995) (internal quotation marks omitted), citing, 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1235, at 274 (2d ed. 1990 & Supp.1994).

and those made by conduct." <u>Sharp v. Patterson</u>, 2004 WL 2480426  at *8 (S.D.N.Y. 2004), <u>citing</u>, <u>Jemzura v. Jemzura</u>, 36 N.Y.2d 496, 503-04 (1975) (citations omitted); <u>People v. Wood</u>, 121 N.Y. 522, 530 (1890); <u>Carter v. Katz</u>, 465 N.Y.S.2d 991, 996 (N.Y.Sup.Ct.1983); <u>see</u>, <u>W.B. David & Co. v. DWA Communications, Inc.</u>, No. 02 Civ. 8479, 2004 WL 369147, at *2 (S.D.N.Y. 2004)<u>Seealso</u>, <u>Rose v. Spa Realty Associates</u>, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926 (1977)  (when an oral agreement to modify a written contract has in fact been acted upon, the need to protect the integrity of the written agreement from false claims of modification (*i.e.*, parole evidence) does not arise.

## V.   OTT'S ALTERNATIVE QUASI-CONTRACT THEORIES MUST BE SUSTAINED

### A.  Plaintiff's Implied and Quasi Contract Claims Must Be Sustained

To state a cause of action for unjust enrichment, Plaintiff properly alleges that she conferred a benefit upon Alger and that Alger obtained such benefit without adequately compensating Plaintiff therefore.  <u>See</u>, <u>Nakamura v. Fuji</u>, 253 A.D.2d 387, 390, 677 N.Y.S.2d 113 (1st Dep't 1998). "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another." <u>City of Syracuse v. R.A.C. Holding, Inc.</u>, 258 A.D.2d 905, 906, 685 N.Y.S.2d 381 (4th Dep't 1999).  It "is against equity and good conscience to permit [the other party] to retain what is sought to be recovered. . ."  <u>Citibank, N.A. v. Walker</u>, 12 A.D.3d 480, 481, 787 N.Y.S.2d 48 2d Dep't 2004), <u>quoting</u>, <u>Paramount Film Distrib. Corp. v. State of New York</u>, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 334 N.Y.S.2d 388 (1972).

Under the doctrine of quantum meruit, one (*i.e.*, Alger) who accepts and benefits from the services of another (*i.e.*, Ott) who renders those services with the full expectation of being paid,

must be paid for the reasonable value of those services. <u>International Custom Assocs. v. Ford Motor Co.</u>, 893 F. Supp. 1257 (S.D.N.Y. 1995).

Quantum meruit recovery "rests on a narrow exception to the rule that a party may not expect compensation for a benefit conferred gratuitously upon another." <u>Trott v. Dean Witter & Co.</u>, 438 F. Supp. 842, 844,  affd, 578 F.2d 1370 (2d Cir. 1978).

In order to make out a claim in quantum meruit, a plaintiff must establish: (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services. <u>Moors v. Hall</u>, 143 A.D.2d 336, 337-338, 532 N.Y.S.2d 412 (2d Dep't 1988).

As a general rule, the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services. <u>See</u>, <u>Matter of Adams</u>, 1 A.D.2d 259, 262, 149 N.Y.S.2d 849 (4th Dep't 1956), <u>aff'd</u>. 2 N.Y.2d 796, 140 N.E.2d 549, 159 N.Y.S.2d 698 (1957).   This inference, however, may not be drawn, "where because of the relationship between the parties, it is natural that such service should be rendered without expectation of pay ... In such situations, the claimant, in order to prevail, must present evidence to indicate that he or she expected to be paid for the services." <u>Moors v. Hall</u>, <u>*supra*</u> at 338. "The question of whether a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it." <u>Moors v. Hall</u>, <u>*supra*</u>, cited in <u>Matter of Adams</u>, 302 A.D.2d 520, 520, 755 N.Y.S.2d 289 (2d Dep't 2003). Here, Ott performed work, labor and services on behalf of Alger in return for compensation.  Thus, a cause of action for quantum meruit is sufficiently stated.

### B.  Plaintiff States A Valid Claim For Promissory Estoppel

As detailed herein, Ott's promissory estoppel claim can be sustained based upon (1) an oral promise that is sufficiently clear and unambiguous, (2) reasonable reliance on the promise by a party, and (3) an injury caused by the reliance.  See, Knight Sec. v. Fiduciary Trust Co., 5 A.D.3d 172, 774 N.Y.S.2d 488 (1st Dep't 2004).  Courts have found that if there comes a time when a party makes an unambiguous promise to another and that party reasonably and forseeably relies upon that promise, it is ***unconscionable*** to allow that party nothing.  See, Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39 (2d Cir. 1995).

New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise.  Pearce v. Manhattan Ensemble Theater, Inc., 2007 U.S. Dist. LEXIS 16487 (S.D.N.Y. 2007).

The Second Restatement of Contracts defines promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance." Restatement (Second) of Contracts § 90(1) (1979).  The Restatement further provides that such a promise is enforceable "if injustice can be avoided only by enforcement of the promise."  Id. The First Restatement's formulation was similar:  "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of Contracts § 90 (1932); see, also, 28 Am. Jur. 2d Estoppel & Waiver § 48 (1966) ("An estoppel may arise from the making of a promise . .

. if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would . . . result in . . . injustice.")

Consequently, Ott alleges a viable cause of action based upon promissory estoppel arising out of Ott's reliance on clear and unambiguous promises that he would be compensated in exchange of her efforts on behalf of Alger.

## VI.   OTT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY

For a claim for breach of fiduciary duty under Massachusetts law, the plaintiff must allege the existence of a fiduciary duty arising from a relationship between the parties, breach of that duty, damages, and a casual relationship between the breach and the damages.  Kriegel v. Bank of Am., N.A., Nos. 07cv12245-NG, 08cv11598-NG, 2010 WL 3169579 (D. Ma. Aug. 10, 2010).

Ott clearly alleges that Chung's institution of the trading policy and the negative consequences to the HS Fund and its shareholders arising from the trading policy amounts to a breach of fiduciary duty on the part of Chung.  Ott further alleges that she raised these concerns with Chung in writing (Amended Compl. ¶ 161) and to Alger's Board (Amended Compl. ¶ 181.)

Here, Defendants allege that Chung instituted the new trading policy to allow him to be involved in all investment decisions of the HS Fund and to ensure that Ott did not subordinate her role as Senior Healthcare Analyst to her role as Co-PM.  Defendants continue that an investigation determined that Chung was within the bounds of his authority and duty as Alger's CIO to enact policy to protect the investments of shareholders and that the new policy did not violate Alger's fiduciary duty to seek best execution for its clients.

Defendants fail to mention the effect of the new trading policy – it allowed other Portfolio Managers managing different Alger funds to "front run" ideas for the HS Fund.  Given

these other Portfolio Managers are compensated for the performance in their funds, they were allowed to personally gain by trading in front of the HS Fund and by obtaining better execution in their funds.   Clearly, Chung's implementation of this new trading policy breached his fiduciary duty as CIO to the shareholders of the HS Fund.

Next, by virtue of the Chung's new trading policy, HS Fund shareholders were damaged. The Amended Complaint is rife with examples of the deleterious effects this new trading policy had on the HS Fund shareholders.   Establishing a two hour holding period is a blatant contradiction to the Investment Advisor Act of 1940 as it pertains to obtaining Best Execution and violates Chung's fiduciary responsibilities to the investors of the HS Fund.   Clearly, the new trading policy limited execution and in other cases, prevented it altogether.

Similarly, the Amended Complaint details examples of the casual connection between the unlawful trading policy and the damage to shareholders.   For example, on April 20, 2010, Ott wanted to buy additional shares of UnitedHealth Group, Inc. Wellpoint, Inc., and Humana, Inc. Chung replied that he hadn't heard "pitches" on the stocks yet and there would be no trade until he heard the "pitches."   Although Chung already owned these stocks in his funds and that they were owned in the HS Fund, Chung's requirement was baseless.   On the same day, Patrick Kelly, a Portfolio Manager, was allowed to buy Wellpoint, Inc. in front of the HS Fund while the HS Fund was never allowed to add to its positions.   Ironically, Kelly, armed with the knowledge that Ott wanted to add Wellpoint, Inc., benefited while Ott's HS Fund was not able to add to its current position despite it being solely Ott's idea.   As a result, the shareholders of the HS Fund suffered as a consequence and did not receive best execution.   In fact, the HS Fund shareholders were denied any execution at all.

Accordingly, Ott's sufficiently states for breach of fiduciary duty.

## VII.  PUNITIVE DAMAGES

Defendants' unlawful treatment of Ott in this instance warrants an award of punitive damages.

In <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court set forth three guideposts for a court to consider in reviewing a punitive damages award: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  <u>Id.</u> at 575, 116 S.Ct. 1589.

Defendants' retaliation of Ott's lawful complaints regarding its new trading policy and consistent abuse and harassment of Ott warrant an award of punitive damages to be determined by a jury.

**C O N C L U S I O N**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants'

Motion to Dismiss Plaintiff's Complaint as set forth herein.


Dated:  New York, New York
        December 21, 2011


                         Respectfully submitted,

                         SACK & SACK, ESQS.

                         /s/ Jonathan Sack
                     By: _____
                         Jonathan Sack, Esq. (JS 1835)

                         110 East 59th Street, 19th Floor
                         New York, New York 10022-2050
                         Tel:     (212) 702-9000
                         Fax:     (212) 702-9702
                         Attorneys for Plaintiff, Roseanne Ott