**SACK & SACK, ESQS.**
Jonathan S. Sack, Esq. (JSS 1835)
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
*Attorneys for Plaintiff, Rosanne F. Ott*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| **ROSANNE F. OTT**, | : | Civ No. 11 Civ. 4418 (LAP) |
| | : | |
| Plaintiff, | : | |
| | : | **THIRD AMENDED** |
| v. | : | **COMPLAINT** |
| | : | |
| **FRED ALGER MANAGEMENT, INC.**, | : | JURY TRIAL REQUESTED |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------X

Plaintiff, Rosanne F. Ott ("*Ott*" or "*Plaintiff*"), by her attorneys Sack & Sack, Esqs., as and for her Third Amended Complaint against Fred Alger Management, Inc., ("*Alger*" or "*Defendant*") alleges as follows:

## NATURE OF ACTION

1.      Alger implemented an unlawful trading policy exclusively targeting the Alger Health Sciences Fund ("*HS Fund*") that deliberately harmed HS Fund investors through the sanctioned acts of their employee, namely Daniel C. Chung, who is employed as Alger's President, Chief Executive Officer, Chief Investment Officer and a Portfolio Manager.

2.      The claims made herein are based upon Alger's unlawful and retaliatory termination of Ott's employment and in connection with Alger's unlawful denial of terms, conditions and privileges of Ott's employment.

3.     Ott was retaliated against immediately following Ott's engaging in lawful, protected activity, namely her prior, documented complaints to Chung, Alger's General Counsel, Hal Liebes ("*Liebes*") and the Alger Trustees and Officers of the Trust and members of Alger Management including Hilary Alger, Alex Alger, Nicole Alger, Maureen A. Hendricks, David J. Hogan, Alistair Jessiman, Charles F.  Baird, Roger P. Cheever, Lester L. Colbert, Stephen E. O'Neil, David Rosenberg, Nathan E. Saint-Amand.

4.     Ott's complaints concerned Alger's unlawful trading policy solely targeting the HS Fund.

5.     Ott was terminated in retaliation for her standing up for the rights of her and her fellow HS Fund shareholders.

6.     Alger violated 15 U.S.C. § 78u-6 of the Frank-Dodd Whistleblower Statute by unlawfully discharging Ott in retaliation for providing information to the SEC regarding potential violations of securities laws, as more fully described herein.

7.     Furthermore, the claims made herein are based upon Alger's breach of the express terms and conditions of Ott's contract for compensation in respect of her deferred compensation for the incentive compensation granted to her on July 30, 2007 and July 30, 2008, respectively.

8.     Although duly demanded both orally and in writing, Alger has failed and/or continues to refuse to pay to Ott the sums of money earned and unconditionally due her in respect of her incentive compensation described herein.

9.     The amounts that were and would be earned by Ott represent wages, bonuses, benefits, wage supplements, and compensation bargained for, earned and belonging to Ott.

10.     By retaliating against Ott, Alger is in violation of the Whistleblower Protection provisions of the Frank-Dodd Act.

11.     In sum, Ott's' claims include:

    (a)     Alger's unilateral alteration of the terms and conditions governing Ott's deferred compensation (including restricted stock) as more fully set forth herein;

    (b)     Alger's failure and refusal to pay Ott back pay and compensatory damages based upon the allegations described herein; and,

    (c)     Punitive damages based upon the allegations described herein.

## JURISDICTION, VENUE AND CHOICE OF LAW

12.     Jurisdiction is conferred on this Court by 28 U.S.C.§ 1331 and 1337, § 209(e)(l) and § 214 of the 1940 Act, 15 U.S.C. § 80b-9(e)(l) and § 80b-14.

13.     Venue is appropriate in this district under 28 U.S.C. § 1391(a) and § 214 of the 1940 Act, 15 U.S.C. § 80b-14.  The acts which give rise to this Complaint as well as certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws took place in this District.

14.     This Court has supplemental jurisdiction over Ott's state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

15.     Ott is an individual residing at 4 Hillcrest Road, Fort Montgomery, New York, County of Orange.

16.     Fred Alger Management, Inc. was founded in 1964 and currently manages more than $14 billion in Assets Under Management ("*AUM*").  Alger's investment philosophy is focused on discovering companies undergoing positive dynamic change, which they believe offer the best investment opportunities. Alger investment strategies are available to institutional

investors through separate accounts and mutual funds and to retail investors through Alger mutual funds. Fred Alger & Company, Incorporated, a broker-dealer and the parent company of Fred Alger Management, Inc. offers mutual funds as well as institutional funds for defined benefit and defined contribution plans.

## FACTS COMMON TO ALL COUNTS[1]

17.     Daniel C. Chung (*"Chung"*) is the President, Chief Investment Officer (*"CIO"*) and Portfolio Manager.   Chung, although acting in the capacity of President of Alger and Principal with supervisory responsibilities, is **not** registered with FINRA.

18.     Alger serves as an investment manager and/or adviser to its managed funds, Alger Partners II., L.P., Alger Partners III, L.P., Alger Partners IV, L.P., Alger Institutional Partners, L.P., BY Partners, L.P., and Alger CPF Partners, L.P. (collectively referred to as the "*Domestic Funds*") and Alger Partners II Offshore, Ltd., and Alger Partners IV Offshore, Ltd. (collectively referred to as the "*Offshore Funds*", together with the Domestic Funds, the "*Funds*").

### OTT'S EDUCATIONAL AND EMPLOYMENT HISTORY

19.     Ott is a highly experienced Portfolio Manager and equity analyst, who has been managing a healthcare portfolio since 2005 and analyzing securities on Wall Street since 1998.

20.     Since Ott's entry into the financial services industry, Ott is known to be a principled individual.

21.     Ott captained her high school basketball team in Chicago, Illinois and was recruited to play basketball at the United States Military Academy, West Point.   Ott had always known she wanted to serve her country and was excited to attend the United States Military

---

1.  All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

Academy Preparatory School ("*USMAPS*") in the hopes that she would receive a Congressional Appointment to West Point the following year.  Partly inspired by her older brother who had just completed his first year at the United States Air Force Academy, Ott eagerly accepted the challenge.

22.     In July 1983, Ott arrived at USMAPS in Fort Dix, NJ and quickly distinguished herself as a leader among her peers.  She was placed in the second highest level of command as the Brigade Executive Officer and was the highest ranking woman in her year group.

23.     One year later, Ott received a Congressional Appointment and was accepted to the United States Military Academy, West Point.  Ott was proud to be a member of the ninth class of women to graduate from West Point.

24.     Over the next 4 years, Ott held multiple leadership roles as part of the Corps of Cadets Chain of Command.  Additionally, Ott participated in extracurricular activities such as Sandhurst (a military knowledge and skills competition involving challenging military tasks), Varsity Softball, Team Handball in which Ott was named Team Captain, Jungle Warfare School training in Panama and received her Open Water SCUBA License.  Ott also was selected as a member of the US Team Handball team as part of the 1987 Olympic Festival.

25.     In May 1988, Ott graduated from the United States Military Academy, West Point, New York with a Bachelor's of Science (BS) in general engineering and was commissioned in the United States Army as a Second Lieutenant.  While a cadet, Ott had competed academically, athletically, and militarily in order to be eligible for selection of a coveted Army Aviation slot.

26.     After passing numerous Flight Aptitude tests as well as rigorous health standards tests, Ott was awarded the branch, Army Aviation, and attended Flight School at Ft. Rucker, Alabama.

27.     In 1988, Ott completed the Aviation Officer Basic Course ("*OBC*").

28.     Following OBC, Ott had a two week gap until her next course and could have taken vacation like her peers.  Instead, Ott drove to the Air Assault training center (repelling from helicopters) without orders in the hopes of convincing the Cadre that she had what it took to complete the grueling Air Assault Course.  Ott arrived at 2:00 AM and waited for instructors to arrive.  By 6:00am, Ott was allowed to attempt the obstacle course and timed run.  Ott's perseverance paid off and after completing both events, Ott was selected to attend and subsequently completed the extremely challenging Air Assault Course and earned the prestigious Air Assault badge.

29.     In 1989, after intense training and testing, Ott completed the Rotary Wing Aviator Course and became a qualified aviator flying UH-1 (Huey) and UH-60 (Black Hawk) helicopters and was awarded the Aviator Badge.  Following her flight training, Ott also completed the Airborne Course (Parachuting) and earned her "jump" wings.

30.     Ott was then assigned to her first unit, 1st Cavalry Division ("*1st CAV*"), in Fort Hood, Texas as a Company Executive Officer responsible for the company's "readiness" (a measure of equipment repair and maintenance).  From July 1989 to July 1990, Ott achieved 95% readiness rate, 5% above the army standards.

31.     After distinguishing herself among her peers, Ott was selected to undergo advanced training on Electronic Warfare equipped Black Hawk helicopters out of 15 competing officers.

32.     In 1990, Ott became qualified on the EH-60 (EW Black Hawk).

33.     Upon Ott's return to 1st CAV, Ott was immediately assigned the leadership role of Platoon Leader ahead of 6 other, competing candidates.  In addition to logging flight hours, Ott trained 7 aviators, 15 linguists, 5 flight crew engineers and 3 electronic warfare/intercept systems repairmen.  Ott was also responsible for equipment valued at $25 million.

34.     During the period of August 1990 to August 1992, Ott consistently was recognized by the company commander for her leadership and having the best platoon (out of 5) in the company.

35.     In September 1990, Ott deployed to Saudi Arabia as part of Operation Desert Shield/Desert Storm.  During this time, Ott focused on safety and maintenance of aircraft by consistently achieving operational rates of 85% in EH-60 helicopters (the standard was 70% during Operation Desert Shield/Desert Storm).

36.     The Division Commander recognized Ott with high praise for completing 85% of Aircraft Phase (an intensive maintenance period in which aircraft is completely stripped for inspection of all parts) in 10 days during combat, average time for Aircraft Phase under normal conditions is approximately 55 days.

37.     During Desert Storm, Ott's key role was to fly her linguists and flight crew engineers along the most forward line of troops at low to moderate altitudes with no protection from enemy fire.  Once in place, her crew would attempt to detect enemy communications and identify anti-aircraft artillery strongholds. Ott's linguists then attempted to intercept and listen to communications and translate that information directly to the Military Intelligence Battalion supporting Division Command.  Ott spent countless hours practicing evasive maneuvering tactics as well as planning, coordinating and flying multiple combat missions during this time.

38.     Upon return to Ft. Hood, Ott was promoted to Captain and enrolled in the Combined Armed Services Staff School in 1992.  In 1993, Ott attended and completed the Aviation Officer Advanced Course.

39.     Ott was assigned to Ft. Eustis, VA where she served as an Aviation Project Officer transporting Major Command VIPs and General Officers to and from the Pentagon via Black Hawk helicopter.

40.     In August 1993, Ott resigned at the rank of Captain after fulfilling her 5 year commitment of service to the U.S. Army.

41.     Ott was Honorably Discharged as a highly decorated officer, awarded the Saudi Arabian Kuwait Liberation Medal, Meritorious Service Medal, Air Medal (awarded only in combat), Army Commendation Medal (twice), National Defense Service Medal, Southwest Asia Service Medal with 3 Bronze Stars, Kuwaiti Liberation Medal, Army Service Ribbon, Parachutist Badge, Aviator Badge and Air Assault Badge.

42.     In July 1993, Ott joined a division of Johnson & Johnson, Ethicon Endo-Surgery, headquartered in Cincinnati, Ohio.  Ott began in a newly formed position described as a Surgical Education Representative ("*SER*").

43.     As a SER, Ott began intensive knowledge and surgical skills training given by surgeons and other professional education leaders staffed by Ethicon Endo-Surgery.

44.     During this time, surgeons were just beginning to utilize small incisions and tiny cameras to convert open surgical procedures to laparoscopic and thoracoscopic procedures.  Ott facilitated the training of these new skills and products required to execute these procedures.

45.     Ott conducted professional, one-on-one labs lasting up to 4 hours per session with domestic and international surgeons and nurses in advanced Laparoscopy and Thoracoscopy.

46.     During these labs, at times, Ott would recommend a competitor's product because it was the superior product for the procedure.  Ott's integrity won the trust of surgeons and nurses simply because Ott put patient outcomes ahead of personal gain.

47.     As a member of the 15 person Professional Education Team, Ott converted competitive business worth $1.6 million over a two month period in 1994.

48.     Ott continued to solidify customer commitment to use Johnson and Johnson surgical products following key customer visits.

49.     Often, Divisional and Regional Sales managers requested Ott to fill temporary sales representative vacancies in territories throughout the United States.

50.     Ott was selected to be the Course Coordinator for the Laparoscopic Hernia repair course out of 8 other, senior candidates.

51.     Among Ott's accomplishments while at Ethicon-Endo Surgery was the development of the "Ott-Knot," an efficient and inexpensive suture technique used by surgeons in Laparoscopy even to this day.

52.     In July 1996 Ott joined Cordis Cardiology, another division of Johnson and Johnson, as a sales representative.  Based in Tampa, Florida, Ott was among the first sales groups to introduce a new technology called "stents" that ultimately revolutionized the treatment of cardiovascular disease.

53.     Ott worked closely with interventional cardiologists helping them master the new technology.  As a result of her conscientious and attentive instruction, Ott gained credibility with each cardiologist and nurse.

54.     As a result of her efforts, Ott increased stent sales by 19% resulting in revenue growth of 14% and achieved sales forecasts in both 1996 and 1997.

55.     Furthermore, in 1996, Ott was also a member of the team winning the prestigious award, "Division of the Year."

56.     In February 1998, Ott was recruited to join Sulzer Spine-Tech headquartered in Minneapolis, MN as a Professional Education Manager.

57.     During this time, Ott facilitated the training of orthopedic spine and neurosurgeons in advanced spinal surgery throughout the nation.

58.     Ott managed and trained three sales training classes during this time as well.

59.     During the course of her various roles in healthcare, Ott often crossed paths with equity research analysts wanting to understand new medical technology.

60.     In September 1998, Ott transitioned from Corporate America to Wall Street beginning as an Equity Research Analyst for Piper Jaffray in Minneapolis, MN.

61.     Ott was responsible for drawing on industry experience to assist in writing major industry reports.  Ott created market models, drafted company research notes and provided insight from key medical meetings.

62.     In June 1999, Ott joined Lehman Brothers in NYC in the same capacity and within two (2) years was promoted to Senior Equity Research Analyst, Vice President covering Orthopedic, Cardio and Supplies companies as well as Small Cap Diversified companies.

63.     In 2001, Ott received multiple Institutional Investor and commission votes from clients in recognition of her strong analytical skills throughout 2000.  During this period, Ott was ineligible to participate in such recognition programs because Ott had not yet been promoted to Senior Equity Research Analyst but investors included Ott in their votes, nonetheless.

64.     On September 11, 2001, Ott was in the subway station inside World Trade Center when the first plane flew into the North Tower.

65.     Ott, along with others, was evacuated and at the time only knew there was some sort of fire.

66.     As Ott left the building, she stood in horror staring at the debris on the ground and then watching others live their own horror as they fell to their deaths.

67.     Ott maintains a vivid memory of their bodies crumbling as they fell and even what they were wearing that day.

68.     Ott stood silently praying for each of those unsuspecting and terrified individuals when the second explosion occurred overhead.

69.     As Ott ran for cover, debris fell all around her.  And in a sickening instant, Ott felt the woman running alongside of her fall to the ground with a fatal blow caused by falling debris.

70.     Ott ran for safety as the buildings collapsed, the whole time thinking she was going to suffocate and die on the street.

71.     At the same time, Fred Alger Management, Inc. lost every employee who was in the North Tower on September 11th.  In total, 35 of its 55 person investment staff perished as a result of the attacks on the World Trade Center including then president, David Alger.

72.     Fred Alger, David Alger's older brother and Founder of Fred Alger Management, returned from retirement to rebuild the firm in the wake of terrible professional and personal loss.

73.     Fred Alger acted quickly.  At the time, his son-in-law, Chung was an analyst at Alger and attending a conference in California.

74.     Chung began at Alger in 1994 as a Research Associate.  Chung later became an Analyst and then Senior Analyst at the time of the attacks.

75.     Scrambling to hold his firm together, Fred Alger immediately appointed Chung as Chief Investment Officer and then set out to recruit former Alger alumni to return in order to sustain and rebuild the firm and to hire a new President and CEO.

76.     Following the tragedy of September 11th, Ott felt compelled, in part for her own healing, to somehow contribute to the recovery process.

77.     In April 2002, Ott was offered and accepted an opportunity to join Fred Alger Management, Inc. as a Vice President and Senior Analyst, covering the medical supplies and device sectors (including cardiology, orthopedics, neurovascular, diabetes, ophthalmology, gynecology, gastroenterology, general surgery, and lasers). Ott also covered death care/funeral home services as well as pharmaceuticals and biotech.  (Exhibit A)

78.     Ott succeeded as an analyst and by 2004, Ott ranked No. 1 in the Small Cap Fund in overall contribution to the fund's performance.  Ott also tied for the top spot in the absolute return of firm-wide, owned stocks which were up 33%.

79.     In 2005, after being a member of the Alger Health Sciences (*"HS"*) Fund team, Ott was promoted to Portfolio Manager (*"PM"*) responsible for co-managing the HS Fund. Alger announced the promotion in a Press Release dated October 7, 2005, saying, "**Rosanne Ott and Joanne Sayers, both of whom have been integral members of the Alger Health Sciences Fund, will lead a new investment team of the Fund. The team will take leadership, effective immediately, following Teresa McRoberts' decision to depart Alger.**"

80.     Daniel C. Chung, Alger's then and current President and Chief Investment Officer of Fred Alger, said, "**… Going forward, we have an experienced team that has**

**been instrumental to the Health Science Fund's success to date, and they are in a strong position to hit the ground running.**" (Exhibit A)

| OTT EXCELS AT ALGER |
| --- |

81.     In 2005, Ott's HS Fund ended with a Lipper ranking in the 6th percentile and assets under management ("*AUM*") at $85.7 million.  Also in 2005, Alger's Marketing department began to tap Ott for client meetings with the purpose of either retaining current assets or winning additional assets for the firm to manage.  By the end of 2005, Ott had conducted 8 client meetings (6 more than the previous year) in addition to her new role as Portfolio Manager and senior analyst.

82.     In 2006 and 2007, Ott's HS Fund year end rankings were in the top 20th percentile along with a Morningstar Rating of 5 stars, the agency's top rating.

83.     In 2006, Ott conducted 14 marketing meetings (6 more than the prior year). Chung noted on Ott's bonus paperwork that, "**Your [Ott's] presentations to clients have been very strong and you are one of our best representatives.**" (Exhibit B)

84.     Chung continued in his comments, stating, "**[Ott is] very responsive to all requests and analysis. All PMs appreciate your professionalism and desire to go the extra step as needed.  Strong knowledge of industry and companies. Modeling is detailed and thorough.  Excellent work product, improved this year from already good work in past years.  Strong work ethic. All sense commitment to 'the Team' and our collective performance.**" (Exhibit B)

85.     In respect of 2006, Ott was awarded a $275,000 bonus on top of a $350,000 base salary and a Deferred Compensation Grant of $150,000 for a total compensation of $775,000. (Exhibit B)

86.     By 2007, Ott had maintained positive attribution across all Alger Funds/Portfolios and again held the number one spot in the firm's largest fund, the Small Cap Fund, in terms of attribution.

87.     In 2007, Ott was tapped for 15 key marketing meetings and was lauded by Chung for such efforts in an email dated June 28, 2007: "**Rose [Ott]:  Wanted to thank you for the marketing you are doing on behalf of the firm.  You do a great job, by all accounts I should probably take some 'lessons' from you on presenting a clear, concise and compelling story for the firm.  We all benefit greatly from efforts such as these and it won't go un-noticed by me at year-end.  Thanks, Dan [Chung]**" (Exhibit C)

88.     In Ott's 2007 analyst review dated December 17, 2007, Ott was noted for, "**Small cap stock picking leader (again).  Strong client representation skills – participation in key consultant meetings, Illinois teachers final.  Team player - good mentoring re junior analysts.  Knowledge of industry, hard worker.**" (Exhibit D)

89.     In respect of 2007, Ott received a $375,000 bonus and Deferred Compensation Grant of $100,000 in addition to her salary of $350,000 for a total compensation of $825,000. (Exhibit E)

90.     In 2008, as a result of her hard work and success, Ott was promoted to Senior Vice President and received an increase in salary of $25,000 bringing her salary to $375,000. (Exhibit F)  During this time, Ott was repeatedly tapped for more marketing by all levels of the Marketing Department including the head of Marketing, James Tambone (*"Tambone"*).

91.     Specifically, on August 21, 2008, Chung sent Ott to meet with Illinois Teachers Retirement Fund when the Small Cap Fund came under pressure due to the cataclysmic market upheaval facing the world markets and economies.  The client wanted to speak with the Portfolio Manager, Jill Greenwald ("*Greenwald*"), but Greenwald refused to reschedule vacation to meet with the client.  As a result of Ott's diligence, the Illinois Teachers Retirement Fund did not withdraw their investment with Alger.

92.     In 2008, Ott also participated in formalized public speaking training arranged by Tambone along with Chung, PMs Patrick Kelly (*"Kelly"*) and Andrew Silverberg (*"Silverberg"*), and fellow PM/analyst Christopher Walsh (*"Walsh"*).

93.     In 2008, Ott's meetings with clients grew to 33 meetings (more than double the prior year).

94.     In calendar year 2008, Ott's bonus award and grant letter dated January 12, 2009 simply stated, "**In recognition and appreciation of your contributions, Fred Alger & Company, Incorporated will pay you the following:  Discretionary Bonus of $135,000 and Deferred Compensation Grant of $75,000.  Thank you for your continued support.**"  (Exhibit G)  Ott's total compensation for calendar year 2008 was $585,000 down 29%.

95.     During the meeting in which Chung gave Ott the 2008 bonus award, Chung informed Ott that all bonuses were down significantly as a result of the selloff of the market and the suddenly dramatic and significant losses of assets under management.  The Madoff Scandal had a deleterious effect; investors were wary of fund managers.

**OTT TAKES ON MORE RESPONSIBILITIES**

96.     Days later, Chung summoned Ott to his office to discuss marketing.  Chung told Ott, "**We're gonna have to call on you to do more marketing.  Would you be willing to do that?  You know 2008 was a tough year, we lost a lot of assets. You obviously do a very good job with clients.  Tambone has told me you do a very good job and that you're credible.**"

97.     Ott replied, "**I'm very happy to help.  I'll do what I can to help this firm.  Let's talk about it.**"  Chung was on his way to the gym and told Ott to speak with Jim Tambone about her assuming more marketing responsibilities.

98.     As early as the first week in January 2009, Ott was sent on a multi-day marketing blitz as a way to increase visibility for the firm.  Ott met with multiple media outlets and appeared on CNBC to discuss Ott's healthcare investment thesis as well as the Alger investment process.

99.     In 2009, Ott went on to conduct an astonishing 69 key marketing meetings, media interviews and panel discussions on behalf of the firm.

100.     Nearly every single week during 2009, Ott met with investors, media, consultants, advisors, wholesalers, internal marketing personnel and also participated as panel expert at large

healthcare conferences on behalf of Alger.  Ott's marketing effort on behalf of the firm more than doubled from the previous year.

101.    Each client meeting, panelist presentation or sales force presentation took a great deal of preparation time.  Ott frequently traveled all over the country and attended evening events as well as met with clients during work hours.  At this point, marketing was clearly taking up more than a third of Ott's work time in addition to her portfolio management and senior analyst responsibilities.

102.    In fact, Ott's marketing meetings, which had previously been rewarded at year end, had grown from two investor meetings in 2004 to a total of 140 meetings by 2009.

103.    In fact, nearly each year from 2004 to 2009, Ott's marketing grew by more than 75% the previous year. In 2008 and 2009 specifically, Ott's marketing grew by over 100% each year.  (Exhibit H)

104.     Essentially, Alger received the benefit of three separate and highly reliable employees rolled up into one in Ott.  The following table depicts Ott's scheduled client, media, wholesaler, marketing and panel presentations in 2009 on behalf of Alger:

| Total Meetings | | Date | Due Dilligence Meetings, Panel Presentations, Media |
|---|---|---|---|
| **2009** | 1 | 16-Dec-09 | Alger National Sales Meeting |
| **69** | 1 | 18-Nov-09 | SEI for Covidien |
| | 1 | 12-Nov-09 | SACRS Nov Conf |
| | 1 | 12-Nov-09 | Wells Fargo |
| | 1 | 11-Nov-09 | NORCAL Mutual Insurance Company presentation |
| | 1 | 10-Nov-09 | NORCAL Mutual Insurance Comapny |
| | 1 | 28-Oct-09 | Russell Investment Group |
| | 1 | 27-Oct-09 | Watson Wyatt |
| | 1 | 20-Oct-09 | Cambridge Associates |
| | 1 | 6-Oct-09 | CNBC |
| | 1 | 5-Oct-09 | CNBC pre interview |
| | 1 | 25-Sep-09 | CapTrust |
| | 1 | 24-Sep-09 | LPL |
| | 1 | 22-Sep-09 | Alger Wholesaler |
| | 1 | 18-Aug-09 | LPL/ Miramar Conf "From Cock pit to Stock pit: Military Discipline to Investor Discipline" |
| | 4 | 17-Aug-09 | Alger Wholesaler marketing |
| | 1 | 4-Aug-09 | Wall Street Journal |
| | 1 | 4-Aug-09 | Smart Money |
| | 1 | 28-Jul-09 | JP Morgan Investment Analytics and Consulting Group |
| | 1 | 24-Jul-09 | Barron's |
| | 1 | 22-Jul-09 | Marquette |
| | 1 | 20-Jul-09 | Smart Money |
| | 1 | 17-Jul-09 | Smart Money |
| | 1 | 16-Jul-09 | Smart Money |
| | 1 | 25-Jun-09 | Kaiser Permanente |
| | 1 | 22-Jun-09 | Oppenheimer |
| | 1 | 19-Jun-09 | SACRS call |
| | 1 | 18-Jun-09 | LPL |
| | 1 | 8-Jun-09 | Alger Wholesaler meeting |
| | 1 | 1-Jun-09 | Barron's |
| | 1 | 19-May-09 | Alger Wholesaler meeting |
| | 1 | 19-May-09 | Trans America |
| | 1 | 15-May-09 | SACRS May Conf |
| | 1 | 6-May-09 | Alger Internal Marketing |
| | 1 | 6-May-09 | Merrill Lynch Van Andel Family |
| | 1 | 30-Apr-09 | Merrill Lynch |
| | 1 | 29-Apr-09 | Alger Internal Marketing Publication |
| | 1 | 27-Apr-09 | SEI Investments |
| | 1 | 17-Apr-09 | Clearbrook Investment Consulting, LLC |
| | 1 | 24-Mar-09 | Barrons Online |
| | 1 | 20-Mar-09 | Heartland and Co of Ohio |
| | 2 | 17-Mar-09 | Lincoln Institute Land Policy |
| | 1 | 12-Mar-09 | Alger Internal Marketing Meeting |
| | 1 | 3-Mar-09 | Smart Money |
| | 1 | 2-Mar-09 | Wall Street Journal |
| | 1 | 19-Feb-09 | Barron's Online |
| | 1 | 19-Feb-09 | Wall Street Journal |
| | 1 | 16-Feb-09 | Market Watch |
| | 2 | 11-Feb-09 | Market Watch, Wall Street Journal |
| | 1 | 9-Feb-09 | Hewitt/Sisters Holy Cross |
| | 1 | 5-Feb-09 | Associated Press |
| | 1 | 5-Feb-09 | Alger Internal Marketing Meeting |
| | 1 | 3-Feb-09 | Associated Press |
| | 1 | 27-Jan-09 | American Red Cross |
| | 1 | 14-Jan-09 | The Street.Com |
| | 3 | 9-Jan-09 | The Street.Com, Reuters, Business Week |
| | 5 | 7-Jan-09 | CNBC, Barrons, Wall Street Journal, The Street.com, Smart Money |
| | <u>1</u> | 6-Jan-09 | Sunstar |
| | 69 | | |

105.   In early February 2009, Tambone approached Ott with a proposition.  Tambone wanted Ott to do more marketing for the firm but also knew Ott was very busy in her roles as a PM and senior analyst.

106.   Ott was prepared to do what was necessary to help raise assets following the previous conversation she had had with Chung at the beginning of the year.

107.   Tambone suggested that Ott give up her analytical role and focus her efforts on being a PM while continuing to market all of the firm's funds.  Tambone outlined an elaborate job description detailing Ott's responsibilities and asked Ott if he [Tambone] could present the idea to Chung.

108.   Ott happily agreed to the new potential role.  Ott had several meetings with Tambone and Chung to discuss a more formal outline of Ott's responsibilities as well as metrics for compensation.

109.   In 2009, Ott recommended owning ISRG to all Portfolio Managers.  In the June quarter, contrary to Ott's recommendation, Chung sold his position in ISRG ahead of the quarterly announcement.  While Chung was in China, the stock rose sharply after the company reported positive earnings as Ott rightfully predicted.

110.   Ott notified Chung over the phone of the stock's outperformance.

111.   Upon his arrival to the office, Chung berated Ott because he had missed the outperformance of ISRG in his Midcap Fund.  Even though Chung had sold the stock based on his own decision, he blamed Ott for his mistake. In fact, Chung went on to state that he got too many emails to read and that it was somehow Ott's fault he had sold the stock.  He also forewarned, "**That could have *made* your year.**"

112.   Vindictively, later that summer when Chung awarded Deferred Compensation Grants, despite telling employees that the average grant was down 25-50%, Ott's grant was down 65%.

113.    Around this time, without any explanation, Chung also rejected the idea of Ott's new role of PM and marketing that Tambone had created.  Ott continued to wear all three hats (*i.e.*, PM of her HS Fund, Healthcare Senior Analyst, and marketer for the firm) without being adequately compensated for all three roles.

114.    By the end of 2009, the HS Fund had outperformed the S&P Healthcare Sector by 22% and the S&P500 by nearly 4% (Source: Morningstar).  Ott completed the fourth year of managing the fund and the record was impressive in its consistent, favorable returns.

115.    In fact, co-worker Alex Bernstein, Vice President, Manager of Internet Marketing, sent Ott a congratulatory email when the September 2009 issue of Kiplinger Mutual Fund Rankings ranked Ott's HS Fund in 3rd place out of 25 funds for the previous 5 years, 11th for the previous 3 years and 15th for the last year.  (Exhibit I)

116.     During her 2009 bonus discussion, however, Chung resented that Ott's performance in her HS Fund did not match up to the attribution in his fund because he did not listen to Ott's recommendations.  Increasingly, Chung also resented all the glowing feedback he received regarding Ott's marketing and client interaction.

117.    Amazingly, Ott received a calendar year 2009 bonus of $121,500 which was lower than the previous year and the Deferred Compensation Grant of $25,000 which was significantly lower than the previous year in addition to her salary of $375,000 for a total compensation of $521,500.

118.    As a PM, Ott always strived to rank in the top quartile of Morningstar rankings as compared against other competing HS Funds.  In each year from 2005 through 2009, Ott managed to deliver consistent, top quartile performance with the exception of the "exceptional" market in 2008.

119.    From 2005 to 2009, compared to its peers, the HS Fund ranked in the 5th, 20th, 17th, 62nd and 22nd percentiles, respectively.

120.    The following chart and table illustrate Ott's HS Fund's performance and returns for 2005 through 2010:

(*the remainder of this page is intentionally left blank*)

## Rosanne Ott
## Senior PM:  Diversified Health Sciences Fund

Diversified, "long-only" Health Sciences Fund focused on all subsectors of Healthcare.  Proven record of consistent outperformance of Category SH (Specialty Health), S & P 500 TR (Total Returns) or both in the last 4 out of 5 years.  Fund delivered only one year of negative returns (2008) yet still out-performed S & P 500 during same year.

| Returns | as of January 20, 2011 | Cumulative* | 5 Yr. Ave* | 5 Yr. Mean* |
|---|---|---|---|---|
| AHSAX | 2.68% | 31.31% | 5.91% | 9.45% |
| Category (SH) | 2.08% | 15.81% | 4.19% | 7.31% |
| S & P 500 TR | 1.89% | 11.97% | 5.16% | 12.11% |

| Trailing Total Returns | as of December 31, 2009 | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|
| AHSAX | % Rank in Category | 22 | 16 | 6 |

### Growth of 10k AHSAX

**05/01/2002 - 12/19/2010**
Source: Morningstar

AUM: $236.0 mil
Turnover: 174.60%

AHSAX
HEALTH (SH)
S & P 500 TR

◆ Analyst since inception
◆ Senior Co-PM since Oct 2005



### Historical Returns

| | | Absolute Return | Outperformance | % Rank In Category |
|---|---|---|---|---|
| through Jan 20, 2011 | AHSAX | 2.68% | | 18 |
| | Category (SH) | 2.08% | 28.85% | |
| | S & P 500 TR | 1.89% | 41.80% | |
| 2010* | AHSAX | 2.99% | | 85 |
| | Category (SH) | 8.38% | -64.32% | |
| | S & P 500 TR | 15.06% | -80.15% | |
| 2009 | AHSAX | 27.38% | | 22 |
| | Category (SH) | 22.48% | 21.80% | |
| | S & P 500 TR | 26.46% | 3.48% | |
| 2008 | AHSAX | -26.16% | | 62 |
| | Category (SH) | -23.43% | -11.65% | |
| | S & P 500 TR | -37.00% | 29.30% | |
| 2007 | AHSAX | 16.09% | | 17 |
| | Category (SH) | 9.27% | 73.57% | |
| | S & P 500 TR | 5.49% | 193.08% | |
| 2006 | AHSAX | 9.26% | | 20 |
| | Category (SH) | 4.27% | 116.86% | |
| | S & P 500 TR | 15.79% | -41.36% | |
| Oct - Dec 2005 | AHSAX | 6.87% | | n/a |
| | Category (SH) | 1.02% | 573.53% | |
| | S & P 500 TR | 1.59% | 332.08% | |
| 5 Year Average | AHSAX | 5.91% | | 20 |
| | Category (SH) | 4.19% | 40.96% | |
| | S & P 500 TR | 5.16% | 14.57% | |
| 5 Year Mean | AHSAX | 9.45% | | n/a |
| | Category (SH) | 7.31% | 29.29% | |
| | S & P 500 TR | 12.11% | -22.01% | |

*Firm-imposed Trading restrictions contributed to atypical returns in 2010.*          *Source:  Morningstar*

121.    In fact, despite a revolving door of co-managers on the HS fund, and heavy distractions from marketing, as well as senior analyst responsibilities and team leader functions, Ott outperformed the S&P Healthcare Index, the S&P 500 *or both* in 4 out of 5 years (2005-2009).

122.    The HS Fund delivered only one year of negative returns (2008), yet still outperformed the S&P 500 during that same year.  Throughout this span of time, Assets Under Management ("*AUM*") grew from $85.7 million to a peak of $355 million in the HS Fund, as a result of consistent returns and stability in Ott's management of the fund.

123.    In contrast, Chung's Midcap Fund performance was highly inconsistent.  Since taking over the fund, assets are estimated to have declined by nearly $6 billion, down to roughly $1billion.  Chung's performance in healthcare worsened within his fund while the HS Fund continued to outperform making it awfully difficult to assign blame to Ott for his own underperformance.

124.    Throughout the eight years of Ott's employment, Chung often lamented his envy of Ott's stellar attribution in the Small Cap Fund.  Chung repeatedly remarked that he "**wished [he] had the same outperformance in [his] Midcap Fund that PM Greenwald had in her Small Cap Fund.**"

125.    Despite Ott continuously recommending the same names to Chung (based on market cap suitability), Chung rarely listened or acted on Ott's recommendations which reflected in his underperformance in health care.

126.    In fact, his abysmal Trailing Total Returns record of being in the 65th percentile for one year of performance, 94th percentile for three years performance, 78th percentile for five

years performance would have gotten him terminated as a Portfolio Manager at any other firm where he was not the husband of an owner of the firm or the son-in-law of the Founder of the firm. In contrast, Ott's trailing total returns record put her in the 6th, 16th and 22nd rankings for the one, three and five year performance rankings, respectively, through December 2009.

**ALGER IMPLEMENTS AN UNLAWFUL POLICY**

127. On April 8, 2010, Alger unlawfully implemented an unprecedented trading policy guaranteeing that investors in the HS Fund would not receive the best execution of transactions within the fund.

128. In an email to both Co-Portfolio Managers (*"Co-PMs"*) of the HS Fund, Ott and David Farhadi, MD. (*"Farhadi"*), as well as all of the members of Alger's trading desk, Chung wrote, "**We need to implement a change to portfolio management on the HC [HS] fund, in particular, in line with the Alger Analyst Fund, a) no trades should be executed in the HC [HS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, b) Trading, if you receive an order, you will need to hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours.**" (Exhibit J)

129. The consequence of this policy allowed other Portfolio Managers managing different Alger funds to "front run" ideas for the HS fund. Given these other PMs are compensated for the performance in their funds, they were allowed to personally gain by trading in front of the HS Fund and by obtaining better execution in their funds.

130. For example, on April 20, 2010, Ott wanted to buy additional shares of UnitedHealth Group, Inc (ticker: UNH), Wellpoint, Inc (ticker: WLP) and Humana, Inc (ticker: HUM). On April 20, 2010 at 7:42am, Ott wrote an email in accordance with the new trading

policy to all PMs and Trading, "**UNH add 100bps, WLP add 100bps, HUM add 50bps. Thanks.**"  In other words, Ott wanted to buy *additional* shares of UNH, WLP and HUM in the HS Fund.  (Exhibit K)

131.    At 8:38 AM on the same day, April 20, 2010, Chung replied, "**I haven't heard pitches on these. No trade until I do.**"

132.    "Pitches" are made to PM's when a stock isn't owned in a fund.  The stock is only "pitched" as a new idea for a fund.

133.    Given that Chung already owned UNH, WLP and HUM in his funds, his demand for a "pitch" was peculiar.  The fact that all three names were already owned in the HS Fund added to the absurdity.

134.    At 8:45 AM on the same day, PM Patrick Kelly (*"Kelly"*) via email to Trading put in orders to buy WLP.  (Exhibit K)  Kelly's Allcap fund was allowed to buy WLP in front of the HS fund. Ultimately in this specific case, the HS fund was never allowed to add to its positions at all.

135.    Ironically, Kelly, armed with the knowledge that Ott wanted to add WLP, benefited while Ott's HS Fund was not able to add to its current position despite it being solely Ott's idea.  As a result, the shareholders of the HS Fund suffered as a consequence and did not receive best execution.  In fact, the HS Fund shareholders were denied any execution at all.

### OTT ACTS IN THE BEST INTERESTS OF HS FUND INVESTORS

136.    In response to the issuance of this new "policy", Ott, a Senior Vice President holding the FINRA Series 7 license, a Co-PM for the Alger HS Fund and a supervised employee as defined under the 1940 Act, took affirmative actions to stop, prevent, and curb the unlawful trading restrictions engaged in by Alger and its senior managers.

137.    At the time this new policy was implemented, Ott's Co-PM, Farhadi, described the new trading policy as "**sabotage**" intended to destroy the stellar performance of the fund. Farhadi further informed Ott that he spoke with Alger's General Counsel, Liebes, about the legality of the policy.  Rather than taking the matter seriously, Liebes was dismissive to Farhadi stating there was "**nothing wrong with the policy**" and that the policy was "**fine.**"

138.    Over the next two weeks, Alger's Head of Trading, Steve Thumm, (*"Thumm"*) informed Ott that he, too, had spoken about the trading policy with the Chief Compliance Officer (*"CCO"*), Barry Mullen (*"Mullen"*), only to learn that Mullen was unaware of the policy at the time it was created.

139.    Upon hearing that the Co-PM, Farhadi, and Head of Trading, Thumm, had been ignored by both Liebes and the Compliance Department, Ott inquired with the SEC as to the legitimacy and legality of the newfangled HS Fund trading policy.

140.    After multiple conversations with members of the Securities Exchange Commission's Investment Management Division, Office of Chief Counsel, Ott was informed that there appeared, on its face, to be serious securities law issues with Alger's newfangled trading policy.

141.    During this time, SEC representative, Michael S. Didiuk (*"Didiuk"*), Division of Investment Management, after conferring with other members of his staff, determined that the policy appeared to harm investors in Ott's HS Fund.

142.    Specifically, Didiuk stated that, "**the SEC takes matters that potentially hurt investors extremely seriously.  This policy absolutely hurts investors by all but guaranteeing poor execution as a result of a two hour holding period.**

**We would like to refer the matter to the SEC's Division of Enforcement so that it can be investigated formally.**" (Exhibit L)

143.   Furthermore, because Chung is also listed on the HS Fund as a co-manager and since he is also Alger's CIO, the SEC representatives found his actions the "**most offensive.**"

144.   Regardless of the fact that Chung did not execute orders in the fund, the SEC explained that in his role as CIO, Chung should be "**zealous**" in his efforts to ensure HS Fund investors receive the very best execution possible.

145.   The SEC representative went on to ask that Ott, as the PM of the HS fund, report the trading policy to the SEC's Division of Enforcement as an official Whistle Blower.

146.   Furthermore, the SEC representative shared specific locations within the 1940 Investment Advisor Act as well as locations within the SEC's website that proved such a policy was in violation of securities laws.

147.   Prior to filing a formal Whistle Blower Complaint, Ott attempted to rectify the policy with Alger before resolving to officially file a Whistle Blower Complaint with the SEC.

148.   On June 22, 2010, Ott drafted a letter to Chung to complain about the illegal policy and outlined specific instances where shareholders of the HS fund were harmed as a result of poor trading execution.  (Exhibit M)

149.   In 2009, Ott had experienced Chung's vindictive behavior when he was angry he had sold ISRG and punished Ott with a much lower Deferred Compensation Grant, was tired of hearing other members of the firm praise Ott's marketing impact and denied her a promotion to the new role defined as sole PM for HS Fund and marketer for the firm, and then subsequently awarded Ott an unjustified lower bonus at year end resulting in lower overall total compensation.

150.     Additionally, Ott was aware of his vindictive reaction to Sonu Chawla, a Junior Analyst, who had done excellent analytical work all throughout 2008.  In January 2009, one of her companies under coverage, Satyam Computer Services, Ltd. ("Ticker: SATY.NS"), admitted to fraud and the stock went into free-fall.  A week later, the analyst received a lower bonus for her work in 2008.

151.     During her review for 2008, Chung told Chawla, "**the number was a lot higher a week ago, but Satyam blew it.**"

152.     Ott also personally observed Chung's malicious behavior towards his former secretary, Pamela Ferguson, whom he unceremoniously fired after five years of demonstrated loyalty and competent service.  Ott also observed Senior Analyst Nam Hoang whom he forced to look elsewhere for employment and Analyst Maura Hersom who resigned after being treated viciously by Chung.  Given Chung's history of irrational and caustic behavior, Ott felt it prudent to obtain counsel, Jonathan Sack, Esq. (*"Sack"*).

153.     On June 22, 2010, on behalf of Ott, Sack met with Alger's General Counsel, Liebes, to discuss the discriminatory, unlawful trading policy solely directed at Ott's HS Fund. Previously, Ott had written a letter to Chung.  Sack read this letter to Liebes.  The letter outlined specific examples of the HS Fund not receiving best execution for trades within the fund and specifically how the policy harmed investors.

154.     Initially, Liebes attempted to say that the HS Fund Prospectus gave Alger the authority to implement such a policy but he gave up on that point when he could not locate any such language in the HS Fund Prospectus that would allow Chung's self-appointed authority to be exempt from the Investor Adviser Act of 1940.

28

155.     Contrary to Liebes' position, the HS Fund in Alger's prospectus states that, "Except as otherwise permitted by the Act, or interpretations or modifications by, or exceptive or other relief from, the SEC or other authority with appropriate jurisdiction, and disclosed to investors, 'the Fund may not invest more than 25% of the value of its total assets in the securities of issuers in any single industry, provided that there shall be no  limitation on the purchase of obligations issued or guaranteed by the U.S. Government, its agencies or instrumentalities or as otherwise permitted by the SEC; and provided that the Fund will invest in the securities of issuers in the health sciences sector, and the group of industries that make up the health sciences sector, **without limit**, as contemplated by its investment strategy."  (Exhibit N)

156.     Clearly, the new trading policy limited execution and in other cases, prevented it altogether.

157.     Failing to justify the policy, Liebes then suggested the new policy was somehow connected to Ott's performance.

158.     Sack discussed with Liebes remedies to correct the policy and even included the spinoff of the HS Fund if Alger no longer wanted the HS Fund or saw a conflict with its various investment strategies.  Liebes agreed to discuss the policy with Chung who was in China at the time.

159.     On June 24, 2010, Chung held a meeting with the Health Care Team with no mention of the newfangled and illegal HS Fund trading policy.

160.     On or about June 25, 2010, Jill Greenwald (*"Greenwald"*), a Partner and PM of the Alger Small Cap Growth (*"Small Cap"*) Fund, informed Ott that she had spoken with Chung over the phone because he was working from home.  Greenwald advised Ott that Chung told her that he [Chung] knew he was not good at managing a fund and that his performance was terrible.

161.    Chung went on to share that he was considering giving up the Alger Midcap Growth (*"Midcap"*) Fund as a result of his multiple years' worth of poor performance. Greenwald also informed Ott that Chung was considering having Ott manage the Midcap Fund along with two other analysts, Chris Walsh (*"Walsh"*) and Ankur Crawford (*"Crawford"*).  The bribe was not lost on Ott.  To Ott the message was clear, "Just go with the flow and you will be promoted with greater responsibilities and opportunities."  Ott did not take the bait.

162.    On July 1, 2010, Liebes informed Sack via letter that Alger had self-reported Ott's assertion that Alger had not complied with its obligations to clients to Douglas J. Scheidt, Associate Director and Chief Counsel of the SEC's Division of Investment Management.  In his letter, Leibes advised the SEC that Alger had directed its very own outside counsel to investigate the charges made by Ott and would provide "the [SEC] Staff" with a copy of Alger's Counsel's report.  How absurd.  When was the last time an "outside counsel," paid for by a firm, found illegality on its client's part?

163.    In mid-July 2010, with no resolution regarding the trading policy and with the HS Fund's performance at all-time lows, Ott reached out to the Alger Trustees and Officers of the Trust, Alger Associates and members of Alger Management (*"the Board"*).

164.    Ott, acting with a fiduciary responsibility to the shareholders of the HS Fund, notified the Board in written correspondence dated July 14, 2010, of the "**improper, unethical, and perhaps illegal trading policy**" instituted "**without forewarning or explanation**" by Chung.   (Exhibit L)

165.    In this same communication, Ott outlined all the steps she had taken to resolve the matter including the information the SEC representatives shared regarding the trading policy.

166.   Ott made clear that rescinding the trading policy was not a permanent corrective action as Chung "**demonstrated he cannot be trusted to act in the best interest of shareholders of the Alger Health Science Fund [HS Fund] given his present roles.**"

167.   As proof of Chung's untrustworthiness, Ott outlined a specific instance where "**Chung cancelled orders with Trading and never informed the Co-PMs of his actions.  On this particular order, he instructed Trading without explanation, 'Do not execute until I say so.'   His interference is both baseless and outrageous.  As managers of the fund, we were attempting to close out those positions.  There was absolutely no reason to restrict or delay that order.**" (Exhibit L)

168.   On the evening of July 14, 2010, Ott received word from Lori McEvoy, (*"McEvoy"*), Senior Vice President (*"SVP"*), Director of Consultant Relations, that Ott was no longer needed for the upcoming marketing meeting with Mercer Investment Consulting, Inc.

169.   In fact, Ott would no longer hear from McEvoy for the rest of the year despite having developed a friendship to include invitations to dinner both at home and at restaurants or drinks at nearby bars and super bowl parties.

170.   Ott was surprised that even if the friendship had been insincere, McEvoy would no longer speak with Ott professionally especially after working together on multiple accounts.

171.   Similar behavior became apparent with the other PMs of Alger Funds.  In fact, the PM of the Large Cap Fund, Andrew Silverberg (*"Silverberg"*), was terrified of being seen talking with Ott.

172.    In fact, Silverberg would actually race out of Ott's office if he heard Chung's voice in the hall.

173.    Partners Greenwald and Kelly stopped talking with Ott altogether and would only communicate by email or only if directly approached by Ott.

174.    It was highly evident that no such communication was desired.   Ott was blacklisted.

175.    During this time, Chung and Liebes met with Farhadi to discuss Ott's actions, the trading policy and the upcoming investigation by Alger's outside counsel.

176.    Farhadi informed Ott that both Liebes and Chung forcefully tried to convince Farhadi that the policy was justified under threat of retaliation.

177.    Later (in December 2010), Farhadi would confide to Ott that during the initial meeting with Chung and Liebes, Chung also promised a 10-20% percent increase in Farhadi's bonus for 2010 as well as promotion to Senior Vice President.

178.    When Farhadi complained to Chung about receiving a 50% cut to his bonus rather than the 10-20% increase that had been promised earlier, Chung told Farhadi that Chung would make Farhadi "**whole**" if Farhadi agreed to stay at Alger until September 2011.   Chung was concerned about the appearance of his retention numbers in front of the Board of Trustees and to investors.

179.    Later, on or about May 6, 2011, Farhadi resigned from Alger in disgust.

180.    During the time of Farhadi's first meeting with Chung and Liebes to discuss the trading policy prior to Alger's outside investigation, Chung and Liebes also met with Ott's junior analyst, Peter Pirsch (*"Pirsch"*).   Pirsch also confided in Ott that Chung and Liebes tried to coerce and convince Pirsch that the trading policy was proper.

181.    Just as he had done with Farhadi, Chung told Pirsch that promotions occurred in September and that Pirsch was on track for promotion as well and a very rewarding bonus at year end.  Chung's hints at the "carrot versus the stick" were not subtle.  Chung further went on to tell Pirsch that, "**Rose [Ott] has lost our trust.**"

**CHUNG ENGAGES IN A HARASSMENT CAMPAIGN AGAINST OTT**

182.    On or about July 14, 2010, Chung began a harassment campaign aimed squarely at Ott.

183.    On July 19, 2010, Ott wanted to "trim SYK (Stryker)" from a higher weighting in the HS Fund to 50bps.

184.    Chung immediately critiqued Ott's request to lower the weighting of SYK in the HS Fund as a "recommendation."   Chung blasted Ott stating, "**We need more, not less, conviction about stocks from senior analysts.   We expect not only price targets, but recommendations on weightings that could be effective in generating real outperformance for the portfolio.  Incremental 'trading' calls, if this is what this call is, with moving price targets all the time are not going to generate any outperformance, in particular when the weightings suggested are also inconsequential.**"

185.    In fact, Ott was not making a "recommendation" to the other PMs at Alger to trim their positions.  Ott simply wanted to reduce the position in the HS Fund as part of her portfolio management decision.

186.    The following day, July 20, 2010, Chung sent a firm-wide caustic email describing his recent review of the new research database called the Tamale database

33

(*"Tamale"*).  Chung railed that Ott had only completed 14 out of 24 updates and attempted to discredit Ott in front of the entire research department and select personnel in sales and marketing by writing, "**ROSE [Ott]: This is UNACCEPTABLE.  Most of these names are owned and all are key names.  Further, you have only 7 write-ups in the system.  This is less than half of the next lowest analyst, despite having a bank that is smaller than most and half the size of several.  ASSIGNMENT:  I expect to see all the missing 14 executive summaries and financial data complete in Tamale summary view by Tuesday or Wednesday of next week at the latest.**"

187.    In reality, Ott's data was not only complete, but also up to date.  After a consultation with the technical experts on the new Tamale system, the experts discovered that Ott had not saved the data in the proper order in Tamale which is why the updates did not appear in the new system.  Once the cause of the problem was identified, an intern very easily transferred all the completed work in merely a few hours.

188.    On July 23, 2010, knowing that Ott had a three day weekend with family visiting from out of state, Chung dug up an email Ott had sent in reply to questions from Partner and PM, Patrick Kelly (*"Kelly"*).  Kelly was preparing for a meeting with clients and had asked all analysts to send investment themes and the drivers for investment thoughts.  Specifically, "**not investment picks, but rather bigger picture ideas.**"

189.    Chung followed up on Ott's reply to Kelly with more than a dozen specific questions for Ott.  When Ott immediately answered Chung's questions, Chung assigned far more detailed "homework" during Ott's vacation.

34

190.    Specifically, Chung wrote to Ott while copying all her peer PMs in an effort to discredit Ott, "**you have not submitted or sent the work on the balance sheets/buybacks, nor the merger and acq [acquisition] spreadsheet, nor answers to the unanswered questions or incomplete work promised and due over a week ago.  Further, a list of m and a [mergers and acquisitions] transactions is not analysis.  I would like to see prices, multiple to revenues and ebitda (or other valuation measures), a sense of the growth rate of the target, analysis of the "reason" for the acquisition…how does it make sense from market trend perspective, etc…I would like to see it this weekend, so I can study it for Monday.**"

191.    While confused by Chung's claim that Ott had made such promises, which she had not, Ott completed the new assignment over the weekend and Chung had no further questions on the matter.  His lack of follow up confirmed her suspicion that the "assignment" was simply "busy work."

192.    Exactly three weeks following Ott's letter to the Board, Chung decided to issue an impromptu and highly irregular "Midyear Midcap Review."  Notably, no other PMs have ever conducted such reviews.

193.    Predictably, Chung's assessment of Ott's performance in the Midcap Fund was beyond subjective, if not disingenuous.   (Exhibit P)

194.    Chung described Ott's performance as the "**second worst among all analysts.**"  Chung continued, "**Your decision-making and communications with**

**PMs regarding when to buy or sell stocks has resulted in your negative returns in a sector with YTD positive returns.**" (Exhibit P)

195.   Chung blamed Ott for his fund's lack of ownership of names that had outperformed as well as owning names that had underperformed.  Ott replied in writing the following: "**My performance attribution is debatable.  As an analyst, I make recommendations for the PM to act upon.  My decision making is not reflected in this performance.  My communication has been clear.  Most importantly, owning out-of-benchmark stocks can doubly help or hurt a portfolio.  You [Chung] acted on your own and contrary to my recommendations with two of these stocks:  Nuvasive Inc. (ticker symbol: "NUVA") and Hologic, Inc. (ticker symbol: "HOLX").  Because neither stock is in the Midcap benchmark, combined these two stocks are the largest detractors for what is actually your poor decision making.**" (Exhibit Q)

196.   Ott also pointed to another instance where Chung purchased a stock in Ott's Healthcare Sector without even discussing it with her.  This stock (Varian Medical Systems, Inc. ticker symbol: "VAR") underperformed as well as another stock (Select Medical Holdings Corporation, ticker symbol: "SEM") which Ott did not even cover.  Nevertheless, Ott was blamed for the underperformance of both stocks despite having never recommended either of them.

197.   Ott then described in detail four separate investment recommendations where Chung ignored Ott's recommendation to buy stocks: Thoratec Corporation, Perrigo Company, Waters Corporation and Edwards Life Sciences Corp. (tickers: "THOR", "PRGO", "WAT" and

*"EW"*).  In each case, Chung did not own the names in his midcap fund, which hurt his fund's performance.

198.    Ott continued that Chung had underperformed the market in roughly 25 out of the last 32 quarters and suggested that Chung's performance needed improvement as did his attendance at work.

199.    Chung never spoke with Ott in person, but rather responded to Ott's replies via multiple emails.  (Exhibit Q).

**SEC INVESTIGATION**

200.    In late July 2010, after no response from Alger or from the Board of Trustees, which is responsible for protecting the interests of shareholders, and after giving Alger every opportunity to correct the trading policy that was now severely harming performance of the HS Fund, Ott's attorney [Sack] contacted the SEC and Ott became an official Whistle Blower under the provisions of the now in-effect Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §78u-6.

201.    Ott felt to take no action would be akin to being complicit with a policy she knew was bad for investors of the HS fund.

202.    Just as she had done in the past when selling surgical devices and putting patient benefit before her personal gain, and with the West Point cadet ethics motto to "do the harder right over the easier wrong," Ott put the investors in her HS fund before her personal benefit and reported the matter to the SEC.  Ott subsequently met with the SEC investigators and then filed a formal complaint on or about September 7, 2010.   (Exhibit R)

203.    On August 4, 2010, Ott met with four members of the SEC's Division of Enforcement at the SEC's offices in World Financial Center, New York, New York.   The

meeting was headed by Gwen Licardo, Senior Investigative Counsel of the SEC New York Regional Office.  Ott answered questions for more than two hours.

204.    Ott provided fourteen (14) exhibits to the SEC containing more than sixty (60) pages of documentation showing multiple examples of poor execution or no execution in the HS Fund.   The newfangled and illegal trading policy had a material and adverse effect on Ott's HS Fund performance.

205.    Oddly, Ott was the <u>last</u> person to be interviewed by Alger's retained, outside counsel.

206.    On September 8, 2010, Ott met with Alger's outside counsel, Melvin A. Brosterman, Esq. ("*Brosterman"*) of the law firm, Stroock & Stroock & Lavan L.L.P. (*"Stroock"*) as part of Alger's "outside investigation" of the trading policy.

207.    Not surprisingly, Alger's outside counsel was highly biased in its investigation.

208.    After Brosterman's attempt to record the meeting with Ott was denied, Brosterman went to task to convince Ott that Chung as the CIO could "**do whatever he wants.**"

209.    After repeatedly making such claims, Ott replied, "**he [Chung] can do whatever he wants but he cannot hurt investors and this policy harms investors.**"

210.    On October 21, 2010, Brosterman sent the "findings" of his investigation to Sack on behalf of Ott.  Brosterman determined that the impact to investors was minimal and that "the policy is appropriate, lawful, and in the best interest of Alger's investors" despite the fund ranking in the 80th percentile compared to the historical and nearly consistent ranking in the top quartile.

211.    Interestingly, the week after Brosterman conducted his interview with Ott and a full month *prior* to sharing the "findings" of his "investigation," Chung accompanied Pirsch on a trip to visit hospital companies in Tennessee.

212.    At one point in the trip, Chung inappropriately discussed Ott with Pirsch.  Even prior to Brosterman's "findings," Chung said, "**You know, Rose [Ott] is wrong and the Board supports me.  She [Ott] is gonna start feeling the heat.**"  Obviously the "investigation" was biased from the beginning and both Chung and the Board directed the outcome.

| CHUNG TRIES TO FORCE OTT TO QUIT |
|---|

213.    From September 24, 2010 through September 26, 2010, Alger held an off-site retreat in Vermont.  During this event, notwithstanding the repeated nasty glares from Chung, Ott participated in each of the activities with Ott's co-workers.

214.    At, or around the time of the retreat, Ott heard discussions that Chung had awarded Long Term Compensation Grants (*"Long Term Compensation"*).  Beginning in 2006, each year, Alger gave such grants to selected employees that could be potentially matched at 175% of the vested grant.  On March 4, 2010, an Alger press release stated, "**Currently, over 70% of Alger's senior officers and investment professionals participate in the Long Term Compensation program.**"

215.    Until 2010, Ott always received such grants.  Each year the pool of participants grew larger as new employees were added.  In 2006, the inaugural year of the Long Term Compensation program, Ott received an award of $150,000.  In 2007, Ott received an award of $100,000.  In 2008, Ott received an award of $75,000 and in 2009, Ott received an award of $25,000.  In 2010, Ott did not receive a Long Term Compensation award.

216.    True to his earlier vow to Pirsch and with the alleged support of the Board, Chung redoubled his efforts to badger Ott.  Chung:

- Created additional "busy work" for Ott;

- Marginalized Ott's performance;

- Demoted Ott;

- Constantly monitored Ott's whereabouts;

- Moved Ott to a smaller office despite Ott's title and tenure after nearly nine years of service at Alger;

- Harassed Ott with nasty, firm-wide emails;

- Changed out Ott's hard drive on her computer during her busiest work period;

- Demanded copies of all of Ott's handwritten notes; and

- Resorted to pettiness including inviting Ott to company dinners only to disinvite Ott for failing to reply prior to 5pm on the day the invite was sent.

217.    On October 25, 2010, during the time that companies report all their quarterly earnings reports and is arguably one of the busiest times for PMs and analysts to listen to hour long conference calls and replays of conference calls, then update all financial models and speak with company management teams, Chung decided to saddle Ott with a research assignment due to him in nine (9) business days in the heart of earnings season.

218.    Specifically, Chung required Ott to "**research and prepare a report/overview on the state of healthcare in India and China.**"  This highly irregular and odd demand came during Ott's busiest week of earnings season and could easily take several weeks to study and then write such a comprehensive report.

40

219.    Furthermore, Chung demanded that Ott write up complete "**research reports on two individual companies with full models going back at least 5 years and looking forward 3 to 5 years, valuation and supporting data including history of strategic growth or expansion, patient sourcing, changes in regulatory background in which they primarily operate,**" both based in India.

220.    Both companies were hospital systems, an area of coverage for which Ott had never been responsible in the nearly nine (9) years of Ott's employment at Alger.  (Exhibit S)

221.    Ott worked day and night to complete the assignment by the preposterous deadline while also focusing on all companies that all Alger Funds owned as they reported earnings.

222.    On November 3, 2010, the day prior to the due date, the Information Technology department arrived to perform an unscheduled swap out of Ott's computer hard drive.

223.    Despite the setback of resetting all her financial software systems, Ott provided Chung's administrative assistant with all four reports on time and never heard from Chung on the matter again.

224.    Once again, Chung saddled Ott with more "busy work" in an attempt to distract her from her responsibilities and even at the last second pulled a lowbrow move of interrupting her momentum by changing out her hard drive in an attempt to make her miss his deadline.

225.    On October 26, 2010, Carrie Manahan (*"Manahan"*), Administrative Assistant, sent a Research Dinner Invite to all of Research asking, "**Please let me know, today, if you can attend a Research Dinner we are trying to schedule on Tuesday, 11/23.**"

41

226.   At 7:47pm on October 26, 2010, while still working, Ott replied, "**yes.**"

227.   At 9:11am on November 12, 2010, Manahan sent updated information to all attendees on the location and time for the dinner and copied Chung.  Ott was included on the list of attendees.

228.   At 9:47am on November 12, 2010, Manahan sent a follow up email to Ott stating, "**Since your name wasn't on the initial list that I provided for attendees to the dinner- since I gave it at 5pm and you responded afterwards, I need to un-invite you to the dinner.**"

229.   Meanwhile, on October 29, 2010, Ott submitted a request to work from Ott's home office under the Work from Home Policy (*"WFH"*) which was a benefit for all PMs, Senior Analysts and Analysts with an allowable 3 days per month to work from home.

230.   Without justification or reason, Chung denied Ott's request while simultaneously approving requests from Farhadi, Michael Young, Michael Melnyk, and John McPeake to work from home during the same period.  (Exhibit T)

231.   On October 28, 2010, Chung held a meeting with Human Resources (HR) Director, Robert Isaaco (*"Isaaco"*) and Larry Vigus (*"Vigus"*), who maintains Alger's analyst performance data and provides such reports to Chung.

232.   During this meeting, it was reported to Ott that Chung was furious that Ott continued to climb in the firm-wide rankings for "Total Effect," a performance analysis metric used to measure an analyst's attribution to overall performance within each portfolio.

233.   In previous years, "Total Effect" was used as a guide for end of year bonus compensation.  It was reported to Ott that Chung demanded to know, "**why the numbers**

**changed.**" During that meeting, it was clear that the "Total Effect" metric was being reconsidered given Ott's improvement in rankings across the firm to the middle of the pack.

| OTT IS DEMOTED |
| --- |

234.    On November 8, 2010, Farhadi, Pirsch, Steven Yang (*"Yang"*) and Ott were summoned to the conference room to meet with Chung and fellow partners Greenwald and Kelly.  Chung read an email to the group announcing a new Sector Head of the Alger Health Care team by the new hire of Maria Liotta ("*Liotta*").

235.    Previously, on October 7, 2005, Ott had been made leader of the Health Care team along with Joanne Sayers (*"Sayers"*) who no longer worked at Alger.

236.    The announcement of Liotta as the "new" leader of the team was a clear demotion for Ott.

237.    The next day, November 9, 2010, HR director Isaaco informed Ott that she would have to move into another, smaller office with one window which faced another wall.  As a Senior Vice President and PM, Ott had been in the same office for five (5) years that was spacious enough to hold team meetings and enjoyed great sunlight from large windows.

238.    When Ott asked why a Senior Vice President had to give up prime office space rather than a more junior member of the firm, Isaaco could offer no justification.  The following day, Ott moved herself into the office formerly occupied by an administrative assistant and previous research analyst.

239.    Ott's fellow co-workers were visibly upset by the announcement as well as the retaliatory treatment Ott had received by Chung.  Ott's co-workers were also afraid to talk with Ott as a matter of self-preservation at Alger.

240.   Liotta joined Alger as a SVP, Senior Analyst, and Co-PM of the HS Fund and Alger Mid Cap Growth fund effective November 15, 2010.

## CHUNG INTRODUCES "NEW" PERFORMANCE BENCHMARKS

241.   On November 29, 2010, Chung held a meeting and outlined the "new" performance benchmarks for bonus compensation.  After eleven months into the year and in an attempt to reverse engineer analyst performance, Chung decided to scrap the "Total Effect" measurement and instead weighed 65% of compensation on *qualitative* factors and 35% on *quantitative* factors.  Furthermore, nearly half of the quantitative metric was derived from the performance in the Alger Analyst Fund, which once again was wholly funded by Alger family investments.

242.   As of December 6, 2010 in the Total Effect Ranking (previously used as a benchmark for compensation), Ott ranked 7th out of 11 Senior Analysts despite having been "marginalized by Chung" according to Partner and PM Patrick Kelly.

243.   In fact, the 6th ranked Senior Analyst had only .01 basis point better performance than Ott.  Said differently, the 6th ranked Senior Analyst had a penny's worth of better performance than Ott.  Ott was squarely in the middle of the pack of Senior Analysts in spite of the ongoing harassment by Chung.

244.   Furthermore, the Senior Analyst who ranked 11th overall, or last, was actually promoted to Senior Vice President in late 2010.

245.   On December 15, 2010, Chung issued a 2010 Annual Performance Review for Ott.  As expected, the review consisted of a subjectively false characterization of Ott's work.  Chung assigned blame of 34% losses despite the fact that Chung had acted on his own decisions and hardly any of Ott's as was previously and very specifically pointed out by Ott in response to the "Midyear Midcap Review" given in August 2010.

44

246.     Furthermore, Chung attacked Ott's decision making by pointing to two examples, Baxter International Inc. (ticker symbol: *"BAX"*) and Covidien Public Ltd Company (ticker symbol: *"COV"*).  Once again, Ott had to remind Chung that she did not cover either company.

247.     Time and again throughout the "review," Chung made bold proclamations without giving any credible examples. Not surprising, Ott was given no credit for the 12 marketing meetings she conducted in the first six months of the year.

248.     As a direct result of Ott's formal SEC Whistle Blower Complaint, Ott was retaliated against and paid a bonus of merely $10,000, down 92% from the previous year. (Exhibit U)

249.     Furthermore, on January 10, 2011, Ott traveled to California to attend the JP Morgan Healthcare Conference.  While in California, Ott sent emails to Alger providing updates and commentary on meetings she attended.

| OTT'S EMPLOYMENT IS TERMINATED IN RETALIATION OF HER LAWFUL COMPLAINTS |
| --- |

250.     Also on January 10, 2011, Ott's counsel, Sack, contacted Bennett L. Epstein (*"Epstein"*) of Foley & Lardner LLP, to discuss Ott departing her gainful employment at Alger on mutually agreeable terms.  Sack again, on January 12, 2011, followed up via email to Epstein regarding a plan to settle Ott's departure.

251.     Epstein replied on January 13, 2011 stating that Chung would be out of the office for the long weekend.  Epstein suggested that he would be in touch with Sack following the long weekend and to expect a call on Tuesday, January 18, 2011.

252.     After a week with no substantive reply, on January 18, 2011, Epstein emailed Sack to inform him that "**I [Epstein] have been stuck in court.  I [Epstein] will get back to you tomorrow [January 19, 2011] or Thursday [January 20, 2011]**."

253.     On January 20, 2011, despite knowing full well the whereabouts of Ott, Alger terminated her gainful employment at Alger without notice, justification or cause.

254.     As more fully described herein, in direct retaliation of Ott's lawful complaints concerning Alger's harmful trading policy directed at the HS Fund investors, Alger terminated Ott because Ott initially launched an internal Whistle Blower Complaint with both Chung and the Board and ultimately filed a formal Whistle Blower Complaint with the SEC.

**OTT'S COMPENSATION (2005-2010)**

255.     In exchange of the work, labor and services Ott rendered on behalf of and for Alger during her tenure at Alger, Ott was paid a base salary, a significant annual bonus, and deferred compensation (Alger Associates, Inc. Incentive Plan) among other benefits.

256.     Ott was paid for excellence and proven results; she was rewarded for her stellar performance, commitment and real contributions to the business.

257.     Ott and Alger anticipated a long partnership and employment relationship.

258.     Deferred compensation grants vested in four (4) years, with a potential match of up to 175% paid in cash.

259.     Therefore, as a result of Ott's 2006 deferred compensation vested grant, Ott received $365,940 in March 2011.

260.     At Alger, deferred compensation was awarded to "give senior executives and investment professionals an opportunity to create meaningful wealth with the firm's growth and success."

261.     The deferred compensation program at Alger is available only to key personnel of Alger's organization, which included Ott.

262.    As Chung was quoted in a press release dated March 4, 2010, "**I am thrilled to be able to recognize key members of the Alger organization.**"

263.    Ott received the exclusive awards for four (4) years beginning with the incentive plan's inaugural grant in 2006 during her employment at Alger.   Initially, Ott was one of approximately a dozen key personnel to receive an award out of all employees.

264.    In 2008, Chung communicated to Ott that the firm's performance necessitated a decline in incentive compensation and deferred compensation grants as a result of the cataclysmic decline in the market resulting in massive asset losses.

265.    In 2007 and in 2009, Chung also communicated to Ott that the entire pool of deferred compensation grants would be awarded to more employees and that the awards would decline in order to add the additional personnel.

266.    Additionally, under terms of the Alger Associates, Inc. Incentive Plan (*"the Plan"*), following termination,

> "(a) the Participant's Award Account shall continue to be maintained until the last day of the Award Period for the Award and, to the extent that the Award would have become vested had the Participant not incurred a Termination of Employment prior to the last day of the Award Period for the Award, the Participant shall become vested in a pro rata portion of that portion of the Award Account that would have become so vested, an (b) as of the last day of the Award Period for the Award, the Award Account shall be credited with a pro rata portion of the Matching Amount, if any, that would have been credited to the Award Account as of the last day of the Award Period if the Participant had not incurred a Termination of Employment prior to the last day of the Award Period. For purposes of this Section 7.2, such pro rata portion of the Award Account (taking into account only the portion of the Award Account that would have become vested had no Termination of Employment occurred prior to the last day of the Award Period for the Award) or Matching Amount, as applicable, shall be determined by multiplying the relevant amount by a fraction, the numerator of which is the number of months from the Date of Grant of the Award until the Participant's Termination of Employment and the denominator of which is the total number of months in the applicable Award Period."

267.    But for the timing of Ott's termination, Ott would have recovered a 12.5% premium to her pro rata award and match for the 2007 grant, a 37.5% premium for the 2008 grant and a 62.5% premium for the 2009 grant.

268.    At the time of the filing of this Third Amended Complaint, both the 2007 grant and the 2008 grants have fully vested but remain unpaid.

269.    Thus, Ott's Award Account for unvested grants at the time of termination are as follows:

| AWARD YEAR | AWARD AMOUNT | POTENTIAL PAYOUT |
|---|---|---|
| 2007 | $100,000 | $275,000 |
| 2008 | $75,000 | $206,250 |
| 2009 | $25,000 | $68,750 |
| **TOTAL** | | **$550,000** |

270.    Accordingly, Ott is due $550,000.00 in earned but unpaid compensation in respect of her incentive awards.

**OTT REMAINED LOYAL TO HS FUND INVESTORS**

271.    During the nearly nine years of employment, Ott continued to remain quiet and concentrate on her work.  Ott counseled many junior employees to do the right thing and stay focused on the work.

272.    For Ott, the last straw was when Chung unnecessarily and harmfully restricted the trading of the Health Sciences Fund.  Ott could look the other way on the infidelity and favoritism but she could not allow investors of the Health Sciences Fund to suffer losses imposed by Chung who was now emboldened to think he could do anything he wanted and nobody would stop him.

273.    Ott confronted Chung in writing, elevated the complaint to the Board of Trustees and ultimately to the SEC.  Not surprisingly, Chung retaliated against Ott in blatant violation of the Whistle Blower Protection Act and cut her 2010 Bonus by 92% and then fired Ott.

## CLAIMS AND DAMAGES

Based upon the above allegations, Ott maintains the following legal claims against Alger:

### COUNT ONE
### (Violation of Dodd-Frank Whistleblower Statute)

274.    Ott incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

275.    15 U.S.C. § 78u-6 ("*Section 922*") states no employer may discharge a whistleblower because of any unlawful act done by the whistleblower in providing information to the SEC regarding potential violations of Section 10(b) or in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), or any other law, rule, or regulation subject to the jurisdiction of the Commission.

276.    Ott reported information to the SEC concerning Chung's violation of SEC rules, laws, and/or regulations.

277.    Section 78u-6(h)(1)(A)(iii) of the Dodd-Frank bill incorporates 18 U.S.C. § 1513(e), which prohibits "interference with the lawful employment or livelihood of any person" who provides truthful information "to a law enforcement officer" relating to the commission of federal offenses.

278.    Ott explained Chung's violations in detail to Alger's Board of Directors, the SEC, and to attorneys from Alger.

279.    As a result or Defendant's violation of Dodd-Frank whistleblower statute, Ott has been injured in an amount to be determined at trial but believed to be not less than $3,000,000.

### COUNT TWO
### (Breach of Contract Concerning Deferred Compensatio)

280.    Ott repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

281.    Ott had a valid and enforceable contract with Alger.

282.    Ott fully performed his obligations thereunder.

283.    Alger's failure to pay Ott monies due under their agreement constitutes a material breach of their Agreement.

284.    Ott has been caused thereby to suffer damages in amount of not less than $550,000.

## ATTORNEY'S FEES AND COSTS

285.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Ott have in good faith, attempted to negotiate a reasonable resolution with Alger without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

286.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.   In light of Alger's obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Alger so that it be deterred from attempting such harmful employment practices in the future.

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.      A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under applicable Federal and State Law;

II.     A judgment granting equitable relief directing Defendant to cease and desist from

exposing Plaintiff to discrimination and retaliation;

III.   A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings he would have received but for Defendant's discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

IV.   A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law, but not less than $3,000,000.

V.    A judgment awarding Plaintiff double back pay damages for Defendant's intentional retaliation of Plaintiff;

VI.   A judgment awarding Plaintiff front pay;

VII.  A judgment awarding Plaintiff double back pay;

VIII. A judgment awarding Plaintiff punitive damages;

IX.   A judgment awarding Plaintiff contractual damages of at least $550,000;

X.    An award of prejudgment interest, costs and attorney's fees; and

XI.   Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

Dated: New York, New York
       May 13, 2013

Respectfully submitted,

**SACK & SACK, ESQS.**

/s/ *Jonathan Sack*

By_____

       Jonathan Sack, Esq.

**Attorneys for Plaintiff**
**ROSANNE F. OTT**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702