**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------  X
ROSANNE F. OTT,                                                     :
                                                                              :
      Plaintiff,                                             :          Civ. No. 11 Civ 4418-LAP
                                                                              :
                                                                              :          **ANSWER TO THIRD**
      v.                                                       :          **AMENDED COMPLAINT**
                                                                              :
                                                                              :          **JURY TRIAL REQUESTED**
FRED ALGER MANAGEMENT, INC.,                    :
                                                                              :
      Defendant.                                         :          **Electronically Filed**
                                                                              :
-------------------------------------------------------------  X

Defendant Fred Alger Management, Inc. ("Alger"), by its attorneys Foley & Lardner

LLP, and for its Answer to the Plaintiff's Third Amended Complaint ("Complaint") hereby states

as follows:

### NATURE OF ACTION[1]

1.      Alger implemented an unlawful trading policy exclusively targeting the
Alger Health Sciences Fund ("*HS Fund*") that deliberately harmed HS Fund investors through
the sanctioned acts of their employee, namely Daniel C. Chung, who is employed as Alger's
President, Chief Executive Officer, Chief Investment Officer and a Portfolio Manager.

ANSWER:      To the extent the allegations set forth in Paragraph 1 are deemed

conclusions of law, a response is not required.  Further answering, Alger denies the

allegations set forth in Paragraph 1, except that Alger admits that Daniel C. Chung is

employed as Alger's President, Chief Executive Officer, Chief Investment Officer and a

Portfolio Manager.

---

[1] The Complaint contains numerous subject headings which do not constitute factual allegations.  To the extent a response to this material is required, Alger denies the purported allegations set forth in each and every one of these headings.

2.     The claims made herein are based upon Alger's unlawful and retaliatory termination of Ott's employment and in connection with Alger's unlawful denial of terms, conditions and privileges of Ott's employment.

ANSWER:     To the extent the allegations set forth in Paragraph 2 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 2.

3.     Ott was retaliated against immediately following Ott's engaging in lawful, protected activity, namely her prior, documented complaints to Chung, Alger's General Counsel, Hal Liebes ("Liebes") and the Alger Trustees and Officers of the Trust and members of Alger Management including Hilary Alger, Alex Alger, Nicole Alger, Maureen A. Hendricks, David J. Hogan, Alistair Jessiman, Charles F. Baird, Roger P. Cheever, Lester L. Colbert, Stephen E. O'Neil, David Rosenberg, Nathan E. Saint-Amand.

ANSWER:     To the extent the allegations set forth in Paragraph 3 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 3.

4.     Ott's complaints concerned Alger's unlawful trading policy solely targeting the HS Fund.

ANSWER:     To the extent that the allegations set forth in Paragraph 4 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 4.

5.     Ott was terminated in retaliation for her standing up for the rights of her and her fellow HS Fund shareholders.

ANSWER:     To the extent that the allegations set forth in Paragraph 5 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 5.

6.     Alger violated 15 U.S.C. § 78u-6 of the Frank-Dodd Whistleblower Statute by unlawfully discharging Ott in retaliation for providing information to the SEC regarding potential violations of securities laws, as more fully described herein.

ANSWER:     To the extent the allegations set forth in Paragraph 6 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 6.

7.     Furthermore, the claims made herein are based upon Alger's breach of the express terms and conditions of Ott's contract for compensation in respect of her deferred compensation for the incentive compensation granted to her on July 30, 2007 and July 20, 2008, respectively.

ANSWER:     To the extent the allegations set forth in Paragraph 7 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 7.

8.     Although duly demanded both orally and in writing, Alger has failed and/or continues to refuse to pay to Ott the sums of money earned and unconditionally due her in respect of her incentive compensation described herein.

ANSWER:     To the extent the allegations set forth in Paragraph 8 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 8.

9.     The amounts that were and would be earned by Ott represent wages, bonuses, benefits, wage supplements, and compensation bargained for, earned and belonging to Ott.

ANSWER:     To the extent the allegations set forth in Paragraph 9 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 9.

10.     By retaliating against Ott, Alger is in violation of the Whistleblower Protection provisions of the Frank-Dodd Act.

ANSWER:      To the extent the allegations set forth in Paragraph 10 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 10.

11.      In sum, Ott's claims include:

(a)      Alger's unilateral alteration of the terms and conditions governing Ott's deferred compensation (including restricted stock) as more fully set forth herein;

(b)      Alger's failure and refusal to pay Ott back pay and compensatory damages based upon the allegations described herein; and,

(c)      Punitive damages based upon the allegations described herein.

ANSWER:      To the extent the allegations set forth in Paragraph 11 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 11.

## JURISDICTION, VENUE AND CHOICE OF LAW

12.      Jurisdiction is conferred on this Court by 28 U.S.C.§ 1331 and 1337, § 209(e)(1) and § 214 of the 1940 Act, 15 U.S.C. § 80b-9(e)(1) and § 80b-14.

ANSWER:      To the extent that the allegations set forth in Paragraph 12 are deemed conclusions of law, a response is not required.   To the extent that Paragraph 12 contains allegations regarding the statutory basis for this Court's jurisdiction, a response is not required.   To the extent a response is required, Alger admits the allegations set forth in Paragraph 12.

13.      Venue is appropriate in this district under 28 U.S.C.   § 1391(a) and § 214 of the 1940 Act, 15 U.S.C.   § 80b-14.   The acts which give rise to this Complaint as well as certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws took place in this District.

ANSWER:     To the extent that the allegations set forth in Paragraph 13 are deemed conclusions of law, a response is not required.  To the extent that Paragraph 13 contains allegations regarding the statutory basis for venue, a response is not required.  To the extent a response is required, Alger denies the allegations set forth in Paragraph 13.

14.     This Court has supplemental jurisdiction over Ott's state law claims pursuant to 28 U.S.C. § 1367.

ANSWER:     To the extent that the allegations set forth in Paragraph 14 are deemed conclusions of law, a response is not required.  To the extent that Paragraph 14 contains allegations regarding the statutory basis for this Court's jurisdiction over Ott's state law claims, a response is not required.  To the extent a response is required, Alger denies the allegations set forth in Paragraph 14.

## PARTIES

15.     Ott is an individual residing at 4 Hillcrest Road, Fort Montgomery, New York, County of Orange.

ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 15.

16.     Fred Alger Management, Inc. was founded in 1964 and currently manages more than $14 billion in Assets Under Management ("AUM").  Alger's investment philosophy is focused on discovering companies undergoing positive dynamic change, which they believe offer the best investment opportunities.  Alger investment strategies are available to institutional investors through separate accounts and mutual funds and to retail investors through Alger mutual funds.  Fred Alger & Company, Incorporated, a broker-dealer and the parent company of Fred Alger Management, Inc. offers mutual funds as well as institutional funds for defined benefit and defined contribution plans.

ANSWER:     Defendant admits the allegations set forth in Paragraph 16.

## FACTS COMMON TO ALL COUNTS

17.     Defendant Daniel C. Chung ("Chung") is the President, Chief Investment Officer ("CIO") and Portfolio Manager.  Chung, although acting in the capacity of President of FAM and Principal with supervisory responsibilities, is not registered with FINRA.

ANSWER:     Alger admits that Chung is President and CIO of, and a Portfolio Manager for, Alger, and is not registered with FINRA.   Alger denies the remaining allegations set forth in Paragraph 17.

18.     Alger serves as an investment manager and/or adviser to its managed funds, Alger Partners II., L.P., Alger Partners III, L.P., Alger Partners IV, L.P., Alger Institutional Partners, L.P., BY Partners, L.P., and Alger CPF Partners, L.P. (collectively referred to as the "Domestic Funds") and Alger Partners II Offshore, Ltd., and Alger Partners IV Offshore, Ltd.  (collectively referred to as the "Offshore Funds", together with the Domestic Funds, the "Funds").

ANSWER:     Alger denies the allegations set forth in Paragraph 18.

## OTT'S EDUCATIONAL AND EMPLOYMENT HISTORY

19.     Ott is a highly experienced Portfolio Manager and equity analyst, who has been managing a healthcare portfolio since 2005 and analyzing securities on Wall Street since 1998.

ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 19.

20.     Since Ott's entry into the financial services industry, Ott is known to be a principled individual.

ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 20.

21.     Ott captained her high school basketball team in Chicago, Illinois and was recruited to play basketball at the United States Military Academy, West Point.  Ott had always known she wanted to serve her country and was excited to attend the United States Military Academy Preparatory School ("USMAPS") in the hopes that she would receive a Congressional

6

Appointment to West Point the following year.  Partly inspired by her older brother who had just completed his first year at the United States Air Force Academy, Ott eagerly accepted the challenge.

> ANSWER:        Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations set forth in Paragraph 21.

22.    In July 1983, Ott arrived at USMAPS in Fort Dix, NJ and quickly distinguished herself as a leader among her peers.  She was placed in the second highest level of command as the Brigade Executive Officer and was the highest ranking woman in her year group.

> ANSWER:        Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations set forth in Paragraph 22.

23.    One year later, Ott received a Congressional Appointment and was accepted to the United States Military Academy, West Point.  Ott was proud to be a member of the ninth class of women to graduate from West Point.

> ANSWER:        Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations set forth in Paragraph 23.

24.    Over the next 4 years, Ott held multiple leadership roles as part of the Corps of Cadets Chain of Command.  Additionally, Ott participated in extracurricular activities such as Sand Hurst (a military knowledge and skills competition involving challenging military tasks), Varsity Softball, Team Handball in which Ott was named Team Captain, Jungle Warfare School training in Panama and received her Open Water SCUBA License.  Ott also was selected as a member of the US Team Handball team as part of the 1987 Olympic Festival.

> ANSWER:        Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations set forth in Paragraph 24.

25.    In May 1988, Ott graduated from the United States Military Academy, West Point, New York with a Bachelor's of Science (BS) in general engineering and was commissioned in the United States Army as a Second Lieutenant.  While a cadet, Ott had competed academically, athletically, and militarily in order to be eligible for selection of a coveted Army Aviation slot.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 25.

26.    After passing numerous Flight Aptitude tests as well as rigorous health standards tests, Ott was awarded the branch, Army Aviation, and attended Flight School at Ft. Rucker, Alabama.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 26.

27.    In 1988, Ott completed the Aviation Officer Basic Course ("OBC").

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 27.

28.    Following OBC, Ott had a two week gap until her next course and could have taken vacation like her peers.  Instead, Ott drove to the Air Assault training center (repelling from helicopters) without orders in the hopes of convincing the Cadre that she had what it took to complete the grueling Air Assault Course.  Ott arrived at 2:00 AM and waited for instructors to arrive.  By 6:00am, Ott was allowed to attempt the obstacle course and timed run.  Ott's perseverance paid off and after completing both events, Ott was selected to attend and subsequently completed the extremely challenging Air Assault Course and earned the prestigious Air Assault badge.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 28.

29.    In 1989, after intense training and testing, Ott completed the Rotary Wing Aviator Course and became a qualified aviator flying UH-1 (Huey) and UH-60 (Black Hawk) helicopters and was awarded the Aviator Badge.  Following her flight training, Ott also completed the Airborne Course (Parachuting) and earned her "jump" wings.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 29.

30.    Ott was then assigned to her first unit, 1st Cavalry Division ("1st CAV"), in Fort Hood, Texas as a Company Executive Officer responsible for the company's "readiness"

8

(a measure of equipment repair and maintenance).  From July 1989 to July 1990, Ott achieved 95% readiness rate, 5% above the army standards.

        ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 30.

        31.     After distinguishing herself among her peers, Ott was selected to undergo advanced training on Electronic Warfare equipped Black Hawk helicopters out of 15 competing officers.

        ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 31.

        32.     In 1990, Ott became qualified on the EH-60 (EW Black Hawk).

        ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 32.

        33.     Upon Ott's return to 1st CAV, Ott was immediately assigned the leadership role of Platoon Leader ahead of 6 other, competing candidates.  In addition to logging flight hours, Ott trained 7 aviators, 15 linguists, 5 flight crew engineers and 3 electronic warfare/intercept systems repairmen.  Ott was also responsible for equipment valued at $25 million.

        ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 33.

        34.     During the period of August 1990 to August 1992, Ott consistently was recognized by the company commander for her leadership and having the best platoon (out of 5) in the company.

        ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 34.

        35.     In September 1990, Ott deployed to Saudi Arabia as part of Operation Desert Shield/Desert Storm.  During this time, Ott focused on safety and maintenance of aircraft by consistently achieving operational rates of 85% in EH-60 helicopters (the standard was 70% during Operation Desert Shield/Desert Storm).

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 35.

36.    The Division Commander recognized Ott with high praise for completing 85% of Aircraft Phase (an intensive maintenance period in which aircraft is completely stripped for inspection of all parts) in 10 days during combat, average time for Aircraft Phase under normal conditions is approximately 55 days.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 36.

37.    During Desert Storm, Ott's key role was to fly her linguists and flight crew engineers along the most forward line of troops at low to moderate altitudes with no protection from enemy fire.  Once in place, her crew would attempt to detect enemy communications and identify anti-aircraft artillery strongholds.  Ott's linguists then attempted to intercept and listen to communications and translate that information directly to the Military Intelligence Battalion supporting Division Command.  Ott spent countless hours practicing evasive maneuvering tactics as well as planning, coordinating and flying multiple combat missions during this time.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 37.

38.    Upon return to Ft.  Hood, Ott was promoted to Captain and enrolled in the Combined Armed Services Staff School in 1992.  In 1993, Ott attended and completed the Aviation Officer Advanced Course.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 38.

39.    Ott was assigned to Ft. Eustis, VA where she served as an Aviation Project Officer transporting Major Command VIPs and General Officers to and from the Pentagon via Black Hawk helicopter.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 39.

40.     In August 1993, Ott resigned at the rank of Captain after fulfilling her 5 year commitment of service to the U.S. Army.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 40.

41.     Ott was Honorably Discharged as a highly decorated officer, awarded the Saudi Arabian Kuwait Liberation Medal, Meritorious Service Medal, Air Medal (awarded only in combat), Army Commendation Medal (twice), National Defense Service Medal, Southwest Asia Service Medal with 3 Bronze Stars, Kuwaiti Liberation Medal, Army Service Ribbon, Parachutist Badge, Aviator Badge and Air Assault Badge.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 41.

42.     In July 1993, Ott joined a division of Johnson & Johnson, Ethicon Endo-Surgery, headquartered in Cincinnati, Ohio.  Ott began in a newly formed position described as a Surgical Education Representative ("SER").

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 42.

43.     As a SER, Ott began intensive knowledge and surgical skills training given by surgeons and other professional education leaders staffed by Ethicon Endo-Surgery.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 43.

44.     During this time, surgeons were just beginning to utilize small incisions and tiny cameras to convert open surgical procedures to laparoscopic and thoracoscopic procedures.  Ott facilitated the training of these new skills and products required to execute these procedures.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 44.

45.     Ott conducted professional, one-on-one labs lasting up to 4 hours per session with domestic and international surgeons and nurses in advanced Laparoscopy and Thoracoscopy.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 45.

46.     During these labs, at times, Ott would recommend a competitor's product because it was the superior product for the procedure.  Ott's integrity won the trust of surgeons and nurses simply because Ott put patient outcomes ahead of personal gain.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 46.

47.     As a member of the 15 person Professional Education Team, Ott converted competitive business worth $1.6 million over a two month period in 1994.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 47.

48.     Ott continued to solidify customer commitment to use Johnson and Johnson surgical products following key customer visits.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 48.

49.     Often, Divisional and Regional Sales managers requested Ott to fill temporary sales representative vacancies in territories throughout the United States.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 49.

50.     Ott was selected to be the Course Coordinator for the Laparoscopic Hernia repair course out of 8 other, senior candidates.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 50.

51.     Among Ott's accomplishments while at Ethicon-Endo Surgery was the development of the "Ott-Knot," an efficient and inexpensive suture technique used by surgeons in Laparoscopy even to this day.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 51.

52.     In July 1996 Ott joined Cordis Cardiology, another division of Johnson and Johnson, as a sales representative.  Based in Tampa, Florida, Ott was among the first sales groups to introduce a new technology called "stents" that ultimately revolutionized the treatment of cardiovascular disease.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 52.

53.     Ott worked closely with interventional cardiologists helping them master the new technology.  As a result of her conscientious and attentive instruction, Ott gained credibility with each cardiologist and nurse.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 53.

54.     As a result of her efforts, Ott increased stent sales by 19% resulting in revenue growth of 14% and achieved sales forecasts in both 1996 and 1997.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 54.

55.     Furthermore, in 1996, Ott was also a member of the team winning the prestigious award, "Division of the Year."

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 55.

56.     In February 1998, Ott was recruited to join Sulzer Spine-Tech headquartered in Minneapolis, MN as a Professional Education Manager.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 56.

57.    During this time, Ott facilitated the training of orthopedic spine and neurosurgeons in advanced spinal surgery throughout the nation.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 57.

58.    Ott managed and trained three sales training classes during this time as well.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 58.

59.    During the course of her various roles in healthcare, Ott often crossed paths with equity research analysts wanting to understand new medical technology.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 59.

60.    In September 1998, Ott transitioned from Corporate America to Wall Street beginning as an Equity Research Analyst for Piper Jaffray in Minneapolis, MN.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 60.

61.    Ott was responsible for drawing on industry experience to assist in writing major industry reports.  Ott created market models, drafted company research notes and provided insight from key medical meetings.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 61.

62.    In June 1999, Ott joined Lehman Brothers in NYC in the same capacity and within two (2) years was promoted to Senior Equity Research Analyst, Vice President

14

covering Orthopedic, Cardio and Supplies companies as well as Small Cap Diversified companies.

   ANSWER:  Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 62.

   63.  In 2001, Ott received multiple Institutional Investor and commission votes from clients in recognition of her strong analytical skills throughout 2000. During this period, Ott was ineligible to participate in such recognition programs because Ott had not yet been promoted to Senior Equity Research Analyst but investors included Ott in their votes, nonetheless.

   ANSWER:  Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 63.

   64.  On September 11, 2001, Ott was in the subway station inside World Trade Center when the first plane flew into the North Tower.

   ANSWER:  Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 64.

   65.  Ott, along with others, was evacuated and at the time only knew there was some sort of fire.

   ANSWER:  Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 65.

   66.  As Ott left the building, she stood in horror staring at the debris on the ground and then watching others live their own horror as they fell to their deaths.

   ANSWER:  Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 66.

   67.  Ott maintains a vivid memory of their bodies crumbling as they fell and even what they were wearing that day.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 67.

68.     Ott stood silently praying for each of those unsuspecting and terrified individuals when the second explosion occurred overhead.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 68.

69.     As Ott ran for cover, debris fell all around her.  And in a sickening instant, Ott felt the woman running alongside of her fall to the ground with a fatal blow caused by falling debris.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 69.

70.     Ott ran for safety as the buildings collapsed, the whole time thinking she was going to suffocate and die on the street.

ANSWER:     Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 70.

71.     At the same time, Fred Alger Management, Inc. lost every employee who was in the North Tower on September 11th.  In total, 35 of its 55 person investment staff perished as a result of the attacks on the World Trade Center including then president, David Alger.

ANSWER:     Alger admits the allegations set forth in Paragraph 71, except

denies that 35 of its 55 person investment staff perished.  Further answering, to the extent

that the phrase "at the same time" implies or refers to Plaintiff's activities during the

terrorist attacks on the World Trade Center, Alger denies knowledge and information

sufficient to form a belief as to the truth or falsity of Plaintiff's activities during the

attacks.

72.    Fred Alger, David Alger's older brother and Founder of Fred Alger Management, returned from retirement to rebuild the firm in the wake of terrible professional and personal loss.

ANSWER:    Alger admits the allegations set forth in Paragraph 72.

73.    Fred Alger acted quickly.  At the time, his son-in-law, Chung was an analyst at Alger and attending a conference in California.

ANSWER:    Alger denies the allegations set forth in Paragraph 73, except admits that Fred Alger took certain steps on behalf of Alger in September 2001 and that Chung was a Senior Analyst, Portfolio Manager, and Head of Technology at Alger.

74.    Chung began at Alger in 1994 as a Research Associate.  Chung later became an Analyst and then Senior Analyst at the time of the attacks.

ANSWER:    Alger admits the allegations set forth in Paragraph 74 except denies that "Chung later became…[a] Senior Analyst at the time of the attacks."

75.    Scrambling to hold his firm together, Fred Alger immediately appointed Chung as Chief Investment Officer and then set out to recruit former Alger alumni to return in order to sustain and rebuild the firm and to hire a new President and CEO.

ANSWER:    Alger denies the allegations set forth in Paragraph 75, except admits that Fred Alger designated Chung as Chief Investment Officer of Alger.

76.    Following the tragedy of September 11th, Ott felt compelled, in part for her own healing, to somehow contribute to the recovery process.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 76.

77.    In April 2002, Ott was offered and accepted an opportunity to join Fred Alger Management, Inc. as a Vice President and Senior Analyst, covering the medical supplies and device sectors (including cardiology, orthopedics, neurovascular, diabetes, ophthalmology, gynecology, gastroenterology, general surgery, and lasers).  Ott also covered death care/funeral home services as well as pharmaceuticals and biotech.  (Exhibit A)

ANSWER:    Alger denies the allegations set forth in Paragraph 77, and refers to

Exhibit A for its contents.


78.    Ott succeeded as an analyst and by 2004, Ott ranked No. 1 in the Small Cap Fund in overall contribution to the fund's performance.  Ott also tied for the top spot in the absolute return of firm-wide, owned stocks, which were up 33%.

ANSWER:    Alger denies the allegations set forth in Paragraph 78.


79.    In 2005, after being a member of the Alger Health Sciences ("HS") Fund team, Ott was promoted to Portfolio Manager ("PM") responsible for co-managing the HS Fund. Alger announced the promotion in a Press Release dated October 7, 2005, saying, **"Rosanne Ott and Joanne Sayers, both of whom have been integral members of the Alger Health Sciences Fund, will lead a new investment team of the Fund.  The team will take leadership, effective immediately, following Teresa McRoberts' decision to depart Alger."**

ANSWER:    Alger denies the allegations set forth in Paragraph 79, and refers to

the Exhibit A for its contents.


80.    Daniel C. Chung, Alger's then and current President and Chief Investment Officer of Fred Alger, said, **"...  Going forward, we have an experienced team that has been instrumental to the Health Science Fund's success to date, and they are in a strong position to hit the ground running."** (Exhibit A)

ANSWER:    Alger admits the allegations set forth in Paragraph 80 except

denies any characterization of the referenced press release, and refers to Exhibit A for its

contents.


## OTT EXCELS AT ALGER


81.    In 2005, Ott's HS Fund ended with a Lipper ranking in the 6th percentile and assets under management ("AUM") at $85.7 million.  Also in 2005, Alger's Marketing department began to tap Ott for client meetings with the purpose of either retaining current assets or winning additional assets for the firm to manage.  By the end of 2005, Ott had conducted 8 client meetings (6 more than the previous year) in addition to her new role as Portfolio Manager and senior analyst.

ANSWER:      Alger denies the allegations set forth in Paragraph 81, and refers to the purported Lipper ranking for its contents.

82.      In 2006 and 2007, Ott's HS Fund year end rankings were in the top 20th percentile along with a Morningstar Rating of 5 stars, the agency's top rating.

ANSWER:      Alger denies the allegations set forth in Paragraph 82, and refers to the purported Morningstar Rating for its contents.

83.      In 2006, Ott conducted 14 marketing meetings (6 more than the prior year). Chung noted on Ott's bonus paperwork that, **"Your [Ott's] presentations to clients have been very strong and you are one of our best representatives."** (Exhibit B)

ANSWER:      Alger denies the allegations set forth in Paragraph 83, and refers to Exhibit B for its contents.

84.      Chung continued in his comments, stating, **"[Ott is] very responsive to all requests and analysis. All PMs appreciate your professionalism and desire to go the extra step as needed. Strong knowledge of industry and companies. Modeling is detailed and thorough. Excellent work product, improved this year from already good work in past years. Strong work ethic. All sense commitment to 'the Team' and our collective performance."** (Exhibit B)

ANSWER:      Alger denies the allegations set forth in Paragraph 84, and refers to Exhibit B for its contents.

85.      In respect of 2006, Ott was awarded a $275,000 bonus on top of a $350,000 base salary and a Deferred Compensation Grant of $150,000 for a total compensation of $775,000. (Exhibit B)

ANSWER:      Alger denies the allegations set forth in Paragraph 85, and refers to Exhibit B for its contents.

86.      By 2007, Ott had maintained positive attribution across all Alger Funds/Portfolios and again held the number one spot in the firm's largest fund, the Small Cap Fund, in terms of attribution.

ANSWER:      Alger denies the allegations set forth in Paragraph 86.

87.     In 2007, Ott was tapped for 15 key marketing meetings and was lauded by Chung for such efforts in an email dated June 28, 2007: **"Rose [Ott]: Wanted to thank you for the marketing you are doing on behalf of the firm.  You do a great job, by all accounts I should probably take some 'lessons' from you on presenting a clear, concise and compelling story for the firm.  We all benefit greatly from efforts such as these and it won't go un-noticed by me at year-end.  Thanks, Dan [Chung]"** (Exhibit C)

ANSWER:      Alger denies the allegations set forth in Paragraph 87, and refers to Exhibit C for its contents.

88.     In Ott's 2007 analyst review dated December 17, 2007, Ott was noted for, **"Small cap stock picking leader (again).  Strong client representation skills – participation in key consultant meetings, Illinois teachers final.  Team player - good mentoring re junior analysts.  Knowledge of industry, hard worker."** (Exhibit D)

ANSWER:      Alger denies the allegations set forth in  Paragraph 88, and refers to Exhibit D for its contents.

89.     In respect of 2007, Ott received a $375,000 bonus and Deferred Compensation Grant of $100,000 in addition to her salary of $350,000 for a total compensation of $825,000.  (Exhibit E)

ANSWER:      Alger denies the allegations set forth in Paragraph 89, and refers to Exhibit E for its contents.

90.     In 2008, as a result of her hard work and success, Ott was promoted to Senior Vice President and received an increase in salary of $25,000 bringing her salary to $375,000.  (Exhibit F) During this time, Ott was repeatedly tapped for more marketing by all levels of the Marketing Department including the head of Marketing, James Tambone ("Tambone").

ANSWER:      Alger denies the allegations set forth in Paragraph 90, and refers to Exhibit F for its contents.

91.     Specifically, on August 21, 2008, Chung sent Ott to meet with Illinois Teachers Retirement Fund when the Small Cap Fund came under pressure due to the cataclysmic market upheaval facing the world markets and economies.  The client wanted to speak with the Portfolio Manager, Jill Greenwald ("Greenwald"), but Greenwald refused to reschedule vacation to meet with the client.  As a result of Ott's diligence, the Illinois Teachers Retirement Fund did not withdraw their investment with Alger.

ANSWER:     Alger denies the allegations set forth in Paragraph 91, except admits that the Illinois Teachers Retirement Fund did not withdraw its investment on August 21, 2008.

92.     In 2008, Ott also participated in formalized public speaking training arranged by Tambone along with Chung, PMs Patrick Kelly ("Kelly") and Andrew Silverberg ("Silverberg"), and fellow PM/analyst Christopher Walsh ("Walsh").

ANSWER:     Alger admits the allegations set forth in Paragraph 92.

93.     In 2008, Ott's meetings with clients grew to 33 meetings (more than double the prior year).

ANSWER:     Alger denies the allegations set forth in Paragraph 93 except admits that Ott participated in marketing events in 2008.

94.     In calendar year 2008, Ott's bonus award and grant letter dated January 12, 2009 simply stated, **"In recognition and appreciation of your contributions, Fred Alger & Company, Incorporated will pay you the following: Discretionary Bonus of $135,000 and Deferred Compensation Grant of $75,000.   Thank you for your continued support."** (Exhibit G) Ott's total compensation for calendar year 2008 was $585,000 down 29%.

ANSWER:     Alger denies the allegations set forth in Paragraph 94, and refers to Exhibit G for its contents.

95.     During the meeting in which Chung gave Ott the 2008 bonus award, Chung informed Ott that all bonuses were down significantly as a result of the selloff of the market and the suddenly dramatic and significant losses of assets under management.   The Madoff Scandal had a deleterious effect; investors were wary of fund managers.

ANSWER:     Alger denies the allegations set forth in Paragraph 95.

## OTT TAKES ON MORE RESPONSIBILITIES

96.     Days later, Chung summoned Ott to his office to discuss marketing. Chung told Ott, **"We're gonna have to call on you to do more marketing.   Would you be willing to do that? You know 2008 was a tough year, we lost a lot of assets.   You obviously**

**do a very good job with clients.  Tambone has told me you do a very good job and that you're credible."**

> ANSWER:      Alger denies the allegations set forth in Paragraph 96.

97.      Ott replied, **"I'm very happy to help.  I'll do what I can to help this firm.  Let's talk about it."** Chung was on his way to the gym and told Ott to speak with Jim Tambone about her assuming more marketing responsibilities.

> ANSWER:      Alger denies the allegations set forth in Paragraph 97.

98.      As early as the first week in January 2009, Ott was sent on a multi-day marketing blitz as a way to increase visibility for the firm.  Ott met with multiple media outlets and appeared on CNBC to discuss Ott's healthcare investment thesis as well as the Alger investment process.

> ANSWER:      Alger denies the allegations set forth in Paragraph 98 except
>
> admits that Ott met with media outlets in January 2009.

99.      In 2009, Ott went on to conduct an astonishing 69 key marketing meetings, media interviews and panel discussions on behalf of the firm.

> ANSWER:      Alger denies the allegations set forth in Paragraph 99 except
>
> admits that Ott participated in marketing events in 2009.

100.      Nearly every single week during 2009, Ott met with investors, media, consultants, advisors, wholesalers, internal marketing personnel and also participated as panel expert at large healthcare conferences on behalf of Alger.  Ott's marketing effort on behalf of the firm more than doubled from the previous year.

> ANSWER:      Alger denies the allegations set forth in Paragraph 100 except
>
> admits that Ott participated in marketing events in 2009.

101.      Each client meeting, panelist presentation or sales force presentation took a great deal of preparation time.  Ott frequently traveled all over the country and attended evening events as well as met with clients during work hours.  At this point, marketing was clearly taking up more than a third of Ott's work time in addition to her portfolio management and senior analyst responsibilities.

ANSWER:     Alger denies the allegations set forth in Paragraph 101 except admits that Ott participated in marketing events in 2009.

102.    In fact, Ott's marketing meetings, which had previously been rewarded at year end, had grown from two investor meetings in 2004 to a total of 140 meetings by 2009.

ANSWER:     Alger denies the allegations set forth in Paragraph 102 except admits that Ott participated in marketing events in 2009.

103.    In fact, nearly each year from 2004 to 2009, Ott's marketing grew by more than 75% the previous year.  In 2008 and 2009 specifically, Ott's marketing grew by over 100% each year.  (Exhibit H)

ANSWER:     Alger denies the allegations set forth in Paragraph 103 except admits that Ott participated in marketing events in 2009, and refers to Exhibit H for its contents.

104.    Essentially, Alger received the benefit of three separate and highly reliable employees rolled up into one in Ott.  The following table depicts Ott's scheduled client, media, wholesaler, marketing and panel presentations in 2009 on behalf of FAM:

| Total Meetings | Date | Due Diligence Meetings, Panel Presentations, Media |
|---|---|---|
| 2009 | | |
| 69 | | |
| 1 | 15-Dec-09 | Alger National Sales Meeting |
| 1 | 18-Nov-09 | SEI for Cowiben |
| 1 | 12-Nov-09 | SACRS Nov Conf |
| 1 | 12-Nov-09 | Wells Fargo |
| 1 | 11-Nov-09 | NORCAL Mutual Insurance Company presentation |
| 1 | 10-Nov-09 | NORCAL Mutual Insurance Comapny |
| 1 | 28-Oct-09 | Russell Investment Group |
| 1 | 27-Oct-09 | Watson Wyatt |
| 1 | 20-Oct-09 | Cambridge Associates |
| 1 | 6-Oct-09 | CNBC |
| 1 | 5-Oct-09 | CNBC pre interview |
| 1 | 25-Sep-09 | CapTrust |
| 1 | 24-Sep-09 | LPL |
| 1 | 22-Sep-09 | Alger Wholesaler |
| 1 | 18-Aug-09 | LPU Miramer Conf "From Cock pit to Stock pit: Military Discipline to Investor Discipline" |
| 4 | 17-Aug-09 | Alger Wholesaler marketing |
| 1 | 4-Aug-09 | Wall Street Journal |
| 1 | 4-Aug-09 | Smart Money |
| 1 | 28-Jul-09 | JP Morgan Investment Analytics and Consulting Group |
| 1 | 24-Jul-09 | Barron's |
| 1 | 22-Jul-09 | Marquette |
| 1 | 20-Jul-09 | Smart Money |
| 1 | 17-Jul-09 | Smart Money |
| 1 | 16-Jul-09 | Smart Money |
| 1 | 25-Jun-09 | Kaiser Permanente |
| 1 | 22-Jun-09 | Oppenheimer |
| 1 | 19-Jun-09 | SACRS call |
| 1 | 18-Jun-09 | LPL |
| 1 | 9-Jun-09 | Alger Wholesaler meeting |
| 1 | 1-Jun-09 | Barron's |
| 1 | 19-May-09 | Alger Wholesaler meeting |
| 1 | 19-May-09 | Trans America |
| 1 | 15-May-09 | SACRS May Conf |
| 1 | 6-May-09 | Alger Internal Marketing |
| 1 | 6-May-09 | Merrill Lynch Van Andel Family |
| 1 | 30-Apr-09 | Merrill Lynch |
| 1 | 29-Apr-09 | Alger Internal Marketing Publication |
| 1 | 27-Apr-09 | SEI Investments |
| 1 | 17-Apr-09 | Clearbrook Investment Consulting, LLC |
| 1 | 24-Mar-09 | Barrons Online |
| 1 | 20-Mar-09 | Heartland and Co of Ohio |
| 2 | 17-Mar-09 | Lincoln Institute Land Policy |
| 1 | 12-Mar-09 | Alger Internal Marketing Meeting |
| 1 | 3-Mar-09 | Smart Money |
| 1 | 2-Mar-09 | Wall Street Journal |
| 1 | 19-Feb-09 | Barron's Online |
| 1 | 18-Feb-09 | Wall Street Journal |
| 1 | 16-Feb-09 | Market Watch |
| 2 | 11-Feb-09 | Market Watch, Wall Street Journal |
| 1 | 9-Feb-09 | Hewitt/Sisters Holy Cross |
| 1 | 5-Feb-09 | Associated Press |
| 1 | 5-Feb-09 | Alger Internal Marketing Meeting |
| 1 | 3-Feb-09 | Associated Press |
| 1 | 27-Jan-09 | American Red Cross |
| 1 | 14-Jan-09 | The Street.Com |
| 3 | 9-Jan-09 | The Street.Com, Reuters, Business Week |
| 5 | 7-Jan-09 | CNBC, Barrons, Wall Street Journal, The Street.com, Smart Money |
| 1 | 6-Jan-09 | Sunstar |
| 69 | | |

ANSWER:     Alger denies the allegations set forth in Paragraph 104, and refers

to the referenced table for its contents.

105.    In early February 2009, Tambone approached Ott with a proposition. Tambone wanted Ott to do more marketing for the firm but also knew Ott was very busy in her roles as a PM and senior analyst.

ANSWER:     Alger denies the allegations set forth in Paragraph 105.

24

106.    Ott was prepared to do what was necessary to help raise assets following the previous conversation she had had with Chung at the beginning of the year.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 106.

107.    Tambone suggested that Ott give up her analytical role and focus her efforts on being a PM while continuing to market all of the firm's funds.  Tambone outlined an elaborate job description detailing Ott's responsibilities and asked Ott if he [Tambone] could present the idea to Chung.

ANSWER:    Alger denies the allegations set forth in Paragraph 107.

108.    Ott happily agreed to the new potential role.  Ott had several meetings with Tambone and Chung to discuss a more formal outline of Ott's responsibilities as well as metrics for compensation.

ANSWER:    Alger denies the allegations set forth in Paragraph 108.

109.    In 2009, Ott recommended owning ISRG to all Portfolio Managers.  In the June quarter, contrary to Ott's recommendation, Chung sold his position in ISRG ahead of the quarterly announcement.  While Chung was in China, the stock rose sharply after the company reported positive earnings as Ott rightfully predicted.

ANSWER:    Alger denies the allegations set forth in Paragraph 109.

110.    Ott notified Chung over the phone of the stock's outperformance.

ANSWER:    Alger denies the allegations set forth in Paragraph 110.

111.    Upon his arrival to the office, Chung berated Ott because he had missed the outperformance of ISRG in his Midcap Fund.  Even though Chung had sold the stock based on his own decision, he blamed Ott for his mistake.  In fact, Chung went on to state that he got too many emails to read and that it was somehow Ott's fault he had sold the stock.  He also forewarned, **"That could have made your year."**

ANSWER:    Alger denies the allegations set forth in Paragraph 111.

112.    Vindictively, later that summer when Chung awarded Deferred Compensation Grants, despite telling employees that the average grant was down 25-50%, Ott's grant was down 65%.

25

ANSWER:     Alger denies the allegations as set forth in Paragraph 112, except admits that Ott's grant was down 65% from the prior year.

113.    Around this time, without any explanation, Chung also rejected the idea of Ott's new role of PM and marketing that Tambone had created.  Ott continued to wear all three hats (*i.e.*, PM of her HS Fund, Healthcare Senior Analyst, and marketer for the firm) without being adequately compensated for all three roles.

ANSWER:     Alger denies the allegations set forth in Paragraph 113.

114.    By the end of 2009, the HS Fund had outperformed the S&P Healthcare Sector by 22% and the S&P500 by nearly 4% (Source: Morningstar).  Ott completed the fourth year of managing the fund and the record was impressive in its consistent, favorable returns.

ANSWER:     Alger denies the allegations set forth in Paragraph 114, and refers to the purported Morningstar source for its contents.

115.    In fact, co-worker Alex Bernstein, Vice President, Manager of Internet Marketing, sent Ott a congratulatory email when the September 2009 issue of Kiplinger Mutual Fund Rankings ranked Ott's HS Fund in 3rd place out of 25 funds for the previous 5 years, 11th for the previous 3 years and 15th for the last year.  (Exhibit I)

ANSWER:     Alger denies the allegations set forth in Paragraph 115, and refers to Exhibit I for its contents.

116.    During her 2009 bonus discussion, however, Chung resented that Ott's performance in her HS Fund did not match up to the attribution in his fund because he did not listen to Ott's recommendations.  Increasingly, Chung also resented all the glowing feedback he received regarding Ott's marketing and client interaction.

ANSWER:     Alger denies the allegations set forth in Paragraph 116.

117.    Amazingly, Ott received a calendar year 2009 bonus of $121,500 which was lower than the previous year and the Deferred Compensation Grant of $25,000 which was significantly lower than the previous year in addition to her salary of $375,000 for a total compensation of $521,500.

ANSWER:     Alger admits that Ott received a calendar year 2009 bonus of $121,500, a Deferred Compensation Grant of $25,000, and a salary of $375,000.  Alger denies the remaining allegations set forth in Paragraph 117.

118.    As a PM, Ott always strived to rank in the top quartile of Morningstar rankings as compared against other competing HS Funds.  In each year from 2005 through 2009, Ott managed to deliver consistent, top quartile performance with the exception of the "exceptional" market in 2008.

ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in the first sentence of Paragraph 118.

Alger denies the remaining allegations set forth in Paragraph 118.

119.    From 2005 to 2009, compared to its peers, the HS Fund ranked in the 5th, 20th, 17th, 62nd and 22nd percentiles, respectively.

ANSWER:     Alger denies the allegations set forth in Paragraph 119.

120.    The following chart and table illustrate Ott's HS Fund's performance and returns for 2005 through 2010:

*(the remainder of this page is intentionally left blank)*

**Rosanne Ott**

**Senior PM:  Diversified Health Sciences Fund**

Diversified, "long-only" Health Sciences Fund focused on all subsectors of Healthcare. Proven record of consistent outperformance of Category SH (Specialty Health), S & P 500 TR (Total Returns) or both in the last 4 out of 5 years. Fund delivered only one year of negative returns (2008) yet still out-performed S & P 500 during same year.

| Returns | as of January 20, 2011 | Cumulative* | 5 Yr. Avg* | 5 Yr. Mean* |
|---|---|---|---|---|
| AHSAX | 2.68% | 31.31% | 5.91% | 9.45% |
| Category (SH) | 2.08% | 15.81% | 4.19% | 7.31% |
| S & P 500 TR | 1.89% | 11.97% | 5.16% | 12.11% |

| Trailing Total Returns   as of December 31, 2009 | 1-Year | 3-Year | 5-Year |
|---|---|---|---|
| AHSAX   % Rank in Category | 22 | 16 | 6 |

**Growth of 10k AHSAX**

05/01/2002 - 12/19/2010
Source: Morningstar

AUM: $236.0 mil
Turnover: 174.60%

AHSAX
Category (SH)
S & P 500 TR



◆ Analyst since inception
◆ Senior Co-PM since Oct 2005

**Historical Returns**

| Period | Fund | Absolute Return | Outperformance | % Rank in Category |
|---|---|---|---|---|
| through Jan 20, 2011 | AHSAX | 2.68% | | 18 |
| | Category (SH) | 2.08% | 28.85% | |
| | S & P 500 TR | 1.89% | 41.80% | |
| 2010* | AHSAX | 2.99% | | 85 |
| | Category (SH) | 8.38% | -64.32% | |
| | S & P 500 TR | 15.06% | -80.15% | |
| 2009 | AHSAX | 27.38% | | 22 |
| | Category (SH) | 22.48% | 21.80% | |
| | S & P 500 TR | 26.46% | 3.48% | |
| 2008 | AHSAX | -26.16% | | 62 |
| | Category (SH) | -23.43% | -11.65% | |
| | S & P 500 TR | -37.00% | 29.30% | |
| 2007 | AHSAX | 16.09% | | 17 |
| | Category (SH) | 9.27% | 73.57% | |
| | S & P 500 TR | 5.49% | 193.08% | |
| 2006 | AHSAX | 9.26% | | 20 |
| | Category (SH) | 4.27% | 116.86% | |
| | S & P 500 TR | 15.79% | -41.36% | |
| Oct - Dec 2005 | AHSAX | 6.87% | | n/a |
| | Category (SH) | 1.02% | 573.53% | |
| | S & P 500 TR | 1.59% | 332.08% | |
| 5 Year Average | AHSAX | 5.91% | | 20 |
| | Category (SH) | 4.19% | 40.96% | |
| | S & P 500 TR | 5.16% | 14.57% | |
| 5 Year Mean | AHSAX | 9.45% | | n/a |
| | Category (SH) | 7.31% | 29.29% | |
| | S & P 500 TR | 12.11% | -22.01% | |

*Firm-imposed Trading restrictions contributed to atypical returns in 2010.          Source: Morningstar

ANSWER:     Alger denies the allegations in Paragraph 120, and refers to the chart for its contents.

121.    In fact, despite a revolving door of co-managers on the HS fund, and heavy distractions from marketing, as well as senior analyst responsibilities and team leader functions, Ott outperformed the S&P Healthcare Index, the S&P 500 **or both** in 4 out of 5 years (2005- 2009).

ANSWER:     Alger denies the allegations set forth in Paragraph 121.

122.    The HS Fund delivered only one year of negative returns (2008), yet still outperformed the S&P 500 during that same year.  Throughout this span of time, Assets Under Management ("AUM") grew from $85.7 million to a peak of $355 million in the HS Fund, as a result of consistent returns and stability in Ott's management of the fund.

ANSWER:     Alger denies the allegations set forth in Paragraph 122, and refers to the purported S&P source for its contents.

123.    In contrast, Chung's Midcap Fund performance was highly inconsistent. Since taking over the fund, assets are estimated to have declined by nearly $6 billion, down to roughly $1 billion.  Chung's performance in healthcare worsened within his fund while the HS Fund continued to outperform making it awfully difficult to assign blame to Ott for his own underperformance.

ANSWER:     Alger denies the allegations set forth in Paragraph 123.

124.    Throughout the eight years of Ott's employment, Chung often lamented his envy of Ott's stellar attribution in the Small Cap Fund.  Chung repeatedly remarked that he **"wished [he] had the same outperformance in [his] Midcap Fund that PM Greenwald had in her Small Cap Fund."**

ANSWER:     Alger denies the allegations set forth in Paragraph 124.

125.    Despite Ott continuously recommending the same names to Chung (based on market cap suitability), Chung rarely listened or acted on Ott's recommendations which reflected in his underperformance in health care.

ANSWER:     Alger denies the allegations set forth in Paragraph 125.

126.   In fact, his abysmal Trailing Total Returns record of being in the 65th percentile for one year of performance, 94th percentile for three years performance, 78th percentile for five years performance would have gotten him terminated as a Portfolio Manager at any other firm where he was not the husband of an owner of the firm or the son-in-law of the Founder of the firm.  In contrast, Ott's trailing total returns record put her in the 6th, 16th and 22nd rankings for the one, three and five year performance rankings, respectively, through December 2009.

ANSWER:     Alger denies the allegations set forth in Paragraph 126.

## ALGER IMPLEMENTS AN UNLAWFUL POLICY

127.   On April 8, 2010, Alger unlawfully implemented an unprecedented trading policy guaranteeing that investors in the HS Fund would not receive the best execution of transactions within the fund.

ANSWER:     To the extent the allegations set forth in Paragraph 127 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 127.

128.   In an email to both Co-Portfolio Managers ("Co-PMs") of the HS Fund, Ott and David Farhadi, MD.  ("Farhadi"), as well as all of the members of Alger's trading desk, Chung wrote, **"We need to implement a change to portfolio management on the HC [HS] fund, in particular, in line with the Alger Analyst Fund, a) no trades should be executed in the HC MS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, b) Trading, if you receive an order, you will need to hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours."** (Exhibit J)

ANSWER:     Alger denies the allegations set forth in Paragraph 128, and refers to Exhibit J for its contents.

129.   The consequence of this policy allowed other Portfolio Managers managing different Alger funds to "front run" ideas for the HS fund.  Given these other PMs are compensated for the performance in their funds, they were allowed to personally gain by trading in front of the HS Fund and by obtaining better execution in their funds.

ANSWER:     Alger denies the allegations set forth in Paragraph 129.

130.   For example, on April 20, 2010, Ott wanted to buy additional shares of UnitedHealth Group, Inc (ticker: UNH), Wellpoint, Inc (ticker: WLP) and Humana, Inc (ticker:

HUM).  On April 20, 2010 at 7:42am, Ott wrote an email in accordance with the new trading policy to all PMs and Trading, "**UNH add 100bps, WLP add 100bps, HUM add 50bps. Thanks.**" In other words, Ott wanted to buy additional shares of UNH, WLP and HUM in the HS Fund.  (Exhibit K)

> ANSWER:      Alger denies the allegations set forth in Paragraph 130, and refers
>
> to Exhibit  K for its contents.

131.    At 8:38 AM on the same day, April 20, 2010, Chung replied, **"I haven't heard pitches on these.  No trade until I do."**

> ANSWER:      Alger denies the allegations set forth in Paragraph 131, and refers
>
> to Exhibit K for its contents.

132.    "Pitches" are made to PM's when a stock isn't owned in a fund.  The stock is only "pitched" as a new idea for a fund.

> ANSWER:      Alger denies the allegations set forth in Paragraph 132.

133.    Given that Chung already owned UNH, WLP and HUM in his funds, his demand for a "pitch" was peculiar.  The fact that all three names were already owned in the HS Fund added to the absurdity.

> ANSWER:      Alger denies the allegations set forth in Paragraph 133.

134.    At 8:45 AM on the same day, PM Patrick Kelly ("Kelly") via email to Trading put in orders to buy WLP.  (Exhibit K) Kelly's Allcap fund was allowed to buy WLP in front of the HS fund.  Ultimately in this specific case, the HS fund was never allowed to add to its positions at all.

> ANSWER:      Alger denies the allegations set forth in Paragraph 134, and refers
>
> to Exhibit K for its contents.

135.    Ironically, Kelly, armed with the knowledge that Ott wanted to add WLP, benefited while Ott's HS Fund was not able to add to its current position despite it being solely Ott's idea.  As a result, the shareholders of the HS Fund suffered as a consequence and did not receive best execution.  In fact, the HS Fund shareholders were denied any execution at all.

> ANSWER:      Alger denies the allegations set forth in Paragraph 135.

## OTT ACTS IN THE BEST INTERESTS OF HS FUND INVESTORS

136.    In response to the issuance of this new "policy", Ott, a Senior Vice President holding the FINRA Series 7 license, a Co-PM for the Alger HS Fund and a supervised employee as defined under the 1940 Act, took affirmative actions to stop, prevent, and curb the unlawful trading restrictions engaged in by Alger and its senior managers.

ANSWER:    To the extent the allegations in Paragraph 136 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 136 except that Alger admits that Ott's title was Senior Vice President, she held the FINRA Series 7 license, and she was a co-PM for the Alger HS Fund.

137.    At the time this new policy was implemented, Ott's Co-PM, Farhadi, described the new trading policy as "**sabotage**" intended to destroy the stellar performance of the fund.  Farhadi further informed Ott that he spoke with Alger's General Counsel, Liebes, about the legality of the policy.  Rather than taking the matter seriously, Liebes was dismissive to Farhadi stating there was "**nothing wrong with the policy**" and that the policy was "**fine.**"

ANSWER:    Alger denies the allegations set forth in Paragraph 137, except that Alger admits that Farhadi spoke to Alger's General Counsel Liebes regarding the trading policy.

138.    Over the next two weeks, Alger's Head of Trading, Steve Thumm, ("Thumm") informed Ott that he, too, had spoken about the trading policy with the Chief Compliance Officer ("CCO"), Barry Mullen ("Mullen"), only to learn that Mullen was unaware of the policy at the time it was created.

ANSWER:    Alger denies the allegations set forth in Paragraph 138.

139.    Upon hearing that the Co-PM, Farhadi, and Head of Trading, Thumm, had been ignored by both Liebes and the Compliance Department, Ott inquired with the SEC as to the legitimacy and legality of the newfangled HS Fund trading policy.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 139.

140.    After multiple conversations with members of the Securities Exchange Commission's Investment Management Division, Office of Chief Counsel, Ott was informed that there appeared, on its face, to be serious securities law issues with Alger's newfangled trading policy.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 140.

141.    During this time, SEC representative, Michael S.  Didiuk ("Didiuk"), Division of Investment Management, after conferring with other members of his staff, determined that the policy appeared to harm investors in Ott's HS Fund.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 141.

142.    Specifically, Didiuk stated that, **"the SEC takes matters that potentially hurt investors extremely seriously.  This policy absolutely hurts investors by all but guaranteeing poor execution as a result of a two hour holding period.  We would like to refer the matter to the SEC's Division of Enforcement so that it can be investigated formally."** (Exhibit L)

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 142.  Further answering,

Alger denies any characterization of Exhibit L, and refers to Exhibit L for its contents.

143.    Furthermore, because Chung is also listed on the HS Fund as a co-manager and since he is also Alger's CIO, the SEC representatives found his actions the **"most offensive."**

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 143.

144.    Regardless of the fact that Chung did not execute orders in the fund, the SEC explained that in his role as CIO, Chung should be **"zealous"** in his efforts to ensure HS Fund investors receive the very best execution possible.

ANSWER:    Alger denies knowledge and information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph 144.

145.    The SEC representative went on to ask that Ott, as the PM of the HS fund, report the trading policy to the SEC's Division of Enforcement as an official Whistle Blower.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 145.

146.    Furthermore, the SEC representative shared specific locations within the 1940 Investment Advisor Act as well as locations within the SEC's website that proved such a policy was in violation of securities laws.

ANSWER:    To the extent that the allegations set forth in Paragraph 146 are deemed conclusions of law, a response is not required.  Further answering, Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 146.

147.    Prior to filing a formal Whistle Blower Complaint, Ott attempted to rectify the policy with Alger before resolving to officially file a Whistle Blower Complaint with the SEC.

ANSWER:    Alger denies the allegations set forth in Paragraph 147.

148.    On June 22, 2010, Ott drafted a letter to Chung to complain about the illegal policy and outlined specific instances where shareholders of the HS fund were harmed as a result of poor trading execution.  (Exhibit M)

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 148, and refers to Exhibit M for its contents.

149.    In 2009, Ott had experienced Chung's vindictive behavior when he was angry he had sold ISRG and punished Ott with a much lower Deferred Compensation Grant, was tired of hearing other members of the firm praise Ott's marketing impact and denied her a promotion to the new role defined as sole PM for HS Fund and marketer for the firm, and then subsequently awarded Ott an unjustified lower bonus at year end resulting in lower overall total compensation.

ANSWER:    Alger denies the allegations set forth in Paragraph 149.

150.    Additionally, Ott was aware of his vindictive reaction to Sonu Chawla, a Junior Analyst, who had done excellent analytical work all throughout 2008.  In January 2009, one of her companies under coverage, Satyam Computer Services, Ltd.  ("Ticker: SATY.NS"), admitted to fraud and the stock went into free-fall.  A week later, the analyst received a lower bonus for her work in 2008.

ANSWER:    Alger denies the allegations set forth in Paragraph 150 except

admits that the stock price of Satyam Computer Services, Ltd. declined in 2009.

151.    During her review for 2008, Chung told Chawla, **"the number was a lot higher a week ago, but Satyam blew it."**

ANSWER:    Alger denies the allegations set forth in Paragraph 151.

152.    Ott also personally observed Chung's malicious behavior towards his former secretary, Pamela Ferguson, whom he unceremoniously fired after five years of demonstrated loyalty and competent service.  Ott also observed Senior Analyst Nam Hoang whom he forced to look elsewhere for employment and Analyst Maura Hersom who resigned after being treated viciously by Chung.  Given Chung's history of irrational and caustic behavior, Ott felt it prudent to obtain counsel, Jonathan Sack, Esq. ("Sack").

ANSWER:    Alger denies the allegations set forth in Paragraph 152 except

denies knowledge and information sufficient to form a belief as to the truth or falsity of

the allegation that "Ott felt it prudent to obtain counsel, Jonathan Sack, Esq."

153.    On June 22, 2010, on behalf of Ott, Sack met with Alger's General Counsel, Liebes, to discuss the discriminatory, unlawful trading policy solely directed at Ott's HS Fund.  Previously, Ott had written a letter to Chung.  Sack read this letter to Liebes.  The letter outlined specific examples of the HS Fund not receiving best execution for trades within the fund and specifically how the policy harmed investors.

ANSWER:    To the extent the allegations in Paragraph 153 are deemed

conclusions of law, a response is not required.  Further answering, Alger denies the

allegations set forth in Paragraph 153 except admits that Sack met with Alger's General

Counsel, Hal Liebes.

154.    Initially, Liebes attempted to say that the HS Fund Prospectus gave Alger the authority to implement such a policy but he gave up on that point when he could not locate

any such language in the HS Fund Prospectus that would allow Chung's self-appointed authority to be exempt from the Investor Adviser Act of 1940.

> ANSWER:     Alger denies the allegations set forth in Paragraph 154.

155.    Contrary to Liebes' position, the HS Fund in Alger's prospectus states that, "Except as otherwise permitted by the Act, or interpretations or modifications by, or exceptive or other relief from, the SEC or other authority with appropriate jurisdiction, and disclosed to investors, 'the Fund may not invest more than 25% of the value of its total assets in the securities of issuers in any single industry, provided that there shall be no limitation on the purchase of obligations issued or guaranteed by the U.S. Government, its agencies or instrumentalities or as otherwise permitted by the SEC; and provided that the Fund will invest in the securities of issuers in the health sciences sector, and the group of industries that make up the health sciences sector, without limit, as contemplated by its investment strategy." (Exhibit N)

> ANSWER:     Alger denies the allegations set forth in Paragraph 155.  Further
>
> answering, Alger denies any characterization of the referenced prospectus, and refers to
>
> Exhibit N for its contents.

156.    Clearly, the new trading policy limited execution and in other cases, prevented it altogether.

> ANSWER:     Alger denies the allegations set forth in Paragraph 156.

157.    Failing to justify the policy, Liebes then suggested the new policy was somehow connected to Ott's performance.

> ANSWER:     Alger denies the allegations set forth in Paragraph 157.

158.    Sack discussed with Liebes remedies to correct the policy and even included the spinoff of the HS Fund if Alger no longer wanted the HS Fund or saw a conflict with its various investment strategies.  Liebes agreed to discuss the policy with Chung who was in China at the time.

> ANSWER:     Alger denies the allegations set forth in Paragraph 158.

159.    On June 24, 2010, Chung held a meeting with the Health Care Team with no mention of the newfangled and illegal HS Fund trading policy.

ANSWER:       To the extent that the allegations set forth in Paragraph 159 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 159, except admits that Chung met with the Health Care Team on June 24, 2010.

160.   On or about June 25, 2010, Jill Greenwald ("Greenwald"), a Partner and PM of the Alger Small Cap Growth ("Small Cap") Fund, informed Ott that she had spoken with Chung over the phone because he was working from home.  Greenwald advised Ott that Chung told her that he [Chung] knew he was not good at managing a fund and that his performance was terrible.

ANSWER:       Alger denies the allegations set forth in Paragraph 160.

161.   Chung went on to share that he was considering giving up the Alger Midcap Growth ("Midcap") Fund as a result of his multiple years' worth of poor performance. Greenwald also informed Ott that Chung was considering having Ott manage the Midcap Fund along with two other analysts, Chris Walsh ("Walsh") and Ankur Crawford ("Crawford").  The bribe was not lost on Ott.  To Ott the message was clear, "Just go with the flow and you will be promoted with greater responsibilities and opportunities."  Ott did not take the bait.

ANSWER:       Alger denies the allegations set forth in Paragraph 161.

162.   On July 1, 2010, Liebes informed Sack via letter that Alger had self-reported Ott's assertion that Alger had not complied with its obligations to clients to Douglas J. Scheidt, Associate Director and Chief Counsel of the SEC's Division of Investment Management.  In his letter, Leibes advised the SEC that Alger had directed its very own outside counsel to investigate the charges made by Ott and would provide "the [SEC] Staff" with a copy of Alger's Counsel's report.  How absurd.  When was the last time an "outside counsel," paid for by a firm, found illegality on its client's part?

ANSWER:       Paragraph 162 contains rhetorical questions to which no response is required.  To the extent this material is deemed to require an answer, Alger denies it. Further answering, Alger denies the remaining allegations set forth in Paragraph 162 except admits that Alger's General Counsel, Hal Liebes, carbon copied Ott's counsel on a letter explaining that Alger self-reported Ott's allegations regarding the trading policy to

the SEC and initiated an investigation by its outside counsel, the conclusion of which would be reported to the SEC.

163.   In mid-July 2010, with no resolution regarding the trading policy and with the HS Fund's performance at all-time lows, Ott reached out to the Alger Trustees and Officers of the Trust, Alger Associates and members of Alger Management ("the Board").

ANSWER:   Alger denies the allegations set forth in Paragraph 163 except admits that Ott sent a letter addressed to "Alger Board of Trustees and members of Alger Management" dated July 14, 2010, and refers to the letter for its contents.

164.   Ott, acting with a fiduciary responsibility to the shareholders of the HS Fund, notified the Board in written correspondence dated July 14, 2010, of the **"improper, unethical, and perhaps illegal trading policy" instituted -without forewarning or explanation"** by Chung.  (Exhibit L)

ANSWER:   Alger denies the allegations set forth in Paragraph 164 except admits that Ott sent a letter addressed to "Alger Board of Trustees and members of Alger Management" dated July 14, 2010.  Further answering, Alger denies any characterization of the referenced letter, and refers to Exhibit L for its contents.

165.   In this same communication, Ott outlined all the steps she had taken to resolve the matter including the information the SEC representatives shared regarding the trading policy.

ANSWER:   Alger denies the allegations set forth in Paragraph 165.  Further answering, Alger denies any characterization of the referenced letter, and refers to Exhibit L for its contents.

166.   Ott made clear that rescinding the trading policy was not a permanent corrective action as Chung **"demonstrated he cannot be trusted to act in the best interest of shareholders of the Alger Health Science Fund [HS Fund] given his present roles."**

ANSWER:      Alger denies the allegations set forth in Paragraph 166.   Further answering, Alger denies any characterization of the referenced letter, and refers to Exhibit L for its contents.

167.    As proof of Chung's untrustworthiness, Ott outlined a specific instance where "Chung cancelled orders with Trading and never informed the Co-PMs of his actions.  On this particular order, he instructed Trading without explanation, 'Do not execute until I say so.' His interference is both baseless and outrageous.  As managers of the fund, we were attempting to close out those positions.  There was absolutely no reason to restrict or delay that order." (Exhibit L)

ANSWER:      Alger denies the allegations set forth in Paragraph 166.   Further answering, Alger denies any characterization of the referenced order, and refers to Exhibit L for its contents.

168.    On the evening of July 14, 2010, Ott received word from Lori McEvoy, ("McEvoy"), Senior Vice President ("SVP"), Director of Consultant Relations, that Ott was no longer needed for the upcoming marketing meeting with Mercer Investment Consulting, Inc.

ANSWER:      Alger admits the allegations set forth in Paragraph 168.

169.    In fact, Ott would no longer hear from McEvoy for the rest of the year despite having developed a friendship to include invitations to dinner both at home and at restaurants or drinks at nearby bars and super bowl parties.

ANSWER:      Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 169.

170.    Ott was surprised that even if the friendship had been insincere, McEvoy would no longer speak with Ott professionally especially after working together on multiple accounts.

ANSWER:      Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 170.

171.    Similar behavior became apparent with the other PMs of Alger Funds.  In fact, the PM of the Large Cap Fund, Andrew Silverberg ("Silverberg"), was terrified of being seen talking with Ott.

ANSWER:    Alger denies the allegations set forth in Paragraph 171.

172.    In fact, Silverberg would actually race out of Ott's office if he heard Chung's voice in the hall.

ANSWER:    Alger denies the allegations set forth in Paragraph 172.

173.    Partners Greenwald and Kelly stopped talking with Ott altogether and would only communicate by email or only if directly approached by Ott.

ANSWER:    Alger denies the allegations set forth in Paragraph 173.

174.    It was highly evident that no such communication was desired.  Ott was blacklisted.

ANSWER:    Alger denies the allegations set forth in Paragraph 174.

175.    During this time, Chung and Liebes met with Farhadi to discuss Ott's actions, the trading policy and the upcoming investigation by Alger's outside counsel.

ANSWER:    Alger denies the allegations set forth in Paragraph 175, except admits that Chung and Liebes met with Farhadi.

176.    Farhadi informed Ott that both Liebes and Chung forcefully tried to convince Farhadi that the policy was justified under threat of retaliation.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 176.

177.    Later (in December 2010), Farhadi would confide to Ott that during the initial meeting with Chung and Liebes, Chung also promised a 10-20% percent increase in Farhadi's bonus for 2010 as well as promotion to Senior Vice President.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 177.

178.   When Farhadi complained to Chung about receiving a 50% cut to his bonus rather than the 10-20% increase that had been promised earlier, Chung told Farhadi that Chung would make Farhadi "**whole**" if Farhadi agreed to stay at Alger until September 2011. Chung was concerned about the appearance of his retention numbers in front of the Board of Trustees and to investors.

ANSWER:     Alger denies the allegations set forth in Paragraph 178.

179.   Later, on or about May 6, 2011, Farhadi resigned from Alger in disgust.

ANSWER:     Alger denies the allegations set forth in Paragraph 179 except states that Farhadi resigned from his position as an employee at Alger in May 2011.

180.   During the time of Farhadi's first meeting with Chung and Liebes to discuss the trading policy prior to Alger's outside investigation, Chung and Liebes also met with Ott's junior analyst, Peter Pirsch ("Pirsch").  Pirsch also confided in Ott that Chung and Liebes tried to coerce and convince Pirsch that the trading policy was proper.

ANSWER:     Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegation that Pirsch also confided in Ott that Chung and Liebes tried to coerce and convince Pirsch that the trading policy was proper, admits that Chung and Liebes have met with Pirsch and deny the remaining allegations contained in Paragraph 180.

181.   Just as he had done with Farhadi, Chung told Pirsch that promotions occurred in September and that Pirsch was on track for promotion as well and a very rewarding bonus at year end.  Chung's hints at the "carrot versus the stick" were not subtle.  Chung further went on to tell Pirsch that, **"Rose [Ott] has lost our trust."**

ANSWER:     Alger denies the allegations set forth in Paragraph 181.

## CHUNG ENGAGES IN A HARASSMENT CAMPAIGN AGAINST OTT

182.   On or about July 14, 2010, Chung began a harassment campaign aimed squarely at Ott.

ANSWER:     Alger denies the allegations set forth in Paragraph 182.

183.   On July 19, 2010, Ott wanted to "trim SYK (Stryker)" from a higher weighting in the HS Fund to 50bps.

ANSWER:   Alger admits the allegations set forth in Paragraph 183.

184.   Chung immediately critiqued Ott's request to lower the weighting of SYK in the HS Fund as a "recommendation." Chung blasted Ott stating, **"We need more, not less, conviction about stocks from senior analysts.  We expect not only price targets, but recommendations on weightings that could be effective in generating real outperformance for the portfolio.  Incremental 'trading' calls, if this is what this call is, with moving price targets all the time are not going to generate any outperformance, in particular when the weightings suggested are also inconsequential."**

ANSWER:   Alger denies the allegations set forth in Paragraph 184, and refers to the referenced writing for its contents.

185.   In fact, Ott was not making a "recommendation" to the other PMs at Alger to trim their positions.  Ott simply wanted to reduce the position in the HS Fund as part of her portfolio management decision.

ANSWER:   Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 185.

186.   The following day, July 20, 2010, Chung sent a firm-wide caustic email describing his recent review of the new research database called the Tamale database ("Tamale").  Chung railed that Ott had only completed 14 out of 24 updates and attempted to discredit Ott in front of the entire research department and select personnel in sales and marketing by writing, **"ROSE [Ott]: This is UNACCEPTABLE.  Most of these names are owned and all are key names.  Further, you have only 7 write-ups in the system.  This is less than half of the next lowest analyst, despite having a bank that is smaller than most and half the size of several.  ASSIGNMENT: I expect to see all the missing 14 executive summaries and financial data complete in Tamale summary view by Tuesday or Wednesday of next week at the latest."**

ANSWER:   Alger denies the allegations set forth in Paragraph 186 except admits that on July 20, 2010, Chung sent an email to Ott regarding her updates in the Tamale database.  Further answering, Alger denies any characterization of the referenced email, and refers to the document for its contents.

187.    In reality, Ott's data was not only complete, but also up to date.  After a consultation with the technical experts on the new Tamale system, the experts discovered that Ott had not saved the data in the proper order in Tamale which is why the updates did not appear in the new system.  Once the cause of the problem was identified, an intern very easily transferred all the completed work in merely a few hours.

ANSWER:    Alger denies the allegations set forth in Paragraph 187.

188.    On July 23, 2010, knowing that Ott had a three day weekend with family visiting from out of state, Chung dug up an email Ott had sent in reply to questions from Partner and PM, Patrick Kelly ("Kelly").  Kelly was preparing for a meeting with clients and had asked all analysts to send investment themes and the drivers for investment thoughts.  Specifically, **"not investment picks, but rather bigger picture ideas."**

ANSWER:    Alger denies the allegations set forth in Paragraph 188, and refers

to the referenced email for its contents.

189.    Chung followed up on Ott's reply to Kelly with more than a dozen specific questions for Ott.  When Ott immediately answered Chung's questions, Chung assigned far more detailed "homework" during Ott's vacation.

ANSWER:    Alger denies the allegations set forth in Paragraph 189.

190.    Specifically, Chung wrote to Ott while copying all her peer PMs in an effort to discredit Ott, **"you have not submitted or sent the work on the balance sheets/buybacks, nor the merger and acq [acquisition] spreadsheet, nor answers to the unanswered questions or incomplete work promised and due over a week ago.  Further, a list of m and a [mergers and acquisitions] transactions is not analysis.  I would like to see prices, multiple to revenues and ebitda (or other valuation measures), a sense of the growth rate of the target, analysis of the "reason" for the acquisition...how does it make sense from market trend perspective, etc...I would like to see it this weekend, so I can study it for Monday."**

ANSWER:    Alger denies the allegations set forth in Paragraph 190 except

admits that Chung sent an email to Ott and certain other employees of Alger.  Further

answering, Alger denies any characterization of the referenced email, and refers to the

document for its contents.

191.    While confused by Chung's claim that Ott had made such promises, which she had not, Ott completed the new assignment over the weekend and Chung had no further

43

questions on the matter.  His lack of follow up confirmed her suspicion that the "assignment" was simply "busy work."

ANSWER:     Alger denies the allegations set forth in Paragraph 191.

192.    Exactly three weeks following Ott's letter to the Board, Chung decided to issue an impromptu and highly irregular "Midyear Midcap Review." Notably, no other PMs have ever conducted such reviews.

ANSWER:     Alger denies the allegations set forth in Paragraph 192.

193.    Predictably, Chung's assessment of Ott's performance in the Midcap Fund was beyond subjective, if not disingenuous.  (Exhibit P)

ANSWER:     Alger denies the allegations set forth in Paragraph 193.  Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit P for its contents.

194.    Chung described Ott's performance as the "second worst among all analysts." Chung continued, **"Your decision-making and communications with PMs regarding when to buy or sell stocks has resulted in your negative returns in a sector with YTD positive returns."**  (Exhibit Q)

ANSWER:     Alger admits the allegations set forth in Paragraph 194 except denies any characterization of the referenced documents, and refers to Exhibit Q for its contents.

195.    Chung blamed Ott for his fund's lack of ownership of names that had outperformed as well as owning names that had underperformed.  Ott replied in writing the following: **"My performance attribution is debatable.   As an analyst, I make recommendations for the PM to act upon.  My decision making is not reflected in this performance.   My communication has been clear.   Most importantly, owning out-of-benchmark stocks can doubly help or hurt a portfolio.  You [Chung] acted on your own and contrary to my recommendations with two of these stocks: Nuvasive Inc. (ticker symbol: "NUVA") and Hologic, Inc. (ticker symbol: "HOLX").  Because neither stock is in the Midcap benchmark, combined these two stocks are the largest detractors for what is actually your poor decision making."**  (Exhibit Q)

ANSWER:    Alger denies the allegations set forth in Paragraph 195.   Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit Q for its contents.

196.    Ott also pointed to another instance where Chung purchased a stock in Ott's Healthcare Sector without even discussing it with her.   This stock (Varian Medical Systems, Inc. ticker symbol: "VAR") underperformed as well as another stock (Select Medical Holdings Corporation, ticker symbol: "SEM') which Ott did not even cover.   Nevertheless, Ott was blamed for the underperformance of both stocks despite having never recommended either of them.

ANSWER:    Alger denies the allegations set forth in Paragraph 196.   Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit Q for its contents.

197.    Ott then described in detail four separate investment recommendations where Chung ignored Ott's recommendation to buy stocks: Thoratec Corporation, Perrigo Company, Waters Corporation and Edwards Life Sciences Corp. (tickers: "THOR", "PRGO", "WAT" and "EW").   In each case, Chung did not own the names in his midcap fund, which hurt his fund's performance.

ANSWER:    Alger denies the allegations set forth in Paragraph 197.   Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit Q for its contents.

198.    Ott continued that Chung had underperformed the market in roughly 25 out of the last 32 quarters and suggested that Chung's performance needed improvement as did his attendance at work.

ANSWER:    Alger denies the allegations set forth in Paragraph 198.   Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit Q for its contents.

199.    Chung never spoke with Ott in person, but rather responded to Ott's replies via multiple emails.   (Exhibit Q).

ANSWER:    Alger denies the allegations set forth in Paragraph 199 except admits that Chung responded to Ott's emails.   Further answering, Alger denies any characterization of the referenced document, and refers to Exhibit Q for its contents.

## SEC INVESTIGATION

200.    In late July 2010, after no response from Alger or from the Board of Trustees, which is responsible for protecting the interests of shareholders, and after giving Alger every opportunity to correct the trading policy that was now severely harming performance of the HS Fund, Ott's attorney [Sack] contacted the SEC and Ott became an official Whistle Blower under the provisions of the now in-effect Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §78u-6.

ANSWER:    To the extent that the allegations in Paragraph 200 are deemed conclusions of law, a response is not required.  To the extent that the allegations relate to Ott's purported interactions with the SEC, Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 200.  Alger denies the remaining allegations set forth in Paragraph 200.

201.    Ott felt to take no action would be akin to being complicit with a policy she knew was bad for investors of the HS fund.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 201.

202.    Just as she had done in the past when selling surgical devices and putting patient benefit before her personal gain, and with the West Point cadet ethics motto to "do the harder right over the easier wrong," Ott put the investors in her HS fund before her personal benefit and reported the matter to the SEC.  Ott subsequently met with the SEC investigators and then filed a formal complaint on or about September 7, 2010.  (Exhibit R)

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 202.  Further answering,

Alger denies any characterization of the referenced document, and refers to Exhibit R for its contents.

203.   On August 4, 2010, Ott met with four members of the SEC's Division of Enforcement at the SEC's offices in World Financial Center, New York, New York.  The meeting was headed by Gwen Licardo, Senior Investigative Counsel of the SEC New York Regional Office.  Ott answered questions for more than two hours.

ANSWER:   Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 203.

204.   Ott provided fourteen (14) exhibits to the SEC containing more than sixty (60) pages of documentation showing multiple examples of poor execution or no execution in the HS Fund.  The newfangled and illegal trading policy had a material and adverse effect on Ott's HS Fund performance.

ANSWER:   Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 204.

205.   Oddly, Ott was the last Alger employee interviewed by Alger's outside counsel, Stroock & Stroock & Lavan L.L.P. ("Stroock").

ANSWER:   Alger denies the allegations set forth in Paragraph 205 except admits that Ott was the last person interviewed by Alger's outside counsel, Stroock & Stroock & Lavan L.L.P.

206.   On September 8, 2010, Ott met with Alger's outside counsel, Melvin A. Brosterman, Esq.   ("Brosterman") of the law firm, Stroock & Stroock & Lavan L.L.P. ("Stroock") as part of Alger's "outside investigation" of the trading policy.

ANSWER:   Alger admits the allegations set forth in Paragraph 206.

207.   Not surprisingly, Alger's outside counsel was highly biased in its investigation.

ANSWER:   Alger denies the allegations set forth in Paragraph 207.

208.    After Brosterman's attempt to record the meeting with Ott was denied, Brosterman went to task to convince Ott that Chung as the CIO could **"do whatever he wants."**

ANSWER:    Alger denies the allegations set forth in Paragraph 208.

209.    After repeatedly making such claims, Ott replied, **"he [Chung] can do whatever he wants but he cannot hurt investors and this policy harms investors."**

ANSWER:    Alger denies the allegations set forth in Paragraph 209.

210.    On October 21, 2010, Brosterman sent the "findings" of his investigation to Sack on behalf of Ott.  Brosterman determined that the impact to investors was minimal and that "the policy is appropriate, lawful, and in the best interest of Alger's investors" despite the fund ranking in the 80th percentile compared to the historical and nearly consistent ranking in the top quartile.

ANSWER:    Alger denies  the allegations set forth in Paragraph 210 except

admits that Brosterman sent the findings of his investigation to Sack on behalf of Ott.

Further answering, Alger denies any characterization of the referenced findings, and refers

to the document for its contents.

211.    Interestingly, the week after Brosterman conducted his interview with Ott and a full month *prior* to sharing the "findings" of his "investigation," Chung accompanied Pirsch on a trip to visit hospital companies in Tennessee.

ANSWER:    Alger denies the allegations set forth in Paragraph 211 except

admits that Chung and Pirsch made a trip to Tennessee in September 2010.

212.    At one point in the trip, Chung inappropriately discussed Ott with Pirsch. Even prior to Brosterman's "findings," Chung said, **"You know, Rose [Ott] is wrong and the Board supports me.  She [Ott] is gonna start feeling the heat."**  Obviously the "investigation" was biased from the beginning and both Chung and the Board directed the outcome.

ANSWER:    Alger denies the allegations set forth in Paragraph 212.

## CHUNG FORCES OTT TO QUIT

213.    From September 24, 2010 through September 26, 2010, Alger held an off-site retreat in Vermont.   During this event, notwithstanding the repeated nasty glares from Chung, Ott participated in each of the activities with Ott's co-workers.

ANSWER:    Alger denies the allegations set forth in Paragraph 213 except it admits that it held an off-site retreat in Vermont from September 24, 2010 through September 26, 2010.

214.    At, or around the time of the retreat, Ott heard discussions that Chung had awarded Long Term Compensation Grants ("Long Term Compensation").   Beginning in 2006, each year, Alger gave such grants to selected employees that could be potentially matched at 175% of the vested grant.   On March 4, 2010, an Alger press release stated, **"Currently, over 70% of Alger's senior officers and investment professionals participate in the Long Term Compensation program."**

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations regarding what Ott heard and denies the remaining allegations set forth in Paragraph 214 except admits that it issued a press release on March 4, 2010.   Further answering, Alger denies any characterization of the referenced press release, and refers to the press release for its contents.

215.    Until 2010, Ott always received such grants.   Each year the pool of participants grew larger as new employees were added.   In 2006, the inaugural year of the Long Term Compensation program, Ott received an award of $150,000.   In 2007, Ott received an award of $100,000.   In 2008, Ott received an award of $75,000 and in 2009, Ott received an award of $25,000.   In 2010, Ott did not receive a Long Term Compensation award.

ANSWER:    Alger admits the allegations set forth in Paragraph 215.

216.    True to his earlier vow to Pirsch and with the alleged support of the Board, Chung redoubled his efforts to badger Ott.   Chung:

- Created additional "busy work" for Ott;

- Marginalized Ott's performance;

- Demoted Ott;

- Constantly monitored Ott's whereabouts;

- Moved Ott to a smaller office despite Ott's title and tenure after nearly nine years of service at Alger;

- Harassed Ott with nasty, firm-wide emails;

- Changed out Ott's hard drive on her computer during her busiest work period;

- Demanded copies of all of Ott's handwritten notes; and

- Resorted to pettiness including inviting Ott to company dinners only to disinvite Ott for failing to reply prior to 5pm on the day the invite was sent.

ANSWER:   Alger denies the allegations set forth in Paragraph 216.

217.   On October 25, 2010, during the time that companies report all their quarterly earnings reports and is arguably one of the busiest times for PMs and analysts to listen to hour long conference calls and replays of conference calls, then update all financial models and speak with company management teams, Chung decided to saddle Ott with a research assignment due to him in nine (9) business days in the heart of earnings season.

ANSWER:   Alger denies the allegations set forth in Paragraph 217, except that Alger admits that Chung assigned Ott a research assignment on October 25, 2010.

218.   Specifically, Chung required Ott to **"research and prepare a report/overview on the state of healthcare in India and China."** This highly irregular and odd demand came during Ott's busiest week of earnings season and could easily take several weeks to study and then write such a comprehensive report.

ANSWER:   Alger denies the allegations set forth in Paragraph 218, except that Alger admits that Chung requested that Ott research and prepare a report/overview on the state of healthcare in India and China.

219.   Furthermore, Chung demanded that Ott write up complete **"research reports on two individual companies with full models going back at least 5 years and looking forward 3 to 5 years, valuation and supporting data including history of strategic**

**growth or expansion, patient sourcing, changes in regulatory background in which they primarily operate,"** both based in India.

> ANSWER:   Alger admits the allegations set forth in Paragraph 219 except
>
> denies that Chung's request was a "demand."

220.   Both companies were hospital systems, an area of coverage for which Ott had never been responsible in the nearly nine (9) years of Ott's employment at Alger.  (Exhibit S)

> ANSWER:   Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations set forth in Paragraph 220.  Further answering,
>
> Alger refers to Exhibit S for its contents.

221.   Ott worked day and night to complete the assignment by the preposterous deadline while also focusing on all companies that all Alger Funds owned as they reported earnings.

> ANSWER:   Alger denies knowledge and information sufficient to form a belief
>
> as to the truth or falsity of the allegations regarding when Ott worked on her assignment
>
> and denies the remaining allegations set forth in Paragraph 221.

222.   On November 3, 2010, the day prior to the due date, the Information Technology department arrived to perform an unscheduled swap out of Ott's computer hard drive.

> ANSWER:   Alger denies the allegations set forth in Paragraph 222.

223.   Despite the setback of resetting all her financial software systems, Ott provided Chung's administrative assistant with all four reports on time and never heard from Chung on the matter again.

> ANSWER:   Alger denies the allegations set forth in Paragraph 223 except
>
> admits that Ott provided reports to Chung's administrative assistant.

224.   Once again, Chung saddled Ott with more "busy work" in an attempt to distract her from her responsibilities and even at the last second pulled a lowbrow move of

interrupting her momentum by changing out her hard drive in an attempt to make her miss his deadline.

        <u>ANSWER:</u>     Alger denies the allegations set forth in Paragraph 224.

      225.   On October 26, 2010, Carrie Manahan ("Manahan"), Administrative Assistant, sent a Research Dinner Invite to all of Research asking, **"Please let me know, today, if you can attend a Research Dinner we are trying to schedule on Tuesday, 11/23."**

        <u>ANSWER:</u>     Alger denies the allegations set forth in Paragraph 225, and refers

to the document for its contents.

      226.   At 7:47pm on October 26, 2010, while still working, Ott replied, "yes."

        <u>ANSWER:</u>     Alger denies the allegations set forth in Paragraph 226, and refers

to the document of its contents.

      227.   At 9:11am on November 12, 2010, Manahan sent updated information to all attendees on the location and time for the dinner and copied Chung.  Ott was included on the list of attendees.

        <u>ANSWER:</u>     Alger denies the allegations set forth in Paragraph 227, and refers

to the document for its contents.

      228.   At 9:47am on November 12, 2010, Manahan sent a follow up email to Ott stating, **"Since your name wasn't on the initial list that I provided for attendees to the dinner- since I gave it at 5pm and you responded afterwards, I need to uninvite you to the dinner."**

        <u>ANSWER:</u>     Alger denies the allegations set forth in Paragraph 228, and refers

to the document for its contents.

      229.   Meanwhile, on October 29, 2010, Ott submitted a request to work from Ott's home office under the Work from Home Policy ("WFH") which was a benefit for all PMs, Senior Analysts and Analysts with an allowable 3 days per month to work from home.

        <u>ANSWER:</u>     Alger admits the allegations set forth in Paragraph 229.

230.   Without justification or reason, Chung denied Ott's request while simultaneously approving requests from Farhadi, Michael Young, Michael Melnyk, and John McPeake to work from home during the same period.  (Exhibit T)

ANSWER:   Alger denies the allegations set forth in Paragraph 230.  Further answering, Alger denies any characterization of the referenced documents, and refers to Exhibit T for its contents.

231.   On October 28, 2010, Chung held a meeting with Human Resources (HR) Director, Robert Isaaco ("Isaaco") and Larry Vigus ("Vigus"), who maintains Alger's analyst performance data and provides such reports to Chung.

ANSWER:   Alger admits the allegations set forth in Paragraph 231.

232.   During this meeting, it was reported to Ott that Chung was furious that Ott continued to climb in the firm-wide rankings for "Total Effect," a performance analysis metric used to measure an analyst's attribution to overall performance within each portfolio.

ANSWER:   Alger denies the allegations set forth in Paragraph 232.  Further answering, Alger lacks knowledge or information sufficient to form a belief about what was purportedly reported to Ott.

233.   In previous years, "Total Effect" was used as a guide for end of year bonus compensation.  It was reported to Ott that Chung demanded to know, **"why the numbers changed."**   During that meeting, it was clear that the "Total Effect" metric was being reconsidered given Ott's improvement in rankings across the firm to the middle of the pack.

ANSWER:   Alger denies the allegations set forth in Paragraph 233.  Further answering, Alger lacks knowledge or information sufficient to form a belief about what was purportedly reported to Ott.

## OTT IS DEMOTED

234.   On November 8, 2010, Farhadi, Pirsch, Steven Yang ("Yang") and Ott were summoned to the conference room to meet with Chung and fellow partners Greenwald and Kelly.  Chung read an email to the group announcing a new Sector Head of the Alger Health Care team by the new hire of Maria Liotta ("Liotta").

ANSWER:    Alger denies the allegations set forth in Paragraph 234, except admits that a meeting was held on November 8, 2010.

235.    Previously, on October 7, 2005, Ott had been made leader of the Health Care team along with Joanne Sayers ("Sayers") who no longer worked at Alger.

ANSWER:    Alger denies the allegations set forth in Paragraph 235.

236.    The announcement of Liotta as the "new" leader of the team was a clear demotion for Ott.

ANSWER:    Alger denies the allegations set forth in Paragraph 236.

237.    The next day, November 9, 2010, HR director Isaaco informed Ott that she would have to move into another, smaller office with one window which faced another wall. As a Senior Vice President and PM, Ott had been in the same office for five (5) years that was spacious enough to hold team meetings and enjoyed great sunlight from large windows.

ANSWER:    Alger denies the allegations set forth in Paragraph 237, except admits that  Ott was asked to move to another office.

238.    When Ott asked why a Senior Vice President had to give up prime office space rather than a more junior member of the firm, Isaaco could offer no justification.  The following day, Ott moved herself into the office formerly occupied by an administrative assistant and previous research analyst.

ANSWER:    Alger denies the allegations set forth in Paragraph 238, except admits that Ott moved offices.

239.    Ott's fellow co-workers were visibly upset by the announcement as well as the retaliatory treatment Ott had received by Chung.  Ott's co-workers were also afraid to talk with Ott as a matter of self-preservation at Alger.

ANSWER:    Alger denies the allegations set forth in Paragraph 239.

240.    Liotta joined Alger as a SVP, Senior Analyst, and Co-PM of the HS Fund and Alger Mid Cap Growth fund effective November 15, 2010.

ANSWER:    Alger admits the allegations set forth in Paragraph 240.

## CHUNG INTRODUCES "NEW" PERFORMANCE BENCHMARKS

241.   On November 29, 2010, Chung held a meeting and outlined the "new" performance benchmarks for bonus compensation.  After eleven months into the year and in an attempt to reverse engineer analyst performance, Chung decided to scrap the "Total Effect" measurement and instead weighed 65% of compensation on qualitative factors and 35% on quantitative factors.  Furthermore, nearly half of the quantitative metric was derived from the performance in the Alger Analyst Fund, which once again was wholly funded by Alger family investments.

ANSWER:   Alger denies the allegations set forth in Paragraph 241.

242.   As of December 6, 2010 in the Total Effect Ranking (previously used as a benchmark for compensation), Ott ranked 7th out of 11 Senior Analysts despite having been "marginalized by Chung" according to Partner and PM Patrick Kelly.

ANSWER:   Alger denies the allegations set forth in Paragraph 242.

243.   In fact, the 6th ranked Senior Analyst had only .01 basis point better performance than Ott.  Said differently, the 6th ranked Senior Analyst had a penny's worth of better performance than Ott.  Ott was squarely in the middle of the pack of Senior Analysts in spite of the ongoing harassment by Chung.

ANSWER:   Alger denies the allegations set forth in Paragraph 243.

244.   Furthermore, the Senior Analyst who ranked 11th overall, or last, was actually promoted to Senior Vice President in late 2010.

ANSWER:   Alger denies the allegations set forth in Paragraph 244.

245.   On December 15, 2010, Chung issued a 2010 Annual Performance Review for Ott.  As expected, the review consisted of a subjectively false characterization of Ott's work.  Chung assigned blame of 34% losses despite the fact that Chung had acted on his own decisions and hardly any of Ott's as was previously and very specifically pointed out by Ott in response to the "Midyear Midcap Review" given in August 2010.

ANSWER:   Alger denies the allegations set forth in Paragraph 245 except admits that Chung issued a 2010 Annual Performance Review for Ott.

246.   Furthermore, Chung attacked Ott's decision making by pointing to two examples, Baxter International Inc. (ticker symbol: "BAX") and Covidien Public Ltd Company

(ticker symbol: "COV").   Once again, Ott had to remind Chung that she did not cover either company.

ANSWER:    Alger denies the allegations set forth in Paragraph 246.

247.    Time and again throughout the "review," Chung made bold proclamations without giving any credible examples.   Not surprising, Ott was given no credit for the 12 marketing meetings she conducted in the first six months of the year.

ANSWER:    Alger denies the allegations set forth in Paragraph 247.

248.    As a direct result of Ott's formal SEC Whistle Blower Complaint, Ott was retaliated against and paid a bonus of merely $10,000, down 92% from the previous year. (Exhibit U)

ANSWER:    To the extent that the allegations set forth in Paragraph 248 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations in Paragraph 248, except that Alger admits Ott was paid a bonus of $10,000.   Further answering, Alger denies any characterization of Exhibit U, and refers to Exhibit U for its contents.

249.    Furthermore, on January 10, 2011, Ott traveled to California to attend the JP Morgan Healthcare Conference.   While in California, Ott sent emails to Alger providing updates and commentary on meetings she attended.

ANSWER:    Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 249 except admits that Ott sent emails to Alger providing updates and commentary on the meetings she purportedly attended.

## OTT'S EMPLOYMENT IS TERMINATED
## IN RETALIATION OF HER LAWFUL COMPLAINTS

250.    Also on January 10, 2011, Ott's counsel, Sack, contacted Bennett L. Epstein ("Epstein") of Foley & Lardner LLP, to discuss Ott departing her gainful employment at Alger on mutually agreeable terms.   Sack again, on January 12, 2011, followed up via email to Epstein regarding a plan to settle Ott's departure.

ANSWER:     Alger denies the allegations set forth in Paragraph 250, except admits that Sack contacted Epstein.  Further answering, Alger refers to the email for its contents.

251.     Epstein replied on January 13, 2011 stating that Chung would be out of the office for the long weekend.  Epstein suggested that he would be in touch with Sack following the long weekend and to expect a call on Tuesday, January 18, 2011.

ANSWER:     Alger admits the allegations set forth in Paragraph 251.

252.     After a week with no substantive reply, on January 18, 2011, Epstein emailed Sack to inform him that **"I [Epstein] have been stuck in court.  I [Epstein] will get back to you tomorrow [January 19, 2011] or Thursday [January 20, 2011]."**

ANSWER:     Alger denies the allegations set forth in Paragraph 252, except admits that Epstein replied to Sack on January 18, 2011.  Further answering, Alger refers to the email for its contents.

253.     On January 20, 2011, despite knowing full well the whereabouts of Ott, Alger terminated her gainful employment at Alger without notice, justification or cause.

ANSWER:     Alger denies the allegations set forth in Paragraph 253.

254.     As more fully described herein, in direct retaliation of Ott's lawful complaints concerning Alger's harmful trading policy directed at the HS Fund investors, Alger terminated Ott because Ott initially launched an internal Whistle Blower Complaint with both Chung and the Board and ultimately filed a formal Whistle Blower Complaint with the SEC.

ANSWER:     To the extent that the allegations set forth in Paragraph 254 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 254.

## OTT'S COMPENSATION (2005-2010)

255.   In exchange of the work, labor and services Ott rendered on behalf of and for Alger during her tenure at Alger, Ott was paid a base salary, a significant annual bonus, and deferred compensation (Alger Associates, Inc. Incentive Plan) among other benefits.

ANSWER:   Alger admits that Alger paid Ott a base salary in exchange for her work, labor and services. Further answering, Alger admits that Ott also received annual bonuses, deferred compensation, and other benefits.   Alger denies the remaining allegations set forth in Paragraph 255.

256.   Ott was paid for excellence and proven results; she was rewarded for her stellar performance, commitment and real contributions to the business.

ANSWER:   Alger denies the allegations set forth in Paragraph 256.

257.   Ott and Alger anticipated a long partnership and employment relationship.

ANSWER:   Alger denies the allegations set forth in Paragraph 257.   Further answering, Alger denies knowledge and information sufficient to form a belief as to the truth or falsity of what Ott anticipated.

258.   Deferred compensation grants vested in four (4) years, with a potential match of up to 175% paid in cash.

ANSWER:   Alger denies the allegations set forth in Paragraph 258.

259.   Therefore, as a result of Ott's 2006 deferred compensation vested grant, Ott received $365,940 in March 2011.

ANSWER:   Alger denies s the allegations set forth in Paragraph 259.

260.   At Alger, deferred compensation was awarded to "give senior executives and investment professionals an opportunity to create meaningful wealth with the firm's growth and success."

ANSWER:   Alger admits the allegations set forth in Paragraph 260.

261.    The deferred compensation program at Alger is available only to key personnel of Alger's organization, which included Ott.

ANSWER:    Alger denies the allegations set forth in Paragraph 261, except admits that there is a deferred compensation program at Alger.

262.    As Chung was quoted in a press release dated March 4, 2010, **"I am thrilled to be able to recognize key members of the Alger organization."**

ANSWER:    Alger denies the allegations set forth in Paragraph 262, denies any characterization of the referenced press release, and refers to the press release for its contents.

263.    Ott received the exclusive awards for four (4) years beginning with the incentive plan's inaugural grant in 2006 during her employment at Alger.  Initially, Ott was one of approximately a dozen key personnel to receive an award out of all employees.

ANSWER:    Alger denies the allegations set forth in Paragraph 263, except admits that Ott received awards for four years beginning in 2006.

264.    In 2008, Chung communicated to Ott that the firm's performance necessitated a decline in incentive compensation and deferred compensation grants as a result of the cataclysmic decline in the market resulting in massive asset losses.

ANSWER:    Alger denies the allegations set forth in Paragraph 264.

265.    In 2007 and in 2009, Chung also communicated to Ott that the entire pool of deferred compensation grants would be awarded to more employees and that the awards would decline in order to add the additional personnel.

ANSWER:    Alger denies the allegations set forth in Paragraph 265.

266.    Additionally, under terms of the Alger Associates, Inc. Incentive Plan ("the Plan"), following termination,

"(a) the Participant's Award Account shall continue to be maintained until the last day of the Award Period for the Award and, to the extent that the Award would have become vested had the Participant not incurred a Termination of Employment prior to

the last day of the Award Period for the Award, the Participant shall become vested in a pro rata portion of that portion of the Award Account that would have become so vested, an (b) as of the last day of the Award Period for the Award, the Award Account shall be credited with a pro rata portion of the Matching Amount, if any, that would have been credited to the Award Account as of the last day of the Award Period if the Participant had not incurred a Termination of Employment prior to the last day of the Award Period. For purposes of this Section 7.2, such pro rata portion of the Award Account (taking into account only the portion of the Award Account that would have become vested had no Termination of Employment occurred prior to the last day of the Award Period for the Award) or Matching Amount, as applicable, shall be determined by multiplying the relevant amount by a fraction, the numerator of which is the number of months from the Date of Grant of the Award until the Participant's Termination of Employment and the denominator of which is the total number of months in the applicable Award Period."

ANSWER:     Alger admits the allegations set forth in Paragraph 266, and refers to the Incentive Plan for its contents.

267.    But for the timing of Ott's termination, Ott would have recovered a 12.5% premium to her pro rata award and match for the 2007 grant, a 37.5% premium for the 2008 grant and a 62.5% premium for the 2009 grant.

ANSWER:     Alger denies the allegations set forth in Paragraph 267.

268.    At the time of the filing of this Third Amended Complaint, both the 2007 grant and the 2008 grant have fully vested but remain unpaid.

ANSWER:     Alger denies the allegations set forth in Paragraph 268.

269.    Thus, Ott's pro rata portion of the Award Account for unvested grants at the time of termination are as follows:

| AWARD YEAR | ORIGINAL AWARD AMOUNT | ORIGINAL POTENTIAL PAYOUT |
|---|---|---|
| 2007 | $100,000 | $275,000 |
| 2008 | $75,000 | $206,250 |

| 2009 | $25,000 | $68,750 |
|------|---------|---------|
| **TOTAL** | | **$550,000** |

ANSWER:     Alger denies the allegations set forth in Paragraph 269.

270.    Accordingly, Ott is due $550,000.00 in earned but unpaid compensation in respect of her incentive awards.

ANSWER:     To the extent that the allegations of Paragraph 270 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in paragraph 271.

271.    During the nearly nine years of employment, Ott continued to remain quiet and concentrate on her work.  Ott counseled many junior employees to do the right thing and stay focused on the work.

ANSWER:     Alger denies the allegations set forth in Paragraph 271 except denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegation that Ott counseled many junior employees to do the right thing and stay focused on the work.

272.    For Ott, the last straw was when Chung unnecessarily and harmfully restricted the trading of the Health Sciences Fund.  Ott could not allow investors of the Health Sciences Fund to suffer losses imposed by Chung who was now emboldened to think he could do anything he wanted and nobody would stop him.

ANSWER:     Alger denies the allegations set forth in Paragraph 272.  Further answering, Alger lacks knowledge and information sufficient to form a belief as to the truth or falsity of Ott's state of mind.

273.    Ott confronted Chung in writing, elevated the complaint to the Board of Trustees and ultimately to the SEC.  Not surprisingly, Chung retaliated against Ott in blatant violation of the Whistle Blower Protection Act and cut her 2010 Bonus by 92% and then fired Ott.

ANSWER:     To the extent that the allegations set forth in Paragraph 273 are deemed conclusions of law, a response is not required.  Further answering, Alger denies the allegations set forth in Paragraph 273.

## CLAIMS AND DAMAGES

Based upon the above allegations, Ott maintains the following legal claims against Alger:

## COUNT ONE
### (Violation of Dodd-Frank Whistleblower Statute)

274.   Ott incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

ANSWER:     Alger repeats and realleges each and every response set forth in the foregoing Paragraphs as if fully set forth herein.

275.   15 U.S.C. § 78u-6 ("Section 922") states no employer may discharge a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC regarding potential violations of Section 10(b) or in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), or any other law, rule, or regulation subject to the jurisdiction of the Commission.

ANSWER:     The allegations in Paragraph 275 summarize 15 U.S.C. § 78u-6 and do not state factual allegations to which a response is required.

276.   Ott reported information to the SEC concerning Chung's violation of SEC rules, laws, and/or regulations.

ANSWER:     Alger denies the allegations set forth in Paragraph 276.

277.   Section 78u-6(h)(1)(A)(iii) of the Dodd-Frank bill incorporates 18 U.S.C. § 1513(e), which prohibits "interference with the lawful employment or livelihood of any person" who provides truthful information "to a law enforcement officer" relating to the commission of federal offenses.

ANSWER:     The allegations in Paragraph 277 summarize 18 U.S.C. § 1513(e) and do not state factual allegations to which a response is required.

278.   Ott explained Chung's violations in detail to Alger's Board of Directors, the SEC, and to attorneys from Alger.

ANSWER:   Alger denies the allegations set forth in Paragraph 278.

279.   As a result of Defendants' violation of Dodd-Frank whistleblower statute, Ott has been injured in an amount to be determined at trial but believed to be not less than $3,000,000.

ANSWER:   To the extent the allegations in Paragraph 279 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 279.

## COUNT TWO
### (Breach of Contract Concerning Deferred Compensation)

280.   Ott repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

ANSWER:   Alger repeats and realleges each and every response set forth in the foregoing Paragraphs as if fully set forth herein.

281.   Ott had a valid and enforceable contract with Alger.

ANSWER:   To the extent the allegations in Paragraph 281 are deemed conclusions of law, a response is not required.   Further answering, Alger admits the allegations set forth in Paragraph 281.

282.   Ott fully performed his obligations thereunder.

ANSWER:   To the extent the allegations in Paragraph 282 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 282.

283.   Alger's failure to pay Ott monies due under their agreement constitutes a material breach of their Agreement.

ANSWER:   To the extent the allegations in Paragraph 283 are deemed conclusions of law, a response is not required.   Further answering, Alger denies the allegations set forth in Paragraph 283.

284.   Ott has been caused thereby to suffer damages in amount of not less than $550,000.

ANSWER:   To the extent the allegations in Paragraph 283 are deemed conclusions of law, a response is not required.   Alger denies the allegations set forth in Paragraph 284.

## ATTORNEY'S FEES AND COSTS

285.   Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Ott have in good faith, attempted to negotiate a reasonable resolution with Alger without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

ANSWER:   Alger denies the allegations set forth in Paragraph 285.

## PUNITIVE DAMAGES — BAD FAITH

286.   It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.   In light of Alger's obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Alger so that it be deterred from attempting such harmful employment practices in the future.

ANSWER:   Alger denies the allegations set forth in Paragraph 286.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a claim upon which relief may be granted.

2.   Plaintiff has not asserted a valid claim under the Dodd-Frank Whistleblower Statute.

3.     Plaintiff is not a "whistleblower" as the term is defined by the Dodd-Frank Whistleblower Statute.

4.     Plaintiff did not reasonably believe that the trading policy implemented by Alger, which she reported to the SEC, violated Alger's duty to provide best execution to its clients.

5.     All actions affecting Plaintiff were at all times based on legitimate business justifications.

6.     Alger took no adverse actions of any kind against Plaintiff as a result of her reporting the trading policy implemented by Alger to the SEC.

7.     Plaintiff's claims are barred in whole or in part because Plaintiff voluntarily resigned from her employment with Alger.

8.     In the alternative, Plaintiff's claims are barred in whole or in part because she was terminated because she violated a published work rule, which expressly states that non-compliance will be deemed job abandonment.

9.     All actions with regard to the Plaintiff's employment were conducted in good faith and without fraud, oppression, or malice for Plaintiff and her rights, thereby precluding any and all claims for punitive, liquidated and exemplary damages.

10.     Plaintiff's Count Two is barred in whole or in part by the terms of the Alger Associates Inc.'s Incentive Plans for the award years 2007-2009.

11.     Plaintiff's Count Two is barred in whole or in part because Plaintiff has received all monies due and owing to her by Alger.

12.     Plaintiff's damages, if any, were not caused, in whole or in part, by the alleged conduct of Alger.

13.     Plaintiff has suffered no compensable damages.

14.     Plaintiff failed to mitigate any alleged damages.

15.     Plaintiff's claims are barred by the doctrine of unclean hands and other equitable defenses.

16.     Plaintiff's claims are barred by laches, waiver and/or estoppel.

17.     Plaintiff's claims are barred by the doctrine of after-acquired evidence.

18.     Alger hereby asserts all additional affirmative defenses that may be revealed in the course of discovery by further investigation or at trial.

WHEREFORE, Alger prays that this Court:

A.  Enter judgment dismissing the Complaint, and each purported Count alleged therein, with prejudice, and denying all relief therein sought;

B.   Enter an Order awarding Alger its costs and disbursements herein, including attorneys' fees, together with such other and further relief as this Court deems just, proper and equitable.

Dated:  November 1, 2013                    Respectfully submitted,


                                            By: */s/ Todd C. Norbitz*

                                                Todd C. Norbitz
                                                Anne B. Sekel
                                                Sara P. Madavo
                                                Foley & Lardner LLP
                                                90 Park Avenue
                                                37th Floor
                                                New York, New York  10016-1314
                                                Tel:  (212) 682-7474
                                                Fax:  (212) 682-2329

                                                Bennett L. Epstein (of counsel)
                                                Foley & Lardner LLP
                                                321 North Clark Street
                                                Suite 2800
                                                Chicago, Illinois  60654-5313
                                                Tel:  (312) 832-4500
                                                Fax:  (312) 832-4700

                                                *Attorneys for Defendant, Fred Alger*
                                                *Management, Inc.*