**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ROSANNE F. OTT,**

        **Plaintiff,**

        v.

**FRED ALGER MANAGEMENT, INC.,**

**Defendant.**

**Civ. No. 11 Civ 4418-LAP**

*Electronically Filed*

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Todd C. Norbitz
Anne B. Sekel
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York  10016-1314
Tel:  (212) 682-7474
Fax:  (212) 682-2329

Of counsel:
Bennett L. Epstein (admitted *pro hac vice*)
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, Illinois  60654-5313
Tel:  (312) 832-4500
Fax:  (312) 832-4700

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ........................................................................1

II.   SUMMARY OF FACTS IN SUPPORT OF SUMMARY JUDGMENT ............................2

III.  ARGUMENT ...............................................................................................10

    A.  Standard for Granting Summary Judgment ...................................................10

    B.  Dodd-Frank Whistleblower Claim ..............................................................11

        1. Ott Has Not and Cannot Establish a *Prima Facie*
           Case Under Dodd-Frank..................................................................12

           a. Ott has not demonstrated that she engaged
              in a protected activity..............................................................13

              i.   Ott's views of the Policy was subjectively unreasonable ................13

              ii.  Ott's views of the Policy was objectively unreasonable .................17

              iii.   Reporting trivial violations of law is not a protected activity..........24

           b. Ott has not demonstrated adverse employment
              actions ..................................................................................25

              i.   Ott was not terminated, she voluntarily resigned .............................26

               ii.  None of the other events that Ott claims were
                  retaliatory satisfy the *Burlington* materiality standard ...................27

           c. There is no causal connection between Ott's activities
              and Alger's supposed adverse employment actions................................28

              i.   Ott has proffered no admissible evidence of causality ...................28

               ii.  The timing of Ott's so-called adverse employment
                 events belies any retaliatory motive..................................................28

               iii.  Acts before Ott's "whistleblowing" do not support
                 her claim ...............................................................................30

        2. Alger Has Legitimate, Non-Retaliatory Reasons for Its Actions .....................30

        3. Ott Has Not Demonstrated that Alger's Reasons Are Pretextual.....................32

C. Ott's Breach Of Contract Claim Should Be Dismissed ...................................................33

IV.  CONCLUSION..........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Pages**

*Allen v. Admin. Review Bd.*,
514 F.3d 468 (5th Cir. 2008) .................................................................13

*Atl. Mut. Ins. Co. v. CSX Lines, LLC*,
432 F.3d 428 (2d Cir. 2005).................................................................11

*Balko v. Ukrainian Nat'l Fed. Credit Union*,
2014 U.S. Dist. LEXIS 42427 (S.D.N.Y. Mar. 28, 2014) ......................................12

*Beacom v. Oracle Am., Inc.*,
2015 U.S. Dist. LEXIS 66599 (D. Minn. Mar. 11, 2015).............................................*passim*

*Boyar v. City of N.Y.*,
2010 U.S. Dist. LEXIS 115289 (S.D.N.Y. Oct. 28, 2010) ..................................27

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)................................................................11

*Burlington N. and Sante Fe Ry. Co. v. White*,
548 U.S. 53 (2006)................................................................25, 26, 27, 28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................10, 11

*Clark Sch. Dist. v. Breeden*,
532 U.S. 268 (2001).................................................................29

*Davis v. NYC Dep't of Educ.*,
2012 U.S. Dist. LEXIS 5633 (E.D.N.Y. Jan. 18, 2012) ..........................................27

*Day v. Staples, Inc.*,
555 F.3d 42 (1st Cir. 2009)................................................13, 14, 16, 23

*Destefano v. MVN Assocs.*,
2013 U.S. Dist. LEXIS 14428 (S.D.N.Y. Feb. 1, 2013)..................................10, 11

*Ewald v. Royal Norwegian Embassy*,
2 F. Supp. 3d 1101, 1122-23 (D. Minn. 2014)..................................................16

*Fraser v. Fiduciary Trust Co. Int'l*,
396 F. App'x 734 (2d Cir. 2010) ..............................................................13

*Fraser v. Fiduciary Trust Co. Int'l,*
    2005 U.S. Dist. LEXIS 48059 (S.D.N.Y. June 23, 2005) ......................................12

*Fraser v. Fiduciary Trust Co. Int'l,*
    2009 U.S. Dist. LEXIS 75565 (S.D.N.Y. Aug. 25, 2009) ................................12, 28

*Galabya v. NYC Bd. of Educ.,*
    202 F.3d 636 (2d Cir. 2000) ................................................................................26

*Garrett v. Garden City Hotel, Inc.,*
    2007 U.S. Dist. LEXIS 31106 (E.D.N.Y. Apr. 19, 2007) ......................................28

*Gladitsch v. Neo@Ogilvy,*
    2012 U.S. Dist. LEXIS 41904 (S.D.N.Y. Mar. 21, 2012) ......................................14

*Harp v. Charter Commc'ns, Inc.,*
    558 F.3d 722 (7th Cir. 2009) ................................................................................13

*Herschman v. City Univ. of N.Y.,*
    2011 U.S. Dist. LEXIS 32854 (S.D.N.Y. Feb. 28, 2011) ......................................27

*Jaramillo v. Weyerhaeuser Co.,*
    536 F.3d 140 (2d Cir. 2008) ................................................................................11

*Kerzer v. Kingly Mfg.,*
    156 F.3d 396 (2d Cir. 1998) ................................................................................11

*In re Kidder, Peabody & Co., Advisers Act of 19940, Release No. 232,*
    1968 WL 87653 (Oct. 16, 1968) ..........................................................................19

*Kolchinsky v. Moody's Corp.*
    2012 U.S. Dist. LEXIS 25650 (S.D.N.Y. Feb. 28, 2012) ......................................26

*Livingston v. Wyeth, Inc.,*
    520 F.3d 344 (4th Cir. 2008) ............................................................13, 17, 20, 22

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ........................................................................12, 13, 28, 32

*In re Menendez,*
    ARB Case Nos. 09-002, 09-003 ..........................................................................26

*Moccio v. Cornell Univ.,*
    889 F. Supp. 2d 539 (S.D.N.Y. 2012) *aff'd*, 526 F. App'x 124 (2d Cir. 2013)......................27

*Nazif v. Comput. Scis. Corp.,*
    2015 U.S. Dist. LEXIS 78673 (N.D. Cal. June 17, 2015) ..............................*passim*

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
   135 F.3d 266 (3d Cir. 1998).................................................................................19

*Nielsen v. AECOM Tech. Corp.*,
   762 F.3d 214 (2d Cir. 2014)..............................................................17, 20, 22, 24

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
   2015 U.S. Dist. LEXIS 77187 (S.D.N.Y. June 15, 2015) ......................................33

*Ott v. Fred Alger Mgmt., Inc.*,
   2012 U.S. Dist. LEXIS 143339 (S.D.N.Y. Sept. 27, 2012)...............................12, 28

*Pardy v. Gray*,
   2008 U.S. Dist. LEXIS 53997 (S.D.N.Y. July 15, 2008) ......................................29

*Ponticelli v. Zurich Amer. Ins. Grp.*,
   16 F. Supp. 2d 414 (S.D.N.Y. 1998).....................................................................29

*Rivera v. Potter*,
   2005 U.S. Dist. LEXIS 1416 (S.D.N.Y. Jan. 31, 2005) (Preska, J.).......................11

*Sharkey v. J.P. Morgan Chase & Co.*,
   805 F. Supp. 2d 45 (S.D.N.Y. 2011)......................................................................17

*Slattery v. Swiss Reinsurance Am. Corp.*,
   248 F.3d 87 (2d Cir. 2001)....................................................................................30

*Sussberg v. K-Mart Holding Corp.*,
   463 F. Supp. 2d 704 (E.D. Mich. 2006).................................................................29

*Sussman v. Rabobank Int'l*,
   739 F. Supp. 2d 624 (S.D.N.Y. 2010)....................................................................33

*Truelove v. Ne. Capital & Advisory, Inc.*,
   715 N.Y.S.2d 366 (2000)........................................................................................33

*Van Asdale v. Int'l Game Tech.*,
   577 F.3d 989 (9th Cir. 2009) .................................................................................13

*Wolcott v. Champion Int'l Corp.*,
   691 F. Supp. 1052 (W.D. Mich. 1987) ..................................................................16

**Statutes**

15 U.S.C. § 78u-6 .....................................................................................11, 12, 25

18 U.S.C. § 1514A(a) ...............................................................................................25

**Other Authorities**

76 Fed. Reg. 34,300 ...................................................................................12, 13, 32, 33

Fed. R. Civ. P. 12(f) ...........................................................................................................1

Fed. R. Civ. P. 56.1 ............................................................................................................2

Defendant Fred Alger Management, Inc. ("Alger") submits this Memorandum of Law in support of its Motion for Summary Judgment on all claims asserted in the third amended complaint ("Complaint") filed by Rosanne Ott ("Ott" or "Plaintiff") in this action.

## I.  PRELIMINARY STATEMENT

The protections afforded by Dodd-Frank were not intended to be used as a sword by a disgruntled employee to threaten a company to submit to her coercive demands and gain an undue advantage. Yet, this is such a case cast in high relief.  Plaintiff's initial complaint was designed publicly to embarrass Alger into submission by making scurrilous allegations, which this Court excised under Fed. R. Civ. P. 12(f). Your Honor then granted Alger's motion to dismiss each and every purported securities law and common law fiduciary duty allegation in Plaintiff's amended complaint, which proved to be a harbinger of the infirmities in Plaintiff's remaining Dodd-Frank whistleblower claim.  Simply put, the uncontested record demonstrates that Ott's purported belief regarding the illegality of an Alger trading policy was advanced in bad faith, and within the meaning of Dodd-Frank, was both subjectively and objectively unreasonable.  To wit, no other Alger employee, or anyone else, including the SEC, shared Ott's concerns about the policy; Ott's interpretation of the policy arose from her own misinformation and willful ignorance; and her supposed "whistleblowing" comprised, in large measure, repeated extortive threats to Alger.  Moreover, there is no controversy that Ott voluntarily resigned from Alger, and was not subject to any retaliatory actions by the Company.

For the reasons set forth herein, Ott's Dodd-Frank claim and her related breach of contract claim for unvested deferred compensation should be dismissed with prejudice.

## II.  SUMMARY OF FACTS IN SUPPORT OF SUMMARY JUDGMENT[1]

### *Background*

Alger is an investment advisor for numerous proprietary funds,[2] including a healthcare sector fund called the Health Sciences Fund (the "HS Fund").  ¶, ¶ 1.  In 2010, while the HS Fund was the only sector-specific fund that Alger managed, healthcare sector securities were a part of every Alger-managed fund.  *Id.*, ¶¶ 2-3.

In 2002, Alger hired Ott as a research Analyst on the healthcare sector research team; all Analysts at Alger focus on a particular commercial sector.  *Id.*, ¶¶ 5, 15-16.  Ott later became a Senior Analyst for the healthcare sector team.  *Id.*, ¶ 6.  Beginning in 2005, Ott wore two hats at Alger.  *Id.*, ¶¶ 6-8.  In addition to her role as Senior Analyst, Ott became a Co-Portfolio Manager ("Co-PM") of the HS Fund.  *Id.*, ¶ 7.  In 2010, her Co-PMs on the HS Fund were another Senior Analyst, David Farhadi, and Daniel Chung, Alger's Chief Investment Officer ("CIO").  Chung also is Alger's Chief Executive Officer ("CEO").  *Id.*, ¶¶ 9-12.

### *Alger's Investment Process*

Alger is an Analyst-centric investment advisory firm, in that Alger Analysts drive the investment strategies utilized by its proprietary funds.  *Id.*, ¶¶ 14-16.  Analysts are responsible to the PMs of all Alger funds for initiating buy recommendations for securities of companies included in their commercial sector that are not yet owned by an Alger fund, as well as recommending buy or sell recommendations for securities in their sectors already held by an Alger fund.  *Id.*, ¶¶ 14-23.  Accordingly, Alger PMs rely heavily on Analysts in order to manage the funds for which they are responsible.  *Id.*  Effective communication between Alger's

---

[1]A full recitation of uncontested material facts is set forth in the accompanying Local Civ. R. 56.1 Statement of Facts ("SOF"), and is incorporated herein by reference.

[2] In or about 2010, for example, Alger had approximately 30 proprietary funds under management.  SOF, ¶¶ 1, 4, 29.

Analysts and the fund PMs is essential to the investment decision-making process. *Id.* To this end, Alger maintains specific guidelines for Analysts to follow regarding their research and communication. *Id.* In addition, from time to time, Alger (through its CIO or otherwise) will implement additional policies or procedures in furtherance of Alger's investment strategies, including, among other things, policies that are intended to facilitate equal and timely dissemination of Analyst trade recommendations to all Alger PMs. *Id.*, ¶¶ 7, 42-43, 48-54.

The investment decision-making process at Alger begins when an Analyst provides the PMs with research, analytics and investment recommendations. *Id.*, ¶¶ 14-20. The formality of the communication between Analysts and PMs depends largely on the type of investment advice being provided by the Analyst, as well as the PM's preference. *Id.*, ¶¶ 21-22, 26. For example, PMs generally want to hear "pitches" from an Analyst concerning new investment ideas in-person, whereas an Analyst's trade recommendation concerning a security that a PM already holds in its Alger fund may be communicated in-person, by email or over the phone. *Id.* All PMs should receive research and trade recommendations from Analysts at or about the same time. *Id.*, ¶¶ 27, 30, 33-36, 66-69, 75, 80, 85-86, 111, 122, 135, 138. This timely sharing of such information is critical and allows all PMs to have equal access to the Analysts' research, analytics and the rationale behind a trade recommendation. *Id.* All of this taken together, among other things, guards against the possibility of an improper trading practice called front running. *Id.*, ¶¶ 14-35. (Front running generally results from one fund placing a trade order (usually in a relatively small amount) before a larger fund places an order in the same security (usually in a larger amount), which can increase the market price of the traded security to the benefit of the first fund.) *Id.*, ¶ 36.

When a PM decides to act on an Analyst's buy or sell recommendation, the PM is responsible for placing trade orders with the Alger Trading Desk. *Id.*, ¶¶ 38-40.  Once a trade order is placed, it is the Trading Desk's responsibility to select an outside broker-dealer to execute the trade. *Id.*, ¶ 41.  With this broker, the Trading Desk then determines, based on a variety of factors, including numerous market conditions, when and how to best execute the trade. *Id.*, ¶¶ 41-44.  (The term "best execution" refers to a trader's efforts to execute a buy or sell order for a particular security on the best overall terms practicable at the time. *Id.*, ¶ 42.  The quality of trade execution is not measured from the time that a PM first places a trade order with Alger's Trading Desk. *Id.*, ¶¶ 41-44,103.  Rather, an evaluation of best execution necessarily commences once the Trading Desk, along with an outside broker, can begin filling the order in the market place. *Id.*  Depending on market and other conditions, a trade may be executed in a few minutes or it may take days or even weeks to complete. *Id.*, ¶ 46.  While Alger PMs generally play no role in directing the execution of trades, they may, at times, elect to provide trading instructions to the Trading Desk. *Id.*, ¶ 45.

Alger discloses to its fund investors and other clients the nature of the discretion that Alger, and in particular, its Trading Desk, has with respect to seeking best execution, which can include, among other things, holding trade orders for a period of time, aggregating trade orders placed by more than one Alger PM, or allocating among Alger funds trades as they are filled in the market. *Id.*, ¶¶ 52-54.  *See also generally* Declaration of Hal Liebes ("Liebes Decl."), Ex. 1 (the "Stroock Report"), Tab 6, Alger Prospectus (ALG0003310-490).

### Ott's Performance as a Senior Analyst and Co-PM

Beginning in 2007, various issues with Ott's performance arose, particularly with respect to her failure as a Senior Analyst for the healthcare sector to communicate effectively research

and investment recommendations to the PMs of other funds.  *Id.*, ¶¶ 55-63.  Jill Greenwald,

Patrick Kelly, and Andrew Silverberg, all Alger PMs at the time who relied heavily on Ott's

healthcare sector analytics, criticized Ott for inappropriately focusing, as Co-PM of the HS Fund,

on her own fund's trading, at the expense of providing all other Alger fund PMs trade

recommendations in her role as a Senior Analyst.  *Id.*  Chung, too, felt that Ott was not

sufficiently sharing her research and trade recommendations as a Senior Analyst.  *Id.*, ¶¶ 66-67,

70-73.  He noted that often Ott (and Co-PM Farhadi) would place trade orders for the HS Fund

(on which Chung was a Co-PM) without notifying him or explaining the trade to other PMs.  *Id.*,

¶¶ 71-73.  For this reason (coupled with poor performance in the HS Fund), Ott's yearly

discretionary bonuses began steadily to decline beginning in 2007.  *Id.*, ¶¶ 64-65.[3]

***Implementation of the Trading Policy***

Against this backdrop, and consistent with his authority as CIO, Chung implemented for

the HS Fund a similar form of trading policy already employed by another Alger fund, the Alger

Analyst Fund.[4]  *Id.*, ¶¶ 74-82.  Specifically, on April 8, 2010, Chung implemented a trading

policy (the "Trading Policy" or "Policy") which provided that: "[I]n line with the Alger Analyst

---

[3] Further, on or about May 24, 2010, Alger began a search for candidates to lead the healthcare sector research team and to manage Ott's lagging performance.  *Id.*, ¶¶ 277-79.

[4] The Alger Analyst Fund faced similar issues to the HS Fund with respect to ensuring that sector-specific research was effectively and timely communicated by Analysts to the PMs of the other Alger funds.  *Id.*, ¶¶ 78-81.  Unlike other Alger funds, the Alger Analyst Fund is comprised of sub-portfolios managed by sector research Analysts.  It is possible for an Analyst to use his or her research to benefit the Alger Analyst Fund before sharing this same information with other Alger fund PMs.  *Id.*, ¶¶ 80-81.  Accordingly, a trading policy was implemented that required the Analysts who managed sub-portfolios in the Alger Analyst Fund to communicate their trade recommendations to all Alger fund PMs prior to trading in the Alger Analyst Fund and also required the Trading Desk to hold all trade orders for the Alger Analyst Fund until 3:00 p.m. each day.  *Id.*, ¶ 82.  Through this procedure, Alger ensured that all PMs were able to engage in an investment decision-making process based on equal access to the same research before any one fund placed a trade order based on that research.  *Id.*  No one – including Ott – ever objected to or raised any concerns in connection with this policy.  *Id.*, ¶ 83.

Fund, (a) no trades should be executed in the HC [HS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, (b) Trading, if you receive an order, you will hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours." *Id.*, ¶ 84.

The purpose of the Policy was to ensure that healthcare sector research and analytics were shared with all Alger PMs in a timely way by Senior healthcare sector Analysts Ott and Farhadi, who at the same time also were HS Fund Co-PMs, and to give Chung (as Co-PM, and also CIO) an opportunity to review and consider the trades that they recommended. *Id.*, ¶¶ 85-86. As Ott readily admits, the express terms of the Policy merely require that Ott and Farhadi notify the other Alger PMs of their trade recommendations. *Id.*, ¶ 195. The Policy did not require Ott or Farhadi to get permission from any other PM to make a trade in the HS Fund. *Id.*, ¶¶ 87, 115-16, 124, 139. In addition, the maximum two hour hold period for HS Fund trades could easily be avoided, if necessary, by seeking Chung's pre-approval of a trade (*id.*, ¶¶ 87, 107-108, 119), and also Ott and Farhadi had the ability to communicate almost immediately with the other Alger PMs, who are always available in their office or by phone. *Id.*, ¶¶ 27, 120, 125.

***Reactions to the Policy***

Reactions to the Policy were positive. *Id.*, ¶¶ 92-98, 110-119, 122-29, 136-43. Kelly and Greenwald both appreciated that the Policy provided equal access by all Alger PMs to healthcare sector research and analytics. *Id.*, ¶¶ 110, 122. No one questioned the Policy's legality or appropriateness and no one at Alger ever complained to Chung about the policy. *Id.*, ¶¶ 92, 121, 129, 143, 144-47, 208. After an initial question regarding the Policy's impact, Ott's Co-PM Farhadi represented to Chung that the Policy had a minor impact on day-to-day work. *Id.*, ¶¶ 144-45, 147. Ott's initial reaction to the policy was acceptance. *Id.*, ¶ 149. She told Chung "OK, David [Farhadi] and I will send emails to PMs and Trading" and "abide by [it]…" *Id.*

After adhering to the Policy for two months without complaining to Alger, Ott claims to have called anonymously the Securities and Exchange Commission ("SEC") in June 2010 and explained that she was now "uncomfortable" with the Policy because she thought it might constitute a violation of best execution. *Id.*, ¶¶ 149-53. During this supposed phone call, Ott characterized the Trading Policy as problematic because she interpreted it – notwithstanding the express language of the Policy to the contrary – as requiring her to obtain permission from other PMs before executing trades in the HS Fund. *Id.*, ¶¶ 153-54. She further believed that it could allow other PMs to front run. *Id.*

Rather than educate herself regarding the contours of best execution, front running or the operation of the Trading Desk at Alger in order to evaluate the legality and propriety of the Policy, Ott hired Jonathan Sack, an employment lawyer (with no substantive securities law experience), purportedly to help her address her concerns with the Policy. *Id.*, ¶¶ 154-56, 199-207. What resulted from that representation, however, had little to do with securities law or the propriety of the Policy. *Id.*, ¶¶ 157-79. Rather, in or about June, 2010, Sack met with Hal Liebes, Alger's Chief Legal Officer ("CLO") and Chief Operating Officer ("COO"), with one threatening message: Alger must pay Ott a seven figure severance or sell her the management contract for the HS Fund or else she would contact the SEC (presumably not anonymously) with her "concerns" about the Trading Policy. *Id.*, ¶¶ 157-62. At no point did Sack raise the possibility of eliminating the Trading Policy or taking any other steps to address Ott's purported concerns about the Policy. *Id.*

After this meeting, unwilling to be extorted by Ott, Alger made it clear that the Company would not pay Ott severance and was not authorized to sell her the management contract for the HS Fund. *Id.*, ¶¶ 163-64. Further, in or about June 2010, Alger "self-reported" the Trading

Policy and Ott's supposed concerns to Douglas J. Scheidt, Associate Director and Chief Counsel of the SEC's Division of Investment Management.  *Id.*  Alger also engaged Stroock & Stroock & Lavan LLP ("Stroock") to conduct a thorough and independent assessment of the legality and propriety of the Trading Policy, including the claims made by Ott.  *Id.*, ¶ 166.  Alger later was informed, in August 2010, that the SEC would examine the Trading Policy.  *Id.*, ¶ 165.

After Liebes rebuffed Ott's extortive overtures, Ott sent the Alger Board of Trustees a letter, dated July 14, 2010, outlining her complaints about the Policy.  *Id.*, ¶ 167.  (This letter also attached a substantively similar letter addressed to Chung, dated June 22, 2010, which was never sent by Ott.  *Id.*, ¶ 168.)  The stated purpose of her July 14 letter was to bring the Policy to the Board's "attention" (*id.*, ¶ 169), but Ott neither identified specifically what was illegal or infirm about the Policy, nor provided any means of addressing its application.  *Id.*, ¶¶ 170-79.  Instead, Ott again made the manifestly self-serving suggestion that Alger "sell" the HS Fund to her.  *Id.*, ¶¶ 174-78.  The letter ended with another threat: if Alger did not sell the Fund, Ott would report to the SEC and, as a shareholder in the HS Fund, would sue Alger herself.  *Id.*, ¶ 178.

### *Independent Assessments of the Policy*

Meanwhile, Stroock prepared an extensive memorandum (the "Stroock Report"), which synthesized the substantial work the firm had performed to review and consider the effect of the Policy.  *Id.*, ¶¶ 180-81.  The Stroock Report was provided to the SEC in early October 2010 and its conclusions were shared with Ott at the same time.  *Id.*, ¶¶ 181, 189.

Stroock concluded that the Policy did not violate any federal securities laws or rules and did not violate any fiduciary duties owed by Alger to the HS Fund to seek best execution.  *Id.*, ¶¶ 182-85.  The Report further concluded that Ott's assertion that a maximum two hour trading delay could impair performance of the HS Fund was entirely implausible given that, among other

things, "[i]t is rare that the HS Fund trades with the intent of capitalizing on a short-term price increase or decrease, where it would be important to place an order at a particular moment during the day." *Id.*, ¶ 186.  Finally, the Report documented through an empirical study of relevant trades, including those identified by Ott as examples of supposedly "poor [trade] execution", that the shareholders suffered no harm whatsoever from the Policy.  *Id.*, ¶ 187.  (In fact, there was a net gain of approximately $185,000.00 due to the implementation of the Policy.  *Id.*, ¶ 188.)

By the time she was advised of the Stroock Report and its conclusions, however, Ott claims that she already had met with the SEC in August 2010 and filed an "Investor Complaint Form" with the SEC in September 2010.  *Id.*, ¶ 189.  (There is no documentary evidence of the meeting and, with respect to the form, there is no record proof of any kind, such as a confirmation slip, that it was in fact filed.)

### *Ott Voluntarily Resigns From Alger*

In January 2011, Ott stopped reporting to work.  *Id.*, ¶¶ 302-314.  She failed to return to the office after traveling to San Francisco on January 8, 2011 for a healthcare conference that she attended on Alger's behalf.  *Id.*, ¶¶ 295, 302.  In particular, Ott represented to Alger that she would return to work on January 13, 2011.  *Id.*, ¶ 295.  Instead, she failed to report for work on January 13 or January 14 and then again on January 18-20, 2011.  *Id.*, ¶¶ 302-308.  She did not have written or oral approval to work from home or to take paid time off, and she did not communicate directly or indirectly with any of her managers or colleagues about her absence.  *Id.*, ¶¶ 309-310.  Alger's Attendance and Punctuality policy, which is part of the Alger Employee Handbook that was received and acknowledged by Ott, provides that any employee who is absent from work for three consecutive days without notifying his or her manager will be considered to have voluntarily resigned.  *Id.*, ¶¶ 291-92.  Consequently, consistent with this

policy, Alger acknowledged and accepted Ott's voluntary resignation at the close of business on
January 20, 2011.  *Id.*, ¶¶ 311-12.

The Trading Policy remains in effect to this day and, in fact, has been implemented in
another fund – the Alger Mid Cap Fund.  *Id.*, ¶¶ 93, 133-35.

**Ott's Complaint**

Ott's Complaint asserts only two purported causes of action against Alger: a Dodd-Frank
whistleblower claim for retaliation and a claim for breach of Alger's incentive compensation
plan (Docket Index "D.I." 31).  Ott maintains that the Trading Policy is unlawful and alleges
that, in violation of Dodd-Frank, Alger engaged in retaliatory acts after she complained to the
Alger Board and reported her beliefs to the SEC.  *Id.*  In particular, Ott claims these retaliatory
acts included, *inter alia*, demotion, a change in the location of her office, exclusion from a
research dinner, poor performance reviews, a *de minimus* discretionary bonus, and termination.
*Id.*  Her second claim, for breach of contract, seeks payment of certain amounts to which Ott
believes she is entitled under the terms of an incentive plan.  *Id.*

As set forth more fully below, there is absolutely no basis for Ott to claim she is a
whistleblower within the meaning of Dodd-Frank, nor can Ott demonstrate any instance of
retaliation by Alger.

## III.    ARGUMENT

### A.  Standard for Granting Summary Judgment

Summary judgment is proper where "admissible evidence in the form of affidavits,
deposition transcripts, or other documentation demonstrates the absence of a genuine issue of
material fact, and one party's entitlement to judgment as a matter of law."  *Destefano v. MVN
Assocs.*, No. 10-cv-05441, 2013 U.S. Dist. LEXIS 14428, at *3 (S.D.N.Y. Feb. 1, 2013); *see also
Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[C]onclusory allegations, conjecture, and

speculation … are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  Moreover, a court must enter summary judgment in a defendant's favor if the plaintiff fails to make a showing sufficient to establish an essential element of a claim. *Celotex*, 477 U.S. 317, 323-24*; see also Destefano*, 2013 U.S. Dist. LEXIS 14428, at *4 (citing *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988)).

As demonstrated below, based on the undisputed factual record, Ott has not and cannot meet her burden of proof with regard to the claims set forth in the Complaint, nor establish with admissible evidence a genuine issue of material fact for trial in order to avoid summary judgment.  *See, e.g.*, *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008); *Atl. Mut. Ins. Co. v. CSX Lines, LLC*, 432 F.3d 428, 433 (2d Cir. 2005); *see also Rivera v. Potter*, No. 03-cv-1991 (LAP), 2005 U.S. Dist. LEXIS 1416, at *7, *24 (S.D.N.Y. Jan. 31, 2005) (Preska, J.) (granting defendant employer's motion with regard to Title VII retaliation claims and noting "[f]or a discrimination plaintiff to survive a motion for summary judgment, he [or she] must do more than present 'conclusory allegations of discrimination'") (internal citations omitted).

## B.  Dodd-Frank Whistleblower Claim

Ott invokes 15 U.S.C. § 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which protects "whistleblowers" from retaliation, and provides that:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower – (i) in providing information to the Commission in accordance with this section; (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 … and any other law, rule, or regulation subject to the jurisdiction of the Commission.

11

15  U.S.C. § 78u-6(h)(1)(A).

**1.  Ott Has Not and Cannot Establish a *Prima Facie* Case Under Dodd-Frank.**

Under Dodd-Frank, to establish a *prima facie* case, Ott must show that she (a) was

engaged in protected activity, (b) suffered an adverse employment action that was (c) causally

connected to the protected activity.  *Ott v. Fred Alger Mgmt., Inc.*, No. 11-cv-4418, 2012 U.S.

Dist. LEXIS 143339, at *9 (S.D.N.Y. Sept. 27, 2012) (citing Securities and Exchange

Commission, Implementation of the Whistleblower Provisions of Section 21F of the Securities

Exchange Act of 1934, Exchange Act Release No. 34-64545 (May 25, 2011), at 18 n.41).

To withstand summary judgment on Plaintiff's Dodd-Frank claim, Ott must first

demonstrate, as a threshold matter, that a rational factfinder could determine that she has

established such a *prima facie* case.  SEC Securities Whistleblower Incentives and Protections,

Exchange Act Release No. 34-64545, 76 Fed. Reg. 34,300, at *34,304 (June 13, 2011) (to be

codified at 17 C.F.R. pts. 240 & 249) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) and explaining that Dodd-Frank whistleblower claims are analyzed under a version of the

*McDonnell Douglas* framework applied to Sarbanes Oxley ("SOX") claims); *see also Fraser v.

Fiduciary Trust Co. Int'l*, No. 04-cv-6958, 2009 U.S. Dist. LEXIS 75565, at *17-18 (S.D.N.Y.

Aug. 25, 2009) (granting defendant's summary judgment motion for SOX whistleblower claim

because plaintiff failed to establish *prima facie* case).[5]

Only if Ott successfully proves a *prima facie* case, including the threshold requirement

that Plaintiff engaged in a protected activity, does the burden then shift to Alger to articulate a

---

[5] In the absence of decisional law regarding the specific whistleblowing provisions of Dodd-
Frank, courts are entitled to look to the case law of SOX or other federal whistleblowing statutes.
*See Fraser v. Fiduciary Trust Co. Int'l*, No. 04-cv-6958, 2005 U.S. Dist. LEXIS 48059, at *16-
17 (S.D.N.Y. June 23, 2005); *Balko v. Ukrainian Nat'l Fed. Credit Union*, No. 13-cv-1333, 2014
U.S. Dist. LEXIS 42427, at *29 (S.D.N.Y. Mar. 28, 2014).

legitimate, non-retaliatory reason for its employment decision(s); if Alger does so, the burden

shifts back to Ott to prove that the proffered legitimate reason is, in fact, a pretext.  76 Fed. Reg.

at *34,304 (citing *McDonnell Douglas*, 411 U.S. 792).

Plaintiff cannot meet this burden at any stage of the analysis.

**a)  Ott has not demonstrated that she engaged in a protected activity.**

At the time a potential Dodd-Frank whistleblower engages in a supposedly protected

activity, he or she must hold a subjectively and objectively reasonable belief that the reported

information relates to a securities law violation.  In other words, the whistleblower must prove

that his or her belief in the illegality of the conduct reported is both genuine and one that "a

similarly situated employee might reasonably possess."  76 Fed. Reg. 34,300, at *34,303; 17

C.F.R. § 240.21F-2(b)(i).  Failure to prove such a subjectively and objectively reasonable belief

warrants dismissal of a whistleblower's claim.  *Fraser v. Fiduciary Trust Co. Int'l*, 396 F. App'x

734, 735 (2d Cir. 2010) (affirming dismissal of SOX claim because "the record evidence would

not permit factfinder to conclude that [the plaintiff] held both a subjective[ly] and objectively

reasonable belief that he was reporting conduct covered by the law."); *Nazif v. Comput. Scis.

Corp.*, No. C-13-5498 EMC, 2015 U.S. Dist. LEXIS 78673, at *16-18 (N.D. Cal. June 17, 2015)

(same standard for Dodd-Frank claim); *see also Day v. Staples, Inc.*, 555 F.3d 42, 54-55 (1st Cir.

2009); *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008); *Allen v. Admin. Review Bd.*,

514 F.3d 468, 477 (5th Cir. 2008); *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 726-27 (7th

Cir. 2009); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009).

**i.     Ott's view of the Policy was subjectively unreasonable.**

A whistleblower must demonstrate that his or her belief  in the illegality of the conduct

reported is genuine and held in good faith.  *See Beacom v. Oracle Am., Inc.*, No. CIV. 13-985

(DWF/FLN), 2015 U.S. Dist. LEXIS 66599, at *11-12 (D. Minn. Mar. 11, 2015); *see also*

*Gladitsch v. Neo@Ogilvy*, No. 11 Civ. 919 (DAB), 2012 U.S. Dist. LEXIS 41904, at *23

(S.D.N.Y. Mar. 21, 2012); *Day*, 555 F.3d at 54 ("[T]he law is not meant to protect those whose

complaints are not undertaken in subjective good faith."); Implementation of the Whistleblower

Provisions of Section 21F of the Sec. Exch. Act of 1934, Release No. 34-64545, at *34,303 (May

25, 2011) ("The 'reasonable belief' standard [under Dodd-Frank] requires that the employee hold

a subjectively genuine belief that the information demonstrates a possible violation.").  The

genuineness of a plaintiff's belief must be considered in light of the employee's behavior with

regard to the conduct or policy at issue, as well as the circumstances surrounding the plaintiff's

related complaints.  *See, e.g.*, *Beacom*, 2015 U.S. Dist. LEXIS 66599, at *11-12.

    Under this standard, Ott has not and cannot demonstrate that she held a genuine belief in

the Trading Policy's illegality, nor prove that she acted in good faith.  Not only has she failed to

produce any evidence in support of this element of her claim, as set forth below, the record is

clear that Ott was indifferent to the Policy until she used it as a means to try to advance her own

self-serving ends.

    First, Ott claims that the Trading Policy is infirm for three reasons: (i) the Policy

improperly requires the HS Fund Co-PMs (Ott and Farhadi) to seek the approval of other PMs

prior to their trading in the HS Fund, and the maximum two hour hold period imposed by the

Policy (ii) results in a failure of best execution and (iii) allows other Alger funds to "front run"

the HS Fund (D.I. 31, ¶¶ 127-135).

    Ott has not identified any specific law, policy, procedure, guideline or practice that the

Trading Policy does, or arguably might, violate that was known to her at or about the time the

Trading Policy was implemented, or any time afterward.   Further, Ott did virtually nothing to

educate herself regarding either securities law or the law on best execution and front running

14

before supposedly reporting the Policy to the SEC.  SOF, ¶¶ 199-212.  Ott did not seek the advice of anyone who could have helped her understand the law or the Policy.  *Id.*, ¶ 212.  She never directly approached Chung, Liebes or the Head of the Trading Desk, Steve Thumm, about the Policy, and she later engaged employment law counsel, not securities law counsel, to assist her effort to force the sale of the HS Fund to her and/or induce Alger to award her severance.  *Id.*, ¶¶ 151-52, 159, 199-212.

Further undermining the reasonableness of Ott's subjective belief is her categorical admission that express language of the Trading Policy does not require the HS Fund PMs to seek the approval of the other Alger fund PMs prior to trading.  *Id.*, ¶ 195.  Instead, Ott admits that this notion was merely her own interpretation that was not shared by another PM.  *Id.*, ¶¶ 196-97, 209-10.  Finally, it is implausible that Ott genuinely found the Trading Policy objectionable when her initial reaction to the Policy was acceptance (*id.*, ¶ 149); she did not contact the SEC for nearly two months after the Policy's implementation (*id.*, ¶ 153); and she complied with the terms of an Alger Analyst Fund policy that had been in place for some time before the Trading Policy and on which the Trading Policy was modeled – never once having objected to or raised any question regarding that policy.  *Id.*, ¶¶ 77-83.

Plaintiff's failure of proof  in this regard warrants summary judgment for Alger.  *See, e.g., Beacom*, 2015 U.S. Dist. LEXIS 66599, at *11-12 (granting summary judgment for defendant where Dodd-Frank plaintiff (1) never told employer that he believed the employer's conduct was illegal and (2) submitted no evidence suggesting he subjectively believed the employer's conduct was illegal at the time he complained).

Second, Ott's conduct towards Alger in connection with the Policy fatally undermines any possible finding of good faith.  In particular, the record is uncontroverted that Ott never

sought to have the Policy rescinded or to otherwise change the manner in which it was implemented.  SOF, ¶¶ 162, 175.  In fact, she claimed that such a measure was not a "permanent corrective solution."  *Id.*, ¶ 176.  Rather, Ott repeatedly threatened Alger and tried to strong-arm from the company a benefit for herself.  *Id.*, ¶¶ 160-61, 174.  Specifically, beginning in June 2010, Ott's newly-retained employment law counsel offered Alger an improper and unethical ***quid pro quo*** arrangement whereby Ott would take no further legal action with respect to the Policy if Alger ***sold her the management agreement for the HS Fund or paid her a seven-figure severance***.  *Id.*, ¶¶ 155, 160-61.  Clearly, each option benefitted only Ott.[6]  *Id.*

Such bad faith extortive conduct operates as a bar to a whistleblower claim.  *See Day*, 555 F.3d at 54; *see also Wolcott v. Champion Int'l Corp.*, 691 F. Supp. 1052, 1065 (W.D. Mich. 1987) (granting summary judgment for defendant on Michigan Whistleblowers Act claim because employee "reported actual violations only after an extortive *quid pro quo* failed"); *Ewald v. Royal Norwegian Embassy*, 2 F. Supp. 3d 1101, 1122-23 (D. Minn. 2014) (noting that courts should investigate whether a report is made in good faith or as a vehicle to support a whistleblowing claim).

Accordingly, since the record demonstrates that Plaintiff cannot sufficiently prove that she held a subjectively reasonable belief that the Policy was illegal as required by Dodd-Frank, summary judgment is appropriate on this basis alone.

---

[6] The specific circumstances surrounding the urgency of Ott's desire to leave Alger in June 2010 further diminishes the credulity of Ott's good faith subjective belief.  While Ott claims that she wanted to leave due to the implementation of the Trading Policy, the evidence reflects that her performance had been declining, as had her discretionary bonus amounts.  *Id.*, ¶¶ 55-65.  Further, Alger had just engaged an executive search firm in late May 2010 to begin a search for a suitable employee to supervise and lead the healthcare research team and, in particular, to address Ott's poor performance as a Senior Analyst and Co-PM.  *Id.*, ¶¶ 277-79.   This search led to the hiring of Maria Liotta as the Head of the healthcare sector research team.  *Id.*  Thus, it is not surprising that in or about June 2010, Ott hired employment law counsel.  *Id.*, ¶ 155.

ii.    **Ott's view of the Policy was objectively unreasonable.**

To prove the objective reasonableness of a whistleblower's belief in the illegality of the conduct reported, Ott must demonstrate "that a reasonable person in [her] position would have believed that the conduct constituted a violation."  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (quoting *Livingston*, 520 F.3d at 352).  The objective prong of the reasonable belief test focuses on the "basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience."  *Id.* (citing *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011)).

As set forth below, Ott has offered no credible evidence whatsoever in support of her objective belief regarding the illegality and impropriety of the Trading Policy, let alone evidence that similarly situated individuals shared her belief.  Ott admits that she was the only Alger employee who took any action that reflected a concern regarding the propriety of the Trading Policy, and she was the only person who believed the Trading Policy was illegal.  SOF, ¶¶ 208-210.  On the other hand, the record is replete with uncontested evidence that no one – either at Alger, Stroock or the SEC – shared any aspect of Ott's assessment of the infirmity of the Policy.  *Id.*, ¶¶ 95, 109, 121, 129, 143, 146-47, 181-88, 192-93.  Nor did they share Plaintiff's understanding of the laws she claimed were being violated.  *Id.*, ¶¶ 36, 41-54, 103-07, 122, 127, 141.  Moreover, the individuals at Alger who were subject to or familiar with the Policy uniformly endorse it.  *Id.*, ¶¶ 94, 98, 110, 122-23, 138.

***No Similarly Situated Employee Believed Policy Required PM Approval of HS Fund Trades***

Ott admits that no other Alger PMs ever indicated that they understood the Trading Policy to require Ott or Farhadi to seek approval from the PMs of other Alger funds before trading in the HS Fund.  *Id.*, ¶¶ 195-96, 208-210.  These include, for example, PMs Patrick Kelly, Jill Greenwald and Andrew Silverberg.  *Id.*, ¶¶ 115-116, 121, 124, 129, 139, 143, 146-47;

*see also* Liebes Decl., Ex. 1, Stroock Report, Tab 6, Alger Prospectus at pp. 9, 42.  Kelly,

Greenwald and, in particular, Christopher Walsh, who became an Analyst and Co-PM of the

Alger Mid Cap Fund, and for this reason is subject to the Policy as it was applied subsequently to

this fund, understood it to require only that they ***acknowledge*** their receipt of HS Fund trade

orders prior to the HS Fund executing on such trades.  *Id.*  According to Steve Thumm, the Head

of Alger's Trading Desk, the Trading Desk not only shared the same understanding as Walsh and

the other PMs but, in practice, required only PM ***confirmation*** of Ott's and Farhadi's notice, and

not approval for trades in the HS Fund.  *Id.*, ¶¶ 99-101.  Moreover, Ott concedes that she was an

"outlier" and that the plain language of the Trading Policy did not support her interpretation that

the Policy required the HS Fund Co-PMs to seek the approval of their trades from other Alger

fund PMs.  *Id.*, ¶¶ 195, 210.  Consequently, there is no basis for Ott to prove that her

interpretation of the Policy's "approval" requirement is objectively reasonable.

### No Similarly Situated Alger Employee Believed the Policy Impaired Best Execution

Ott's belief that the Policy impaired best execution is uniformly contradicted by the

assessments of Alger employees who were similarly situated to her.  In particular, Jill Greenwald

and Christopher Walsh, have attested that they did not share Ott's belief that the Trading Policy

affected best execution.  *Id.*, ¶¶ 29, 119, 127-28, 141-42, 146-47.  Nor did the Trading Desk.  *Id.*,

¶¶ 100-105.  Even David Farhadi, Ott's Co-PM, never raised the Policy's legality – in this or any

other regard – as an issue. *Id.*, ¶¶ 144-45, 147.

Further, Ott's claim that the Policy prevents the HS Fund from obtaining best execution

is premised on an unreasonably faulty understanding of the trading process at Alger, as well as

an implausible understanding of the duty of best execution.  *See generally id.*, ¶¶ 153-54, 157-58,

168-71, 184-86, 194-212.  As explained by the Head of the Trading Desk, Steve Thumm, and

similarly understood by PMs Greenwald, Kelly and Walsh, best execution is obtained when the

Alger Trading Desk, only after it has consulted with its chosen broker-dealer, examines various

market conditions and determines the time and the manner in which the broker can execute a

trade on the best overall terms under the circumstances. *Id.*, ¶¶ 41-47, 118-119, 126-28, 141-42;

*see also In re Kidder, Peabody & Co., Advisers Act of 19940, Release No. 232*, 1968 WL 87653

at * 4 (Oct. 16, 1968); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266,

270 (3d Cir. 1998). In other words, while the amount of time a trade requires to achieve "best

execution" is considered relative to the type of order that is being filled, the quality of execution

is not measured from when an Alger PM places a trade order with the Alger Trading Desk.

Rather, it is measured after the Trading Desk, along with an outside broker-dealer, begins the

process to determine how an order can be filled in the market. SOF, ¶¶ 41, 103-104. As also

explained by Thumm and understood by Greenwald, Kelly and Walsh, depending on market

conditions and other factors, trades may be executed in minutes or hours, or they may take days

or even weeks to execute. *Id.*, ¶ 46; *see also id.*, ¶¶ 106, 117, 126, 141. Therefore, any

temporary hold by the Alger Trading Desk before a trade goes live is irrelevant to the assessment

of best execution. *Id.*, ¶¶ 102-104.

  In stark contrast, Ott appears to believe that best execution is simply a matter of

communicating a trade order to the Alger Trading Desk, which necessarily means the trade is

filled in the market immediately on the best overall terms. *See* Declaration of Todd Norbitz , Ex.

1, Deposition Transcript of Rosanne Ott, 48:13-51:5; SOF, ¶¶ 168-71. This notion that whatever

moment a PM chooses to communicate his or her trade order to the Trading Desk is the only

moment in which the trade is best executed in the market is unsupportable, and Ott's belief, not

surprisingly, is contrary to the informed understanding of the trading process and the exercise of best execution shared by her colleagues.  SOF, ¶¶ 40-46, 101-105, 117-118, 125-27, 140-41.

Ott has failed to present any evidence from any similarly situated Alger employee to support that her interpretation of best execution is objectively reasonable, and the record instead reflects that Ott's interpretation is patently false.  For this reason summary judgment dismissal of Plaintiff's Dodd-Frank claim is warranted.  *See Nazif*, 2015 U.S. Dist. LEXIS 78673, at *2-4 (dismissing plaintiff's Dodd-Frank claim on summary judgment where plaintiff failed to present evidence that his interpretation of GAAP – on which he based his assertion that the defendant was engaged in securities fraud – was reasonable to other accountants such that they too would have believed that defendant's conduct constituted a securities violation); *Livingston*, 520 F.3d at 354 (affirming summary judgment dismissal of SOX claim because the plaintiff's "chain of speculation [was] simply too long"); *Beacom*, 2015 U.S. Dist. LEXIS 66599, at *11-13 (dismissing SOX and Dodd-Frank claims on summary judgment because plaintiff's beliefs were not objectively reasonable in that he could point to "no authority to support the proposition that a sales target that is higher than he believes it should be is fraudulent"); *Nielsen*, 762 F.3d at 221, n.6 (affirming dismissal of SOX claim where the employer's purported fire safety violations were "wholly untethered" from the law concerning fraud or other securities violation such that plaintiff's belief in the illegality of the complained of conduct was not objectively reasonable).

### *No Similarly Situated Alger Employee Believed the Policy Permitted Front Running*

Ott's belief that the Trading Policy promoted front running also is contrary to the informed beliefs of similarly situated Alger employees.  *Cf.* Complaint (D.I. 31, ¶¶ 127-135) *with* SOF, ¶¶ 34-37, 96-98, 109-112, 114, 121-22, 129, 136-38, 143, 145; *see also id.*, ¶¶ 94-95. For example, Greenwald and Walsh believed that the Policy allowed for front running.  *Id.*, ¶¶

122, 128, 138, 140.  Indeed, these PMs acknowledged the Policy was an effective tool for providing equal access to healthcare sector research and trade recommendations by all the Alger PMs and preventing – not promoting – front running.[7]  *Id.*, ¶¶122, 138.  In line with Greenwald and Walsh, Thumm also understood that the Policy guarded against front running.  *Id.*, ¶ 98. Moreover, all these similarly situated Alger employees understood that the maximum two hour waiting period imposed by the Policy could easily be avoided in its entirety by seeking Chung's pre-approval of a trade or ensuring that interested PMs received notification of HS Fund trades in an expedited manner, which is easily accomplished at Alger.  *Id.*, ¶¶ 107-108, 119, 128, 140.

Ott's apparent belief that the Trading Policy provided a context for other Alger fund PMs to front run is markedly contrary to the understanding of the application of front running by similarly situated Alger employees.  *Cf.* Complaint (D.I. 31, ¶¶ 127-135) *with* SOF, ¶¶ 34-36. Similarly situated Alger employees recognize that front running involves one fund (usually a relatively small fund trading in a relatively small number of shares) trading in advance of another fund (usually larger and trading in a relatively larger number of shares) and benefitting from the increase in the traded security's price caused by the second fund's trading activity.  *Id.*, ¶¶ 34-36. Here, the HS Fund was a relatively small Alger fund.   Liebes Decl., Ex. 1, Stroock Report, at pp. 6-8.  Accordingly, it was unlikely (if not impossible), for a larger Alger fund, which traded prior to the HS Fund, to realize an increase in the price of the security it purchased where the HS Fund takes a smaller position in the same security later in time.

Ott's failure to demonstrate that any other similarly situated Alger employees considered Ott's beliefs to be anything other than patently wrong, much less reasonable, is an additional,

---

[7] Further, both Walsh and Thumm were familiar with policies similar to the Trading Policy that other investment advisor firms implemented in order to promote the effective communication between analysts and portfolio managers and to ensure equal access to research analytics and trade recommendations.  *Id.*, ¶¶ 97, 136-37.

independently sufficient ground to dismiss Ott's Dodd-Frank claim.  *See supra* at pp. 20-21; *see also Nazif*, 2015 U.S. Dist. LEXIS 78673, at *2-4; *Livingston*, 520 F.3d at 354; *Beacom*, 2015 U.S. Dist. LEXIS 66599, at *11-12; *Nielsen*, 762 F.3d at 221, n.6.

### Stroock Did Not Credit Any of Ott's Claims Regarding the Trading Policy

The objective unreasonableness of Ott's position with respect to the legality of the Trading Policy is further amplified by Stroock's independent examination and findings.  *See* SOF, ¶¶ 180-88.

After an exhaustive assessment of the Trading Policy, which included in-person interviews with numerous Alger employees – including Ott and Farhadi – and a detailed analysis (conducted by the financial consulting firm Charles River Associates) of thousands of pages of trading data to determine the financial impact, if any, of the implementation of the Trading Policy on the HS Fund's performance, Stroock concluded that the Trading Policy complied with all relevant federal securities law and rules and was an entirely appropriate course of action for Chung, as the CEO, CIO and Co-PM of the HS Fund, to take.  *Id.*, ¶ 182.  In particular, Stroock reported that the Trading Policy does not allow other Alger PMs to front run and does not deprive the Alger funds of best execution.  *Id.*, ¶ 183.  Notably, Stroock determined that none of the so-called examples of a failure of best execution identified by Ott resulted in any disadvantage to the HS Fund.  *Id.*, ¶¶ 184-85.  To the contrary, any delay in the placement of the HS Fund's trades with the Trading Desk actually had a positive impact of $185,365.00.  *Id.*, ¶¶ 187-88.

***The SEC Did Not Credit Ott's Claim***

Ott's alleged concerns were further shown to be objectively unreasonable by the SEC's decision, issued after a full examination of the Trading Policy and its effects, not to recommend "any enforcement action by the Commission."   *Id.*, ¶¶ 192-93.

***Ott's Ignorance of Best Execution and Front Running Renders Her Beliefs Unreasonable***

A whistleblower's belief cannot be deemed "reasonable" if it is based on erroneous information that would be dispelled with basic research.  *See Day*, 555 F.3d at 46, 56 (affirming dismissal of SOX claim on the ground that Plaintiff was objectively unreasonable in his belief that his employer was engaged in securities fraud where Plaintiff failed to investigate the basis of his claims and, had he done so, he would have learned that his employer never misrepresented its business practices to shareholders and, therefore, his allegations against the company were unfounded); *see also Nazif*, 2015 U.S. Dist. LEXIS 78673, at *28-29.

Here, Ott has conceded that she did little to legally substantiate her claim regarding the illegality of the Policy or in any way investigate her so-called concerns.  SOF, ¶¶ 201-212. Among other things, Ott did not contact the Trading Desk to inquire about the effect of the Policy's implementation or to learn about the Trading Desk's general operating procedures.  *Id.*, ¶ 152.  Ott did not review or reference key Alger fund documents concerning the firm's investment decision-making processes, its trading operations or its disclosures to shareholders. *Id.*, ¶¶ 196-207.  In fact, Ott admitted that had she conducted a full review of such documents and learned that there was a basis for implementing the Trading Policy, "there would probably [] [have been a] different discussion [with Alger]."[8]  *Id.*, ¶ 207.  Ott did not consult securities or

---

[8] Had Ott conducted even the least bit of diligence she would have learned that Alger fully discloses to its fund investors that it may implement various measures to manage investment decision-making and trading policies concerning the Alger funds, which can result in disparate

investment services lawyers regarding the Policy, and she did not investigate her own examples of so-called "poor execution" to determine if the at-issue trades negatively impacted the value of the HS Fund.  *Id.*, ¶¶ 155-56, 208-212.

Ott's failure to take even the most basic investigatory steps with respect to her claim that the Policy is illegal renders her belief unreasonable.  Therefore, Ott has failed to prove this element of her Dodd-Frank claim and for this separate and independent reason the entire count should be dismissed.

### iii.    Reporting trivial violations of law is not a protected activity.

Even assuming, *arguendo*, that Ott's purported beliefs regarding the infirmity of the Policy were to be credited as subjectively and objectively reasonable, which they should not be, they are insufficient to prove that Ott engaged in a protected activity.

The Second Circuit has acknowledged that "[i]t may well be that a complainant's complaint concerns such a trivial matter, in terms of its relationship to shareholder interests, that he or she did not engage in protected activity …"  *Nielsen*, 762 F.3d at 222 (affirming dismissal of SOX whistleblower claim involving employee's reporting of purported fire safety violations); *see also Nazif*, 2015 U.S. Dist. LEXIS 78673, at *28-29 (dismissing Dodd-Frank claim, in part, because plaintiff could not establish how minor GAAP accounting issues and the company's supposed failure to maintain a global contracts database were more than trivial – i.e., how they could lead to fraud against shareholders or material financial misrepresentations).

Here, the record is filled with uncontested evidence that the Trading Policy had no material negative impact on the HS Fund.  SOF, ¶¶ 181-88.  First, Stroock concluded that the

---

effects between and among Alger funds.  *Id.*, ¶ 54.  *See also* Liebes Decl., Ex. 1, Stroock Report, Tab 6, Alger Prospectus.  Alger was acting within the meaning of these disclosed guidelines by implementing the Trading Policy.  *Id.*

implementation of the Policy resulted in a net positive benefit to the shareholders of the HS Fund.  *Id.*, ¶ 188.  Next, in a December 2010 presentation to Chung and others at Alger, Farhadi explicitly stated that he was "not concerned with the change in Healthcare Fund trading policy" given its "minor impact on day-to-day work."  *Id.*, ¶ 147.  Third, Thumm, Walsh, Greenwald and Kelly all agree that the Policy's impact on the timing of the placement of trade orders could be eliminated entirely, if needed, by seeking out the potentially interested PMs in person or over the phone to notify them of the intended HS Fund trade, or by obtaining Chung's pre-approval of any trade.  *Id.*, ¶¶ 107-108, 119, 128, 140.  Finally, Thumm, Greenwald, Walsh and Kelly agree that in light of the Alger funds' long term investment strategy, the inability to capitalize on a short term price fluctuation because of the Policy's maximum two hour hold period, would have no material impact on the long-term value of the fund.  *Id.*, ¶¶ 114, 119, 128, 142.

Thus, it is clear that the reporting of any supposed infirmity of the Trading Policy would not be deemed a protected activity due to the trivial impact of the Trading Policy.

### b)  Ott has not demonstrated adverse employment actions.

Apart from failing to show that Plaintiff engaged in a protected activity within the meaning of Dodd-Frank, Ott similarly cannot demonstrate that she suffered any adverse employment action within the meaning of the statute.  The Dodd-Frank whistleblower protection provision (like the provision in SOX) states that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower."  15 U.S.C. § 78u-6(h)(1)(A); *see also* 18 U.S.C. § 1514A(a).  Specifically, a Dodd-Frank plaintiff must prove that he or she has suffered a materially adverse employment action – meaning an action that might "dissuade a reasonable worker from making or supporting a charge" against his or her employer.  *See Burlington N. and Sante Fe Ry. Co. v. White*, 548

U.S. 53, 57, 68 (2006) (internal citations and quotations omitted; stating standard applied in a Title VII case); *In re Menendez*, ARB Case Nos. 09-002, 09-003, 2011 DOL Ad. Rev. B. LEXIS 83, at *37-38 (Dep't of Labor Admin. Rev. Bd. Sept. 13, 2011) (stating that "adverse actions" under SOX refer to unfavorable employment actions that are more than trivial, "either as a single event or in combination with other deliberate employer actions alleged").

In other words, the adverse employment action must negatively affect important employment issues (*see Galabya v. NYC Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds*; *Burlington*, 548 U.S. at 68; *Kolchinsky v. Moody's Corp.* No. 10 Civ. 6840, 2012 U.S. Dist. LEXIS 25650, at *17-18 (S.D.N.Y. Feb. 28, 2012)), and inconveniences or unpleasant exchanges with others at the company cannot qualify as material adverse actions under the law because a whistleblower "cannot immunize [him or herself] from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68

### i.  Ott was not terminated, she voluntarily resigned.

To begin with, Ott's principal complaint – that she was fired from Alger – is unsupported by any evidence.  To the contrary, Ott admits that she failed to appear for work on three consecutive days (January 18, 19 and 20, 2010).  SOF, ¶¶ 302-308.  She further admits that she did not have approval from any one at Alger to stay home from work during this period, nor did she communicate her whereabouts to anyone at Alger.[9]  *Id.*, ¶ 309.  Finally, she concedes that pursuant to the Attendance and Punctuality Policy of Alger's Employee Handbook – which Ott acknowledges having received – any employee who fails to attend work for three consecutive days without prior notice to the company voluntarily resigns.  *Id.*, ¶¶ 291-92, 311-12.  At the

---

[9] In fact, it is undisputed that after attending a conference on Alger's behalf in California and failing to perform her job duties as requested during the conference, Ott did not appear for work as she was scheduled to, on January 13 and 14, 2010 as well.  *Id.*, ¶¶ 302-303.

close of business, on January 20, 2011, Alger sent Ott a letter acknowledging her voluntary resignation.  *Id.*, ¶¶ 311-12.  Accordingly, Ott's separation of employment from Alger cannot support her claim of retaliation.

> ii.   **None of the other events that Ott claims were retaliatory satisfy the *Burlington* materiality standard.**

Apart from this, Plaintiff merely identifies certain decisions made by Alger during the ordinary course of business that are otherwise applicable to all other Alger employees, but which Plaintiff alleges are nonetheless retaliatory acts when applied to her.  These include (i) two research assignments; (ii) poor performance evaluations; (iii) moving offices; (iv) the hiring of a Head of Healthcare sector research team; (v) a small discretionary bonus award; (vi) a dis-invitation to a dinner; (vii) changing the hard drive on her computer and (viii) instances where her requests to work from home were denied.  *See generally* Complaint (D.I. 31, ¶¶ 213-54).

Pursuant to the *Burlington* standard, as a matter of law, the following acts do not constitute adverse employment actions: a negative performance evaluation alone – even if wrongly administered (*Herschman v. City Univ. of N.Y.*, No. 08 Civ. 11126 (JSR)(FM), 2011 U.S. Dist. LEXIS 32854, at *53 (S.D.N.Y. Feb. 28, 2011) report and recommendation adopted, No. 08 Civ. 11126 JSR, 2011 U.S. Dist. LEXIS 32806 (S.D.N.Y. Mar. 29, 2011); moving offices (*Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 586 (S.D.N.Y. 2012) *aff'd*, 526 F. App'x 124 (2d Cir. 2013); changes in the organization structure of the company or having plaintiff report to new supervisor (*id.*); and no discretionary bonus award (*Davis v. NYC Dep't of Educ.*, No. 10-CV-3812 (KAM)(LB), 2012 U.S. Dist. LEXIS 5633, at *24 (E.D.N.Y. Jan. 18, 2012) (citing *Boyar v. City of N.Y.,* No. 10–CV–65, 2010 U.S. Dist. LEXIS 115289, at *8 (S.D.N.Y. Oct. 28, 2010)) (where Title VII plaintiff did not suggest that bonus was awarded as a matter of course or that he

could rely on it, "[d]efendants' decision not to provide discretionary pay did not change the terms or conditions of Plaintiff's employment").

Similarly, under *Burlington*, assessing work performance, assigning research, managing dinner invitations, occasional denials of requests to work from home and IT repairs are all the type of non-retaliatory, routine actions undertaken in the usual course of business, and as such, cannot be construed as material adverse actions. *See, e.g.*, 548 U.S. at 69.

### c) There is no causal connection between Ott's activities and Alger's supposed adverse employment actions.

#### i. Ott has proffered no admissible evidence of causality.

In addition to failing to establish any material adverse employment actions, Ott also cannot establish a *prima facie* Dodd-Frank claim because she has proffered no admissible evidence that any so-called adverse employment actions were "causally connected to the protected activity." *Ott*, 2012 U.S. Dist. LEXIS 143339, at *9 (plaintiff must show causal nexus between protected activity and alleged adverse employment action).

Ott's failure to provide any evidence whatsoever in support of causality is fatal to her entire Dodd-Frank claim. *Fraser*, 2009 U.S. Dist. LEXIS 75565, at *17-18.

#### ii. The timing of Ott's so-called adverse employment events belies any retaliatory motive.

Where the time between a protected activity and an adverse employment action is more than a few months, courts generally will not find causality absent other evidence of a defendant's retaliatory motive.[10] Where such evidence is missing, summary judgment is warranted. *See,*

---

[10] There is no specific amount of time which must pass before the inference of causality is undermined. Courts in the Second Circuit consistently have held in Title VII cases – which, like SOX and Dodd-Frank claims, are analyzed under a version of the *McDonnell Douglas* framework – that "a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *See, e.g., Garrett v. Garden City Hotel, Inc.*, No. 05-cv-0962 (JFB)(AKT), 2007 U.S. Dist. LEXIS 31106, at *69

*e.g.*, *Sussberg v. K-Mart Holding Corp.*, 463 F. Supp. 2d 704, 714 (E.D. Mich. 2006) (granting summary judgment to SOX defendant and finding that a five month gap between protected activity and adverse employment action was too long a period from which to infer causality); *Clark Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that time between employer's knowledge of activity and adverse action must be "very close").

Ott contends that she reported her complaints about the Trading Policy to Alger and the SEC for the first time in June 2010 (D.I. 31, ¶ 139).  Further, it is uncontested that all of the following events – which Ott claims were retaliatory – took place four months or more after her reporting: Ott was assigned research during earnings season (October 25, 2010) (D.I. 31, ¶ 217; SOF, ¶ 249); the IT department "swapped out" Ott's computer hard drive (November 3, 2010) (D.I. 31, ¶ 222; SOF, ¶ 256); Maria Liotta was hired as the Head of the Healthcare sector research team (November 8, 2010) (D.I. 31, ¶ 234; SOF, ¶ 277); Ott was dis-invited to a work-related dinner (November 12, 2010) (D.I. 31, ¶ 228; SOF, ¶ 241); Ott moved offices (November 2010) (D.I. 31, ¶ 238; SOF, ¶ 266); Ott was awarded a $10,000 discretionary bonus (December 15, 2010) (D.I. 31, ¶ 245; SOF, ¶¶ 64-65); Ott voluntarily resigned (January 20, 2011) (SOF, ¶¶ 290-91, 310-11).

In light of the significant amount of time that passed between Ott's initial reporting and these events, no inference of retaliatory motive can be drawn from their timing.

---

(E.D.N.Y. Apr. 19, 2007); *Ponticelli v. Zurich Amer. Ins. Grp.*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (same).  With respect to SOX and Dodd-Frank claims, a six month gap between an employee's activities and termination has been held to be too long a period from which to infer retaliatory causation.  *See Pardy v. Gray*, No. 07-cv-6324, 2008 U.S. Dist. LEXIS 53997, at *15-16 (S.D.N.Y. July 15, 2008).

### iii.   Acts before Ott's "whistleblowing" do not support her claim.

Gradual adverse employment actions that begin prior to a plaintiff's supposed protected activity do not give rise to any inference of retaliation.  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (in ADEA case, holding that where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise").

Here, it is uncontroverted that the vast majority of the events that Ott claims were retaliatory had their beginnings months, if not years, before she raised any issue with respect to the Trading Policy.  Ott's performance evaluations – which she claims were wrongfully negative after she became a whistleblower – had been declining since 2007.  SOF, at ¶¶ 55-65.   Similarly, while Ott claims that her mid-year Mid Cap review in 2010 was issued in retaliation – she had, in fact, been given the same type of review in 2009.  *Id.*, at ¶ 61.  While Ott alleges that her 2010 bonus amount was retaliatory, her bonus awards had been declining steadily since 2008.  *Id.*, at ¶¶ 64-65.  Furthermore, the search to find an appropriate candidate to hire as the Head of the healthcare sector at Alger – the filling of which position Ott claims resulted in her demotion – began in May 2010, approximately one month before Ott claims to have questioned the Trading Policy to either Alger or the SEC.  *Id.*, at ¶ 279.

In addition to the lack of any cognizable protected activity, it is also clear that Ott cannot establish any retaliatory activity in support of a *prima facie* case and, therefore, for this separate and independent reason, her entire Dodd-Frank claim must be dismissed.

### 2.  Alger Has Legitimate, Non-Retaliatory Reasons for Its Actions

However, even if the Court were to give credence to Plaintiff's whistleblower claim, Alger has rebutted with uncontested evidence that it had a legitimate, non-retaliatory business reason for each of Ott's purportedly retaliatory events.

***Criticism of Ott's Research Database Entries:***  Ott claims that Chung singled her out and erroneously reprimanded her for failing to complete certain research database entries.  (D.I. 31, ¶¶ 186-87).  *See also* SOF, ¶¶ 213-23.  Ott admits that despite having performed the work that was to be entered into the database, she had not yet done so.  *Id.*, at ¶¶ 222-23.  Therefore, Chung's assessment of her work was consistent with the information that he had before him.  Further, Ott was not alone in being reprimanded: another Analyst whose database deficiencies were similar in magnitude also was criticized.  *Id.*, at ¶¶ 219-20.

***"Homework" Assignment over a Weekend:***  Ott claims that she was assigned "homework" by Chung over a weekend during which her family was visiting.  (D.I. 31, ¶¶ 188-91).  *See also* SOF,  ¶¶ 224-28.  The record is clear, however, that the timing of Chung's request was due entirely to Ott's failure to provide him with information and material that he had requested and that she promised to deliver ***nine days earlier***.  *Id.*, at ¶ 226.

***Denial of Certain Work from Home Requests:***  Ott claims that, on certain occasions, she was denied work from home ("WFH") requests when others' requests purportedly were granted (D.I. 31, ¶¶ 229-30).  *See also* SOF, ¶¶ 229-40.  Ott admits that she has no knowledge whatsoever with respect to the granting of WFH requests by any other Alger employee.  *Id.*, at ¶¶ 233, 235-37.  Further, she concedes that she was granted WFH after the time that she engaged in purported protected activity.  *Id.*, at ¶ 232.  Ott also agrees that Alger's WFH policy provides that the CIO (Chung) must pre-approve any WFH request before the employee can work from home, and the employee is limited to three WFH days per month.  *Id.*, at ¶ 229.  The policy states that one team member from each coverage area must be in the office at all times.  *Id.*, at ¶ 230.  Thus, her WFH requests could have been denied for either of those reasons.  Ott also concedes that on several occasions, she was provided with legitimate and non-retaliatory reasons for her WFH denials.  *Id.*, at ¶ 239.  Specifically, with respect to the denial of Ott's WFH requests for December 3 (Friday), 6 (Monday), 13 (Monday) and 14 (Tuesday), 2010, she was told that they were denied because Chung, as a general rule, did not approve of requests for back-to-back WFH time or WFH and paid time off.  *Id.*

***A Rescinded Invitation to a Research Team Dinner:***  Ott claims that she was dis-invited to a work-related dinner (D.I. 31, ¶¶ 225-28).  *See also* SOF, ¶¶ 241-48.  The record is clear that Ott was asked not to attend the dinner because the guest list had been set and confirmed prior to Ott's response to the invitation.  *Id.*, at ¶ 243.  Further, others also were told that they could not attend the dinner due to a late response and a lack of room at the dinner.  *Id.*, at ¶¶ 245-46.

***Research Assigned During Earnings Season:***  Ott asserts that Chung assigned her research to complete during earnings season – which, according to Ott, is a busy time of year (D.I. 31, ¶¶ 217-21).  *See also* SOF, ¶¶ 249-55.  Chung explained to Ott that the research he asked her to perform was vital and pertinent; he had assigned research to other Analysts during the same period; and he had confirmed that Ott's calendar was clear enough for her to complete the work.  *Id.*, at ¶¶ 251-55.

***Replacement of Ott's Hard Drive:***  Ott alleges that Chung directed IT to remove Ott's computer's hard drive at an inconvenient time for her.  (D.I. 31, ¶¶ 222-23).  *See also* SOF, ¶¶ 256-65.  Ott revealed during her deposition, however, that Chung had no part in ordering the

timing of the computer work.  *Id.*, at ¶¶ 256-57.  (Chung himself testified that he knew nothing about it.  *Id.*, at ¶ 265.)  Ott explained that she had coordinated with IT with respect to the timing of the computer work and had deferred completion of the work several times before it ultimately was completed.  *Id.*, at ¶¶ 256-57.  Further, she admits that another healthcare sector Analyst also had work done on his computer at this time.  *Id.*, at ¶¶ 258-59.

***Moving Offices:***  Ott complains that she was moved into a smaller and less desirable office. (D.I. 31, ¶¶ 237-39).  *See also* SOF, ¶¶ 266-72.  The record is clear that Ott was among several individuals who were moved to accommodate newly hired – more senior – employees.  *Id.*, at ¶¶ 267-68.  Further, the individual who moved into Ott's office, was more senior to her.  *Id.*, at ¶ 268.  The move, in any event, was temporary, pending the entire company moving to new office space.  *Id.*, at ¶ 271.

***Administration of a Midyear Mid Cap Review:***  Ott alleges that she was administered a midyear Mid Cap review in 2010 (D.I. 31, ¶¶ 192-95).  *See also* SOF, ¶¶ 273-76.  The record is uncontested that she received a midyear Mid Cap review in 2009 as well.  *Id.*, at ¶ 61. Furthermore, most if not all other Analysts also received such a review in 2010.  *Id.*, at ¶ 276.

***Hiring of a Head of Healthcare:***  Ott asserts that Alger's hiring of Maria Liotta, a seasoned healthcare sector analyst and manager, to be the Head of the healthcare sector resulted in her demotion (D.I. 31, ¶¶ 234-40).  *See also* SOF, ¶¶ 277-82.  It is clear from the evidence that the search for a candidate to fill the position of Head of the healthcare sector began approximately one month prior to any complaint raised by Ott with respect to the Trading Policy.  *Id.*, at ¶ 279. Furthermore, the position that Ms. Liotta filled was not one that Ott had occupied and Ott's duties and title did not change after Liotta was hired.  *Id.*, at ¶¶ 280-81.  Moreover, Chung explains that because of Ott's failing performance – prior to her whistleblowing – Alger sought to hire someone more senior to Ott to manage the healthcare team.  *Id.*, at ¶¶ 267, 278.

***2010 Discretionary Bonus:***  Ott objects to the size of her discretionary bonus in 2010.  (D.I. 31, ¶¶ 241-48).  *See also* SOF, ¶¶ 283-90.  As discussed *supra* at pp. 5, 16, n.6, Ott's discretionary bonuses had been reduced in tandem with her declining performance.  Further, Alger consults with an external industry resource to help evaluate employee comparative compensation levels, and such data was also used for Ott to set her bonus accordingly.  *Id.*, at ¶ 287.  The criteria that was applied to determine Ott's bonus was consistent across all Alger Analysts.  *Id.*, at ¶ 285.

### 3.  Ott Has Not Demonstrated that Alger's Reasons Are Pretextual

Alger has demonstrated legitimate, non-discriminatory reasons for the alleged retaliatory conduct, so to survive summary judgment, Ott must demonstrate that these reasons are false and mere pretext.  76 Fed. Reg. at *34304 (citing *McDonnell Douglas*).  Ott cannot do this.  Simply put, there is no record evidence proffered by Plaintiff to establish that any of the above-referenced non-retaliatory reasons are mere pretext, while at the same time Ott concedes many of

the very facts that substantiate each of Alger's legitimate business decisions.  *See, e.g.*, SOF, ¶¶ 222-23, 231-33, 239, 247-48, 251, 259-60, 267, 275, 285, 302-310.

### C.  Ott's Breach Of Contract Claim Should Be Dismissed

Ott's Complaint states a claim for "Breach of Contract Concerning Deferred Compensation" (D.I. 31, ¶¶ 263-70, 280-84).  Specifically, Ott was awarded deferred compensation grants of $100,000, $75,000 and $25,000, in 2007, 2008 and 2009, respectively. SOF, ¶¶ 315, 322, 328.  These grants were made pursuant to certain terms set forth in Alger Associates Inc.'s Incentive Plan agreements ("Incentive Plan").  *Id.*  (The Incentive Plans were issued separately for each grant year.  *Id.*)  Relying on a provision of the Incentive Plans that pertains to the distribution of deferred compensation grants upon the Termination of Employment (as that term is defined in the Incentive Plans), because Ott claims she was fired from her employment with Alger, she believes she is owed a *pro rata* share of her 2007, 2008 and 2009 deferred compensation grants (D.I. 31, ¶¶ 263-70).  However, it is uncontested that Ott voluntarily resigned her employment from Alger and the plain language of the Incentive Plans provides that Ott forfeited her deferred compensation grants upon her voluntary resignation. SOF, at ¶¶ 291-312, 318-21, 325-27, 331-33.

It is black letter law that when the plain terms of an employment agreement or compensation plan foreclose a breach of contract claim, that claim must be dismissed.  *See Sussman v. Rabobank Int'l*, 739 F. Supp. 2d 624, 627-29 (S.D.N.Y. 2010) (granting summary judgment for employer, dismissing plaintiff's claim for "vested deferred compensation" because under the plain terms of the Bonus Deferral Plan the alleged sums had not vested when plaintiff left the company).  Courts routinely dismiss claims in circumstances nearly identical to those presented here.  *See O'Grady v. BlueCrest Capital Mgmt. LLP*, No. 15-cv-1108 (SMS), 2015 U.S. Dist. LEXIS 77187, at *9-10 (S.D.N.Y. June 15, 2015); *Truelove v. Ne. Capital &*

*Advisory, Inc.*, 715 N.Y.S.2d 366, 369 (2000) (granting summary judgment to defendant where plaintiff's resignation precluded him from receiving bonus payments predicated on his continued employment).

More specifically, Ott was granted a deferred compensation bonus pursuant to the Incentive Plans each year from 2007 through 2009.  SOF, at ¶¶ 315, 322, 328.  The Incentive Plans plainly and unambiguously state that each award must fully vest before it is paid out and conditions the payment of any award on the terms and conditions of the Incentive Plan.  *Id.*, at ¶¶ 318-21, 325-27, 331-32. The Plans further provide that when the award is granted, an "Award Account" is established for a period of four years from the date of the award (the "Award Period").  *Id.*, at ¶¶ 316-17, 323-24, 329-30.

On June 30, 2007, Ott was granted an award of $100,000.  *Id.*, at ¶ 315.  The Award Period for this grant was from June 30, 2007 until June 30, 2011.  *Id.*, at ¶ 317.  On June 30, 2008, Ott was granted an award of $75,000.  *Id.*, at ¶ 322.  The Award Period for this grant was from June 30, 2008 until June 30, 2012.  *Id.*, at ¶ 324.  On June 30, 2009, Ott was granted an award of $25,000.  *Id.*, at ¶ 328.  The Award Period for this grant was from June 30, 2009 until June 30, 2013.  *Id.*, at ¶ 330.

Section 7.2 of the 2007-2009 Incentive Plans unambiguously provides that an employee who ceases to be an Alger employee prior to the last day of any Award Period forfeits that Award Account except in the following circumstances: death, disability, retirement, and termination with or without cause.  *Id.*, ¶¶ 318-21, 325-27, 331-33.  Voluntary resignation is not among the circumstances carved out from the forfeiture.  *Id.*

Accordingly, when Ott voluntarily resigned on January 20, 2011 (*see supra* at pp. 9-10, 26-27), she forfeited the entirety of each Award Account that had not yet vested – to wit, her

2007 Award, that had not yet vested and would not vest until June 30, 2011; her 2008 Award that had not yet vested and would not vest until June 30, 2012; and her 2009 Award that had not yet vested and would not vest until June 30, 2013.

Accordingly, Ott's breach of contract claim should be dismissed.

## IV.   CONCLUSION

For all the foregoing reasons, Alger respectfully requests that the Complaint be dismissed in its entirety with prejudice.

Dated:   New York, New York           Respectfully submitted,
        October 7, 2015               By: */s/ Todd C. Norbitz*

                                  Todd C. Norbitz (tnorbitz@foley.com)
                                  Anne B. Sekel (asekel@foley.com)
                                  Adam G. Pence (apence@foley.com)
                                  Foley & Lardner LLP
                                  90 Park Avenue
                                  New York, New York  10016-1314
                                  Tel.:212-682-7474
                                  Fax: 212-239-2326

                                  *Attorneys for Defendant Fred Alger*
                                  *Management, Inc.*