UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

ROSANNE F. OTT,                       :        11 Civ. 4418 (LAP)

        Plaintiff,                   :

        -v.-                         :        OPINION AND ORDER

FRED ALGER MANAGEMENT, INC.,          :

        Defendant.                   :

------------------------------------x

LORETTA A. PRESKA, United States District Court Judge:

    Plaintiff Rosanne F. Ott ("Plaintiff" or "Ott") brings this
action against her former employer Fred Alger Management, Inc.
("Defendant" or "Alger").  Ott alleges that Alger violated the
whistleblower protection provision of the Dodd-Frank Wall Street
Reform and Consumer Protection Act ("Dodd-Frank") by retaliating
against her for reporting an allegedly unlawful trading policy
to the Securities and Exchange Commission ("SEC").  (See Third
Am. Compl. ("Compl.") 50, Aug. 30, 2013, ECF No. 31.)  Ott also
asserts a claim for breach of contract.  (See id. at 50-51.)
Alger moves for summary judgment on both claims.  (See Notice of
Mot. 1-2, Oct. 7, 2015, ECF No. 52.)  In seeking summary
judgment, Alger also moves the Court to strike all or parts of
the counter-statement of facts (see Pl.'s Counterstatement to
Def.'s Statement of Undisputed Material Facts Pursuant to Local
Civil Rule 56.1 ("Pl.'s CSOF"), Dec. 15, 2015, ECF No. 75) that
Ott filed in support of her response in opposition to Alger's

1

motion for summary judgment (see Pl.'s [Am.] Mem. of Law in
Opp'n of Def.'s Mot. for Summary Judgment ("Pl.'s Resp."), Dec.
15, 2015, ECF No. 76.), as well as its related affidavits, or in
the alternative to disregard the CSOF and the related
declarations for the purpose of deciding Alger's motion for
summary judgment.  See Reply Mem. of Law in Supp. of Def.'s Mot.
for Summary Judgment ("Def.'s Reply") 1-3, Jan. 28, 2016, ECF
No. 78.

For the reasons set forth below, the Court DENIES Alger's
motion to strike all or part of Pl.'s CSOF and GRANTS Alger's
motion for summary judgment on both of the claims in Plaintiff's
Complaint.

## I.   BACKGROUND

This case involves two disputes that arose at the
conclusion of an employment relationship between an investment
adviser firm and its employee.  The employee, Ott, alleges that
her employer, Alger, wrongfully terminated her employment in
retaliation for Ott's reporting of Alger's allegedly illegal
trading policy to the Securities and Exchange Commission
("SEC").  Ott also alleges that Alger breached her contract by
refusing to pay her deferred compensation after the end of her
employment.

### A.    Parties

Alger is a New York corporation registered with the SEC as an investment adviser for numerous proprietary funds, including a healthcare sector fund entitled the Health Sciences Fund ("HS Fund").  (See Def. Fred Alger Mgmt., Inc.'s Statement of Uncontested Material Facts Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1 (A) ("Def.'s SOF") ¶ 1, Oct. 7, 2015, ECF No. 52.[1])  In 2010, the HS Fund was the only sector-specific fund that Alger managed.  (See id. at ¶ 2.)  However, healthcare sector securities were part of all funds managed by Alger, comprising between 5% and 25% of every Alger-advised fund.  (See id. at ¶¶ 3-4.)

Alger hired Ott in April 2002 as a research analyst in the healthcare sector.  (See id. at ¶ 5.)  In 2005, Ott became a co-Portfolio Manager ("co-PM") of Alger's HS Fund.  (See id. at ¶ 7; Pl.'s CSOF at ¶ 7.)  Ott remained a senior analyst and co-PM of the HS Fund until the end of her employment with Alger in January 2011.  (See Def.'s SOF at ¶ 8.[2])

Daniel Chung was the Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") of Alger.  (See id. at ¶ 9.)  As CEO and CIO of Alger, Chung was ultimately responsible for

---

[1] Unless otherwise noted herein, citations to Def.'s SOF refer to facts that Ott declared "Undisputed" in Pl.'s CSOF.
[2] Alger describes the end of Ott's employment with the firm as a "separation of employment."  (See Def.'s SOF at ¶ 8.)  Ott alleges that Alger fired her.  (See Pl.'s CSOF at ¶ 8.)

decisions made within the funds Alger managed, including investment decisions in the HS Fund.  (See Pl.'s CSOF at ¶ 13.)

### B.  Alger's Investment Policies and Practices

By design, Alger's investment process was "analyst-driven," meaning that the PMs of Alger's various funds rely extensively on the research, analytics, and ideas of its analysts to make their investment decisions.  (See Def.'s SOF at ¶ 15.)  PMs tended to rely significantly on analysts to identify investment opportunities.  (See id. at ¶ 23.)

As a senior analyst, Ott was in a high-demand role with a significant amount of responsibility.  (See id. at ¶ 25.)  Ott's responsibilities included serving as a co-PM of the HS Fund and as a research analyst for the HS Fund and all other Alger funds.  (See id. at ¶ 32.[3])  Ott understood that her role as a co-PM entailed ensuring that the HS Fund continued to perform well, but she also understood that, in connection with Alger's research-driven investment model, her responsibility as a healthcare sector analyst was to communicate her investment

---

[3] Ott lists this assertion as "Disputed" (see Pl.'s CSOF at ¶ 32) but does not deny the truth of her co-PM responsibilities or her research responsibilities to the HS Fund and to the other Alger funds.  She only adds that she had the additional responsibility of "extensive marketing on behalf of Alger."  (See id.)  The Court therefore deems that Ott has admitted Alger's assertions regarding Ott's co-PM responsibilities and research responsibilities to the HS Fund and to the other Alger funds. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly v. City of New York, 576 F. Appx. 22, 24 n.2 (2d Cir. 2014).

recommendations to all interested Alger PMs in a manner that gave the other PMs access to Ott's research and recommendations before she acted on such recommendations in the HS Fund.  (See id. at ¶ 32.[4])

In 2010, Alger advised approximately thirty individual Alger funds, each of which was managed by one or more of Alger's eleven PMs.  (See Def.'s SOF at ¶ 29.)  In addition to the HS Fund, Alger traded securities in another fund known as the Alger Analyst Fund ("AA Fund").  (See id. at ¶ 78.)  The AA Fund comprised investment selections made by Alger analysts who were each allocated a percentage of the fund's total assets to manage.  (See id.)  While Chung was named the PM of this fund, the analysts were primarily responsible for stock selection and weighting of the individual stocks, because each analyst had discretion over his or her sub-portfolio.  (See id. at ¶ 79.)  The management structure of the AA Fund created a situation in which an analyst could potentially trade in the fund based on his or her sector research before sharing the trading recommendation with other Alger PMs.  (See id. at ¶ 80.)

---

[4] Ott lists this assertion as "Disputed" (see Pl.'s CSOF at ¶ 33) but does not deny that it was her responsibility to communicate in the prescribed manner.  She only adds that she "made every effort" to do so.  (See id.)  The Court therefore deems that Ott has admitted Alger's assertions regarding Ott's responsibility to communicate her research and recommendations to other PMs prior to Ott's placement of trade orders.  See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

Because the volume of securities traded in the AA Fund was small compared to the trading volume of other Alger funds, there was a risk that an analyst, to improve his or her performance in the AA Fund, could place an order for the AA Fund and then recommend the stock to a fund whose purchase could impact the market price. (See id. at ¶ 81.[5]) Accordingly, Chung implemented a policy in the AA Fund ("the AA Fund policy") that required analysts who managed sub-portfolios in the AA Fund to communicate new trade ideas to all PMs prior to trading in the AA Fund and that required all trades to be held until 3:00 p.m. each day so that the PMs of other funds could consider whether to act on the investment recommendations in their respective funds. (See id. at ¶ 82.[6])

### C.   Ott's Performance at Alger

In a 2006 document that Alger characterizes as a "performance review" (see Def.'s SOF at ¶ 55) and Ott characterizes as a "bonus letter," (see Pl.'s CSOF at ¶ 55)

---

[5] Ott neither disputes nor admits the truth of these assertions about the AA Fund, responding instead that the practice described herein, known as "front running," did not occur in the HS Fund. The Court therefore deems this assertion regarding the AA Fund to be admitted. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[6] Ott lists this assertion as "Disputed" but does not deny the truth of any of the facts cited herein, responding instead that there were differences between the AA Fund and HS Fund that made this policy unnecessary for the HS Fund. The Court therefore deems this assertion regarding the AA Fund to be admitted. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

CEO/CIO Chung complimented Ott's performance in some respects
and stated that Ott needed to "[w]ork on" other aspects of her
performance.  (See Decl. of Hal Liebes in Supp. of Mot. for
Summary Judgment ("Liebes Decl.") Ex. 4 OTT00561, Undated Letter
from Dan Chung to Rose Ott, ECF No. 56-57.)  The document
advises Ott,

> Communication of stock "story" needs to be
> more focused on what will drive the stock.
> Presentations do not always highlight
> generalist mindset (PMs) why the stock is a
> "great idea."

(See id.)  The document concludes, "Your bonus is $275,000 [¶]
Dan."

In a 2007 document entitled "Analyst Review," Ott received
another series of compliments and criticisms.  (See Liebes Decl.
Ex. 5, Analyst Review of Rose Ott, Dec. 17, 2007, ECF No. 56-
58.)  The critiques included the following:

> Frequency of communication: (DC) feels like
> we are "on different trains" alternating out
> of office, etc. such that I don't hear often
> enough from you on your sector.
>
> Was disappointed in midcap overall
> performance - given ISRG, HOLX - thought
> overall results would be stronger.  Not sure
> why?  Perhaps it is the gap between pitch,
> follow up research and communication to get
> both understanding/conviction for the PM to
> make right calls together?

(See id.)  Ott's discretionary bonus for 2007 was $375,000.
(See Liebes Decl. Ex. 11, Salary and Bonus Award Letter to
Rosanne F. Ott, Dec. 18, 2007, ECF No. 56-64.)

In a 2008 performance review, PMs Patrick Kelly, Jill
Greenwald, and Andrew Silberg rated Ott's performance in the
areas of Decision Making, Proactive Communication, New Ideas/Big
Picture, Financial Analysis, Research Quality, and
Organization/Discipline.  (See Liebes Decl. Ex. 6, Performance
Review of Rosanne Ott 1, Jan. 31, 2009, ECF No. 56-59.)  The
grades were on a scale of "1 to 10."  (See id.)  According to
the review's rating legend, a grade of "3" equaled "Makes an
effort but below standard," "5" equaled "Acceptable," and "7"
equaled "Strong."  (See id.)  From the three PMs, Ott received
four grades of "6," eight grades of "5," and six grades of "4,"
for an average of 4.89.  (See id.)  Kelly began his comments in
the review with, "Overall disappointed with performance."  (See
id. at 2.)  He listed several issues with Ott's performance and
then concluded, "Rose works hard and is a good team player but I
need more performance from a senior healthcare analyst."  (See
id.)  Greenwald offered a single "Opportunity for Improvement"
regarding "basic companies vs. 'high alpha' types" and no
positive feedback.  (See id.)  Silverberg was the only PM to
list "Accomplishments" for Ott in the review, which included
"Relatively solid attribution."  (See id.)  He added

"Opportunities for Improvement" including "Need to hear more ideas" and "Too much focus on healthcare fund vs. other portfolios." (See id.) Ott's discretionary bonus for 2008 was $135,000. (See Liebes Decl. Ex. 12, Bonus Award and Grant Letter to Rosanne F. Ott, Jan. 12, 2009, ECF No. 56-65.)

In 2009, CEO/CIO Chung emailed Ott what he called a "q3 midcap performance review," which began, "Rose: you Underperformed in the q3" and, after listing several negative comments, concluded "As a team, you need to generate significantly more ideas and performance." (See Liebes Decl. Ex. 7, Email from Dan Chung to Rosanne Ott, Oct. 7, 2009 3:27 PM, ECF No. 56-60.) Ott's discretionary bonus for 2009 was $121,500. (See Liebes Decl. Ex. 13, Salary & Bonus Award Letter to Rosanne F. Ott, Jan. 8, 2010, ECF No. 56-66.)

In 2010, CEO/CIO Chung gave Ott another "Mid Cap Review," in which he criticized her performance in several respects. (See Liebes Decl. Ex. 10, Mid Cap Review: Rose Ott, [undated], ECF No. 56-62.) Ott's discretionary bonus for 2010 was $10,000. (See Liebes Decl. Ex. 14, Salary and Bonus Award Letter to Rosanne F. Ott, Dec. 15, 2010, ECF No. 56-67.)

D.   The HS Fund Policy

In his capacity as CIO, on April 8, 2010, Chung announced a trading policy in the HS Fund ("the HS Fund policy"), which provided as follows: "[I]n line with the [AA] Fund, (a) no

trades should be executed in the [HS] Fund without prior notice to all PMs by email, with explanation of the sales or buys, (b) Trading [desk], if you receive an order, you will hold it for the shorter time of (a) confirm back from CIO/PMs or (b) two hours." (See id. at ¶ 84, quoting Decl. of Todd C. Norbitz in Supp. of Mot. for Summary Judgment ("Norbitz Decl.") Ex. 20, Email from Dan Chung to Rosanne Ott and David Farhadi, Apr. 8, 2010 9:10 a.m., ECF. No. 55-20.) Ott responded to Chung, "Ok, David and I will send emails to PMs and Trading." (See Norbitz Decl. Ex. 20, Email from Rosanne Ott to Dan Chung and David Farad, Apr. 8, 2010 3:09 p.m.)

### E.   Ott's Allegation and Purchase Offer

On or about June 22, 2010, Ott's attorney, Jonathan Sack, met with Alger's General Counsel, Hal Liebes. (See Def.'s SOF at ¶¶ 157-163; Pl.'s CSOF at ¶¶ 157-163.) The parties dispute much of the discussion that occurred in this meeting. (See id.) However, the parties agree that the attorneys discussed Ott's contention that the HS Fund policy prejudiced the interests of HS Fund shareholders. (See Def.'s SOF at ¶¶ 157-160; Pl.'s CSOF at ¶¶ 157-160.) The parties agree that Ott, through Sack, did not demand the HS Fund policy be eliminated during this meeting. (See Def.'s SOF at ¶ 162; Pl.'s CSOF at ¶ 157.) The parties also agree that Ott, through Sack, offered to buy the HS Fund from Alger during this meeting. (See Def.'s SOF at ¶ 161; Pl.'s

CSOF at ¶ 157.)   Alger asserts that Sack threatened Liebes with
the possibility that Ott would report the HS Fund policy to the
SEC if Alger did not sell the HS Fund to Ott.   (See Def.'s SOF
at ¶ 161.)   Ott denies this allegation and explains that she did
not demand that the HS Fund policy be eliminated "because Chung
was untrustworthy."   (See Pl.'s CSOF at ¶ 157.)

After Sack and Liebes's meeting, Alger self-reported the HS
Fund policy to Douglas J. Scheidt, Associate Director and Chief
Counsel of the SEC's Division of Investment Management.   (See
Def.'s SOF at ¶ 163.[7])   An SEC investigator requested from Alger
various documents regarding its trading policies and practices.
(See Liebes Decl. Ex. 3, Letter from Gwen A. Licardo to Hal
Liebes 1-2, Aug. 5, 2010, ECF No. 56-56.)

Meanwhile, Ott wrote a letter to the Board of Trustees of
Alger Management, alleging that the HS Fund policy had led to a
"severe decline in performance of the [HS] Fund."   (See Norbitz
Decl. Ex. 23, Letter from Rosanne F. Ott to Trustees and
Officers of the Trust and members of Alger Management 2, July
14, 2010, ECF No. 55-23.)   Ott told the Board and other Alger
employees copied on her letter that an "SEC representative of
the Division of Investment Management, Office of Chief Counsel"

---

[7] Ott lists this assertion as "Disputed" but does not deny the
truth of the facts cited herein.   The Court deems this assertion
admitted as well.   See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ.
P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

had "concluded that [the HS Fund policy] 'absolutely hurts investors by all but guaranteeing poor execution as a result of a two hour holding period' and would like to investigate formally." (See id. (internal quotations in original).)  Ott quoted the unnamed SEC official again, stating that "they found [CIO Dan Chung's] actions the 'most offensive'" because Chung was listed as a manager of the HS Fund. (See id. (internal quotations in original).)

Ott told the Board that her attorney, Sack, had met with General Counsel Liebes and "offered the best corrective solution was to sell the [HS] Fund to me [Ott], the fund manager." (See id. at 3.)  Ott elaborated that selling the HS Fund to her would guarantee "permanent, corrective action without any financial, regulatory or reputational risk," a solution that would not be possible if Alger merely rescinded the HS Fund policy because "Mr. Chung has demonstrated he cannot be trusted to act in the best interest of shareholders of the [HS] Fund . . . ." (See id.)  Ott notified the Board that she felt compelled to report her concerns to the SEC. (See id. at 4.)  She then stated, as an HS Fund shareholder, that she felt compelled to initiate a class-action lawsuit against Alger. (See id.)  After expressing her discomfort with the idea of suing her own firm "in this time of populace (sic) outcry of 'Wall Street' vs. 'Main Street,'" Ott immediately noted that she "remain[ed] open to amicable,

correction solutions from the Board of Trustees and Alger Management.  The most elegant solution remains the sale of the [HS] Fund . . . ."  (See id. at 4.)

On March 8, 2011, SEC investigator Licardo sent a letter to Ott's attorney, Sack, which stated that the SEC's investigation "has been completed as to Fred Alger Management, Inc., against whom we do not intend to recommend any enforcement action by the Commission."  (See Norbitz Decl. Ex. 25, Letter from Gwen A. Licardo to Jonathan Sack, Esq., Mar. 8, 2011, ECF No. 55-25.)

### F.   Ott's Attendance

Alger's Employee Handbook contains an Attendance and Punctuality policy that states: "An employee who is absent for three (3) or more consecutive working days without notifying the employee's manager will be considered to have voluntarily resigned."  (See Def.'s SOF at ¶ 291 (citing Norbitz Decl. Ex. 18, Alger Associates, Inc. & Subsidiaries Employee Handbook ("Employee Handbook") 25, Apr. 1, 2009, ECF No. 55-18).[8])  Ott received this handbook, including the Attendance and Punctuality policy.  (See Def.'s SOF at ¶ 292.[9])

---

[8] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein.  The Court deems this assertion admitted as well.  See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[9] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein.  The Court deems this assertion admitted as well.  See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

It appears that Ott did not report to Alger's office from at least as early as January 3, 2011 until the end of her employment on January 20, 2011. She took paid time off on January 3, 4, and 5, 2011. (See id. at ¶ 293.) Ott then called out sick on January 6 and 7, 2011. (See id.) On January 10, 2011, Ott traveled to California to attend the JP Morgan Healthcare Conference. (See Pl.'s CSOF at ¶ 294.)

During the conference, Ott received an email from the Alger's Head of the Healthcare Sector, Maria Liotta, which stated that the information Ott was sending Alger from the conference "is far more helpful on a real time basis, so could you please provide updates to me and the other PMs throughout the trading day?" (See Def.'s SOF at ¶ 296 (citing Norbitz Decl. Ex. 12, Email from Maria Liotta to Rosanne Ott, Jan. 11, 2011 10:04 a.m., ECF No. 55-12).[10]) Liotta added, "Please make sure to check in with me--give me a call this morning. [Phone number redacted] I am in all day." (See id.[11]) Ott received an email from Liotta the next day, which stated,

> I am really disappointed that you have not
> provided real time updates to me and the

---

[10] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein. The Court deems this assertion admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

[11] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein. The Court deems this assertion admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

> other PMs from your meetings over the past
> two days.  I am surprised that you have not
> called me as I asked or acknowledged my
> requests to you over the last several days.
> Please be sure to provide meaningful real
> time feedback from your meetings today and
> for the remainder of the conference.

(See Def.'s SOF at ¶¶ 298-99 (citing Norbitz Decl. Ex. 13, Email

from Maria Liotta to Rosanne Ott, Jan. 12, 2011 11:19 a.m., ECF

No. 55-13).[12])  Ott forwarded this latter email to herself at her

personal email address.  (See Def.'s SOF at ¶ 300.[13])

Ott was originally scheduled to return to Alger's office on

January 13, 2011.  (See Pl.'s CSOF at ¶ 294.)  Ott did not

return to New York from California until Sunday, January 16,

2011.  (See id.)  Ott communicated in an email exchange with

Liotta and others that she would be available for a meeting on

the afternoon of January 18, 2011.  (See Def.'s SOF at ¶ 301.)

Monday, January 17, 2011 was the Rev. Dr. Martin Luther King,

Jr. holiday.  Ott did not report to Alger's office on Tuesday,

January 18, Wednesday, January 19, or Thursday, January 20th,

2011.  (See Def.'s SOF at ¶¶ 306-08.[14])  Ott did not receive any

---

[12] Ott lists this assertion as "Disputed" but does not deny the
truth of the facts cited herein.  The Court deems this assertion
admitted as well.  See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ.
P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

[13] Ott lists this assertion as "Disputed" but does not deny the
truth of the facts cited herein.  The Court deems this assertion
admitted as well.  See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ.
P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

[14] Ott lists this assertion as "Disputed" but does not deny the
truth of the facts cited herein.  The Court deems this assertion

written or oral approval to work from home at any time between January 13 and January 20, 2011. (See id. at ¶ 309.[15]) Ott did not communicate directly or indirectly with any of her managers to obtain their consent that she be allowed to work from home during this period. (See id. at ¶ 310.[16])

Alger acknowledged and accepted Ott's voluntary resignation by the close of business on January 20, 2011. (See id. at ¶ 311 (citing Norbitz Decl. Ex. 17, Letter from Robert J. Isacco to Rosanne F. Ott ("Acceptance Letter"), Jan. 20, 2011, ECF No. 55-17).[17])

### G. Ott's Deferred Compensation

On July 30, 2007, Ott received a deferred compensation award under the Alger Incentive Plan of $100,000 over an award period of four years. (See Def.'s SOF at ¶¶ 315-17 (citing Liebes Decl. Ex. 15, Alger Associates, Inc. Award Agreement for Rose Ott ("2007 Award Agreement"), July 30, 2007, ECF No. 56-

---

admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[15] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein. The Court deems this assertion admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[16] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein. The Court deems this assertion admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[17] Ott lists this assertion as "Disputed" but does not deny the truth of the facts cited herein. The Court deems this assertion admitted as well. See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

68).[18])   The 2007 Award, which bears Ott's signature, contained

the following terms and conditions: "The Award shall be subject

to, and governed by, the terms and conditions of the Alger

Associates, Inc. Incentive Plan . . . ."   (See 2007 Award

Agreement at 1.)   In the copy of the aforementioned Incentive

Plan, which was attached to the award, Alger stated,

> In the event that a Participant incurs a
> Termination of Employment prior to the last
> day of the Award Period for an Award, the
> Award Account for the Award shall be
> forfeited in its entirety . . . .

(See id. Attach. 2, Alger Assoc., Inc. Incentive Plan ("2007

Incentive Plan") at § 7.2.)   The same Incentive Plan defined

"Termination of Employment" as "[A] Participant's termination of

employment with the Company and its Affiliates."   (See id. at §

1.23.)

Ott received similar deferred compensation awards in 2008

and 2009.   (See Def.'s SOF at ¶¶ 322-26, 328-332.[19])   The

Incentive Plan attached to Ott's 2008 deferred compensation

Award stated,

> In the event that a Participant incurs a
> Separation From Service prior to the last

---

[18] Ott lists this assertion as "Disputed" but does not deny the
truth of the facts cited herein.   The Court deems this assertion
admitted as well.   See S.D.N.Y. Local Rule 56.1(c); Fed. R. Civ.
P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.
[19] Ott lists these assertion as "Disputed" but does not deny the
truth of the facts cited herein.   The Court deems these
assertion admitted as well.   See S.D.N.Y. Local Rule 56.1(c);
Fed. R. Civ. P. 56.1(e)(2); Kelly, 576 F. Appx. at 24 n.2.

> day of the Award Period for an Award, the
> Award Account for the Award shall be
> forfeited in its entirety . . . .

(See Alger Associates, Inc. Award Agreement for Roseanne (sic)

Ott ("2008 Award Agreement") Att. 2 ("2008 Incentive Plan"),

June 30, 2008, ECF No. 56-69.)  The 2008 Incentive Plan defined

"Separation From Service" as follows:

> "Separation From Service" means a
> "separation from service" from the Company
> and all Affiliates within the meaning of
> Section 409A of the [Internal Revenue Code
> of 1986].  A Separation From Service shall
> not be deemed to have occurred if (a) the
> Participant is absent from active employment
> due to military leave, sick leave, or other
> bona fide leave of absence provided the
> duration of such leave does not exceed the
> greater of (i) six (6) months or (ii) the
> period during which the Participant has a
> right to reemployment by the Company or any
> Affiliate under applicable law or (b) it is
> reasonably anticipated at the time the
> Participant's employment terminates that the
> Participant will continue to perform
> services for the Company or any Affiliate
> (either as an employee or independent
> contractor) at a level that is twenty
> percent (20%) or more of the average level
> of bona fide services performed by the
> Participant during the thirty-six (36) month
> period (of the actual period of service if
> less) immediately prior to the termination
> of the Participant's employment
> relationship.  In the case of (b) above, a
> Separation From Service shall be deemed to
> occur when there is a permanent reduction in
> the level of bona fide services to be
> provided by the Participant to a level that
> is less than twenty percent (20%) of the
> average level of bona fide services
> performed by the Participant during the
> thirty-six (36) month period (of the actual

> period of service if less) immediately prior
> to the termination of the Participant's
> employment relationship.

(See id. at § 1.23.)   The Incentive Plan attached to Ott's 2009

Award Agreement contained identical language regarding

forfeiture upon Separation From Service and the definition

thereof.   (See Alger Associates, Inc. Award Agreement for

Rosanne Ott ("2009 Award Agreement") Att. 2 ("2009 Incentive

Plan"), June 30, 2009, ECF No. 56-70.)

## II.   PROCEDURAL HISTORY

Alger made a motion to dismiss Ott's original complaint

pursuant to Fed. R. Civ. P. 12(b)(6), which this court granted

in part and denied in part.   Ott v. Fred Alger Mgmt., Inc., No.

11 CIV. 4418 LAP, 2012 WL 4767200, at *1 (S.D.N.Y. Sept. 27,

2012) ("Ott I").   Ott filed her Third Amended Complaint on

August 30, 2013.   (See Compl. at 1.)   After discovery, Alger

moved for summary judgment on all of Ott's remaining claims.

(See Notice of Mot. 1-2, ECF No. 52.)

## III. DISCUSSION

The Court has considered Plaintiff's CSOF to the extent

that it relies upon admissible evidence and complies with the

applicable rules.   Nevertheless, the Court finds upon

consideration of the affidavits, depositions, and other

documents in the record that Ott cannot establish sufficient

facts upon which a reasonable trier of fact may find in her

favor for her unlawful retaliation claim and therefore grants
Defendant's motion for summary judgment on the whistleblower
retaliation claim and the breach of contract claim in
Plaintiff's Third Amended Complaint.

### A.   Defendant's Motion to Strike

The Court will disregard assertions in Plaintiff's CSOF and
related affidavits to the extent that such statements are
improper under the Federal Rules of Civil Procedure and the
Court's Local Rules.  However, the Court denies Defendant's
motion to strike Plaintiff's CSOF.

"Because a decision on the motion to strike may affect [the
movant's] ability to prevail on summary judgment, it is
appropriate to consider the Motion to Strike prior to [the
parties' motions for] summary judgment."  Rund v. JPMorgan Chase
Grp. Long Term Disability Plan, No. 10-cv-5284, 2012 WL 1108003,
at *1 (S.D.N.Y. Mar. 30, 2012) (quotations omitted).  "An
affidavit or declaration used to support or oppose a motion must
be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant
is competent to testify on the matters stated."  Fed. R. Civ. P
56(c)(4).  This Court, however, has broad discretion to accept a
Rule 56.1 counterstatement.  See Primmer v. CBS Studios, Inc.,
667 F. Supp. 2d 248, 254 (S.D.N.Y. Feb. 25, 2015).  Strict
compliance with the Rule is not required.  Id.; See also

Photopaint Techs., LLC v. Smartlens Corp., 355 F.3d 152, 155 n.2
(2d Cir. 2003).

Rule 56(e) states that affidavits filed in connection with
a summary judgment motion "shall be made on personal knowledge,
shall set forth such facts as would be admissible in evidence,
and shall show affirmatively that the affiant is competent to
testify to the matters stated therein." Fed. R. Civ. P. 56(e).
"A court may . . . strike portions of an affidavit that are not
based upon the affiant's personal knowledge, contain
inadmissible hearsay or make generalized and conclusory
statements." Hollander v. American Cyanamid Co., 172 F.3d 192,
198 (2d Cir.1999) (emphasis added). However, nothing requires a
court to strike such material. Primmer 667 F. Supp. 2d at 254
(citations omitted). The Court, instead, "may decline to
conduct a line-by-line analysis and simply disregard" any
material that does not comply with Rule 56(e)." Sauerhaft v.
Board of Educ. of the Hastings–on–Hudson Union Free Sch. Dist.,
No. 05-cv-09087, 2009 WL 1576467, at *7-8, (S.D.N.Y. June 2,
2009).

To the extent that Plaintiff's submitted affidavits are
conclusory or argumentative, "the Court will not make the
suggested inferences simply because Plaintiff has suggested
them." Primmer 667 F. Supp. 2d at 255 (citations omitted).

Accordingly, the Court will disregard materials contained in the affidavits or Plaintiff's CSOF that are inadmissible or improper under the applicable rules but denies Defendant's motion to strike.

### B.   Summary Judgment Standard

A party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)[20]).  A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.; see also Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir.2004).  "[C]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).  A Court must grant a Defendant summary

---

[20] The Federal Rules of Civil Procedure have been amended in the years since the Supreme Court's quotation of them in Celotex. Rule 56(c) was renumbered as Rule 56(a); while the wording of the Rule was slightly changed, the Committee's notes state that "Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c)."

judgment where a plaintiff fails to make a showing of an essential element of a claim. Celotex, 477 U.S. at 323-24. Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim. Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (citing Celotex, 477 U.S. at 322-23 (additional citations omitted)). In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. Jaramillo, 536 F.3d at 145 (citing Celotex, 477 U.S. at 322-23 (additional citations omitted)).

### C.   Whistleblower Retaliation

In order to establish a prima facie case for unlawful retaliation in violation of Dodd-Frank, Ott must show (a) she engaged in protected activity, (b) Alger took adverse employment action against her, and (c) Alger's adverse employment action was causally connected to Ott's protected activity. See Ott I, 2012 WL 4767200 at *9 (citing Securities and Exchange Commission, Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934, Exchange Act Release No. 34-64545 18 n.41 (May 25, 2011)); see also, Bechtel v. Admin. Rev. Bd., U.S. Dept. of Labor, 710 F.3d 443, 447 (2d

Cir. 2013) (citations omitted) (establishing the same standard for whistleblower retaliation claims under Sarbanes Oxley).

In the Exchange Act Release cited above, the SEC observed, "there is a well-established legal framework for making this factual determination on a case-by-case basis." See Exchange Act Release No. 34-64545 at 18 n.41.  The framework involves a burden-shifting analysis between a plaintiff and defendant, where the plaintiff "must first make a prima facie case of retaliation," which obliges the defendant to "articulate a legitimate, non-retaliatory reason for its employment decision," at which point the plaintiff must "show that the proferred legitimate reason is in fact a pretext . . . ." See id. (citing Collazo v. Bristol-Myers Squibb Mfg, Inc., 617 F.3d 39, 46 (1st Cir. 2010) (citations and quotations omitted); see also Rumsey v. Northeast Health, Inc., 634 Fed. Appx. 318, 319 (2d Cir. 2016) (applying the same analysis for Title VII retaliation claims).

For the reasons set forth below, the Court finds that Ott cannot establish sufficient facts to support the "adverse employment action" requirement of a Dodd-Frank claim.  Even if she could establish that requirement, Ott also lacks sufficient factual basis to establish a causal connection between Alger's

allegedly adverse employment actions and Ott's allegedly
protected whistleblowing activity.[21]

Ott cannot establish at trial that Alger took sufficiently
adverse employment action against her to support a retaliation
claim under Dodd-Frank.  The Dodd-Frank Act specifically
provides,

> No employer may discharge, demote, suspend,
> threaten, harass, directly or indirectly, or
> in any other manner discriminate against, a
> whistleblower in the terms and conditions of
> employment because of any lawful act done by
> the whistleblower.

Murray v. UBS Sec., LLC, No. 12-cv-5914 (JMF), 2013 WL 2190084,
*2 (S.D.N.Y. May 21, 2013) (quoting 15 U.S.C. § 78u-6(h)(1)(A)).
In cases involving allegations of retaliation, courts have held
that unlawfully retaliatory conduct involves employer action
against a whistleblower that is materially adverse; the sort of
action that might "dissuade a reasonable worker from making or
supporting a charge" against her employer.  See, e.g.,
Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 68
(2006) (internal citations and quotations omitted) (applying
retaliation analysis in a Title VII case).  To support such a
charge, an employee must establish that her employer's actions
negatively affected important employment issues.  See Galabaya

---

[21] Given Ott's failure to establish these two essential elements,
the Court need not address the other element of her claim,
whether Ott engaged in protected whistleblowing activity.  See
Exchange Act Release No. 34-64545 at 18 n.41.

v. NYC Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (abrogated

on other grounds); Burlington, 548 U.S. at 68; Kolchinsky v.

Moody's Corp., No. 10-cv-6840, 2012 WL 639162, *17-18 (S.D.N.Y.

Feb. 28, 2012).  The law does not contemplate enforcement

against employers only on the basis of "those petty slights or

minor annoyances that often take place at work and that all

employees experience."  See Burlington, 548 U.S. at 68.

As the analysis below will show, many of Ott's allegations

do not rise to the level of materially adverse employment action

contemplated under the anti-retaliation law.  As for those

allegations that might be sufficiently adverse to come within

the mandate of Dodd-Frank, the record does not support Ott's

contention that they occurred as Ott described them or that

Alger lacked a legitimate, non-retaliatory basis for taking

these actions.  Even if a reasonable trier of fact were to

credit Ott's allegations, it could not reasonably conclude that

her allegedly protected whistleblowing activity caused Alger's

actions.

Ott claims that CEO/CIO Chung criticized her performance in

"nasty, firm-wide emails" in retaliation for her 2010

whistleblowing activity.  (See Complaint at ¶ 216.)  Even if a

trier of fact were to credit this allegation as materially

adverse enough to dissuade a reasonable employee from reporting

illegal activity, there is uncontested evidence that this kind

of criticism long predated Ott's alleged whistleblowing.  Alger
has produced undisputed documentary evidence of negative
critiques and evaluations of Ott's performance from Chung and
other PMs at Alger occurring every year from 2006 up through and
beyond the alleged whistleblowing period.  (See, e.g., Def.'s
SOF at ¶¶ 55-62.)  Although Ott complains about a particular
post-whistleblowing email in which Chung criticized her failure
to save her work in a firm database, she does not specifically
deny that Chung's critique was accurate: Ott's research work had
not yet been properly saved into the firm's research database.
(See Def.'s SOF at ¶¶ 222-23.)  Furthermore, Ott was not the
only analyst criticized.  Another analyst, who is not alleged to
have participated in whistleblowing, was reprimanded in a
similar manner for a similar failure.  (See Def.'s SOF at
¶¶ 219-20.)  Ott has not specifically alleged that the reasons
for this reprimand were pretextual but states that the reprimand
was unnecessary because she had completed the research and only
made what she admits was a "mechanical error" in failing to save
it to the prescribed database.  (See Pl.'s CSOF at ¶ 218.)  Ott
does not allege that Chung should have been aware of the
mechanical nature of her error or that Chung's response to the
absence of Ott's research from the database was different from
his response to the absence of a non-whistleblower's research
from the same database.  (See id.)

Ott claims that on July 23, 2010, Chung gave her an unreasonable "homework" assignment over a weekend that she planned to spend on vacation with visiting family in retaliation for her 2010 whistleblowing activity. (See Complaint at 188-91.)  Alger has provided uncontested evidence that Chung had asked for the work nine days earlier and that Ott had responded that she would provide the work nine days earlier. (See Def.'s SOF at ¶¶ 224-26.)  Ott alleges that this homework assignment was retaliatory harassment because Chung "never questioned Ott about her submission nor did he ever mention the contents ever[] again." (See Pl.'s CSOF at ¶ 226.)  Even if this allegation were more than the kind of "petty slight[]" that did not rise to the level of a retaliation claim (see Burlington, 548 U.S. at 68), Ott has not introduced any admissible evidence to controvert Alger's legitimate, non-retaliatory purpose for the action (see Collazo, 617 F.3d at 46).

Ott claims that on October 29, 2010, Alger denied her work from home requests in retaliation for her 2010 whistleblowing activity. (See Complaint at ¶¶ 229-30.)  Alger has provided uncontested evidence of non-retaliatory reasons for denying these requests, such as management's preference that at least one member of a team be present in the office at any given time or that employees not take back-to-back work from home and paid time off periods. (See Def.'s SOF at ¶¶ 229-40.)  Ott has put

28

forth no admissible evidence to refute Alger's legitimate, non-retaliatory purpose or to suggest that it is pretextual. She also has not introduced admissible evidence to suggest causality.

Ott claims that she was excluded from a team dinner in retaliation for her 2010 whistleblowing activity. (See Complaint at ¶¶ 225-28.) Obviously, the Supreme Court's admonition against "petty slights and minor annoyances" as a basis for retaliation cases arises again with this claim. (See Burlington, 548 U.S. at 68.) Regardless, Alger has provided uncontested evidence that others were excluded from the dinner for the same reason provided to Ott: The excluded employees, including Ott, had responded to the invitation after the guest list had been set, and the size of the party could not be increased. (See Def.'s SOF at ¶¶ 241-46.) There is no allegation that the others excluded had engaged in whistleblowing. Ott has not introduced admissible evidence to refute Alger's evidence of legitimate, non-retaliatory reasons for its conduct.

Ott claims that Chung assigned her research to complete during earnings season in retaliation for her 2010 whistleblowing activity. (See Complaint at ¶¶ 217-21.) Alger has provided uncontested evidence that Alger expected research analysts to conduct research before, during, and after earnings

season.   (See Def.'s SOF at ¶ 251.)   Ott does not provide

admissible evidence of retaliatory causality here either.

Ott claims that Alger replaced her computer's hard drive at

an inconvenient time in retaliation for her whistleblowing

activity.   (See Complaint at ¶¶ 222-24.)   Alger has provided

Ott's admission in her deposition that when she told Alger's

Information Technology department employees that it was an

inconvenient time to change out her hard drive, they were

"pretty respectful about it" and that they did accede to her

request to delay the replacement of her hard drive.   (See Def.'s

SOF at ¶ 257 (quoting Depo. of Rosanne Frances Ott ("Ott Depo.")

158:22-159:7, Feb. 26, 2015, ECF No. 55-1).)   To the extent that

this allegation survives a "pett[iness]" analysis, it cannot

survive a legitimate, non-retaliatory purpose analysis because

Ott also acknowledged that at least one other employee, who was

not alleged to have participated in any whistleblowing activity,

also had a hard drive replaced during the same period.   (See

Def.'s SOF at ¶ 258.)

Ott claims that Alger moved her to a different office in

retaliation for her whistleblowing activity.   (See Complaint at

¶¶ 237-38.)   However, Ott admitted in her deposition that

multiple other employees, who were not alleged to have engaged

in whistleblowing, were moving offices at the same time.   (See

Ott Depo. at 116:6-10.) Once again, Ott cannot establish causality on this record.

Ott claims that Alger conducted a mid-year review of her performance in 2010 in retaliation for her 2010 whistleblowing activity. (See Complaint at ¶¶ 192-95.) Alger has provided uncontested evidence that Ott received a mid-year review in 2009, when she had not yet engaged in any alleged whistleblowing. (See Def.'s SOF at ¶ 61.) Alger also provides uncontested evidence that other employees, who were not alleged to have engaged in whistleblowing activity, received mid-year reviews in 2010. (See Def.'s SOF at ¶ 276.) Ott cannot establish causality here.

Ott claims that Alger effectively demoted her by hiring a new Head of Healthcare in retaliation for her 2010 whistleblowing activity. (See Complaint at ¶ 234-36.) Alger has provided uncontested evidence that Alger had reached out to an executive search firm to find an employee for the new position prior to Ott's alleged whistleblowing activity in May 2010. (See Def.'s SOF at ¶ 279 (citing Liebes Decl. Ex. 10, Retained Search Agreement between Alger Assoc. Inc. & Subisd. And Westwood Partners LLC, June 1, 2016, ECF No. 56-63.) Ott cannot establish causality here.

Ott claims that Alger reduced her discretionary bonus in retaliation for her 2010 whistleblowing activity. (See

31

Complaint at ¶¶ 241-49.)  Alger has provided uncontested evidence that Alger had reduced Ott's discretionary bonus in previous years as well.  (See Liebes Decl. Ex. 11-14.)  Alger has also provided documented complaints about Ott's performance from multiple PMs over several years, as well as critiques by CEO/CIO Chung, that preceded and followed Ott's alleged whistleblowing activity.  (See Liebes Decl. Ex. 4-9.)  Critiques across this period include consistent themes: PMs and Chung consistently complained about Ott's lack of communication of stock trading ideas to other funds in 2006, 2007, and 2008. (See Liebes Decl. Ex. 4-8.)  No factfinder could find that Alger's proffered non-retaliatory reason for its critiques was pretextual.

Ott claims that Alger terminated her employment in retaliation for her whistleblowing activity.  (See Complaint at ¶ 273.)  There is no dispute that Ott did not report to Alger's offices from June 13, 2011 until June 20, 2011.  (See Def.'s SOF at ¶¶ 302-08.)  There is no dispute that Ott received neither written nor oral permission to work from home on any of these days.  (See Def.'s SOF at ¶ 309.)  Likewise, there is no dispute that Ott was familiar with the process of requesting permission to work from home and that she had submitted such requests in the past, some of which were approved and others of which were denied.  (See Ott Depo. at 104:14-18.)  Ott does not dispute

that Alger's Attendance and Punctuality Policy provides that an employee will be deemed to have voluntarily resigned if she is "absent for three (3) or more consecutive working days without notifying the employee's manager." (See Def.'s SOF at ¶ 291.) Ott received a letter from Alger on January 20, 2011, accepting her voluntary resignation on the basis of her failure to report to work on January 18, 19, and 20, 2011. (See Norbitz Decl. Ex. 17.)

Ott argues that Alger's acceptance of her voluntary resignation was pretextual because her supervisor, Liotta, did not contact her during the period in which she was allegedly working from home. (See Pl.'s CSOF at ¶ 306.) Ott acknowledges that Liotta had emailed her twice the previous week, asking for a phone call that Ott did not make. (See id.) Ott also admits that she did not attend a meeting on January 18, 2011, which she had previously stated she would attend. (See id.) Ott also admits that her attorney was engaged in negotiations with Alger at this time regarding the end of Ott's employment with the firm. (See id.)

Ott has not produced admissible evidence that she performed any work for Alger after the conclusion of her conference in California on January 13. There can, therefore, be no dispute that Ott had voluntarily resigned at least as early as January 20, 2011, and possibly earlier. Alger's acceptance of Ott's

voluntary resignation does not constitute an adverse employment action.  See Cadet v. Deutsche Bank Securities Inc., No. 11-Cv-7964, 2013 WL 3090690, *14 (S.D.N.Y. June 18, 2013) (holding that a voluntary resignation does not constitute an adverse employment action unless the plaintiff was constructively discharged—i.e., the resignation was in fact involuntary as a result of coercion or duress).

On this record, a reasonable fact finder could not credit Ott's contentions that Alger made her work conditions materially adverse because of her whistleblowing activity.  Accordingly, the Defendant's motion for summary judgment is granted.

### D.    Breach of Contract

It is black letter law that when the plain terms of an employment agreement or compensation plan foreclose a breach of contract claim, that claim must be dismissed.  See Sussman v. Rabobank Int'l, 739 F. Supp. 2d 624, 627-29 (S.D.N.Y. Sept. 16, 2010) (granting summary judgment for employer on plaintiff former employee's claim for vested deferred compensation because the terms and conditions of the bonus deferral plan precluded the vesting of the interest when plaintiff left the company); see also O'Grady v. BlueCrest Capital Mgmt LLP, 111 F. Supp. 3d 494, 501 (S.D.N.Y. June 15, 2015).

The deferred compensation award that Ott received on July 7, 2007 did not vest until the conclusion of what the 2007 Award

Agreement described as the "Award Period," which was June 30,
2011.  (See 2007 Award Agreement at ¶ 2.)  The 2007 Incentive
Plan attached to the 2007 Award Agreement stated that an
employee who incurs a Termination of Employment prior to the
last day of the Award Period would forfeit the award in its
entirety.  (See 2007 Incentive Plan at § 7.2.)  Nothing in the
2007 Incentive Plan's definition of Termination of Employment
indicates that an employee's voluntary resignation would not be
treated as a termination.  (See id. at §1.23.)  Nothing
elsewhere in the 2007 Incentive Plan indicates that voluntary
resignation is not a form of Termination of Employment.  To the
contrary, the 2007 Incentive Plan's use of the passive voice to
describe the Termination of Employment and its consequences
indicates that the forfeiture consequences applied regardless of
whether the decision to end the employment was the employee's or
the company's.  (See id. ("In the event that a Participant
incurs a Termination . . . the Award Account . . . shall be
forfeited . . . ").)  The 2008 Award Agreement, which did not
vest until June 30, 2012 (see 2008 Award at ¶ 2), contained a
similar Incentive Plan warning that an employee would forfeit
the entire Award Account for that award if that employee
incurred a Separation From Service prior to the end of the Award
Period.  (See 2008 Incentive Plan at § 7.2.)  The 2008 Incentive
Plan's definition of "Separation From Service" contains nothing

35

to indicate that a voluntary resignation would not trigger forfeiture.  (See id. at § 1.23.)  Likewise, the 2009 Award Agreement, which did not vested until June 30, 2013, contained identical language to the relevant portions of the 2008 Award Agreement, including its Incentive Plan.  (See 2009 Award Agreement at ¶ 2; 2009 Incentive Plan at §§ 1.23, 7.2.)

As the Court has noted in Part III.C, supra, Ott voluntarily resigned her employment with Alger at least as early as January 20, 2011, because she was "absent for three (3) or more consecutive working days without notifying [her] manager." (See Employee Handbook at 25.)  Therefore, she forfeited the entire Award Accounts associated with her 2007, 2008, and 2009 deferred compensation awards because she incurred a Termination of Employment or a Separation From Service within the meaning of the Award Agreements.  (See 2007 Award Agreement at ¶ 2; 2008 Award Agreement at ¶ 2; 2009 Award Agreement at ¶ 2.)

Ott argues that she did not voluntarily resign but was terminated by Alger.  (See Pl.'s Resp. at 23.)  First, there is no evidence in the record to support the proposition that she was terminated.  Second, Ott points to no language in any of the Award Agreements or Incentive Plans indicating that, if Alger had terminated her, she would not forfeit her Award Accounts. (See id.)

Accordingly, in the absence of any issue of material fact regarding Ott's entitlement to her deferred compensation awards, Alger's motion for summary judgment on Plaintiff's breach of contract claim is granted.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 52) is GRANTED with respect to Plaintiff's retaliation claim and GRANTED with respect to Plaintiff's breach of contract claim.   Judgment shall be entered accordingly.

SO ORDERED.

Dated:    New York, New York
          September 27, 2016

LORETTA A. PRESKA
United States District Judge